IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

          Plaintiff,

vs.                                              CR 05-2051 JP

ROBERT VIGIL,

          Defendant.

## MEMORANDUM OPINION AND ORDER

On October 20, 2005, Defendant Robert Vigil, former Treasurer of the State of New Mexico, filed a "Motion to Dismiss Indictment Counts for Failure to Charge Crimes and for Defects in Indictment Under Rule 12 of the Federal Rules of Criminal Procedure" (Docket No. 30).  In his motion, Defendant asserts that the First Superceding Indictment charging him with twenty-one counts of violating 18 U.S.C. § 1951 ("the Hobbs Act") is defective.  In particular, Defendant contends that the indictment fails to allege the existence of a *quid pro quo*, which Defendant argues is an essential element of extortion made "under color of official right" as proscribed by the Hobbs Act.  Defendant further contends that, in light of all the material evidence, the Government cannot prove the existence of a *quid pro quo,* and thus cannot establish a violation of the Hobbs Act as a matter of law.  Defendant attached several exhibits in support of his motion.[1]

---

[1]  By a letter dated January 16, 2006, counsel for Defendant also asked the Court to consider the transcript of the plea hearing of Kent Nelson held on September 14, 2005.  The Court acknowledges receipt of this letter.  However, because the Court determines that it is not appropriate to weigh the sufficiency of the evidence against Defendant in deciding the motion, the Court will not consider the transcript in evaluating Defendant's motion to dismiss.

Plaintiff the United States of America (" the Government") filed a response in opposition to Defendant's motion to dismiss on October 24, 2005 (Docket No. 33).  The Government contended, first, that the indictment did not have to allege the existence of a *quid pro quo* in order to charge Hobbs Act extortion under color of official right, and, second, that even if the indictment must allege a *quid pro quo*, the First Superceding Indictment fulfills this requirement. The Government further argues that the Court should not consider extrinsic evidence in evaluating the sufficiency of the indictment, and consequently asserts that the Court should deny the Defendant's motion to dismiss without an evidentiary hearing.  However, the Government also filed exhibits in support of its response should the Court decide to consider extrinsic evidence (Docket No. 34).

On November 9, 2005, the grand jury returned a Second Superceding Indictment against Defendant (Docket No. 47).  The Court instructed  both parties to provide supplemental briefs addressing whether the Second Superceding Indictment cured any of the alleged deficiencies Defendant had previously challenged in his motion to dismiss.  The Government filed a supplemental response on December 5, 2005 (Docket No. 56), and Defendant filed a supplemental brief on December 12, 2005 (Docket No. 60).  Defendant's response demonstrates that his motion to dismiss the First Superceding Indictment is fully applicable to the Second Superceding Indictment, and his arguments therefore carry over to the new indictment.

Defendant's motion raises two primary issues:  First, whether the existence of a *quid pro quo* must be alleged in an indictment charging extortion made "under color of official right" in violation of the Hobbs Act; and second, if the indictment must allege a *quid pro quo*, whether the Second Superceding Indictment fulfills this requirement.  For the reasons stated below, the Court

2

GRANTS, in part, and DENIES, in part, Defendant's motion to dismiss.

## I. Consideration of Extrinsic Evidence

A preliminary matter that must be resolved is whether the Court will consider the extrinsic evidence presented by the parties in evaluating Defendant's motion to dismiss.  Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure provides that "[t]he following must be raised before trial: . . . a motion alleging a defect in the indictment or information—but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense."  Generally, "[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994).  *See also Costello v. United States*, 350 U.S. 359, 363-64 (1956) ("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more.").  Therefore, courts usually should not consider outside evidence when evaluating the sufficiency of an indictment.  *Hall*, 20 F.3d at 1087.

The Tenth Circuit has recognized a very narrow exception to this rule, however, and district courts can dismiss an indictment based upon insufficiency of the evidence before trial when (1) the operative facts are undisputed and (2) the government does not object to the court's consideration of those undisputed facts.  *Hall*, 20 F.3d at 1088.  Here, even if the operative facts are undisputed, the Government has objected to the Court's consideration of extrinsic evidence.  Therefore, the Court will not consider the sufficiency of any evidence in evaluating Defendant's motion to dismiss, and will instead accept the allegations of the indictment as true.

