## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                          No. CR 05-2051 JP

ROBERT VIGIL,

      Defendant.

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS

On November 4, 2005 Defendant Robert Vigil filed a Motion to Suppress (Doc. No. 44). The Court held a hearing on December 19, 2005.  Defendant Vigil was present and was represented by counsel Sam Bregman and Jason Bowles.  Plaintiff United States was represented by counsel John Gerson.  After carefully considering the arguments of counsel, the testimony of witnesses, the exhibits of record, and the relevant case law, the Court finds that the motion should be denied.

The basis for Defendant Vigil's Motion to Suppress is an attack on the truthfulness and completeness of the affidavit sworn by FBI Special Agent Drew McCandless in support of the search warrant issued by United States Magistrate Judge Richard L. Puglisi on September 13, 2005.[1]  The warrant authorized searches of Defendant Vigil's home and of the New Mexico State Treasurer's Office ("NMSTO").  Defendant contends that the affidavit contained false statements about confidential informant Leo Sandoval (referred to as "CW1" in the affidavit) in an effort to

---

[1] Agent McCandless swore and presented to Magistrate Judge Puglisi several affidavits at the same time. The affidavits were virtually identical in all material respects, except in the description of the properties to be searched. I refer to the affidavits and search warrants in the singular in this Memorandum Opinion and Order.  In my review of the sufficiency of the affidavit I refer to the one used for the warrant to search Mr. Vigil's home.

bolster Sandoval's credibility.  Defendant also contends that the affidavit contained false statements about the content of tape recordings of some of the conversations between Defendant Vigil and two other confidential informants, Angelo Garcia ("CW2") and Kent Nelson (CW3"). Finally, Defendant contends that the affidavit omitted matters that were materially exculpatory. Defendant argues that the search warrant was issued improperly because all of these defects in the affidavit caused Magistrate Judge Puglisi to be misled in making his probable cause determination and authorizing the searches.

Plaintiff United States responds that the search warrant was fully supported by probable cause, and that the affidavit in support of the search warrant was truthful.  Plaintiff argues that none of the alleged errors in the search warrant amounts to a deliberate or reckless falsity. Plaintiff also argues that the Defendant lacks standing to challenge the search of the NMSTO because he lacked a privacy interest in the offices searched.[2]

The Second Superceding Indictment contains 26 counts, plus one forfeiture clause.  The charges against Defendant Vigil include conspiracy, along with Michael Montoya and Angelo Garcia, to commit extortion and to commit money laundering with the proceeds of extortion (Count One), money laundering (Counts Two through Five), extortion of funds from investment advisor Kent Nelson, using Angelo Garcia as a go-between, in violation of the Hobbs Act (Counts Six through Twenty-Four), and extortion of funds from investment advisor Kent Nelson directly, in violation of the Hobbs Act (Counts Twenty-Five and Twenty-Six).  On February 3, 2006 the Court entered a Memorandum Opinion and Order that dismissed, without prejudice, Counts Twenty-Five and Twenty-Six (Doc. No. 79).

---

[2]  The United States does not question Defendant's standing to contest the search of his home.

Leo Sandoval, a NMSTO employee, was questioned by Secret Service agents in December 2003 about counterfeiting U.S. currency, and his office at the NMSTO was searched. At the time of the search, Mr. Sandoval admitted he had improperly duplicated the currency as well as two driver's licenses, a birth certificate, and a voter registration card.  Mr. Sandoval also offered that he had information about public corruption in the NMSTO.  The Secret Service agents called in FBI agents, and Mr. Sandoval described to them a kickback scheme initiated under former Treasurer Michael Montoya.  The scheme involved outside investment advisors who received commissions from brokerage firms bidding on flexible repurchase agreements.  Mr. Sandoval indicated he participated in, and maintained records of, the kickback transactions.  FBI agents began using Mr. Sandoval in their undercover investigation to record conversations, and to provide other information and written documents.  The FBI recorded numerous conversations involving Mr. Sandoval, Mr. Montoya, Angelo Garcia, investment advisor Kent Nelson, and Defendant Vigil.

