**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                          No. CR 05-2051 JB

ROBERT VIGIL,

        Defendant.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on: (i) Defendant Robert Vigil's Motion to Dismiss Racketeering Acts Five Through Twenty-Six and Counts Seven Through Twenty-Eight of the Fourth Superseding Indictment Under Fed. R. Evid. 29, filed May 10, 2006 (Doc. 196); (ii) Defendant Robert Vigil's Motion to Dismiss Racketeering Acts Five Through Twenty-Six and Counts Seven Through Twenty-Eight of the Fourth Superseding Indictment Under Fed. R. Evid. 29, filed May 24, 2006 (Doc. 208); and (iii) Defendant's Renewed Motion for Judgment of Acquittal on RICO Counts, filed May 25, 2006 (Doc. 209).  The Court held a hearing on these motions on June 14, 2006.  The primary issue is whether the United States introduced sufficient evidence for a reasonable jury to conclude that: (i) Vigil obtained payments from Kent Nelson to which Vigil was not entitled, knowing that the payments were made in return for official acts; (ii) Vigil wrongfully attempted to obtain property from George Everage and that, in so doing, Vigil affected interstate commerce; (iii) Vigil engaged in a pattern of racketeering activity and conducted, or participated in the conduct of, an enterprise through the pattern of racketeering activity; and (iv) Vigil agreed to participate in a conspiracy.  Because a reasonable jury could conclude that the United States, with the record at the

trial, proved each of these allegations beyond a reasonable doubt, the Court denied the motions in an Order entered on June 23, 2006 (Doc. 240).  In footnote 1 of that Order, the Court promised to issue a memorandum opinion explaining the reason for its decision to deny the motions.

## PROCEDURAL BACKGROUND

This case began when the United States indicted Vigil on two counts of violating 18 U.S.C. § 1951, also known as the "Hobbs Act," with one count including an aiding and abetting charge under 18 U.S.C. § 2.  See Indictment at 1-2, filed September 13, 2005 (Doc. 1).  At the time, Vigil was the Treasurer of the State of New Mexico, having been elected in 2002 after a stint as Deputy Treasurer under Michael Montoya.  Over the next six months, the United States obtained four superseding indictments against Vigil.  See First Superseding Indictment, filed October 12, 2005 (Doc. 20); Second Superseding Indictment, filed November 9, 2005 (Doc. 47); Third Superseding Indictment, filed February 22, 2006 (Doc. 87); Fourth Superseding Indictment, filed March 21, 2006 (Doc. 133).

The Fourth Superseding Indictment, which formed the basis of the United States' case at trial, charged Vigil: (i) in Count I of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (ii) in Count II of conspiring to violate RICO, 18 U.S.C. § 1962(d); (iii) in Counts III-VI of money laundering, 18 U.S.C. § 1956(a)(1); (iv) in Counts VII-XXV of violating the Hobbs Act and aiding and abetting, 18 U.S.C. § 2; (v) in Counts XXVI-XXVII of violating the Hobbs Act; and (vii) in Count XXVIII of violating the Hobbs Act and aiding and abetting, 18 U.S.C. § 2.  The money laundering and Hobbs Act counts were also alleged as Racketeering Acts in furtherance of the RICO and RICO conspiracy charges.  In general, the charges involve Vigil's alleged use of his office to extort or to attempt to extort money from Nelson, an

investment adviser in the Office of the Treasurer of the State of New Mexico, and from Everage, a private contractor who wanted to become the state's Securities Lending Oversight Manager ("SLOM").

Vigil's trial began on April 17, 2006, before the Honorable James A. Parker, Senior United States District Judge. After the United States concluded its case-in-chief on May 10, 2006, Vigil filed written motions for a judgment of acquittal under rule 29 of the Federal Rules of Criminal Procedure as to: (i) the money laundering counts and related racketeering acts, see Doc. 194; (ii) the Hobbs Act counts and related racketeering acts, specifically Racketeering Acts Five through Twenty-Six and Counts VII-XXVIII, see Doc. 196; and (iii) the RICO counts, see Doc. 198. After hearing oral argument, Judge Parker entered a judgment of acquittal on Counts III-VI, the money laundering counts. See Judgment of Acquittal at 1-2, filed May 12, 2006. Judge Parker reserved decision as to the Hobbs Act counts and related racketeering acts. Judge Parker orally denied the motion for judgment of acquittal as to the RICO counts, following up with an Order, filed May 25, 2006 (Doc. 212).

Vigil chose not to present any case after the conclusion of the United States' case-in-chief. After closing arguments, the jury began its deliberations on May 15, 2006. On May 22, 2006, the Court declared a mistrial because the jury was not able to reach a unanimous verdict. See Order Declaring Mistrial at 1-2, filed May 22, 2006 (Doc. 206). Two days later, Vigil filed a new motion for a judgment of acquittal on the Hobbs Act counts and related racketeering acts.

On June 1, 2006, the case was reassigned from Judge Parker to Judge Browning. See Minute Order at 1, filed June 1, 2006 (Doc. 230). Three motions are before the Court for decision. First, Vigil's motion for a judgment of acquittal on the Hobbs Act counts and related racketeering acts

(Doc. 196) remains unresolved.  Second, Vigil has filed a renewed motion for a judgment of acquittal

on the Hobbs Act counts and related racketeering acts (Doc. 208).  Finally, Vigil renews his motion

for judgment of acquittal on the RICO counts (Doc. 209).

## LAW REGARDING MOTIONS FOR JUDGMENT OF ACQUITTAL

In deciding a motion for judgment of acquittal, the court must ask "only whether taking the

evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn

therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant

guilty beyond a reasonable doubt."  United States v. Stiger, 413 F.3d 1185, 1193 (10th Cir.

2005)(quoting United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000))(internal quotations

omitted), cert. denied, 126 S. Ct. 775 (2005).  The court relies "on the jury, as the fact finder, to

resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented."  Id.

at 1194 (quoting United States v. Radcliff, 331 F.3d 1153, 1157 (10th Cir. 2003))(internal quotations

omitted).  See United States v. Brooks, 438 F.3d 1231, 1236 (10th Cir. 2006)("Furthermore, it is not

our duty to weigh conflicting evidence nor to consider the credibility of witnesses.").  The Court must

refrain from "examining the evidence in bits and pieces," and must instead "evaluate the sufficiency

of the evidence by considering the collective inferences to be drawn from the evidence as a whole."

