**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                  No. CR 05-2051
                                                                          JB

ROBERT VIGIL,

      Defendant.

**<u>MEMORANDUM OPINION</u>**

**THIS MATTER** comes before the Court on the Defendant's Motion to Transfer to Another District in Order to Ensure a Fair Trial, filed August 10, 2006 (Doc. 280).  Pursuant to counsel's agreement and request, the Court held a hearing on the motion on August 15, 2006 at which Defendant Robert Vigil presented evidence.  The primary issues are: (i) whether pretrial publicity in this case is so extreme, and whether the negative advertising related to the current First New Mexico Congressional District campaign in the state is so inflammatory, that combined with the theory of the government's case, the Court should presume prejudice against Vigil, and therefore a change of venue is required as a matter of law; and (ii) whether the responses that prospective jurors gave in their questionnaires are evidence of actual prejudice against Vigil, and therefore a change of venue is required as a matter of law.  At the hearing, the Court indicated that it was inclined to deny the motion.  Vigil's counsel asked the Court to issue an order that day so that Vigil could seek a writ of mandamus from the United States Court of Appeals for the Tenth Circuit directing the Court to transfer the case.  To accommodate Vigil's case, the Court entered an order denying his motion, but indicated that it would later issue an opinion more fully detailing its reasoning.  <u>See</u> Order Denying

Motion to Transfer to Another District in Order to Ensure a Fair Trial, filed August 15, 2006 (Doc. 288).  This opinion is the one promised.

## PROCEDURAL BACKGROUND

At the time of his arrest and initial indictment, Vigil was the acting New Mexico State Treasurer, which is a position elected by the people of New Mexico.  There is no question that media coverage of this criminal case has been extensive.  Indeed, since this case began, the United States' case against Vigil has been one of the most publicized and controversial matters in the District's history.  Since the first trial of Vigil ended in a mistrial, and as this case began moving toward a retrial, the intense press coverage has continued and has been mostly negative toward Vigil.

Furthermore, since the first trial, the United States Congressional campaigns of Representative Heather Wilson and her challenger, New Mexico Attorney General Patricia Madrid, have been advertising heavily in preparation for the November 2006 election.  Both candidates have run extensive television advertisement campaigns, both casting Vigil in a negative light.

To empanel a fair and impartial jury, the Court summoned 1,200 jurors from a venire comprised of citizens from all three of the District's Petit Jury Divisions: (i) Albuquerque/Santa Fe; (ii) Las Cruces; and (iii) Roswell.[1]  The Court summoned 400 prospective jurors from each division, meaning that no more than 400 will come from the northern part of the state and Albuquerque.  Most will come from southern and eastern New Mexico.  Indeed, given the population distribution in the

_____

[1]There are three petit jury divisions: (i) The Albuquerque/Santa Fe Division which includes Bernalillo, Cibola, Colfax, Harding, Los Alamos, McKinley, Mora, Quay, Rio Arriba, San Juan, San Miguel, Sandoval, Santa Fe, Socorro, Taos, Torrance, Union, and Valencia Counties; (ii) The Las Cruces Division which includes Catron, Doña Ana, Grant, Hidalgo, Luna, Otero and Sierra Counties; and (iii) The Roswell Division which includes Chaves, Curry, DeBaca, Eddy, Guadalupe, Lea, Lincoln, and Roosevelt Counties.  The population of New Mexico is approximately 1.8 million people.

state, it is more likely a prospective juror will be from Hobbs, Clovis, and/or Roswell -- the eastern side of the state-- than from Albuquerque, just one city in the large Albuquerque/Santa Fe Division. On August 8, 2006, Vigil received the first set of completed questionnaires that were returned by prospective jurors.[2]  A number of those prospective jurors stated in their questionnaires that they already believe Vigil to be guilty.

As a result of these factors, Vigil moves the Court to transfer the upcoming trial to a different judicial district, so that an impartial jury may be selected, and Vigil may receive a fair trial.  Vigil has suggested that the Court try this case in Durango or Denver, Colorado.[3]  Vigil states that, if the Court grants his motion, he will waive his right to a speedy trial.