*II.  Background*

The Second Superceding Indictment contains twenty-six counts: it charges Defendant with one count of conspiracy, 18 U.S.C. § 371, four counts of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i), and twenty-one counts of violating the Hobbs Act, 18 U.S.C. § 1951.  The indictment also requests forfeiture of property derived from the alleged violations.  Nineteen of the Hobbs Act counts (Counts Six through Twenty-four) allege that Defendant committed extortion acting in concert with others.  The indictment begins by describing the position and duties of Defendant as the elected Treasurer of the State of New Mexico, and the Defendant's involvement as State Treasurer in structuring particular types of investment transactions called "flexible repurchase agreements."

Counts Six through Twenty-four of the indictment describe a scheme whereby Defendant, acting in concert with others, would allegedly require monetary payments from Kent Nelson "as a condition of doing business with the Treasurer of the State of New Mexico" (Docket No. 47, ¶ 5 at 10).[2]  In summary, Defendant arranged for Kent Nelson to be appointed as an investment advisor to the New Mexico State Treasurer's Office for the purpose of obtaining bids from brokerage firms for flexible repurchase agreements.  Kent Nelson received commissions from the brokerage firms for his services as an investment advisor.  Defendant would require Kent Nelson to share a portion of his commissions with Angelo Garcia, and Defendant then directed the disbursement of the funds received by Angelo Garcia.  Each of these nineteen counts represents a

---

[2]  The relevant portions of Counts Six through Twenty-four of the indictment state:

> Counts Six Through Twenty-four: . . . the defendant Robert Vigil, the Treasurer of the State of New Mexico, acting in concert with others, engaged in extortion, in that he obtained funds from Investment Advisor Kent Nelson, with his consent, induced by wrongful use and threat of use of economic harm and under color of official right. . . . It was part of the extortion that the defendant Robert Vigil maintained Kent Nelson as an outside investment advisor. . . . [and the defendant] would authorize Kent Nelson to obtain bids from brokerage firms on flexible repurchase agreements. . . . [and the defendant] would monitor Kent Nelson's commissions from brokerage firms that won flexible repurchase agreements. . . . [and the defendant] would require Kent Nelson to share Nelson's commissions with others as a condition of doing business with the Treasurer of the State of New Mexico. . . . [and the defendant] would require Kent Nelson to transfer substantial portions of his commission fees to bank accounts controlled by Angelo Garcia. . . . [and the defendant] would direct the disbursement of funds received by Angelo Garcia. . . .

(Docket No. 47, ¶¶ 1-8 at 9-11).

specific monetary payment made by Kent Nelson on a specific date.[3]

---

[3] Counts Six through Twenty-four allege that Defendant extorted the following amounts from Kent Nelson on the following dates:

| Count | Amount | Date |
|---|---|---|
| Six | $ 10,000.00 | August 19, 2003 |
| Seven | $ 51,100.00 | August 22, 2003 |
| Eight | $ 3,750.00 | September 8, 2003 |
| Nine | $ 5,000.00 | September 24, 2003 |
| Ten | $ 14,120.00 | October 3, 2003 |
| Eleven | $ 5,000.00 | October 9, 2003 |
| Twelve | $ 2,000.00 | October 27, 2003 |
| Thirteen | $ 5,000.00 | October 31, 2003 |
| Fourteen | $ 6,000.00 | November 7, 2003 |
| Fifteen | $ 10,050.00 | November 14, 2003 |
| Sixteen | $ 5,500.00 | December 9, 2003 |
| Seventeen | $ 9,690.00 | December 24, 2003 |
| Eighteen | $ 10,800.00 | February 9, 2005 |
| Nineteen | $ 5,000.00 | June 16, 2004 |
| Twenty | $ 5,000.00 | August 30, 2004 |
| Twenty-one | $ 6,000.00 | November 24, 2004 |
| Twenty-two | $ 27,500.00 | January 13, 2005 |
| Twenty-three | $ 27,500.00 | January 19, 2005 |
| Twenty-four | $ 43,000.00 | March 15, 2005 |

(Docket No. 47, at 11-12).