### The Affidavit

The affidavit in support of the search warrant is 31 pages long.  Although Mr. McCandless swore to the affidavit and presented it to Judge Puglisi, FBI Agent Margaret Russin actually prepared the affidavit.  The affidavit summarizes years of investigative work, and it begins with an explanation of the nature of flexible repurchase agreements and the use of third party investment advisors by the NMSTO.  The affidavit identifies four confidential informants, including Leo Sandoval, Angelo Garcia, and Kent Nelson, and gives information about their reliability.  It briefly describes extortionate activities by Michael Montoya during his term as Treasurer from 1995 to 2002, and reports how investment advisor Kent Nelson became involved in New Mexico public

finance.  The affidavit indicates that the information provided by Mr. Sandoval and by Mr. Garcia was corroborated by records and other sources, as well as by taped recordings.  It also states that much of the information provided by Mr. Sandoval and Mr. Garcia was already known to the FBI and other law enforcement officials.  The affidavit notes that Mr. Sandoval was investigated by the Secret Service for counterfeiting and manufacturing a fake driver's license, and states that charges against Mr. Sandoval were dropped because the money "contained sports hero pictures and was intended for Christmas gifts."  Aff. at 5.

The affidavit at pages 9-19 contains a section detailing allegations involving Defendant Vigil's tenure as Treasurer.  A section entitled "Campaign contributions" contains excerpts of transcripts of conversations in which Defendant Vigil was a party.  The first transcript excerpt is from a March 23, 2004 conversation between Mr. Vigil and Mr. Garcia.  In that conversation, the transcript quotes Mr. Vigil as saying that Kent Nelson "has made us some pretty good money," and later that Nelson has "made some . . . pretty good money."  Aff. at 13.  When Mr. Garcia asked whether Mr. Nelson had taken care of him well, according to the transcript Mr. Vigil replied, "[n]o . . . not much for me.  I mean . . . I can't . . . complain."  Aff. at 13.

The next transcript excerpt quoted in the affidavit is from a conversation between the same parties, Mr. Garcia and Mr. Vigil, recorded on June 8, 2004.  Mr. Garcia stated that he would give Mr. Vigil a third of what Mr. Nelson and Mr. Garcia, between themselves, received.  Further, Mr. Garcia said that he could help Mr. Vigil build his fence or do something else.  Mr. Vigil said the bottom line was that he needed to build up his campaign fund.  Mr. Garcia then said he would give Mr. Vigil a third for his campaign fund.  Later in the conversation, Mr. Garcia said he would "give it to you in cash or whatever and whatever's gonna benefit you."  Aff. at 15.  Mr.

4

Vigil is quoted as saying, "[y]eah, I'll play that."  Aff. at 15.

Two conversations with Defendant Vigil were recorded on August 16, 2004, the first with two FBI undercover agents, the second with Mr. Garcia.  In the conversation with the undercover agents, Mr. Vigil explained the use of third party consultants to get around the "Rule G-37" legal restrictions on campaign contributions by brokers.  The conversation with Mr. Garcia involved a discussion of revenue anticipation notes, or "TRANS."   Mr. Garcia stated that every time Mr. Nelson did a TRANS he would give former Treasurer Montoya a third of what Mr. Nelson made, to which Mr. Vigil responded, "Kent hasn't said (sic) me nothing for two times I've given him stuff."  Aff. at 16.

The affidavit summarizes another conversation between Mr. Vigil and Kent Nelson on April 22, 2005 in which Mr. Vigil told Mr. Nelson that he needed at least $1,500 for his campaign fund-raiser, and that Angelo Garcia owed him $10,000.  The affidavit also describes two hand-to-hand cash payments by Mr. Nelson to Mr. Vigil on May 2, 2005, one of $1,500 for the fund-raiser, and one of $10,000 for future business with the NMSTO.  The affidavit states that Mr. Nelson "specifically stated that he could not give the $10,000 without future business."  Aff. at 17.  It goes on to say that Mr. Vigil took the cash, immediately stated that the business was no problem, and later told Mr. Nelson that a repurchase agreement would be available at the end of the week or early the next week.

The affidavit also describes a conversation between Mr. Vigil and Mr. Nelson on August 21, 2005 in which they discussed the small size of a commission Mr. Nelson was to receive from a recently completed repurchase agreement.  Mr. Vigil commented that because of the cost of a plane ticket, perhaps Mr. Nelson should not come to New Mexico and should send Mr. Vigil a

check instead.  Mr. Vigil told Mr. Nelson that he gets requests for money from other campaigns, and that he would contact Mr. Nelson to pay those monetary requests.  Mr. Nelson did come to New Mexico a few days later on August 24, 2005, and Mr. Vigil picked him up at the airport. While parked in a NMSTO vehicle, Mr. Nelson offered Mr. Vigil $5,000 in cash.  Mr. Vigil took $1,900 "as payment for a recently completed repurchase agreement."  Aff. at 18.  Mr. Vigil told Mr. Nelson he would call him later with instructions about various campaigns, including his own campaign for Treasurer, for which Mr. Nelson should write checks and send them to Mr. Vigil for distribution.  The affidavit states that immediately after receiving the $1,900 payment, Mr. Vigil talked about funds that would be available soon for investment and discussed the availability of future repurchase agreements at length with Mr. Nelson.  The affidavit does not mention a verbal exchange at page 97 of the transcript of the August 24, 2005 encounter in which Mr. Nelson asked if the payment would expedite the process of giving Mr. Nelson more business, to which Mr. Vigil responded, "[n]o, no, it wouldn't matter."