United States v. Brooks, 438 F.3d at 123 (citation and internal quotations omitted).

The court's role is to determine whether the evidence, if believed, would establish each

element of the crime.  See United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir.

2004)(citations omitted).  "[T]he evidence necessary to support a verdict need not conclusively

exclude every other reasonable hypothesis and need not negate all possibilities except guilt."  United

States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)(quoting United States v. Wilson, 182 F.3d

737, 742 (10th Cir. 1999))(internal quotations omitted).  The court should not enter a judgment of

acquittal unless no reasonable juror could have found the defendant guilty.  See United States v.

Carter, 130 F.3d 1432, 1439 (10th Cir. 1997)(citations omitted)("We will not overturn a jury's finding

unless no reasonable juror could have reached the disputed verdict.").  The court should not find that

there is enough evidence to support a conviction, however, if a conviction can only be "obtained by

piling inference upon inference.  An inference is reasonable only if the conclusion flows from logical

and probabilistic reasoning." United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir.

1998)(citations and internal quotations omitted).  As the United States Court of Appeals for the

Tenth Circuit stated in United States v. Summers, 414 F.3d 1287 (10th Cir. 2005):

> The rule that prohibits the stacking of inference upon inference merely indicates that
> at some point along a rational continuum, inferences may become so attenuated from
> underlying evidence as to cast doubt on the trier of fact's ultimate conclusion. In other
> words, the chance of error or speculation increases in proportion to the width of the
> gap between underlying fact and ultimate conclusion where the gap is bridged by a
> succession of inferences, each based upon the preceding one.

Id. at 1294-95 (internal quotations omitted).

## LAW REGARDING THE HOBBS ACT

The Hobbs Act provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the
> movement of any article or commodity in commerce, by robbery or extortion or
> attempts or conspires so to do . . . shall be fined under this title or imprisoned not
> more than twenty years, or both. . . .

> The term "extortion" means the obtaining of property from another, with his consent,
> induced by wrongful use of actual or threatened force, violence, or fear, or under
> color of official right.

18 U.S.C. § 1951(a), (b)(2).  The United States must prove three elements to obtain a conviction

under the Hobbs Act: (i) the defendant wrongfully obtained or attempted to obtain property from

another with that person's consent; (ii) the defendant did so under color of official right; and (iii) the defendant's conduct interfered with or affected interstate commerce.  See Tenth Circuit Criminal Pattern Jury Instruction 2.71, at 232.  As the Tenth Circuit Criminal Pattern Jury Instructions explain, "the wrongful use of otherwise valid official power may convert legitimate official conduct into extortion.  If a public official accepts or demands property in return for promised performance or nonperformance of an official act, the official is guilty of extortion."  Id.  Extortion is proven if the payments are made to a third party or to an entity at the defendant's direction.  See Tenth Circuit Criminal Pattern Jury Instruction 2.71 Use Note, at 233 (citing United States v. Green, 350 U.S. 415, 420 (1956)).  The Hobbs Act itself outlaws attempts and conspiracies to commit extortion, as well as completed acts of extortion.  See 18 U.S.C. § 1951(a).

Before trial, Judge Parker, interpreting the Supreme Court of the United States' decisions in Evans v. United States, 504 U.S. 255 (1992), and McCormick v. United States, 500 U.S. 257 (1991), determined that the United States must prove, as part of the "under color of official right" element, that Vigil "obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  Memorandum Opinion and Order at 18.  Requiring an expressly articulated agreement would allow public officials to circumvent the Hobbs Act by "knowing winks and nods."  Id. (quoting Evans v. United States, 504 U.S. at 274 (Kennedy, J., concurring))(internal quotations omitted).

Even so, the United States must prove more than that an official had knowledge that "the payment is made with a mere hope for general favorable treatment in the future."  Id. (citation omitted).  Instead, the United States must show that specific action was contemplated; the United States must prove that Vigil "should know that as a result of the payment he [is] expected to exercise

*particular* kinds of influence on behalf of the payor."  Id. at 19 (citation and internal quotations omitted)(emphasis and alteration in original).

## ANALYSIS

The United States presented sufficient evidence at trial to prove that Vigil wrongfully obtained money from Nelson under color of official right.  The United States also presented sufficient evidence at trial that Vigil attempted to extort Everage in the summer of 2005.  The evidence also was sufficient to show that Vigil violated the RICO statute.[1]

I.     **THE COURT WILL DENY VIGIL'S MOTION FOR JUDGMENT OF ACQUITTAL ON RACKETEERING ACTS FIVE THROUGH TWENTY-SIX AND COUNTS VII-XXVIII.**

The United States and Vigil agree that Vigil's motions for judgment of acquittal on Racketeering Acts Five through Twenty-Six and Counts VII-XXVIII can be divided into three factually distinct groups of offenses: (i) Racketeering Acts Five through Twenty-Three and Counts VII-XXV charge Vigil with violating the Hobbs Act, aided and abetted by Angelo Garcia, by the receipt of nineteen transfers of funds from Nelson, as a condition of Nelson receiving work from the Treasurer's Office; (ii) Racketeering Acts Twenty-Four through Twenty-Five and Counts XXVI-XXVII pertain to Vigil's alleged direct receipt of cash from Nelson personally; and (iii) Racketeering Act Twenty-Six and Count XXVIII relates to Vigil's alleged attempt to extort Everage to pay money to Samantha Sais, the wife of former Treasurer Montoya.  See Response at 6, filed June 8, 2006

---

[1] The parties have not submitted complete transcripts of the trial to the Court to aid it in deciding these motions.  The Court's discussion of the evidence is based on those transcripts that have been made available to it by the trial's Court Reporter in the time since the trial ended.