---

[2]The Clerk's office distributed 629 completed questionnaires on August 8th and 243 more on August 11th.  The total that was received as of August 11th was 872.  Thirty-nine questionnaires were returned undeliverable, and 122 did not respond to the questionnaire.  The Clerk's office excused 107 under 28 U.S.C. § 1865(b): (i) Members of the Armed Forces on active duty; (ii) Members of professional fire and police departments; (iii) "Public officers" of the United States, state or local governments, who are actively engaged in the performance of public duties.  (A public officer is a person who is either elected to public office or who is directly appointed by a person elected to public office.  28 U.S.C. § 1869(i)); (iv) Volunteer safety personnel; (v) Not a citizen of the United States; (vi) Not at least 18 years old; (vii) No longer a resident of the judicial district; (viii) Not an English speaker; (ix) Not able to read, write, and understand English with the proficiency necessary to fill out a qualification form; (x) Not capable, by reason of mental or physical infirmity, to render satisfactory jury service; (xi) Has a pending felony charge or has a felony conviction (and civil rights have not been restored).  The Clerk's office disqualified another 44 because of: (i) planned vacation, which are often prepaid or have time-sensitive, non-refundable deposits; (ii) persons over 70 years of age, if they call reporting an excuse; and (iii) persons who have served as a grand or petit juror in a federal court within the last two years, if they call reporting an excuse.  Another twenty or so questionnaires have come in since August 11th.

[3]Although the United States objects to this motion, they have requested, that, if the Court were to grant the motion, the Court should choose a district: (i) that is capable of accommodating the trial of this case on the same schedule as is currently set; (ii) that can provide an electronic courtroom; and (iii) that is served by a major airport to accommodate the many witnesses that the United States will need to bring from locations all over the country.

**RULE 21(a) AND JURY IMPARTIALITY**

The Constitution, the Federal Rules of Criminal Procedure, and the trial court's discretion govern the situs of a trial of a federal criminal case.  The Sixth Amendment provides, in relevant part, that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."  U.S. Const., amend. VI.  Rule 18 of the Federal Rules of Criminal Procedure, titled "Place of Prosecution and Trial," states:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.  The court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18.  The Sixth Amendment and rule 18 accordingly provide for the trial of a federal criminal case to take place anywhere within the state and district where the crime is alleged to have taken place.

Rule 21(a) of the Federal Rules of Criminal Procedure permits a defendant to waive this vicinage requirement and to request transfer to another district.  Rule 21 allows transfers of districts for prejudice and states that the "court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  See 1944 Advisory Committee Notes to Rule 21 (stating that, by filing motion for change of venue, defendant waives constitutional right to trial in district where the offense was committed).

The determination whether rule 21's prejudice requirement is met, and the decision to transfer venue, is in the trial court's discretion and is reviewed for abuse of discretion.  See Goss v. Nelson,

439 F.3d 621, 627 (10th Cir. 2006) (stating that appellate court should overturn trial court's finding

regarding jury impartiality only in cases of manifest error); United States v. Pedraza, 27 F.3d 1515,

1525 (10th Cir. 1994); United States v. Abello-Silva, 948 F.2d 1168, 1176 (10th Cir. 1991).   The

trial judge is in the best position to evaluate the impact of pretrial publicity.  See Mu'Min v. Virginia,

500 U.S. 415, 427 (1991)("The judge of that court sits in the locale where the publicity is said to

have had its effect and brings to his evaluation of any such claim his own perception of the depth and

extent of news stories that might influence a juror."); United States v. Abello-Silva, 948 F.2d at 1176.

On review, an appellate court "must 'give great deference to the trial court's discretion.'"  United

States v. Abello-Silva, 948 F.2d at 1176  (quoting United States v. Tokoph, 514 F.2d 597, 606 (10th

Cir. 1975)).  The trial court's discretion is "entitled to a presumption of correctness and will not be

overturned unless there is a manifest error."  Id. (quoting United States v. Affleck, 776 F.2d 1451,

1454 (10th Cir. 1985)).

## LAW REGARDING PRETRIAL PUBLICITY

The Supreme Court of the United States has examined pre-trial publicity in two contexts–

circumstances where pre-trial publicity leads to a presumption of prejudice against a defendant and

circumstances where pre-trial publicity results in actual prejudice against a defendant.  See United

States v. McVeigh, 153 F.3d 1166, 1179 (10th Cir. 1998).  Prejudice will be presumed when pretrial

publicity "is so pervasive and prejudicial that [the Court] cannot expect to find an unbiased jury pool

in the community."  Goss v. Nelson, 439 F.3d at 628.  Actual prejudice exists when, as a result of

pretrial publicity, members of the particular jury panel are unable to be impartial.  See United States

v. McVeigh, 153 F.3d at 1183.