Count Twenty-five charges that Defendant obtained "$ 11,500.00 in funds not due him, nor due his office . . . from Kent Nelson . . . with his consent, induced by wrongful use and threat of use of economic harm and under color of official right, in return for business with the New Mexico State Treasurer's Office." (Docket No. 47, at 12).  Count Twenty-six similarly charges Defendant with obtaining $ 1,900.00 from Kent Nelson "with his consent, induced by wrongful use and threat of use of economic harm and under color of official right, in return for business with the New Mexico State Treasurer's Office." (Docket No. 47, at.13).  Counts Twenty-five and Twenty-six do not discuss in detail the kickback scheme described earlier in Counts Six through Twenty-four.  Further, none of the individual counts in the Second Superceding Indictment expressly incorporates prior allegations made in other counts.  *See* FED. R. CRIM. P.  7(c)(1) ("A count may incorporate by reference an allegation made in another count.")

### III.  Standard of Review

In accordance with FED. R. CRIM. P. 7(a) and (c)(1), all federal felonies must be prosecuted by an indictment that contains a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Under this rule, courts will not dismiss an indictment based only on "minor and technical deficiencies which do not prejudice the accused." *Russell v. United States*, 369 U.S. 749, 763 (1962) (quoting *Smith v. United States*, 360 U.S. 1, 9 (1959)).  But "the substantial safeguards to those charged with serious crimes cannot be eradicated under the guise of technical departures from the rules."  *Id.*

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, . . . nor be deprived of life, liberty, or property without due process of law."  Under the Sixth Amendment,

"[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."   Accordingly, an indictment must contain all the essential elements of the offense charged, adequately inform the defendant of the charge he must be prepared to defend against, and enable the defendant to plead a double jeopardy defense in any subsequent prosecution.  *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997).  These requirements ensure both that the defendant is informed of the nature and cause of the accusation as is required by the Sixth Amendment, and that a grand jury returns an indictment only when it finds probable cause to support all the necessary elements of the crime as is required by the Fifth Amendment.  *See, e.g., United States v. Prentiss*, 206 F.3d 960, 964 (10th Cir. 2000), *modified en banc,* 256 F.3d 971 (10th Cir. 2001); *United States v. Radetsky*, 535 F.2d 556, 562 (1976), *cert. denied*, 429 U.S. 820 (1976).

*IV.  Analysis*

As a preliminary matter, the Court finds that each count of the indictment enables Defendant to plead a double jeopardy defense to any subsequent prosecution.  The Second Superceding Indictment details with specificity the relevant dates and amounts of money Defendant is accused of extorting, as well as the persons involved in that extortion.  *Cf. Russell*, 369 U.S. at 764 (reasoning that the factual specificity in the indictment allows defendants to assert a double jeopardy defense).  The Court thus proceeds to determine whether the indictment adequately alleges all of the essential elements of extortion made "under color of official right."

*a.  Essential Elements of Hobbs Act Extortion Under Color of Official Right*

*1.  The Statutory Language*

Defendant's primary argument is that the indictment fails to allege an essential element of

extortion under color of official right because the indictment does not adequately allege the existence of a *quid pro quo*.  The Government contends that a *quid pro quo* is not an essential element of extortion under color of official right.  The relevant portion of the Hobbs Act provides:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so . . . shall be fined under this title or imprisoned not more than twenty years, or both.
>
> (b) As used in this section . . . (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951 (2006).  As the Government points out, it is generally sufficient for an indictment to track the words of the statutory offense charged.  *Hamling,* 418 U.S. at 117.  However, tracking statutory language is only sufficient if the statute's words, "'themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).  Defendant argues that the Supreme Court's opinion in *McCormick v. United States*, and its progeny establish another essential element, namely, the *quid pro quo* requirement. *McCormick v. United States*, 500 U.S. 257 (1991).

### 2.  McCormick *and Progeny*

The defendant in *McCormick* was an elected legislator from West Virginia who had received monetary campaign contributions from a lobby group in return for his sponsorship of certain legislation.  *McCormick*, 500 U.S. at 260.  The defendant did not list the money as a campaign contribution, and he was later charged with violating the Hobbs Act and with filing a

false tax return.  *Id.* at 261.  The jury convicted him of one count of Hobbs Act extortion and the

tax violation, but could not return a verdict on the remaining counts of extortion.  *Id.* at 266.