The next section of the affidavit describes Mr. Vigil's efforts to funnel money to Mr. Montoya in the wake of a rescinded purchase of mutual funds made at the end of Mr. Montoya's term as State Treasurer.  The purchase would have generated a large commission to Mr. Nelson and a stream of income to Mr. Montoya for several years after leaving office.  Mr. Vigil rescinded the deal after the New Mexico Board of Finance raised questions because the purchase of mutual funds was against state investment policy.  Mr. Vigil's efforts to channel money to Mr. Montoya involved providing employment income to Mr. Montoya's wife, Samantha Sais-Montoya.

Judge Puglisi issued the search warrant on the same day Agent McCandless appeared before him with the affidavit.

## Standing To Contest Search of State Treasurer's Office

Standing to challenge a search depends on whether the defendant has a legitimate expectation of privacy in the area searched.  Rakas v. Illinois, 439 U.S. 128, 143 (1978); United States v. Anderson, 154 F.3d 1225, 1229 (10th Cir. 1998).  This involves two inquiries: (1) whether the defendant has shown a subjective expectation of privacy in the area searched; and (2) whether that expectation is one that society is prepared to recognize as reasonable.  Anderson, 154 F.3d at 1229.  The ultimate question is whether a claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances.  Id.

When a defendant is challenging a search of a workplace, the court must engage in a particularized analysis of the relevant factors on a case-by-case basis.  Anderson, 154 F.3d at 1229 (*citing* O'Connor v. Ortega , 480 U.S. 709, 718 (1987)).  A general principle is that the expectation of privacy in a workplace is necessarily less than in a home.  Anderson, 154 F.3d at 1229 (citing New York v. Burger, 482 U.S. 691, 700 (1987)).  An employee may show that he has a reasonable expectation of privacy in his own private office by demonstrating that he works in the searched area on a regular basis.  Anderson, 154 F.3d at 1230 (*citing* Mancusi v. DeForte, 392 U.S. 364, 369 (1968) and Specht v. Jensen, 832 F.2d 1516, 1520 (10th Cir. 1987).  In Specht, the court found there was a reasonable expectation of privacy in the office of a person who testified that he closed his office doors and drapes when he was not there, and that he kept confidential business information on his desk.  832 F.2d at 1520.  However, a  high-ranking corporate employee does not have standing to challenge the search of corporate offices merely because that person has control over the entire workplace.  Anderson, 154 F.3d at 1230.  When a defendant challenges the search of areas in the workplace that are not the defendant's own office,

7

the court must consider other factors.  The court should look for a nexus between the defendant-employee and the place searched, and in doing so should consider such factors as whether an item seized was owned by the defendant, whether the item seized was of a personal nature, whether the search was in an area containing personal items, and whether the seized items were corporate records.  Anderson, 154 F.3d at 1230-31.  When the property seized from a defendant's workplace is business property, or property connected with the operation of a business, there is a lesser expectation of privacy in that property.  Anderson, 154 F.3d at 1231.

Mr. Vigil presented no evidence that he worked in his own office on a regular basis, that he excluded others from his office when he was not there, or that he kept confidential material in his office.  Thus he lacks standing to contest the search of his own office.  Mr. Vigil also failed to demonstrate a legitimate expectation of privacy in any of the other spaces in the Treasurer's Office that were searched.  Therefore, he lacks standing to contest the search of any other part of the NMSTO.

### Standards for Challenge To Search Warrant

A search warrant protects an individual's privacy interest in the individual's home and possessions against unjustified police intrusions, and may only be issued upon a showing of probable cause to believe the legitimate object of a search is located in a particular place. Steagald v. United States, 451 U.S. 204, 213 (1981); see Fed. R. Crim. P. 41(d) (magistrate judge "must issue the warrant if there is probable cause to search . . ..").  The application for a warrant must be presented to an impartial magistrate, whose duty is to consider the facts and circumstances presented and to make an independent assessment regarding probable cause.  See Illinois v. Gates, 462 U.S. 213, 238 (1983).  The magistrate judge must "make a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit before him,

including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there

is a fair probability that contraband or evidence of a crime will be found in a particular place."