(Doc. 232); Transcript of Hearing at 4:4-11 (taken June 14, 2006).[2]  The Court will thus analyze each

in turn, keeping in mind that the Court must ask only whether taking the evidence -- both direct and

circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most

favorable to the United States, a reasonable jury could find the defendant guilty beyond a reasonable

doubt.  See United States v. Stiger, 413 F.3d at 1193.  The Court must refrain from examining the

evidence in bits and pieces, and must instead evaluate the sufficiency of the evidence by considering

the collective inferences to be drawn from the evidence as a whole.  See United States v. Brooks, 438

F.3d 123.  The Court's role is to determine whether the evidence, if believed, would establish each

element of the crime.  See United States v. Delgado-Uribe, 363 F.3d at 1081.  The Court should not

enter a judgment of acquittal unless no reasonable juror could have found the defendant guilty.  See

United States v. Carter, 130 F.3d at 1439.

### A.   RACKETEERING ACTS FIVE THROUGH TWENTY-THREE AND COUNTS VII-XXV.

Vigil contends that the United States did not present, at trial, sufficient evidence to prove that

he wrongfully obtained money from Nelson under color of official right, because the United States

did not show a quid pro quo between the two men.  See Motion to Dismiss at 4-7 (Doc. 196);

Motion to Dismiss at 4-7 (Doc. 208).  Judge Parker required that the United States prove that Vigil

obtained a payment to which he was not entitled, knowing that the payment was made in return for

official acts.  See Memorandum Opinion and Order at 18.  The United States responds that the

testimony of Garcia and Nelson, along with evidence of Vigil's knowledge of and participation in a

similar scheme during his predecessor's term, establishes the requisite quid pro quo.  See Response

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

at 6-15.

Taking the evidence in the light most favorable to the United States, the United States introduced enough evidence for a reasonable jury to convict Vigil on these Racketeering Acts and Counts.  To show a Hobbs Act violation, the United States had to prove that: (i) Vigil wrongfully obtained or attempted to obtain property from another with that person's consent; (ii) Vigil did so under color of official right; and (iii) Vigil's conduct interfered with or affected interstate commerce. See Tenth Circuit Criminal Pattern Jury Instruction 2.71, at 232.  Regarding the under color of official right element, the United States had to demonstrate that Vigil obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts. See Memorandum Opinion and Order at 18.

Vigil asserts that Nelson's testimony that Nelson had no specific agreement with Vigil to pay Vigil a portion of the commissions in return for state business dooms these charges, because the United States has therefore failed to prove the quid pro quo requirement of the under color of official right element. See Motion to Dismiss at 4-6 (Doc. 196); Motion to Dismiss at 5-7 (Doc. 208).  Vigil also points to Nelson's testimony that: Vigil never told Nelson that campaign contributions to Vigil were a requirement of getting future business; Nelson's payments to Garcia were not an attempt to bribe Vigil, but a part of legitimate fee splitting; and Vigil never asked Nelson for money. See Motion to Dismiss at 4-5 (Doc. 196); Motion to Dismiss at 5 (Doc. 208).

If these highlighted portions of Nelson's testimony were the sum of the United States' evidence, then Vigil's argument – that the United States failed to prove the elements of a Hobbs Act violation – might have force.  The evidence presented at trial, however, was more extensive than Vigil implies.

Montoya's testimony explained the scheme that he devised and implemented to fleece brokers of a percentage of their commissions in exchange for sending future business their way.  See Transcript of Testimony of Michael Montoya at 8:25-9:7 (taken April 18, 2006).  Apparently finding no shortage of willing participants in his plan, Montoya continued using his office for pecuniary gain through several different brokers before reaching Nelson.  See id. at 15:10-22; 18:15-21:7; 31:17-20.  Upon hiring Nelson as an investment adviser, Montoya set up a similar division of fees with him as with the prior associates; Nelson would give cash to Garcia, Garcia would pass it along to Leo Sandoval, and Sandoval would drop it off with Montoya.  See Transcript of Testimony of Michael Montoya at 91:6-92:3 (taken April 19, 2006).  Montoya preselected Nelson for the position and told Vigil that he wanted Nelson to score highly on the evaluation process, even though Nelson was not the most qualified person for the job.  See id. at 97:18-23, 109:4-13, 110:3-111:1, 112:14-113:5.

Vigil told Montoya in 2000 that questions were being raised about Nelson.  See id. at 132:1-4.  Also, as Montoya's term was winding down, Vigil told Montoya that Vigil would run all of his investments through Montoya; Montoya understood this to mean that Montoya would be able to serve as the intermediary between Vigil and the brokers during Vigil's term as Treasurer, just as Garcia was the intermediary during Montoya's years in power in Santa Fe.  See id. at 182:1-183:6.  Montoya believed that this statement meant that Montoya would have to pay Vigil for this privilege.  See id.

Vigil also explained to Montoya that he would use more than one adviser, which Montoya interpreted as describing an arrangement whereby Vigil would receive money from more than one source to "spread the risk."  Id. at 183:-184:17.  Garcia testified that Vigil told him, during a campaign trip in October 2002, that Vigil could help Garcia by instituting a "rotation" of advisers,

-10-

so that Garcia would receive a portion of the brokers' commissions.  Transcript of Testimony of Angelo Garcia at 107:4-109:20 (taken May 2, 2006).  Vigil told Garcia that, if Garcia could find three brokers, Garcia would get a portion of each transaction from the brokers.  See id. at 109:21-110:3. Garcia understood that he would then have to share the money with Vigil by supporting him politically.  See id. at 110:4-22.

Garcia told Vigil that he had been working with Nelson and that Nelson had been dealing with Montoya.  See id. at 110:23-111:6.  At a later time, Garcia showed Vigil "exactly how we were disbursing fees to Michael Montoya, the percentages and everything that he was getting, and I told him that we would work out the same transactions that Michael had, [Vigil] would be receiving the same thing."  Id. at 111:23-112:4.  "[T]he same thing" meant that Vigil would receive thirty percent of the commissions.  Id. at 112:5-11.

Garcia explained that it was his understanding that Nelson's payment of money to Vigil through Garcia was a condition of Nelson continuing to do business with Vigil and the Treasurer's Office.  See Transcript of Testimony of Angelo Garcia at 158:1-12 (taken May 3, 2006).  Garcia testified that Vigil knew, by the summer of 2002, that money that Nelson, Garcia, and Montoya gave to Vigil's campaign came from kickbacks.  See Transcript of Cross Examination and Redirect Testimony of Angelo Garcia at 121:2-122:20 (taken May 8, 2006).