1. **Presumption of Prejudice.**

The presumption of prejudice is an extraordinary remedy, "rarely invoked[,] and only in extreme situations." United States v. Abello-Silva, 948 F.2d at 1177.  See Goss v. Nelson, 439 F.3d at 628 (noting that "[t]he Supreme Court has found presumed prejudice based on pretrial publicity in only three cases, all dating from the 1960s").  It is not sufficient that there simply be publicity related to the trial; rather, courts recognize that "[p]re-trial publicity in topical criminal cases is inevitable." United States v. Abello-Silva, 948 F.2d at 1176.  Thus, to establish the presumption of prejudice, a court must find that "pretrial publicity so permeated the community as to render impossible the seating of an impartial jury . . . [and] in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." United States v. McVeigh, 153 F.3d at 1181.  See Hale v. Gibson, 227 F.3d 1298, 1332 (10th Cir. 1994) (summarizing those cases in which the Supreme Court had presumed prejudice as those in which "'the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings,' and created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial")(internal citation omitted).  Only when a "trial atmosphere [has] been utterly corrupted by press coverage" can prejudice be presumed.  Goss v. Nelson, 439 F.3d at 631.

Not only is it the defendant's burden to establish the presumption of prejudice,  see Murphy v. Florida, 421 U.S. 794, 800 (1975)("[I]t remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'"), but "the bar facing the defendant wishing to prove presumed prejudice from pretrial publicity is extremely high." United States v. McVeigh, 153 F.3d at 1182.  See Stafford v. Saffle, 34 F.3d 1557, 1566

(10th Cir. 1994) (describing defendants' burden of proof as "a difficult standard, even in cases in which there has been extensive media coverage").  To do so, the defendant must "establish[] that an irrepressibly hostile attitude pervade[s] the community" to such a degree that "it dictates the community's opinion as to guilt or innocence."  United States v. Abello-Silva, 948 F.2d at 1176 (citing Estes v. Texas, 381 U.S. 532, 536 (1965)).

In determining whether the defendant has satisfied his burden of proof, the Tenth Circuit has recently enumerated two legally relevant factors: "(a) the nature of the publicity and its temporal nexus to the trial, and (b) the effect of the publicity on the potential jury pool."  Nelson v. Goss, 439 F.3d at 631.  In applying the first factor, the Tenth Circuit in Nelson v. Goss considered the magnitude of media coverage, the geographic distribution of the coverage, the frequency with which media accounts were published or distributed, and the editorial disposition of those accounts, i.e., whether the coverage was predominantly factual or sensational and inflammatory.  See id. at 631-33. In applying the second factor, the Tenth Circuit considered the size of the community from which the jurors were to be drawn, the amount of time between the publicity and the commencement of trial, and statements made by prospective jurors.  See id. at 633.

### 2. **Actual Prejudice.**

In determining whether actual prejudice exists, "[t]he trial court has broad discretion in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial."  See Stafford v. Saffle, 34 F.3d at 1567 (quoting United States v. Abello-Silva, 948 F.2d at 1177 (internal quotation omitted)).  In light of the pervasive and ubiquitous character of modern methods of communication and information dissemination, combined with the difficulty of eradicating juror prejudice once it has been established, "the trial courts must take strong measures to ensure that the

balance is never weighed against the accused." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). When publicity occurs before a trial, "the court and the defendant still have available powerful mechanisms to ensure juror impartiality, namely voir dire and the potential of a change in venue." United States v. McVeigh, 153 F.3d at 1183 n.5. Voir dire examination, in particular, is "[t]he proper occasion for determining juror partiality." United States v. Lamb, 575 F.2d 1310, 1315 (10th Cir. 1978).