On appeal to the United States Supreme Court, the defendant argued that the lower

court's interpretation of extortion "under color of official right" was erroneous.  *Id.* at 269.  The

jury had been instructed that it could find the defendant guilty "if *any* of the payments, even

though campaign contributions, was made . . . with the expectation that [defendant's] official

action would be influenced for their benefit and if [defendant] knew that the payment was made

with that expectation."  *Id.* at 274 (emphasis added).  The defendant argued that these instructions

were defective because they did not adequately distinguish extortion from the legitimate

solicitation of campaign contributions.  *Id.* at 269-70.  Accepting certiorari "[b]ecause of

disagreement in the Courts of Appeals regarding the meaning of the phrase 'under color of official

right' as it is used in the Hobbs Act," the Supreme Court sided with the defendant and reversed

his conviction.  *Id.* at 266.

The Supreme Court determined that the jury should have considered whether or not the

cash payments made to the defendant were legitimate campaign contributions.  *Id.* at 271.

Consequently, the jury should focus on the intent of the official in determining whether the official

was illegally extorting payments or was legally soliciting donations.  *Id.*  Otherwise, the Hobbs

Act would criminalize legitimate campaigning as extortion under color of official right.  *Id.* at

272-73.

The Supreme Court reasoned that:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.

*McCormick*, 500 U.S. at 272. However, the Court continued:

> This is not to say that it is impossible for an elected official to commit extortion in the course of financing an election campaign. Political contributions are of course vulnerable if induced by the use of force, violence, or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

*Id.* at 273. Therefore, the Supreme Court determined that "if the payments to [the defendant] were campaign contributions, proof of a *quid pro quo* would be essential for an extortion conviction." *Id.* The *quid pro quo* was the "explicit promise or undertaking" made by the official to perform an official act in return for cash payments. *Id.* The Supreme Court expressly limited

its holding, however, to cases involving campaign contributions and did not address "the application of the Hobbs Act to payments made to nonelected officials or to payments made to elected officials that are properly determined not to be campaign contributions." *Id.* at 269. *McCormick* therefore clearly established that proof of a *quid pro quo* is essential for conviction under the Hobbs Act when an elected official receives cash payments properly characterized as campaign contributions.

One year after *McCormick*, the meaning of extortion under color of official right under the Hobbs Act was again addressed by the Supreme Court in *Evans v. United States*, 504 U.S. 255 (1992). The issue in *Evans* was "whether an affirmative act of inducement by a public official, such as a demand, is an element of the offense of extortion 'under color of official right' prohibited by the Hobbs Act." *Id.* at 256. In *Evans*, the defendant was an elected official in Georgia who had passively accepted cash payments, including a check payable to his campaign, in return for favorable official action. *Id.* at 257. In deciding whether the defendant need have "induced" payment under Hobbs Act extortion the Court "assume[d] that the jury found that [the defendant] accepted the cash knowing that it was intended to ensure [his favorable vote] . . . his acceptance of the bribe constituted an implicit promise to use his official position to serve the interests of the bribegiver." *Id.* The Court determined that the defendant could commit extortion by passively accepting bribes—he need not have "induced" or otherwise demanded payment because "the coercive element [of extortion under color of official right] is provided by the public office itself." *Id.* at 267.

The inducement or demand issue is distinct from the *quid pro quo* requirement, because the *quid pro quo* requirement is essentially a requirement of intent. However, the defendant in

12

*Evans* also challenged the lower court's *quid pro quo* jury instruction, arguing that "it did not properly describe the *quid pro quo* requirement for conviction if the jury found that the payment was a campaign contribution." *Id.* at 268. The lower court in *Evans* had instructed the jury that "if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution." *Id.* at 257-58. The Supreme Court rejected the defendant's challenge to the instruction, stating:

> We reject [the defendant's] criticism of the instruction, and conclude that it satisfies the *quid pro quo* requirement of *McCormick* . . . because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense. We also reject [the defendant's] contention that an affirmative step is an element of the offense of extortion "under color of official right" and need be included in the instruction. As we explained above, our construction of the statute is informed by the common-law tradition from which the term of art was drawn and understood. *We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.*

*Id.* at 268 (emphasis added). The *Evans* majority's holding may be interpreted to both expand and modify the *quid pro quo* requirement as articulated by *McCormick*: it can be read both to extend a *quid pro quo* requirement to non-campaign cases, and to modify the *quid pro quo* standard to require only the official's acceptance of the payment with knowledge that it was made in return for official action or inaction.