Gates, 462 U.S. at 238.  Probable cause to issue a search warrant exists only when the supporting

affidavit sets forth facts that lead a prudent person to believe a fair probability exists that

contraband or evidence of a crime will be found in a particular place.  *See* United States v. Wicks,

995 F.2d 964, 972-73 (10th Cir. 1993).

     A magistrate judge's decision to issue a warrant is reviewed with great deference.  Ornelas

v. United States, 517 U.S. 690, 698-99 (1996).  After considering the totality of the

circumstances, the reviewing court must determine whether under Fourth Amendment principles

the magistrate judge had a "substantial basis" for concluding that probable cause existed and that

a search would uncover evidence of wrongdoing.  Gates, 462 U.S. at 238-39; United States v.

Tisdale, 248 F.3d 964, 970 (10th Cir. 2001).

     A defendant challenging the veracity of statements in a supporting affidavit may be entitled

to an evidentiary hearing to determine whether the warrant was issued in reliance on a deliberately

or recklessly false affidavit.  *See* Franks v. Delaware, 438 U.S. 154, 156-57 (1978); United States

v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001).  To establish the right to a hearing, the

defendant must meet a two-part test.  First, the defendant must make a substantial preliminary

showing that the affiant's statement was deliberately false or demonstrated reckless disregard for

the truth.  Franks, 438 U.S. at 156-57.  Second, the defendant must make a substantial

preliminary showing that the challenged statements were necessary to the magistrate judge's

finding of probable cause.  Franks, 438 U.S. at 156-57, 171-72.  If the defendant proves the

allegations of deliberate or reckless falsity at an evidentiary hearing, the court voids the search

warrant and suppresses the evidence seized only if the affidavit's remaining content is insufficient

to establish probable cause.  Franks, 438 U.S. at 156, 171-72.  The Tenth Circuit has extended

the Franks standards of deliberate falsehood and reckless disregard to material omissions.  United

States v. Avery, 295 F.3d 1158, 1166 (10th Cir. 2002); United States v. McKissick, 204 F.3d

1282, 1297 (10th Cir. 2000); United States v. Kennedy, 131 F.3d 1371, 1377 (10th Cir. 1997).

**Discussion**

On December 19, 2005 the Court held a hearing on Defendant Vigil's motion to

suppress.[3]  Defendant called three witnesses, and Plaintiff, the United States, called three

witnesses.  Regarding Defendant's witnesses, Plaintiff's counsel withdrew an objection he had

made at a prior hearing related to whether the subpoenas for the witnesses were proper; Plaintiff's

counsel stated that "the government has no objection to the witnesses to testify."  Tr. at 19-20.

As to three other witnesses subpoenaed by Defendant, Angelo Garcia, Kent Nelson, and Leo

Sandoval, the Court granted, in part, motions to quash filed or made orally by their counsel.  The

Court ruled that the subpoenaed witnesses did not have to testify at the December 19, 2005

hearing, but reserved ruling as to whether they might have to testify at a later time, pending

further briefing from counsel.  After the motions hearing, counsel for Defendant informed the

Court in writing that "Mr. Vigil no longer opposes the quashing of those subpoenas and no longer

wishes to pursue the testimony of Garcia, Nelson and Sandoval" for the purposes of the pending

---

[3]  The Court scheduled the Dec. 19, 2005 hearing on Defendant's Motion to Suppress (Doc. No. 44) and
on Defendant's Motion to Dismiss (Doc. No. 30).  These were the only motions pending at the time the Notice was
served.  Shortly before the scheduled hearing, the United States filed a Motion to Amend the Scheduling Order
(Doc. No. 61).  The Court heard argument on that motion at the Dec. 19, 2005 hearing and granted it, in part.  *See*
Amended Scheduling Order (Doc. No. 65).

10

motions.  Ltr. from attorney Bregman, Dec. 20, 2005.  The Court then entered an Order (Doc.

No. 67) quashing the subpoenas.  Therefore, the Court will decide the motion to suppress on the

existing record.

*Statements in Affidavit About Leo Sandoval*

The affidavit indicates that the investigation was predicated on information provided by

Leo Sandoval.  Defendant Vigil calls into question the veracity of following portion of the

affidavit in support of the search warrant:

> It should be noted that CW1 [Leo Sandoval] was under
> investigation by the United States Secret Service for manufacturing
> counterfeit money and a driver's license.  The charges were
> dropped as the xeroxed money contained sports hero pictures and
> was intended for Christmas gifts.

Aff. at 5.