Nelson laid out the terms of his deal with Garcia as it existed during the Montoya era: Garcia would take seventy-five percent of the commissions, and Nelson would keep the remaining twenty-five percent.  See Transcript of Testimony of Kent Nelson at 19:17-20:9 (taken April 25, 2006). Nelson understood that Garcia had access to the Treasurer and that Nelson was paying Garcia for assistance in getting work from the Treasurer's Office.  See id. at 64:20-66:5.  Montoya led Nelson

to believe that Nelson would be able to continue doing investment work for the Treasurer's Office after Vigil was elected in 2002.  See id. at 69:17-70:8.  When Nelson worked for the Treasurer's Office in 2003-04, he shared fees with Garcia in "[a]pproximately the same way" as during the Montoya years, except that Nelson was getting a larger share – fifty percent instead of twenty-five percent – of the commissions than before Vigil took office.  Id. at 83:21-84:10.

Sandoval testified about a conversation he had with Vigil during the latter's service as Deputy Treasurer.  See Transcript of Testimony of Leo Sandoval at 68:4-69:24 (taken April 24, 2006).  Vigil told Sandoval that Vigil did not understand "why Michael [Montoya] did this thing with the investment adviser."  Id. at 68:4-14.  Sandoval understood Vigil to be referring to the kickback scheme between Montoya and Nelson.  See id. at 69:5-10.  Vigil then explained to Sandoval that he would have set up a nonprofit organization to host workshops or conferences; the organization would contract out for speakers, and Vigil would receive money from those speakers.  See id. at 68:16-23.

From this evidence, a reasonable jury could conclude, beyond a reasonable doubt, that Vigil obtained these payments knowing that the payments were made in return for official acts.  The evidence showed that Montoya set up a kickback scheme whereby the Treasurer would give business to brokers who paid a portion of their commissions to Montoya in exchange for that business.  The jury could have determined that Vigil knew about the kickback scheme that Montoya had devised, because Garcia testified that he had shown Vigil how the money went from Nelson to Montoya and the percentage of money that Montoya received from Nelson, and Vigil told Sandoval that he did not understand why Montoya engaged in the kickback scheme with Nelson.  The jury could also have concluded that Vigil agreed to accept payments for the same purpose, because Garcia told Vigil that

he would set up the same arrangement with Vigil as with Montoya.  In addition, Vigil indicated to both Montoya and Garcia that he intended to continue the fee-sharing arrangement, except that Vigil led each man to believe that he would be the intermediary.  Furthermore, Garcia understood that he would be obligated to financially support Vigil's political career in exchange for taking fees from brokers.  Finally, Nelson testified that he had paid Garcia for receiving business during the Montoya administration, and that the fee-sharing arrangement continued in approximately the same way during the Vigil years as it had during the Montoya years.

Vigil argues that this evidence is unpersuasive, because Nelson denied, on cross-examination, that he had a specific agreement with Vigil to pay the Treasurer for the right to do business, or that Vigil asked or required Nelson to give him money.  <u>See</u> Motion to Dismiss at 4-6 (Doc. 196); Motion to Dismiss at 5-7 (Doc. 208).  Vigil maintains that Nelson thereby denied the existence of one of the essential elements of the crime, dealing a body blow to the United States' case.  <u>See</u> Motion to Dismiss at 4-6 (Doc. 196); Motion to Dismiss at 5-7 (Doc. 208).  Also, Vigil characterizes Garcia's testimony as summary in nature, and asserts that what Garcia understood to be the arrangement with Vigil is irrelevant.  <u>See</u> Motion to Dismiss at 6 (Doc. 196); Motion to Dismiss at 6 (Doc. 208). Finally, Vigil notes that Garcia did not testify that Vigil knew he was being bribed or that Vigil stated that Nelson must siphon off part of his commission to keep in Vigil's good graces.  <u>See</u> Motion to Dismiss at 6 (Doc. 196); Motion to Dismiss at 6 (Doc. 208).

Vigil's argument fails to carry the day, because it misapprehends the law in two ways.  First, it misunderstands the role of the Court on a motion for judgment of acquittal.  Vigil asks the Court to cherry pick the testimony of the witnesses, keeping the bits and pieces in his favor while discarding the evidence that tends to prove his guilt.  To decide in Vigil's favor, the Court must ignore the

-13-

evidence, outlined above, that establishes the quid pro quo requirement beyond a reasonable doubt. The Tenth Circuit, however, has enjoined district courts from deciding such motions on isolated parcels of the evidence alone; instead, district courts must consider the collective inferences to be drawn from the evidence as a whole.  See United States v. Brooks, 438 F.3d at 123.  Here, the evidence that the United States introduced at trial includes testimony by Montoya, Nelson, and Garcia that showed that Vigil undertook the same kickback scheme as Montoya did for the same purpose.

To the extent that tension exists between Nelson's description of his financial activities and his denials on cross-examination that he ever had a specific deal with Vigil to commit bribery, Vigil wants the Court to resolve this conflict in his favor.  Yet it is the jury's role, not the Court's, to resolve conflicting testimony and weigh the evidence.  See United States v. Stiger, 413 F.3d at 1194. Besides, if the Court must cut a testimonial Gordian knot, it must do so in favor of the United States, because the Court must take the evidence in the light most favorable to the United States.  See id. at 1193.  In this case, the most favorable interpretation of the evidence that is obtainable beyond a reasonable doubt is that Vigil knew that Montoya skimmed money from Nelson's commissions in exchange for business and adopted a similar understanding with Nelson and Garcia.

Second, Vigil's argument requires the United States to prove more than necessary to win a conviction under the Hobbs Act.  Vigil demands that the United States show that Nelson and Vigil expressly articulated the contours of their alleged arrangement each time Nelson funneled money to Vigil.  The Hobbs Act mandates, however, only that the United States prove that Vigil obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts. See Evans v. United States, 504 U.S. at 268.  Justice Anthony Kennedy explained that "otherwise

-14-

the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." Id. at 274 (Kennedy, J., concurring). Vigil's argument would leave the door open for public officials to commit the very acts that Congress sought to prohibit, so long as the principals do not commit to words the unlawful objectives they have in mind. The Hobbs Act cuts off such a possibility by implying the existence of the quid pro quo from the fact that the public official accepts the payment with the knowledge of the intent behind the payment.