Evidence that potential jurors are aware of a case, however, is not equivalent to a finding that they cannot be impartial in its adjudication. To the contrary, complete ignorance of a highly publicized case may be evidence that an individual is not ideally fit for jury service. See Stafford v. Saffle, 34 F.3d at 1567 ("[J]urors who are completely unaware of such a highly publicized trial would probably not be the best jurors."); United States v. Abello-Silva, 948 F.2d at 1178 ("Indeed, it is difficult to imagine how an intelligent venireman could be completely uninformed of significant events in his community.").

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961). All that is required is a showing that "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Murphy v. Florida, 421 U.S. at 800 (quoting Irvin v. Dowd, 366 U.S. at 723 (1961)). See Sheppard v. Maxwell, 384 U.S. at 362 ("Due process requires that the accused receive a trial by an impartial

jury free from outside influences.").

## ANALYSIS

Vigil moves the Court to change the district in which this matter is tried. Vigil contends that, because of the overwhelming negative pretrial publicity that he has received in New Mexico, it is impossible for him to receive a fair trial in this District. Because the Court believes that Vigil has not met his burden of showing the Court that the publicity and media attention related to this case are so nefarious as to make empaneling a fair jury impossible in this District, or that the media coverage has effectively displaced the judicial process, the Court finds that Vigil is not entitled to a presumption of prejudice. The Court also believes that it has effected adequate safeguards, in the form of a juror questionnaire, an enlarged venire, and the allowance of voir dire examination, to protect Vigil from actual prejudice.

## I.    VIGIL IS NOT ENTITLED TO A PRESUMPTION OF PREJUDICE.

While Vigil is careful to argue that it is a combination of factors-- not one factor-- that suggests a transfer, it is necessary to analyze each factor before deciding their impact on empaneling a jury. It should be kept in mind, however, that Vigil has indicated the triggering event for this motion was the receipt of the first batch of completed questionnaires. Vigil suggests that the responses support a finding of the presumption of prejudice.

### 1.    Media Coverage.

Vigil complains that extensive media coverage renders it impossible for him to receive a fair trial. With regard to the magnitude of the coverage, the Court agrees with both Vigil and the United States, and acknowledges that the intensity of the media coverage in Vigil's case has been virtually unprecedented in New Mexico. Nevertheless, in contemporary times, comprehensive media coverage

of topical criminal cases is a fact of life, and Vigil retains a heavy burden to prove that the character of that coverage, and its effect on the jury pool, are so insidious that they dictate the community's opinion of guilt or innocence.  See Stafford v. Saffle, 34 F.3d at 1566.  Simply proving that all, or virtually all, members of the venire have some awareness of the case will not sustain a presumption of prejudice.

The Supreme Court has found presumed prejudice based on pretrial publicity in only three cases, none since 1966, and all of which may be distinguished from Vigil's case.  In Rideau v. Louisiana, 373 U.S. 723 (1963), a twenty-minute long videotape of the defendant's jailhouse confession to participation in a crime involving bank robbery, kidnapping, and murder was repeatedly televised throughout the small Louisiana community in which the crime and the trial took place.  Id. at 723-34.  In the Supreme Court's view, these broadcasts not only affected the potential jurors that were exposed to them, but in a very real sense, displaced the judicial process.

> For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial -- at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

Id. at 726 (emphasis in original).  The Supreme Court's result in Estes v. Texas, a case in which the pretrial publicity included not only reporting about the case, but included live coverage of important pretrial hearings, is based on similar reasoning.  The Supreme Court reasoned that the widespread broadcast of these pretrial proceedings, over the defendant's objection, conveyed to the community that was exposed to them, the "notorious character that the trial would take and, therefore, set it apart in the public mind as an extraordinary case." 381 U.S. at 548.  Finally, in Sheppard v. Maxwell, 384 U.S. 333 (1966), a murder case that garnered national media attention, the Supreme Court held

-10-

that a presumption of prejudice was established when the news media was not only permitted to report on the case, but was given a prominent place in the courtroom before and during the trial. 384 U.S. at 355 (observing that "bedlam reigned at the courthouse").

In light of the pervasive and direct effect that media publicity had on the actual court proceedings in all three of these cases, none of these cases has adequate precedential value to sustain Vigil's argument that media coverage of his case prohibits him from receiving a fair trial in this District.