Justice Kennedy's concurrence in *Evans* supports this interpretation:

> In my view the dissent is correct to conclude that [the majority's holding] requires a *quid pro quo* as an element of the Government's case in a prosecution under [the Hobbs Act], and the Court's opinion can be interpreted in a way that is consistent with this rule . . . The requirement of a *quid pro quo* means that without pretense of any entitlement to the payment, a public official violates [the Hobbs Act] if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied. The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.

*Evans*, 504 U.S. at 273-74 (Kennedy, J., concurring). The dissent in *Evans* also agreed that the majority opinion expanded the *quid pro quo* to non-campaign cases, but asserted that the requirement was "textually and historically artificial," and served only "to rescue the Court's definition of extortion from substantial overbreadth." *Id.* at 287 (Thomas, J., dissenting).

However, "[e]xactly what effect *Evans* had on *McCormick* is not altogether clear." *United States v. Blandford*, 33 F.3d 685, 695 (6th Cir. 1993). The language of the majority's opinion in *Evans* does not expressly state whether or not it was expanding the *quid pro quo* requirement into the non-campaign context. Strong arguments can be made against finding that the *quid pro quo* requirement applies to non-campaign cases.

For example, among the payments received by the defendant in *Evans* was a check payable to his campaign, and thus *Evans* was, at least in part, a campaign contribution case. Therefore the majority's discussion of the *quid pro quo* requirement would not itself extend the requirement to non-campaign cases, since its discussion could logically be limited to the campaign

14

contributions received by the defendant.  Further, there was less than one year between the decisions in *Evans* and *McCormick*.  It seems unlikely that the Supreme Court would impliedly address an issue that it had expressly declined to consider less than one year earlier.

The reasoning behind *McCormick* supports the conclusion that the *quid pro quo* requirement is only necessary for conviction in campaign contribution cases.  In *McCormick* the Supreme Court required the government to establish an explicit agreement between the official and the payor—a *quid pro quo*—in campaign cases because the Hobbs Act language was broad enough to criminalize otherwise legitimate campaigning.  Campaign contributions are often given with the hope that the official will act favorably to the contributors' interests in the future.   Proof of a *quid pro quo* distinguishes criminal extortion from otherwise legitimate campaign solicitation. The policy concerns that underlie the reasoning in *McCormick* are not as readily apparent in the non-campaign context.  *See, e.g., United States v. Antico*, 275 F.3d 245, 258 (3d Cir. 2001) ("Outside the campaign contribution context . . . the line between legal and illegal acceptance of money is not so nuanced.").

Such reasoning led the Sixth Circuit in *Blandford* to suggest that *Evans* did not expand the *quid pro quo* requirement to non-campaign cases. *Blandford,* 33 F.3d at 695.  The Government also suggests that the recently adopted Tenth Circuit pattern criminal jury instruction for Hobbs Act extortion supports a finding that *Evans* did not expand the *quid pro quo* to

non-campaign cases, as the "use note" for the instruction states:

> If a public official is alleged to have extorted a campaign contribution "under color of official right," the jury must be instructed that receipt of such contribution violates section 1951 "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick v. United States*, 500 U.S. 257, 273 (1991). "Fulfillment of the quid pro quo is not, however, an element of the offense." *Evans v. United States*, 504 U.S. 255, 256 (1992); *Id.* at 268.

TENTH CIRCUIT CRIMINAL PATTERN JURY INSTRUCTIONS § 2.70.  Thus, the instruction discusses the *quid pro quo* requirement only in the context of campaign contribution cases, and does not discuss *Evans* as expanding the requirement.

However, the Court finds that the arguments in support of expanding the *quid pro quo* requirement to non-campaign cases are more persuasive.  For example, the Defendant suggests that the Supreme Court's decision in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999) influences the issue.  *Sun-Diamond* involved the illegal gratuity statute, 18 U.S.C. § 201(c)(1)(A), which prohibits making gifts to a public official "for or because of any official act."  In *Sun-Diamond* the Supreme Court held that "in order to establish a violation of 18 U.S.C. § 201(c)(1)(A), the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given."  *Sun-Diamond*, 526 U.S. at 413.  The Supreme Court reasoned that a link between the gratuity and the official act must be established in part because otherwise § 201 "would criminalize, for example, token gifts to the President based on his official position and not linked to any identifiable act—such as the replica jerseys given by championship sports teams each year during ceremonial White House visits . . . as the President always has before him or in prospect matters that affect

college and professional sports . . ."  *Id.*  Although *Sun-Diamond* dealt with § 201, whereas

Defendant is charged under the Hobbs Act, the Supreme Court's discussion demonstrates that the

policy concern of distinguishing legitimate from illegitimate payments to officials as expressed in

*McCormick* may exist outside of the campaign contribution context, such as when an official

receives gifts.