The *Albuquerque Journal* published a story on October 26, 2005 titled "Key Witness in

Vigil Case Resigns," Pl. Ex. 4, reporting that Secret Service agents concluded Mr. Sandoval was

printing fake bills with the faces of sports heroes for Christmas presents and no charges were

filed.  Secret Service Agent James Helminski sent an e-mail to the *Journal* stating that the story

was incorrect, that the counterfeit notes were not printed with faces of sports heroes "but were in

fact printed for the purpose of being presented and passed as original currency."  Pl. Ex. 5.  Agent

Helminski  also stated that Mr. Sandoval's case was still pending.  The *Journal* printed another

article on October 29, 2005, retracting that part of the earlier story.  Def. Ex. C.

Defendant has made a substantial preliminary showing that the information on page five of

the affidavit related to Leo Sandoval's involvement in copying currency and other documents was

deliberately or recklessly false.  It may have been reckless for Agent Russin to write and for Agent

11

McCandless to adopt the statements that Leo Sandoval copied money with pictures of sports heroes to be used as Christmas gifts, and that charges against Mr. Sandoval for manufacturing counterfeit money and a driver's license were dropped.  The FBI agents made these statements without checking the facts with the Secret Service agents who had investigated Mr. Sandoval for these activities.

According to a Secret Service report, Mr. Sandoval stated to agents that he made the bills "with the intention that this counterfeit be passed as genuine US currency."  Def. Ex. B at 008. Mr. Sandoval never produced bills with pictures of sports heroes or grandchildren.  The Secret Service had information that Mr. Sandoval had given fake bills worth $860 to Paul Steven Silva for payment of a debt, and that Mr. Silva used some of the bills in Arizona.  When Mr. Silva was arrested, he had in his possession the fake driver's license Mr. Sandoval had made for him.  Mr. Silva was prosecuted for counterfeiting violations, pled guilty, and received a 12-month sentence. The Secret Service also had information that Mr. Sandoval had given counterfeit bills to Phillip Arellanes who used them in Las Vegas, New Mexico.  Although Mr. Arellanes has not been prosecuted for counterfeiting, neither has he been exonerated; that matter is in abeyance.  Tony Surodjawan, a Secret Service special agent, testified that he determined during his investigation that Leo Sandoval was counterfeiting U.S. currency.  Agent Surodjawan completed a case report and submitted it to the U.S. Attorney's Office.  In the report, Agent Surodjawan requested that Mr. Sandoval be prosecuted for counterfeiting violations under 18 U.S.C. §§ 471 and 472.  Def. Ex. B at 6.

At the hearing on December 19, 2005, the government presented evidence to refute Defendant's preliminary showing.  The government's evidence included the following.  On

December 17, 2003, the Secret Service agents who were investigating the Sandoval counterfeiting

matters contacted the Federal Bureau of Investigation ("FBI") after Mr. Sandoval made

allegations regarding corruption at the NMSTO.  Former FBI agent Jeffrey W. Campbell testified

that he was the first FBI agent who interviewed Mr. Sandoval.  During discussions in December

2003 and January 2004 concerning NMSTO corruption, Mr. Sandoval maintained that he copied

the currency, later used by Mr. Arellanes, for innocent purposes such as making sports

memorabilia with pictures of sports heroes in place of the engraved portraits, and making

Christmas cards with his grandchildren's photographs on the money.   Mr. Sandoval did not offer

an innocent explanation for making a fake driver's license for Mr. Arellanes.  Agent Campbell's

focus was on Mr. Sandoval's allegations of corruption at the NMSTO, which he believed.  Agent

Campbell testified that he also believed the statements of Leo Sandoval concerning his copying of

currency and manufacturing of a fake driver's license for Mr. Arellanes.  From his testimony it

does not appear that Agent Campbell was aware of, or discussed with Mr. Sandoval, the copied

currency and other fake documents given to Mr. Silva.

Margaret Russin, the FBI special agent in charge of the investigation of allegations of

corruption at the NMSTO, also testified at the hearing.  She is the person who drafted the

affidavit, including the language regarding Leo Sandoval, that was signed by Agent McCandless.

Agent Russin's involvement in the investigation began in July 2004; she became the case agent in

April 2005.  Her explanation of the portion of the affidavit having to do with Leo Sandoval is that

she relied on other agents to assess his credibility as to his intent in duplicating currency, that she

only intended to convey that no counterfeiting charges had been filed against Mr. Sandoval, and

that she understood no charges were ever going to be filed because an agreement was in the

works that would immunize Mr. Sandoval from prosecution for counterfeiting.  She was aware of

an immunity agreement that was being discussed between Mr. Sandoval and the U.S. Attorney's

Office.  That agreement was later finalized on September 21, 2005.  However, from a common-

sense perspective, the implications of an agreement to grant immunity against criminal charges,

are quite different from criminal charges being dropped.  The former implies guilt whereas the

latter implies possible innocence or a lack of sufficient evidence to convict.