The United States shouldered its burden on this element by showing that Nelson intended to buy access to the Treasurer's Office with part of his commissions, and that Vigil knew how Montoya's operations worked and continued them in approximately the same way. The jury could reasonably infer from this evidence that Vigil accepted the payments from Nelson while knowing the purpose behind them, thereby establishing the requisite quid pro quo between the two of them.

## B.    RACKETEERING ACTS TWENTY-FOUR THROUGH TWENTY-FIVE AND COUNTS XXVI-XXVII.

Racketeering Act Twenty-Four and Count XXVI concern a taped conversation between Nelson and Vigil on May 2, 2005. During the conversation, Nelson handed Vigil $10,000.00 and asked for more work from Vigil. See Session Two of Transcript of Taped Conversation at 7 (taped May 2, 2005)("NELSON: You don't have anything right now? There's $10,000."). Vigil then told Nelson:

> Not anything that's uh that's uh uh but we'll see, I mean, but we'll have something, we'll work, you know, just in just one more month, you know, we're gonna get the trans. . . ,  maybe we can do a little bit on that. . . . And, and it's gonna, I mean, I don't know, that's why uh, I mean it's gonna, it's gonna get, it's gonna get better, I mean that's all I can say.

Id. at 7-8.

Vigil told Nelson that he would "try to work" a deal for Nelson.  Session Three of Transcript of Taped Conversation at 13 (taped May 2, 2005).  Later, as Vigil and Nelson took their leave of each other after dinner, Vigil told Nelson: "The one, the, we have that option if it pans through, if not, if not, after uh we return the money to this tax repo, we might do something with that bond money. . . . For sure, we're gonna have something in the next month-and-a-half, but hopefully sooner than that, okay."  See Session Seven of Transcript of Taped Conversation at 19 (taped May 2, 2005).  At trial, Nelson understood Vigil to be offering him a particular deal during the May 2nd conversation. See Transcript of Testimony of Kent Nelson at 304:20-305:5 (taken April 26, 2006).

Vigil contends that the United States failed to prove the quid pro quo requirement as to this incident, because Nelson testified that Vigil did not explicitly promise him any business.  See Motion to Dismiss at 7 (Doc. 196); Motion to Dismiss at 7 (Doc. 208).  Vigil asserts that, without an explicit promise of business, the United States cannot convict Vigil.  See id.  A reasonable jury, however, could find that Vigil obtained Nelson's money, knowing that Nelson gave it to him in return for official acts, because Nelson linked the money with his desire to get more business.  See Session Two of Transcript of Taped Conversation at 7 ("NELSON: You don't have anything right now?  There's $10,000.").

Vigil told Nelson that he would have something for Nelson "[f]or sure" in the next month and a half.  Session Seven of Transcript of Taped Conversation at 19.  While Vigil did not say that he would trade Deal X for the $10,000.00, a reasonable jury could infer that Vigil knew that, as a result of the payment, he was expected to exercise particular kinds of influence on Nelson's behalf, namely to send more business opportunities Nelson's way.  See Memorandum Opinion and Order at 19.

-16-

Indeed, Nelson testified that he understood Vigil to be offering a particular deal, and a reasonable jury could credit his interpretation of this event.  See Transcript of Testimony of Kent Nelson at 304:20-305:5 (taken April 26, 2006).

Racketeering Act Twenty-Five and Count XXVII concern a taped conversation between Nelson and Vigil on August 24, 2005.   That day, Nelson and Vigil went to a racetrack in Albuquerque, with the FBI surreptitiously tagging along through a recording device.   See id. at 207:12-18.  Nelson offered Vigil $5,000.00 from the last deal in which Nelson had been involved: "So listen uh, that's what I got, I got five grand[,] wasn't a very big deal . . . you gave me." Transcript of Taped Conversation at 14 (taken August 24, 2005).

Vigil responded that $5,000.00 was too much money, leading to the following exchange:

NELSON:  I typically gave Angelo uhm 50 percent of what I got and it's not 50 percent, but it's . . .

VIGIL:  I know, no ah well I don't wanna put you out or anything, cause I want you to, I wanted you to write some checks to some people for me.

NELSON: Okay.

VIGIL:  Uhm, but . . .

NELSON:  But you know what I want Robert, I want a bigger deal, you know what I mean, I wanna . . .

VIGIL: Well we're . . .

NELSON: [B]ig . . .

VIGIL:  [B]e more consistent now, we just haven't, I'll show you, I should take some of my stuff and show you what we're doing, what we're doing but . . . yeah, I mean, you know I appreciate what you do for me, you know, it's just . . .

NELSON:  Well I appreciate what you do.

-17-

See id. at 14-15.  Nelson asked how much Vigil needed, and Vigil then explained that he wanted Nelson to write checks directly to certain candidates for office.  See id. at 15.  Finally, Vigil requested $2,000.00 from Nelson; Nelson, who apparently had trouble counting in this stressful situation, gave Vigil $1,900.00 by accident.  See id. at 16; Transcript of Testimony of Kent Nelson at 194:11-15 (taken April 26, 2006).

Vigil attacks the sufficiency of this evidence by arguing, as he did with the May 2nd recording, that the recording gives "absolutely no evidence" of a quid pro quo between Vigil and Nelson.  See Motion to Dismiss at 7 (Doc. 196) (emphasis in original); Motion to Dismiss at 8 (Doc. 208)(emphasis in original).  Vigil's argument might have more force, if one ignored the transcript of the August 24th meeting and Nelson's testimony about it.  Examining those sources, however, reveals that the picture is not as one-sided as Vigil makes it out to be.

Nelson offered Vigil a sizeable sum that was linked with the last business transaction.  See Transcript of Taped Conversation at 14 (taken August 24, 2005).  When Vigil commented on the amount of money that Nelson proposed to give him, Nelson explicitly linked the money to the scheme with Garcia whereby Nelson would give Garcia fifty percent of his commission and keep the remaining fifty percent; Vigil responded that he knew about Nelson's fifty-fifty split with Garcia.  See id. at 14 ("NELSON:  I typically gave Angelo uhm 50 percent of what I got and it's not 50 percent, but it's . . . VIGIL:  I know. . . ." (emphasis added)).  Nelson then told Vigil that he wanted a "bigger deal."  Id.  Soon afterward, Vigil accepted what he thought was $2,000.00 from Nelson.  Id. at 16; Transcript of Testimony of Kent Nelson at 194:2-6.