> The proceedings in these [Supreme Court] cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about . . . news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

Murphy v. Florida, 421 U.S. at 799.  Vigil has not presented evidence, and the Court is not aware of any evidence, of media coverage documenting confessional statements made by Vigil or providing assurances of his guilt.  Nor does the Court believe that the solemnity or fairness of judicial proceedings has been compromised by the media attention which the case has received.

The Tenth Circuit has recently indicated that, in evaluating whether pretrial publicity has established a presumption of prejudice, a trial court should consider "the nature of the publicity and its temporal nexus to the trial."  Goss v. Nelson, 439 F.3d at 631.  The Court acknowledges that it is concerned by both the magnitude of the publicity being afforded Vigil's case, and the publicity's temporal proximity to his trial. The Tenth Circuit did not, however, indicate that the presence of considerable publicity around the trial date was enough to create the presumption of prejudice. Instead, the Tenth Circuit directed trial courts to consider these two factors.  The Tenth Circuit did not preclude the consideration of other factors.  The Court believes that several other factors counsel

against the extraordinary remedy of presuming prejudice.  First, and most important, although Vigil will be tried in Albuquerque, and Albuquerque is home to many of the largest media outlets that have expressed interest in this case, the pool of potential jurors in this case includes citizens from throughout the entire state.  New Mexico is a large geographic state, and Vigil has not presented evidence that all of its communities fall within the Albuquerque media market.  The state's second largest city, Las Cruces, is illustrative.  The judge was in Las Cruces for court duties last week and stayed in a chain hotel.  While there, he could not get Albuquerque television stations.  Much of the television and radio programming in that city is distributed through stations in El Paso; considering El Paso's location in Texas, and its distance from Albuquerque and New Mexico's political capital in Santa Fe, one can presume that there is less interest in covering Vigil's trial among El Paso news stations.

The judge is from Hobbs, and frequently visits family there.  While some Albuquerque stations are carried by cable providers in that area, people there often watch Lubbock, Odessa, and Midland stations.  Clovis' residents often watch Amarillo stations.  While the Court, the lawyers, and Vigil live in Albuquerque, and media coverage is intense here, Vigil has not attempted to measure the impact of media coverage of the trial in other areas of the state– from which most of the jury panel will come.

On Sundays, the Albuquerque Journal is distributed throughout the state,[4] but people in Hobbs, for example, often take as a second paper the Lubbock Avalanche-Journal rather than the Albuquerque Journal.  Certainly Associated Press stories run in many local newspapers, but Vigil has

_____

[4] The Albuquerque Journal has a Sunday circulation of about 150,000 copies, and a daily circulation of about 110,000 copies.

-12-

not documented that information.  Given that the large majority of people are going to come from the sourthern and eastern parts of the state-- not Albuquerque-- the Court does not have the ability, in the record before it, to judge the impression of pretrial publicity on citizens living outside of Albuquerque.  While the Court does not doubt that there has been coverage throughout the state, according to Vigil's submissions, 27% of the prospective jurors have indicated that they are not familiar with the case because of the media.  This large number of people who have not heard of the case suggests there may be parts of the state that are not receiving the coverage citizens in Albuquerque are receiving.

A second factor counseling against a presumption of prejudice is the relatively neutral content of the mainstream media coverage in Vigil's case.  Vigil's counsel, in support of their brief on this motion, have not submitted to the Court any news account that does more than document the allegations against Vigil.  In fact, of the two lengthier articles submitted to the Court, at least one includes extensive statements made by one of Vigil's attorneys in support of his defense.[5]  See Motion to Transfer, Exhibit E (Scott Sandlin, <u>AG Office: Treasurer's Past Post Fair Game</u>, Albuquerque J., Aug. 10, 2006, at A1.).  Vigil has not presented the Court with media accounts alleging Vigil to have a criminal history or that include heinous facts about his character or criminal predisposition.[6]

_____

[5]Consistent with the reasoning that the Court offered at the hearing on this issue, the Court references media accounts that include statements in Vigil's defense, made by his counsel, solely to suggest that at least some portion of mainstream news accounts have been editorially neutral.  That some of the media attention in this case is generated by Vigil's counsel is in no other way a factor in the Court's decision on this motion.  The Court simply looks to whether media coverage in the community makes the community presumptively predisposed to find Vigil guilty.  The source of that coverage is not otherwise relevant.