Further, the "language in *Evans,* which, although not entirely clear, can easily be read to

lend support to an inference that the *quid pro quo* requirement applies in all extortion

prosecutions under the Hobbs Act—not to mention that four of the Justices read the language to

include the requirement." *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001).  A number of

Circuits addressing the issue have found that *Evans* established that proof of a *quid pro quo*

should be required in all Hobbs Act prosecutions for extortion under color of official right,

including non-campaign cases.  *See, e.g., Giles*, 246 F.3d at 972; *United States v. Hairston*, 46

F.3d 361, 365 (4th Cir. 1995), *cert. denied*, 516 U.S. 840 (1995); *United States v. Martinez*, 14

F.3d 543, 553 (11th Cir. 1994); *United States v. Garcia*, 992 F.2d 409, 414 (2d Cir. 1993).  Even

the Sixth Circuit later retreated from its suggestion in *Blandford* that *Evans* did not expand the

*quid pro quo* requirement, and has found that a *quid pro quo* must be shown in all extortion

under color of official right cases.  *United States v. Collins*, 78 F.3d 1021, 1035 (6th Cir. 1996).

The Court will follow the guidance of these Circuits and find that the Government must establish

the existence of a *quid pro quo* in all extortion "under color of official right" cases.[4]

Finally, the Court also finds that *Evans* clarified that the Government need not prove an expressly articulated agreement in order to establish the *quid pro quo*, "for otherwise the law's effect could be frustrated by knowing winks and nods." *Evans*, 504 U.S. at 274 (Kennedy, J., concurring). Rather, *Evans* established that an official's passive and knowing acceptance of a bribe could constitute an "implicit promise to use his official position to serve the interests of the bribegiver." *Id.* at 256. Therefore, the defendant's agreement to take official action—the *quid pro quo*—may be inferred or implied by proof that, first, the defendant accepted a payment that was made in return for official action, and, second, that the defendant *knew* the payment was made in return for official action.

Thus, in order to fulfill the *quid pro quo* requirement, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268. However, an official's knowledge that the payment is made with a mere hope for general favorable treatment in the future is not enough.

---

[4] The Court also notes that there is some question as to whether the payments from Kent Nelson to Defendant were, in fact, campaign contributions. Although Defendant asserts that the payments were campaign contributions, Counts Six through Twenty-six of the Second Superceding indictment do not characterize the payments as campaign contributions or otherwise. Count One, which charges Defendant with conspiracy, alleges that "it was an object of the conspiracy that the proceeds of extortion committed under color of official right during the term of office of Treasurer Michael Montoya would be used to pay expenses of the campaign for election as State Treasurer of New Mexico of the defendant Robert Vigil" (Docket No. 47, ¶ 1, at 5). However, Count One and Counts Six through Twenty-six involve different payments allegedly extorted by Defendant, and the payments were made on different dates. Therefore, the payments in Count One and the payments in Counts Six through Twenty-six do not overlap, and thus the nature of the alleged payments at issue in Count One do not conclusively establish the nature of the alleged payments at issue in the remaining counts of the Second Superceding Indictment.

*Cf. McCormick,* 500 U.S. at 273.  Instead, *specific* official action should be contemplated—in other words, the official should know "that as a result of the payment he [is] expected to exercise *particular* kinds of influence on behalf of the payor."  *Giles*, 246 F.3d at 972.

### 3.  Quid Pro Quo as an Essential Element

Even though the Government must establish a *quid pro quo* in order to fulfill its burden of proof under the Hobbs Act, it does not necessarily follow that the existence of a *quid pro quo* is an "essential element" of the offense such that it must be alleged in the indictment.  The Government asserts that the Supreme Court in *McCormick* and *Evans* did not establish a new element under the Hobbs Act, but rather was defining the phrase "under color of official right" as used in the Act.  The Government therefore contends that its averment in the indictment that Defendant extorted payments "under color of official right"satisfies any requirement *McCormick* may have articulated.