The government asserts that a December 23, 2003[4] recorded conversation between Mr.

Sandoval and Mr. Montoya provides corroboration that Mr. Sandoval lacked criminal intent with

regard to the fake bills.  *See* Tr. of Tape #1, 12/23/03, Pl. Ex. 1.  The Court does not accept this

interpretation.  It is more likely that Mr. Sandoval was making up a story about using, as gifts,

fake bills with pictures of sports heroes and grandchildren to throw Mr. Montoya off guard, so he

would not suspect Mr. Sandoval had agreed to cooperate with federal agents.[5]    The fact that Mr.

Sandoval made these self-exculpatory statements about the counterfeiting during this conversation

with Mr. Montoya does not reasonably corroborate Mr. Sandoval's lack of criminal intent.

The FBI agents were, understandably, more interested in and perhaps completely focused

on the NMSTO corruption charges and did not independently attempt to verify what Mr.

---

[4]  The government mislabeled Plaintiff's Exhibit 1 as a conversation between Michael Montoya and Leo
Sandoval on 12/24/03, but the transcript of this conversation shows it actually occurred on 12/23/03.

[5]  On December 17, 2003, less than a week earlier, the Secret Service had questioned Mr. Sandoval and
searched his office at the NMSTO regarding counterfeiting bills.  Mr. Sandoval did not tell agents at that time that
he made the bills with pictures of sports heroes and grandchildren to use as gifts. However, during their
conversation on December 23, 2003 Mr. Sandoval may have wanted Mr. Montoya to think that is what he had told
the agents so that Mr. Montoya would not suspect him of cooperating.  Thus, to deflect Mr. Montoya from such
suspicions, Mr. Sandoval apparently was making up a story that he had denied criminal intent during his interview
with the Secret Service agents.  In the conversation, Mr. Montoya seems to agree it was wise for Mr. Sandoval to
make up such a story to tell the federal agents, although it does not even seem that Mr. Montoya believed that
story.

Sandoval was telling them about his involvement in counterfeiting.  At most, the Court would characterize the bolstering statements about Mr. Sandoval in the affidavit as recklessly false. Agent Russin could have been more careful in checking on the accuracy of the assertions that Mr. Sandoval was making bills as sports memorabilia and/or Christmas gifts with pictures of grandchildren, and that charges had been dropped.  Agent Russin was heading a complex investigation and had to rely upon other agents to develop the facts of the case.  Leo Sandoval was important in the investigation because he was an insider who offered information to the FBI about alleged corruption at the NMSTO.  Nevertheless, the Court assumes that the statements about Mr. Sandoval in the affidavit were false, and were made with reckless disregard as to their truth.

*Statements in Affidavit About Taped Conversations With Robert Vigil*.

Defendant claims that the affidavit contains other misleading false statements designed to bolster the prosecution's case against Mr. Vigil, in several respects.  The affidavit quotes Mr. Vigil as saying to Mr. Garcia in the March 23, 2004 recorded conversation, "Kent has made us some pretty good money" Aff. at 13.  Defendant contends the word "us" is not on the tape.  In regard to the June 8, 2004 recorded conversation, the affidavit quotes Mr. Vigil's response to Mr. Garcia's statement that he would give Mr. Vigil money as, "[y]eah I'll play that."  Aff. at 15. Defendant asserts that Mr. Vigil merely said, "Hopefully, that...."  As to these two alleged falsehoods in the transcription of the conversations, the United States presented the testimony of Agent Russin.  Agent Russin testified that although she included in the affidavit the challenged excerpts from transcripts of recorded conversations between Defendant and Angelo Garcia and between Defendant and Kent Nelson, she did not listen to the audio tapes herself.  She testified

that FBI employees transcribed the tapes, and that her predecessor case agent, Lori Greenwell, reviewed the transcripts for accuracy by listening to the tapes.  Tr. at 146.

The cooperating witness who participated in the March 23, 2004 and June 8, 2004 conversations, Angelo Garcia, did not listen to the tapes and review the transcripts prior to their inclusion in the affidavit, but he has since done so and has affirmed the accuracy of the challenged portions.  Thus, as to the quotes "Kent has made us some pretty good money" and "[y]eah I'll play that," Defendant has failed to demonstrate that the transcripts quoted in the affidavit are false, or even that they are incorrect.