Taking all reasonable inferences from this evidence in the light most favorable to the United States, although Vigil made no "explicit promise" to Nelson in the August 24th conversation, a

reasonable jury could find that Vigil obtained the money from Nelson, knowing that Nelson made the payment in return for Vigil's use of the Treasurer's Office to give him further business in the future -- a finding that satisfies the Hobbs Act.  The jury could have determined that Nelson intended to purchase Vigil's influence over investment work from the Treasurer's Office, because Nelson stated that he was giving Vigil the money as he had to Garcia in the past and because Nelson testified at the trial that he had paid Garcia for assistance in getting work from the Treasurer's Office.  See Transcript of Taped Conversation at 14 (taken August 24, 2005); Transcript of Testimony of Kent Nelson at 64:20-66:5 (taken April 25, 2006).  The jury could have determined that Vigil knew about Nelson's purpose in making payments to Garcia based on the evidence outlined above in Part I.A, on Vigil's comment that he knew about Nelson and Garcia's fee-sharing arrangements, and on Nelson's statement that he wanted a more lucrative deal next time.  See supra Part I.A; Transcript of Taped Conversation at 14 (taken August 24, 2005).  Because the jury could have found in the United States' favor on Racketeering Acts Twenty-Four and Twenty-Five and Counts XXVI-XXVII, the Court will not grant a judgment of acquittal on those Racketeering Acts and Counts.

### C.       RACKETEERING ACT TWENTY-SIX AND COUNT XXVIII.

Racketeering Act Twenty-Six and Count XXVIII focus on the alleged attempted extortion of Everage in the summer of 2005.  At trial, Everage testified that he had researched, while working in the Treasurer's Office, whether it should dabble in securities lending, whereby the Treasurer's Office would loan out the securities that it held to earn a higher rate of return on those instruments.  See Transcript of Testimony of George Everage at 17:6-19:1 (taken April 19, 2006).  Vigil decided to take the plunge into this new arena of investment, by creating a position known as a SLOM who would oversee the Treasurer's Office's securities lending.  See Transcript of Testimony of George

Everage at 36:18-37:22 (taken April 20, 2006).

Vigil determined that the best way to fill the position was to publish a Request for Proposals ("RFP") in Albuquerque newspapers to allow members of the public to bid on it. See id. at 37:2-7, 40:17-17-22, 45:22-46:8. Everage left the Treasurer's Office so that he could submit a proposal, under the RFP, to be the SLOM. See id. at 42:4-15. Everage lodged his proposal with the Treasurer's Office in early May 2005, but the Assistant Deputy State Treasurer, who worked for Vigil, informed Everage that his proposal would not be considered unless Sais was included. See id. at 50:9-52:15.

After determining that Sais "knew nothing about securities lending," Everage decided not to hire her if he obtained the SLOM position. Id. at 54:2-11. Over time, however, Vigil became more insistent that Everage reach an understanding with Sais "that would keep her happy." Id. at 56:5-10. Vigil told Everage that the SLOM position would "die" if Everage did not make an arrangement with Sais. Id. at 67:15-68:12. The Assistant Deputy State Treasurer told Everage that working with Sais was a requirement for the SLOM position. See id. at 85:20-86:20.

On June 13, 2005, Vigil told Everage that the latter's proposal – which would give Sais a percentage of Everage's net revenue – was not acceptable and that Everage had to offer Sais a percentage of his gross revenue, or else the deal would fall apart in the next few minutes. See id. at 101:4-116:15, 228:2-10. Everage also received a letter from the Treasurer's Office giving, according to Everage, an ultimatum to hire Sais or lose the contract. See id. at 143:1-18. After speaking again with the Assistant Deputy State Treasurer, Everage concluded that the deal was "dead." Id. at 121:14-17.

Vigil argues that the evidence – or lack thereof – warrants a judgment of acquittal on four

grounds.  First, Vigil contends that the evidence showed that Everage did not lose any property to Vigil and, conversely, Vigil did not obtain any property from Everage, resulting in a lack of evidence on the first element of the Hobbs Act: the obtaining of property from another with that person's consent.  See Motion to Dismiss at 7-8 (Doc. 196); Motion to Dismiss at 8-9 (Doc. 208).  This line of reasoning fails to take into account, however, that the United States pled Racketeering Act Twenty-Six and Count XXVIII as *attempted*, not completed, extortion, which the statute also prohibits.  See Fourth Superseding Indictment at 20-21, 26; 18 U.S.C. § 1951(a).  As Judge Parker instructed the jury, the United States did not have to prove that Vigil did "all of the acts necessary in order to commit the crime."  Court's Instructions to the Jury at 41; Tenth Circuit Criminal Pattern Jury Instruction 1.32, at 52.  To require that the United States must prove that a defendant actually extorted property, when that defendant is charged only with attempt, would deprive potential victims of extortion of protection until the extortionist has successfully wrung his unlawful gains from his prey.

Next, Vigil argues that he could not have attempted to obtain Everage's property, because Everage had no property to obtain.  See Motion to Dismiss at 7-8 (Doc. 196); Motion to Dismiss at 8-9 (Doc. 208).  Vigil's argument boils down to the fact that Everage had not yet earned any commissions on the SLOM contract and so there was nothing, according to Vigil, for him to extort from Everage.  See id.  Again, Vigil confuses the completed crime of extortion with attempt, with the latter requiring that the United States prove that Vigil intended to commit extortion and took a substantial step toward committing the crime.  See Court's Instructions to the Jury at 41; Tenth Circuit Criminal Pattern Jury Instruction 1.32, at 52.

A reasonable jury could have found that Vigil intended to obtain property from Everage, in

the form of commissions, by requiring Everage to pay Sais a certain percentage of those commissions. See Transcript of Testimony of George Everage at 50:9-52:15, 67:15-68:12, 85:20-86:20, 101:4-116:15, 228:2-10.  A reasonable jury could also have determined that Vigil, by threatening that Everage would not receive the SLOM contract unless he agreed to this arrangement, took a substantial step toward committing the crime.  See id.  In fact, the only steps remaining before Vigil obtained Everage's money were Everage's agreement to the extortion and the payment of Everage's commissions to Sais.