[6]Nor does the Court consider the substance of the crimes alleged to lend themselves to sensational journalism.  Vigil's prominence as a state officer notwithstanding, the charges pending do not involve crimes of violence, passion, sex, or some other unique characteristic that might tend

Although Vigil has demonstrated, and the United States and the Court agree, that publicity in this case has been extensive, he has not met the very high burden the Supreme Court has required for a party to establish a presumption of prejudice derived from pretrial publicity. Vigil has not shown that pretrial publicity has had any direct effect on the integrity of judicial proceedings to this point, he has not shown that it is so pervasive throughout all of the geographic regions from which the jury pool will be drawn, and he has not presented evidence that the editorial disposition of the mainstream media has unfairly hindered his defense in court, i.e., that he has been "convicted in the press." In considering the totality of the circumstances, the Court finds that, while adverse publicity exists, it does not, given the safeguards that the Court has put in place with a statewide jury pool, "permeate the community to such a degree that empaneling a fair jury would [be] impossible," United States v. Abello-Silva, 948 F.2d at 1177 (quoting United States v. Affleck, 776 F.2d at 1454), and therefore the Court will not presume prejudice under rule 21 against Vigil.

   2.   **Congressional Campaign Advertising.**

Vigil argues that the pending election campaign for the First New Mexico Congressional District prejudices him. Although Vigil separates this argument from the one that he makes concerning pretrial publicity, the same difficult standards discussed above apply to both. Just as in the context of pretrial publicity, Vigil's argument that this advertising makes it impossible for the Court to empanel a fair jury is not persuasive.

Vigil notes that the Congressional candidates have run 7,531 political advertisements since

---

to pique the general public's interest or engender an inordinate amount of scrutiny. Compare United States v. Witting, 2005 U.S. Dist. LEXIS 5736, at *19-20 (D. Kan. 2005)(reasoning that media coverage of defendant's trial on charges of conspiracy, circumvention of internal controls, wire fraud, and money laundering stemming from his tenure as an officer of a utility corporation did not involve highly sensational facts).

June 26, 2006.  See Motion to Transfer, Exhibit B (Affidavit of Tina L. Crisp ¶ 6, at 2 (executed August 10, 2006)).  Vigil does not identify how many of the advertisements reference him as opposed to campaign advertising concerning other issues.  He states only that "an alarming number" of the advertisements invoked his name.  Nevertheless, the Court acknowledges that, at least in the Albuquerque metropolitan area where the Court is seated, the advertisements referencing Vigil are numerous and often condemning.

This does not mean, however, that these advertisements make selecting a fair jury impossible. Modern political campaigns tend to be very sophisticated, and target their audiences with precision. New Mexico is a large geographical state and has three congressional districts.  Most of the state is not in the First New Mexico Congressional District.[7]  Presumably, the congressional campaigns, would not spend their limited campaign dollars running advertisements in the northern, southern, and eastern parts of the state if they could avoid doing so.  Even if there is some advertising in those areas, given, for example, that El Paso stations are important broadcasters into Las Cruces, Amarillo stations into Clovis, and Lubbock, Odessa, and Midland stations into Hobbs, there is likely not to be the same intensity of First Congressional advertising in areas outside of the Albuquerque metropolitan area.

While the Court does not doubt, and indeed assumes, that citizens outside the First Congressional District have seen the Madrid-Wilson advertisements, the issue is whether they are seeing them with the frequency people in Albuquerque are seeing them.  Again, the record before the Court does not assist it on this question.  While the Court appreciates the time constraints under

---

[7]The First Congressional District includes Torrance, most of Bernalillo, some of Valencia, and small parts of Sandoval and Santa Fe Counties.

which Vigil is laboring, he did not meet his burden to show that-- taking the entire state, not just Bernalillo County-- the political advertising has made empaneling a jury drawn from throughout the state impossible.