The Court agrees that the *quid pro quo* requirement was articulated as a gloss on the phrase "under color of official right" for use in jury instructions.  *See, e.g., McCormick,* 500 U.S. at 266.  However, the Court does not agree that a mere allegation in the indictment that payments were obtained "under color of official right" in violation of the Hobbs Act fulfills the requirement that an indictment contain all the essential elements of the offense charged.  The Court finds that the statutory phrase "under color of official right" as used in the Hobbs Act does not "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *Hamling*, 418 U.S. at 117.

As discussed above, proof of a *quid pro quo* is necessary for conviction under the Hobbs Act, for the *quid pro quo* distinguishes legitimate conduct from criminal activity—without proof

of the *quid pro quo* there can be no crime.  As Justice Kennedy emphasized in his concurrence in *Evans*, the *quid pro quo*, as an intent element, is the "essence" of extortion under color of official right.  *Evans*, 504 U.S. at 272-73 ("Readers of today's opinion should have little difficulty in understanding  that the rationale underlying the Court's holding applies not only in campaign contribution cases, but in all § 1951 prosecutions.  That is as it should be, for, given a corrupt motive, the *quid pro quo*, as I have said, is the essence of the offense.") (Kennedy, J., concurring).  It is also necessary for the indictment to allege the existence of a *quid pro quo* in order to ensure that the grand jury found probable cause that a crime had been committed.  *Cf. Prentiss*, 206 F.3d at 964 (emphasizing that one of the central purposes of an indictment is to ensure that the grand jury finds probable cause that the defendant has committed every element of the offense).  Thus, the Court finds that the Second Superceding Indictment must allege the existence of a *quid pro quo* in order to adequately allege the essential elements of extortion made under color of official right as proscribed by the Hobbs Act.

### b.  Sufficiency of the Second Superceding Indictment

Finally, the Court must consider whether the language used in the Second Superceding Indictment adequately alleges the existence of a *quid pro quo*.  In evaluating whether the indictment adequately alleges an essential element, courts "do not insist that any particular word or phrase be used in stating an essential element." *United States v. Kilpatrick*, 821 F.2d 1456, 1463 (10th Cir. 1987)*, cert. granted in part*, 484 U.S. 1003 (1988)*, and aff'd*, 487 U.S. 250 (1988).  Thus, the issue is whether it is clear from the language of the Second Superceding Indictment that the grand jury understood that Defendant could not be indicted for accepting monetary payments from Kent Nelson unless Defendant knew that the payments were made in

20

return for specific official action.

The Court finds that Counts Six through Twenty-four indictment sufficiently allege the *quid pro quo* element.  As discussed above, Counts Six through Twenty-four detail a scheme whereby Defendant would "enter into flexible repurchase agreements with brokerage firms whose bids were obtained by Kent Nelson," and allege that Defendant "would require Kent Nelson to share Nelson's commissions with others as a condition of doing business with the Treasurer of the State of New Mexico" (Docket No.  47, at 10).  The language that Defendant "would require" Nelson to make payments, coupled with the "condition of doing business" language, sufficiently alleges that Defendant knew that the payments were made in return for official action. Because Defendant required that Kent Nelson make payments before Defendant would act, logically Defendant must have known the payments were made in return for official action.  Further, the indictment's detailed discussion of Defendant's and Kent Nelson's roles in structuring flexible repurchase agreements sufficiently alleges what specific official acts were contemplated.  Thus, although the indictment does not quote the *quid pro quo* language of either the *McCormick* or *Evans,* the language used adequately alleges that Defendant accepted payments from Kent Nelson, knowing that the payments were made in return for particular official acts.

Counts Twenty-five and Twenty-six state that Defendant obtained funds from Kent Nelson "in return for business with the New Mexico State Treasurer's Office."   Defendant suggests that the language "in return for business" does not adequately allege a *quid pro quo* because "[t]his language does not state that [Defendant] made an explicit promise to do an official act . . . or that he promised to do any specific act . . ." (Docket No. 60, at 4).  Further, since Counts Twenty-five and Twenty-six do not expressly incorporate any of the allegations made in

21

other counts, Defendant argues that the Court should evaluate each count in the indictment by itself and not consider any prior allegations made in the indictment.  *See* FED. R. CRIM. P. 7(c).