Defendant also complains of other minor errors in the March 23, 2004 transcript, such as the aside, "[l]ater in the conversation," Aff. at 12,  which should have read "earlier in the conversation," and the failure to include an ellipsis between line 17 ("CW2:  He wants more money.  No.") and line 18 ("Well I'm not much to complain . . .."), also on page 12.  These matters are insignificant and do not amount to falsities.

Defendant contends that the statement in the affidavit that he told Mr. Nelson that he was "owed" $10,000 by Mr. Garcia is false.  Aff. at 17.  Mr. Vigil only said that Mr. Garcia had committed to raising a minimum of $10,000 for him for a fundraiser.  Agent Russin testified that she believes that her summary of the April 22, 2005 conversation indicating that Defendant told Kent Nelson that Angelo Garcia "owed" him $10,000 was an appropriate characterization in light of previous statements by Defendant, although she agrees that Defendant did not use the term "owed" in that conversation.  After reviewing the entire transcript of the April 22 conversation, the Court accepts this explanation by Agent Russin.  Even though using the term "owed" sounds worse than what Defendant actually said, this does not amount to a deliberate or reckless

16

falsehood.  It is clear from the transcript of the conversation that Mr. Vigil was upset about Mr.

Garcia's apparent disappearance after Mr. Garcia had committed to "raising" a minimum of

$10,000 for a fundraiser.  This part of the conversation shows that Mr. Vigil had an acute need

for funds because he did not get the money that Mr. Garcia had committed to raise for him.  The

use of the term "owed" in the affidavit does not amount to a deliberate or reckless falsehood.

       Two other alleged falsities involve the *quid pro quo* the United States must prove in

connection with campaign contributions.  The affidavit states that during the face-to-face meeting

on May 2, 2005 when Mr. Nelson handed Mr. Vigil two envelopes filled with cash, Mr. Nelson

"specifically stated that he could not give the $10,000 [the cash in the second envelope] without

future business."  Aff. at 17.  The affidavit also states that Mr. Vigil told Mr. Nelson "that a

repurchase agreement would be available at the end of the week or early the following week."

Aff. at 17.  Defendant claims the tapes do not contain either of these statements.

       Agent Russin testified that she believes the affidavit was an accurate characterization and a

truthful summary of the conversation.  First, regarding the statement in the affidavit attributed to

Mr. Nelson, the transcript reads as follows:

> NELSON: So listen, the thing about it is, is that I mean you have
> to understand, I mean I'm I mean I'm I mean I got a lot of money
> out now and I mean what I'm looking at here is I'm basically saying
> to you, you know, I'm willing to help you out and do what I can,
> but I mean, I need some business, I mean I can't I can't be on a
> three-man rotation and expect uh a $25 million deal where I get
> paid you know $5,000 or $7,000 and and ...
> VIGIL:  right, right
> NELSON:  you want me to help you out.

Def. Ex. 50 to Motion to Dismiss at 7 (ellipsis in original).  Next, as to the statement about what

Mr. Vigil said, the United States' response brief quotes Mr. Vigil as saying:

> [T]he overnight has been running about 50 basis points higher than
> my portfolio gets.  I would of had it back to normal, but these guys
> in that, finance authority, uh in fact, in fact they might do a flex
> even as early as next week okay, so, we're gonna try to do it, so I'll
> call you on that.

Pl. Resp. at 21 (quoting transcript, 5/2/05 at 1299).  To use a litotes, the statements in the

affidavit are not unreasonable interpretations and summaries of those parts of the May 2, 2005

conversation.  Kent Nelson gave $10,000 to Defendant during that conversation, cash that had

been supplied to him by the FBI.  Although Mr. Nelson did not say he would give the money only

in exchange for a promise of future business, he was imploring Mr. Vigil for more business.  The

gist of the conversation also included a promise of sorts from Defendant Vigil, or at least a hope,

that a repurchase agreement would be available soon, even though the deal did not actually

happen for a few more months.  These parts of the affidavit may exaggerate and/or simplify an

important issue, the *quid pro quo* requirement, but Defendant has not shown that they constitute

deliberate or reckless falsehoods.

Finally, the affidavit implies that Mr. Vigil was involved in illegal activities as Deputy

Treasurer from 2000 until his election as Treasurer, Aff. at 9-10, but Defendant contended in his

motion to suppress that he actually resigned his position with NMSTO in December 2001 and he

had no involvement in the Treasurer's office in the year 2002.  However, the parties have entered

into a stipulation which indicates that although Defendant resigned from the NMSTO on

December 31, 2001, he was rehired by the NMSTO on a half-time basis from July 22, 2002 to

December 13, 2002.  There was only a six and a half month period in 2000 when Defendant was

not employed by the NMSTO.  It is unclear from the stipulation whether Defendant was acting as

the Deputy Treasurer during his part-time work in the latter half of 2002, but in any case

18

Defendant has failed to prove that the affidavit is deliberately or recklessly false in this respect.