Vigil likens the property in this case – Everage's commissions – to the property in Scheidler v. NOW, Inc., 537 U.S. 393 (2003), where the plaintiffs sued groups of abortion protesters, who were disrupting the operations of abortion clinics, for extortion under the Hobbs Act.  See id. at 397-98.  The plaintiffs argued that the protesters had obtained property from the clinics, because the protestors' activities interfered with and sought control over the clinics' use and disposition of their land.  See id. at 401.  The Supreme Court held that adopting the clinics' interpretation of the phrase "obtaining of property from" would be an "unwarranted expansion" of that term, because the protestors did not actually obtain the clinics' property.  Id. at 402-405.  While the protestors may have sought to deprive the clinics of the exclusive control of their property, the protestors did not obtain any property, nor did they seek or receive something of value from the clinics.  Id. at 405. "[M]erely interfering with or depriving someone of property," the Supreme Court concluded, is insufficient to qualify as extortion – obtaining the property itself is required.  Id.

This case is distinguishable from Scheidler v. NOW, Inc., because a reasonable jury could have concluded here that Vigil attempted, not only to interfere with or deprive Everage of his money, but also to obtain it for another at Vigil's direction.  Vigil demanded that Everage *give* a percentage

-22-

of his money to Sais, thereby crossing the line between interfering with property and attempting to obtain it. See Transcript of Testimony of George Everage at 50:9-52:15, 67:15-68:12, 85:20-86:20, 101:4-116:15, 228:2-10 (taken April 20, 2006). Unlike the protestors in Scheidler v. NOW, Inc., who did not attempt to obtain the clinics themselves, Vigil attempted to obtain Everage's money itself. See id.

Third, pointing to the requirement that Vigil must attempt to obtain the property "wrongfully," Vigil asserts that there was nothing wrongful about his dealings with Everage, because they were part of contract negotiations where each side was attempting to bargain with the other for a deal most advantageous to him. Transcript of Hearing at 9:5-10:11, 11:23-12:10, 17:1-9. Vigil contends that recognizing his interactions with Everage as extortion would open the floodgates to the criminalization of most legitimate business negotiations. See id. Vigil argues that, as a state official rather than as a person in the private sector, he could put any condition that he wanted on a contract or offer, and his request that Everage hire Sais was no different than other state contracts or RFPs that require the hiring or use of specific persons. See id.

While Vigil is free to argue to the jury that his discussions with Everage were run-of-the-mill contract negotiations, a reasonable jury could have found otherwise, because the evidence at trial demonstrated that Vigil's actions violated the RFP in two ways. First, the RFP prohibited the prime contractor from subcontracting the SLOM work to other parties: "All work that may result from this procurement must be performed by the prime contractor. Subcontracting of work is not acceptable." RFP at 7. Everage testified that hiring Sais, as Vigil mandated for Everage to receive the SLOM contract, would have violated this provision, because she would have been a subcontractor. See Transcript of Testimony of George Everage at 47:3-49:8 (taken April 20, 2006).

Second, the RFP commands that "[a]ny additional terms and conditions, which may be the subject of negotiation, will be discussed only between the [Treasurer's Office] and the selected offeror and shall not be deemed an opportunity to amend the offeror's proposal."   RFP at 10. Everage testified that this meant that any additional terms must be discussed between the Treasurer's Office and the offeror – in this case, Everage.  See Transcript of Testimony of George Everage at 49:9-50:5 (taken April 20, 2006).  Everage explained that Vigil had discussed having Everage hire Sais with Sais and that these discussions violated the RFP, because they were not taking place between the Treasurer's Office and Everage.  See id. at 68:15-70:7.

Taking this evidence in the light most favorable to the United States, a reasonable jury could have believed, beyond a reasonable doubt, that Vigil's "negotiations" were wrongful.  There is evidence that Vigil did not merely place a condition in the RFP, or impose a condition on all bidders, that the successful bidder hire Sais.  Instead, the jury could have concluded that Vigil attempted to wrongfully impose that condition on one bidder.

Vigil's next assault on the sufficiency of the evidence regarding Everage is that the United States did not prove that Vigil's actions interfered with or affected interstate commerce.  See Motion to Dismiss at 8-9 (Doc. 196); Motion to Dismiss at 9-10 (Doc. 208).  Vigil points out that the main actors in this drama – Vigil, Sais, and Everage – were all from New Mexico and that Vigil's conduct did not have "even a minimal effect on interstate commerce."   Id.

The Court's Jury Instructions required the jury to find that "the natural and probable consequence of the acts the defendant took would be to affect interstate commerce."   Court's Instructions to the Jury at 31.  Considering the collective inferences to be drawn from the evidence as a whole, a reasonable jury could make such a determination.  See United States v. Brooks, 438

F.3d at 123.   Everage explained to the jury that the SLOM would oversee the lending out of securities that the Treasurer's Office held in its portfolio, including agency paper and bonds.  See Transcript of Testimony of George Everage at 17:6-19 (taken April 19, 2006).  Montoya testified that the financial instruments in which the Treasurer's Office dealt crossed state lines, because Montoya stated that they involved calls to "Wall Street."  Transcript of Testimony of Michael Montoya at 21:3-7 (taken April 18, 2006); Transcript of Testimony of Michael Montoya at 120:19-121:25 (taken April 19, 2006).  The jury could have made a reasonable inference that Everage's financial transactions, as SLOM, would have fallen into line with these interstate transactions and thereby affected interstate commerce, but for Vigil's actions in not hiring Everage.

In a late-breaking development, Vigil filed, a week after the Court held a hearing on his motions, a reply outlining a new argument that his counsel explicitly abjured at the hearing: that application of the Hobbs Act to Vigil's actions regarding Everage violated the Due Process Clause of the Fifth Amendment to the United States Constitution.  See Reply at 2, filed June 21, 2006 (Doc. 239); Transcript of Hearing at 18:3-7.  Vigil contends that the Hobbs Act does not provide sufficient notice that "hard bargaining" can be a wrongful attempt to obtain property under the statute.  Reply at 5-6.  At this juncture, the Court need not decide whether the Hobbs Act reaches simple contract negotiations between two parties or whether such an application renders the statute unconstitutional due to vagueness, because the United States' evidence has shown that Vigil engaged in more than hard bargaining.  Indeed, the evidence demonstrated that Vigil attempted an end run around the RFP by imposing a condition on Everage that the RFP prohibited and allowing negotiations between the Treasurer's Office and a third party.  A reasonable jury could have found that this is more than one party attempting to extract the best bargain that he can out of a negotiation; instead, a reasonable jury

-25-

could have concluded that Vigil wrongfully used his official position to circumvent the RFP and wrongfully obtain that which state law did not allow.

## II.    THE COURT WILL DENY VIGIL'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE RICO COUNTS.

Vigil moves separately for a judgment of acquittal on Counts I and II.  See RICO Motion for Judgment of Acquittal at 1.  The Court will deny the motion on both Counts.  The United States introduced sufficient evidence on each one.

### A.    COUNT I.

Count I charges Vigil with violating the RICO statute.  See Fourth Superseding Indictment at 3-21.  To prove a violation of RICO, the United States had to show: (i) an enterprise existed as alleged in the Fourth Superseding Indictment; (ii) the enterprise engaged in, or its activities affected, interstate commerce; (iii) Vigil was associated with or employed by the enterprise; (iv) Vigil engaged in a pattern of racketeering activity; and (v) Vigil knowingly conducted or participated in the conduct of the enterprise through that pattern of racketeering activity.  See Court's Instructions to the Jury at 26.  Vigil maintains that the United States failed to prove the fourth and fifth elements.

For the same reasons that Vigil contends that Racketeering Acts Five through Twenty-Six are not extortion or did not occur under the Hobbs Act, Vigil argues that there is not sufficient evidence that these acts are a pattern of racketeering activity or that Vigil participated in the conduct of the enterprise under RICO.  See RICO Motion for Judgment of Acquittal at 3-7.  In essence, Vigil argues that the United States has not shown that these acts, which are also charged as Counts VII-XXVIII, are extortion or that Vigil engaged in these acts.  See id.  Because a reasonably jury could have concluded that these Racketeering Acts are extortion and that Vigil participated in these acts, for the

same reasons that a reasonable jury could have found their corresponding charged Counts to be extortion and that Vigil participated in those charged Counts, the Court will deny the motion as to that argument.

Vigil next asserts that the United States did not show that Racketeering Act Twenty-Six, regarding Everage, was related to the other Racketeering Acts, because Everage had nothing to do with the alleged kickback scheme among Montoya, Garcia, Nelson, and Vigil. See id. at 6. To be related to each other, racketeering acts must have had the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and were not isolated events. See Court's Instructions to the Jury at 31.

Although the other Racketeering Acts involved separate people and different business before the Treasurer's Office, a reasonable jury could have found beyond a reasonable doubt that three links tied all of the Racketeering Acts together. First, all of the Racketeering Acts involved people having to pay for the privilege of doing business with the Treasurer's Office. The testimony demonstrated that Nelson had to pay Vigil to continue to receive investment work from the Treasurer's Office, see supra Part I.A-B; similarly, the evidence showed that Vigil required that Everage pay an associate of Vigil's to obtain the SLOM contract, see supra Part I.C. The proceeds in both cases were used to enrich those connected with the Treasurer's Office, either Vigil through campaign contributions or Sais through a position in Everage's company. See Transcript of Testimony of Angelo Garcia at 110:4-22 (taken May 2, 2006). Finally, the Racketeering Acts concerned the investment work of the Treasurer's Office: Nelson paid commissions for his work on flexible repurchase agreements and Vigil told Everage to pay for his work on securities lending. See Transcript of Testimony of Kent Nelson at 64:20-66:5 (taken April 25, 2006); Transcript of Testimony of George Everage at 67:15-68:12

(taken April 20, 2006); Transcript of Testimony of George Everage at 17:6-19:1 (taken April 19, 2006). A reasonable jury could have found that these distinguishing characteristics connected these Racketeering Acts to such an extent that they were related to each other.

**B.      COUNT II.**

Count II charges Vigil with conspiracy to violate the RICO statute. See Fourth Superseding Indictment at 21-22. To prove a conspiracy, the United States had to prove the following: (i) an enterprise existed as alleged in the Fourth Superseding Indictment; (ii) the enterprise was engaged in, or its activities affected, interstate commerce; (iii) Vigil was employed by or associated with the enterprise; (iv) Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity; (v) Vigil knew at least the essential objectives of the conspiracy; (vi) Vigil knowingly and voluntarily participated in the conspiracy; (vii) there was interdependence among the members of the conspiracy. See Court's Instructions to the Jury at 34. Vigil contends that the United States did not prove that he knowingly agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity. See RICO Motion for Judgment of Acquittal at 7-8. While this argument does not fit neatly into any of the elements for conspiracy, it appears likely that Vigil is challenging either the fourth or sixth element. A reasonable jury could have found that Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy, because Garcia told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold

the SLOM contract from Everage.  See supra Part I.A-C.  Because the United States introduced sufficient evidence on each of the Counts of the Fourth Superseding Indictment that remain in this case, the Court will deny Vigil's motions.

**IT IS ORDERED** that Defendant Robert Vigil's Motion to Dismiss Racketeering Acts Five Through Twenty-Six and Counts Seven Through Twenty-Eight of the Fourth Superseding Indictment Under Fed. R. Evid. 29 (Doc. 196), Defendant Robert Vigil's Motion to Dismiss Racketeering Acts Five Through Twenty-Six and Counts Seven Through Twenty-Eight of the Fourth Superseding Indictment Under Fed. R. Evid. 29 (Doc. 208), and Defendant's Renewed Motion for Judgment of Acquittal on RICO Counts are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David C. Iglesias
   United States Attorney
Jonathon M. Gerson
Steven C. Yarbrough
   Assistant United States Attorneys
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Jason Bowles
B.J. Crow
Bowles & Crow
Albuquerque, New Mexico

– and –

Sam Bregman
Eric Loman
Bregman Law Firm
Albuquerque, New Mexico

      *Attorneys for the Defendant*