Among the assertions made by John Goss, the defendant in Nelson v. Goss, was that prejudice against him because of publicity before his trial for murder of his former girlfriend was exacerbated after a Kansas gubernatorial candidate referenced Goss' release from prison shortly before the murder.  See Nelson v. Goss, 439 F.3d at 624.  The reference was in a campaign brochure advocating harsher punishments for violent crimes.  The Tenth Circuit in Nelson v. Goss, however, pointed out the limited geographic distribution of those brochures regionally within Kansas, noted that none of those citizens who were candidates to be jurors referenced the brochure during voir dire, and saw no obvious connection between their distribution and any purported effect on the jury pool.[8]

The very large jury pool for this case is comprised of citizens from all three New Mexico Congressional districts.  Vigil has not attempted to take into consideration these demographics or identify the intensity of advertising in areas of the state other than the immediate Albuquerque area.  As a result, the picture of First Congressional District advertising in the entire state, and thus with most of the jury pool, remains vague, and his assertion of unfair prejudice from this advertising is general and unconvincing.

Finally, the Tenth Circuit has pointed out on more than one occasion that, in highly publicized

---

[8]There is a fact in Goss v. Nelson that distinguishes this case from that case.  The distribution of campaign brochures referencing the defendant in Goss v. Nelson was not contemporaneous with the defendant's trial whereas the campaign advertisements referencing Vigil are being disseminated in the period immediately leading up to his trial, and will presumably continue to run during his trial.  While this factual distinction distinguishes Goss v. Nelson as precedent, the Court continues to find the case instructive.

cases, jurors with some awareness of the case may actually be preferable to jurors who are completely ignorant of the matter.  See Stafford v. Saffle, 34 F.3d at 1567 ("[J]urors who are completely unaware of such a highly publicized trial would probably not be the best jurors.");  United States v. Abello-Silva, 948 F.2d at 1178 ("Indeed, it is difficult to imagine how an intelligent venireman could be completely uninformed of significant events in his community.").  At the hearing on this matter, Vigil's counsel questioned whether the Court would want jurors who were not well informed with regard to current events in their community, and suggested that a jury comprised of such people would not be a jury of Vigil's peers and therefore a trial conducted with such a jury would be unfair. See Transcript of Hearing at 16:4-14 (taken Aug. 15, 2006)(Bregman).  In light of Vigil's presupposition that the jury would be comprised of intelligent, thoughtful jurors, it is unlikely that such individuals would be unable to interpret the campaign advertisements for what they are-- partisan political statement-- rather than as examples of independent and factual journalism.

Vigil has not shown that the advertisements infiltrate a significant portion of the state not in the First Congressional district, or presented evidence that jurors would not be able to put aside their impression of the advertisements and decide the case fairly based on the evidence presented in court. In sum, Vigil's reliance on the recent First Congressional District campaign advertising is not sufficient to establish that it would be impossible to select an impartial jury.

### 3.    The United States' Theory of the Case.

Vigil argues that the Court should presume prejudice because the United States alleges that his use of investment advisors lowered the state's returns on investments.  Vigil argues that this theory suggests to New Mexico jurors that they are the victims of his conduct.  Vigil argues that the Court should not allow the victim of an alleged crime to serve as a juror for the trial of the alleged

crime.

While Vigil's argument has logic to it, the Court is not persuaded that it counsels for a transfer. Vigil's principle would sweep far, and certainly farther than the case law has yet to go. By Vigil's reasoning, no federal court could try a case involving theft of local government funds in, or with jurors from, the district where the crime occurred. Yet the Sixth Amendment, rule 18, and rule 21(a) require the federal court to try an offense in the district where the crime is alleged to have occurred unless the accused can satisfy a heavy burden to establish prejudice. It would seem to the Court that, rather than adopting bright line rules such as Vigil promotes, it would be best to rely on the one in rule 21(a) that requires some showing of prejudice. Moreover, the Court finds the United States' response convincing in so much as it characterizes Vigil's argument as a reductio ad absurdum: where would federal courts try offenses involving theft of federal funds? Those cases must, by definition, be tried in the United States before United States citizens.

Vigil attempts to substantiate this argument by comparing the impact of the present criminal case upon potential New Mexico jurors to that of the Oklahoma City bombing case on its original presiding judge, citing Nichols v. Alley, 71 F.3d 347 (10th Cir. 1995). The Tenth Circuit, in Nichols v. Alley, granted the Defendant's request to reassign the case because the chambers and courtroom of the presiding district court judge had been damaged during the 1995 bombing of the Alfred P. Murrah Federal Building and a member of his staff had been injured in the attack. While the comparison involves some perspective on the part of the beholder, and Vigil's travails are no doubt a very heavy burden for him, the Court does not think that the magnitude of personal involvement of the judge in the Nichols v. Alley case compares, at a fundamental level, with the personal involvement of a New Mexico juror in this case. The potential juror in this case lacks the personal

relationship with the underlying crimes charged that was present for the judge in <u>Nichols v. Alley</u>.

In the end, the United States' theory of the case is merely a factor, and not the determinative factor, in Vigil's attempt to establish the existence of prejudice.  From that, the Court will not presume prejudice against Vigil merely because the indictment alleges that the people of the State of New Mexico are his victims.  The Court does not, from this factor alone or in combination with other factors, conclude that it should transfer the case to another district.

## II.   <u>VIGIL HAS NOT SHOWN ACTUAL PREJUDICE.</u>

Vigil incorrectly argues that, even if he cannot establish a presumption of prejudice, the juror questionnaires show actual prejudice requiring a change of venue.  Evidence that a significant percentage of jurors are aware of a case, however, or even that many might have some preconceived notion of the defendant's guilt, is not a prima facie case of actual prejudice.  In support of his motion, Vigil indicated to the Court that, out of the first 630 prospective juror questionnaires which he examined, 73% of the prospective jurors were familiar with the case from media coverage, and 34% of the respondents have already formed an opinion as to the matter and deem Vigil guilty.  <u>See</u> Motion to Transfer, Exhibit D (Affidavit of Joana F. Linn, ¶¶ 2, 5, at 1 (executed Aug. 10, 2006)). If these percentages are applied to the entire panel, there should be about 235 prospective jurors who are not familiar with this case from media coverage and 566 that have not formed an opinion on Vigil's guilt.  As a matter of law, Vigil's 34% figure alone, while not insignificant, falls short of establishing actual prejudice in the jury pool.  <u>See</u> <u>Patton v. Yount</u>, 467 U.S. 1025, 1040 (1984) (holding that voir dire testimony was enough to overcome danger that a jury would be impartial in a case in which 77% of pre-screened prospective jurors indicated they were predisposed to find the defendant guilty); <u>Goss v. Nelson</u>, 439 F.3d at 634 (declining to find actual prejudice when defendant

was not precluded from conducting voir dire as extensively as he wished despite 39% of prospective jurors expressing an opinion that defendant was guilty); <u>Hale v. Gibson</u>, 227 F.3d 1298, 1334 (10th Cir. 2000)(affirming trial court's decision to empanel jury after six of twelve jurors seated admitted they had held opinions on the case, but assured the trial judge that they could put their opinions aside and judge impartially).

The trial court retains potent tools to manifest its obligation to ensure a fair trial. Consistent with this obligation, the Court has expanded the pool of prospective jurors to 1,200 citizens from all three petit jury divisions in New Mexico, it has used comprehensive juror questionnaires for the benefit of the parties, it has agreed to summon 120 jurors for voir dire, and it has preserved Vigil's right to re-raise the motion to transfer if, after jury selection, Vigil continues to believe his trial is infected by juror prejudice. At this time, Vigil has not presented evidence to show that actual prejudice against him exists, and the Court believes it has put in place adequate safeguards to ensure that he receives a fair trial in this district.

## ORAL MOTION TO STAY PROCEEDINGS

The Court has summoned 1,200 jurors for September 5, 2006. Hundreds of citizens have spent considerable time answering these questionnaires. The Court and its staff has also invested considerable resources in securing the jurors and reviewing all the questionnaires

While the Court has no desire to hinder Vigil seeking appellate review of this decision, it is concerned that a stay for him to do so would effectively vacate the trial date. It would bring to an end all the work of the lawyers, too. This matter is proceeding toward trial regardless of location. The issues here are left to the sound discretion of the Court, and mandamus has some procedural hurdles. Given these factors, the Court does not believe it should stay the case pending an appeal of

the Court's ruling on this motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David C. Iglesias
   United States Attorney
Jonathon M. Gerson
Steven C. Yarbrough
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Jason Bowles
B.J. Crow
Bowles & Crow
Albuquerque, New Mexico

– and –

Samuel H. Bregman, II
Eric Loman
The Bregman Law Firm, P.C.
Albuquerque, New Mexico

   *Attorneys for the Defendant*

-21-