Although the Tenth Circuit has indicated that "the indictment should be read as a whole and interpreted in a common-sense manner," the Court need not address Defendant's argument that the indictment must expressly incorporate prior allegations.  *Kilpatrick*, 821 F.2d at 1462.  *See also United States v. Staggs*, 881 F.2d 1527 (10th Cir. 1989) (evaluating the sufficiency of an indictment that did not expressly incorporate prior allegations by considering the indictment as a whole).  For, even if the indictment is read as a whole and prior allegations are taken into consideration, Counts Twenty-five and Twenty-six do not adequately allege the existence of a *quid pro quo*.

As discussed above, a *quid pro quo* is adequately alleged by language demonstrating that Defendant accepted payments, knowing they were made in return for specific official acts.  Reading the indictment in a common sense manner and as a whole, the Court concludes that it is easy to infer that the language "business with the New Mexico State Treasurer's Office" refers to the flexible repurchase agreement scheme detailed earlier in the indictment.  Further, the language alleges that the payments were made "in return for" official acts by the Defendant.

But Counts twenty-five and twenty-six do not expressly allege that Defendant obtained the funds from Kent Nelson *knowing* they were made in return for official action.[5]  Even when considered in light of the allegations made in Counts Six through Twenty-four, the Court finds that the mere allegation that Defendant obtained funds "in return for business" does not adequately focus either on Defendant's actions or on his knowledge.  Hence, the allegation fails to ensure that the grand jury found that Defendant *knew* the payments were made in return for official action.  In other words, Counts Twenty-five and Twenty-six do not sufficiently allege that Defendant knew that the payments were bribes.  For example, if Defendant did not know that Mr. Nelson was attempting to make a bribe, but Defendant instead thought the payment was a legitimate campaign contribution, then Defendant's passive acceptance of the payment would not constitute extortion under color of official right.

_____

[5]  Count Twenty-five alleges, in full, that:

> On or about May 2, 2005, in the State and District of New Mexico, in Bernalillo County, the defendant, Robert Vigil, did knowingly, willfully, and unlawfully affect and attempt to affect interstate commerce and the movement of articles and commodities in interstate commerce by extortion, in that the defendant Robert Vigil obtained approximately $ 11,500.00 in funds not due him, nor due his office, namely, the Treasurer of the State of New Mexico, from Kent Nelson, an investment advisor involved in the investment of State of New Mexico funds, with his consent, induced by wrongful use and threat of use of economic harm and under color of official right, in return for business with the New Mexico State Treasurers Office.  In violation of Title 18, United States Code, Section 1951.

(Docket No. 47, at 12).  Count Twenty-six similarly charges Defendant with obtaining $ 1,900.00 in funds (Docket No. 47, at 13).

23

Although both Counts Twenty-five and Twenty-six use the word "knowingly," the Court finds that this language at most suggests that Defendant knew that he was affecting interstate commerce, and does not pertain to whether Defendant knew about Kent Nelson's motivations for making the payment.  Further, even if the word "knowingly" modifies the word "obtain" in the dependent clauses of the two counts, this would still not adequately allege that Defendant knew the payments were made in return for business.  Although Defendant may have known that he obtained the payments, he still may not have known that the payments were bribes.

Without an allegation suggesting that Defendant knew that the payments were in return for official action, the Court cannot find that Defendant "implicit[ly] promise[d] to use his official position to serve the interests of the bribegiver." *Evans*, 504 U.S. at 256.  Thus, Counts Twenty-five and Twenty-six do not adequately allege the existence of a *quid pro quo*.  Consequently, the Court finds that Counts Twenty-five and Twenty-six fail to sufficiently allege an essential element of extortion under color of official right and should be dismissed.

IT IS THEREFORE ORDERED THAT Defendant's Motion to Dismiss (Docket No. 30) is GRANTED, in part, as to Counts Twenty-five and Twenty-six of the Second Superceding Indictment, and Counts Twenty-five and Twenty-six are DISMISSED without prejudice.

IT IS FURTHER ORDERED THAT Defendant's Motion to Dismiss is DENIED, in part, as to the remaining counts of the Second Superceding Indictment.

_____
SENIOR UNITED STATES DISTRICT JUDGE