In sum, Defendant failed to make a substantial preliminary showing, or to prove, that any of the affidavit's alleged falsities in characterizing the contested conversations involved deliberate or reckless falsehoods.

*Material Omissions of Exculpatory Material*

Although the suppression motion alleges "several" exculpatory matters omitted from the affidavit, it identifies only one: in the August 24, 2005 encounter, when Mr. Nelson presented Mr. Vigil with an envelope containing $5,000 in cash and Mr. Vigil only took $1,900 of it, Mr. Nelson asked if the payment of the rest of the money would expedite the process of giving Mr. Nelson more business. Mr. Vigil responded, "[n]o, no, it wouldn't matter." This omission seems exculpatory on its face, but when viewed in the context of other statements, it seems less so. The words "it wouldn't matter" could be interpreted to mean simply that Mr. Vigil did not need to get all of the rest of the money directly because he expected Mr. Nelson to give him checks for other persons' political campaigns. Earlier in the conversation, Mr. Vigil had said that Mr. Nelson could help him by sending him the money for various political campaigns. "You just mail me their checks, you know, I'll tell you as soon as I, I communicate with them." Tr. 8/24/05 at 16. It is not a defense to extortion under the Hobbs Act that the defendant may have directed that payments be made to third parties. *See* United States v. Green, 350 U.S. 415, 420 (1956) (conviction for extortion does not depend on having direct benefit conferred on defendant). Defendant failed to make a substantial preliminary showing that this or any other omission was exculpatory, or that any omission involved a deliberate or reckless falsity or an attempt to mislead the magistrate judge.

*Materiality of Statements about Leo Sandoval*

The only possible reckless falsity in the affidavit is the segment about Leo Sandoval, as discussed above.  Therefore, under the second prong of the Franks analysis, the Court considers only whether the challenged statements regarding Leo Sandoval's culpability for counterfeiting and document falsification were essential to Judge Puglisi's finding of probable cause.  The challenged statements about Mr. Sandoval were included in the affidavit to show his reliability as an informant.  Purged of all statements suggesting Mr. Sandoval's innocence of counterfeiting, the affidavit still contains a surfeit of other information about Mr. Sandoval's reliability that is sufficient to allow the magistrate judge, in making a probable cause assessment, to credit the information Mr. Sandoval provided.  Even if the affidavit had described Mr. Sandoval as an intentional counterfeiter, and had indicated that he would be prosecuted or that he would be immunized, rather than that charges had been "dropped" because he lacked criminal intent, it is likely that Judge Puglisi nevertheless would have found credible Mr. Sandoval's other information.

Most of the information given by Mr. Sandoval was corroborated by documents and records, by other informants, and by recorded conversations.  *See* United States v. Artez, 389 F.3d 1106, 1114 (10th Cir. 2004) (tip from second informant may help corroborate information from unreliable "unwitting" informant).  Mr. Sandoval agreed to wear a recorder and to record conversations with other individuals, including the former Treasurer, Michael Montoya.  Thus Mr. Sandoval's reliability did not depend solely on whether or not his intent was criminal in relation to the counterfeiting.  Further, confidential informants are often people who have been caught in criminal activities and who, consequently, have a motive to escape criminal prosecution by

providing evidence against others.  Magistrate Judge Puglisi knew of Mr. Sandoval's personal

criminal involvement in the extortion scheme.  *See* <u>Avery</u>, 295 F.3d at 1168 (concluding affidavit

that omitted information about informant's lengthy criminal history contained sufficient probable

cause because magistrate knew informant had violated other laws and "was not a model citizen,"

and affidavit contained other information about informant's reliability, and information was

otherwise corroborated).  Additionally, the affidavit contains sufficient other information,

independent of that provided directly by Sandoval, to establish probable cause to issue the

warrant.  Information from the other confidential informants (CW2 - Angelo Garcia, and CW3 -

Kent Nelson) was more directly inculpatory of Mr. Vigil than the information given by Mr.

Sandoval.

      The affidavit gave Judge Puglisi a substantial basis for concluding that there was a fair

probability that a search would uncover evidence of criminal wrongdoing in Defendant Vigil's

home, thus satisfying Fourth Amendment requirements, even if the affidavit had been purged of

information that tended to exonerate Leo Sandoval of criminal intent for counterfeiting.

      THEREFORE, Defendant Vigil's Motion to Suppress is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE