# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                        No. CR 05-2051 JB

ROBERT VIGIL,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Motion in Limine Regarding Admissibility of Predisposition Evidence, filed August 8, 2006 (Doc. 274)(the "Predisposition Motion"). The Court held a hearing on the motion on August 29, 2006. The primary issues are: (i) whether the Court should require Defendant Robert Vigil to immediately provide the United States notice if he intends to assert entrapment as a defense at retrial; and (ii) whether the Court should warn Vigil that he will open the door to the introduction of predisposition evidence, including evidence of his conduct while State Auditor, if he chooses to pursue a defense that he was "set up." Because the Court is concerned that the parties should know as soon as possible precisely if and when Vigil is pursuing the entrapment defense, but also does not want to infringe on Vigil's ability to adapt his defense to the United States' presentation of its case in chief, the Court will grant the United States' motion in part and deny the motion in part. The Court will: (i) require Vigil to provide the United States notice during trial if he intends to assert an entrapment defense; and (ii) warn Vigil that he will open the door to the introduction of predisposition evidence if he pursues a defense that he was entrapped.

## PROPOSED PREDISPOSITION EVIDENCE

The United States is attempting to offer evidence of conduct in which Vigil engaged while he was the New Mexico State Auditor. Vigil served as the New Mexico State Auditor from 1991 through 1998. The United States represents that, during this time, he engaged in a "pay to play" operation; in other words, those who sought state contracts and were willing to pay Vigil, or to donate to political campaigns or charities of Vigil's choosing, received state contracts. The United States characterizes this conduct as "extortion activity similar to that currently charged while [Vigil] was State Treasurer." United States Motion In Limine Regarding Admissibility of Federal Rule of Evidence 404(B) Material at 4, filed August 8, 2005 (Doc. 275).

The United States represents that the nature and prevalence of Vigil's activity while State Auditor was significant enough that the New Mexico Attorney General, the New Mexico State Police, and the FBI all investigated the conduct. As a result of these investigations, the United States has obtained documents, which it has provided to Vigil in discovery, that the United States will seek to admit as proof of Vigil's conduct while State Auditor.

The first specific "pay to play" activity in which Vigil allegedly engaged relates to solicitations for political donations and payments for personal expenses that Vigil made of auditors who sought state business. The second "pay to play" activity in which Vigil allegedly engaged relates to training seminars partially funded with state money that he used to create revenue that he could then donate to various organizations as a means of increasing his political capital.

1.     **Donations.**

The United States contends that, when Vigil first became the State Auditor, he asserted sole control over which independent auditors would receive contracts to perform various audits for the

state.  As a condition of receiving these contracts, Vigil would often require prospective auditors to donate to his political campaign or to a political campaign that he designated.  The United States offers that a witness will testify that he was present when Vigil told an independent auditor that, if the auditor did not give political contributions, he would not receive state work.

The same witness will testify that, on another occasion, Vigil indicated that the witness should pay for the apartment of Vigil's daughter while she attended the University of New Mexico. After this witness/auditor declined to pay for the apartment, he failed to receive the next three audits that state agencies requested him to perform.  Another auditor, Don Damon (now deceased), went from receiving $600,000.00 worth of contracts to not receiving any contracts after he refused to sell tickets to Vigil's birthday-party fundraiser.  The United States represents that auditors/witnesses will testify that these witnesses subsequently adopted the term "Damonized" to signify what happened to auditors who refused to contribute to Vigil.

A former New Mexico Assistant Attorney General with personal knowledge will testify that the Attorney General's Office investigated Vigil's "pay to play" practices in 1991.  Vigil was allegedly defiant in the face of this investigation and informed the Attorney General's Office that he intended to help those people who assisted him.  In response, the Attorney General's Office filed a civil lawsuit, and Vigil indicated he would refrain from soliciting donations from accountants who were seeking contracts from the State Auditor's Office ("SAO").

The United States also alleges that, to execute his "pay to play" scheme while State Auditor, Vigil often vetoed or changed a government agency's choice of independent auditors for no apparent legitimate reason.  According to the United States, this practice led to lawsuits against Vigil and to a modification of the New Mexico Statutes.  The Compiler's notes to New Mexico Statutes

Annotated §12-6-3 refer to three orders a New Mexico District Court entered in 1992 and 1993 in Vigil v. King, No. SF 92-1487(C) (First Jud. Dist. Ct. 1992).  The Compiler's notes summarize these court orders, which establish the formal procedure the State Auditor must employ before rejecting a state agency's chosen independent auditor.  See N.M. Stat. Ann. §12-6-3 Compiler's notes.

      **2.**      **SAO Sponsored Training.**

The United States alleges that, after becoming State Auditor, Vigil instituted continuing education training seminars for accountants.  Records from the SAO indicate the SAO sponsored these training seminars and held them around the state several times a year.  Internal SAO documents reveal that Vigil, as State Auditor, preferentially awarded state contracts to accountants who attended these seminars.  The United States contends that, in this way, Vigil pressured accountants to attend these seminars and pay the fees associated with them.

During the period when he was state auditor, Vigil's wife was president of Big Brothers/Big Sisters of Las Vegas, New Mexico ("Big Brothers/Big Sisters").  The United States alleges that Vigil dispersed the revenue collected at the education seminars to Big Brothers/Big Sisters.  In addition, the United States alleges that Vigil employed a person whose job included organizing training seminars, and therefore did not need assistance in performing such organization.  Nevertheless, Vigil entered into contracts to have Big Brothers/Big Sisters help organize these training seminars.

Pursuant to these contracts, Big Brothers/Big Sisters retained a significant portion of the revenue from these seminars.  The SAO, however, was responsible for funding one-half of its own budget and, therefore, according to the United States, revenue earned from training should have more appropriately gone to the SAO.  The United States contends that Vigil publicly acknowledged involving Big Brothers/Big Sisters in the seminar program, because of his wife's position in the

organization.

In addition to helping fund the charitable organization his wife headed, Vigil directed revenue from the seminars to other charitable organizations.  In connection with an October 27, 1997 seminar, for example, Vigil distributed $1,109.00 to the Hispano Business Student Association; Vigil's daughter was an officer in this organization at the time.

Finally, Vigil used revenue from these seminars to create a discretionary fund through which he directed contributions to other preferred organizations, including the Intellectual and Cultural Association, which was headed by contributors to his unsuccessful gubernatorial campaign.  The United States represents that Vigil has publicly acknowledged to the media that he used these discretionary funds with the intent to generate positive public relations for the SAO and for himself.

## PROCEDURAL BACKGROUND

In his opening statement in the first trial of this case, Vigil's counsel argued that the FBI "decided to 'test [their] theory that Robert Vigil is dirty' by getting Kent Nelson to do something he had never done before, and that this is what led to [Vigil's] taking the bribe money offered him on May 2, 2005."  Predisposition Motion at 1 (quoting Defendant's Opening Statement).  Vigil's defense counsel further argued that the May 2, 2005 bribe "was a completely made up deal on the part of the FBI.  Literally, they created it.  They created the attempt of the next two incidents."  Id. at 2.  Vigil's defense counsel then argued that the FBI told Nelson exactly what to say and that the FBI told Nelson to pay Vigil in cash rather than a check because cash "slimes it up a bit."  Id.

At Vigil's trial, the United States presented evidence that Vigil required various companies and individuals who wished to work with the New Mexico State Treasurer's Office ("STO") to send checks to Vigil that were made payable to a charity of Vigil's choosing, including Big Brothers/Big

Sisters.  The United States further presented evidence that Vigil required this procedure so that he could deliver the money to the charities himself and thereby receive credit for raising money for these charitable organizations.  The United States represents that Vigil employed this scheme in an effort to increase his political capital.

The United States played a February 2, 2005 recording of a conversation between Vigil and Angelo Garcia in which Vigil stated that he could "extract" money from certain brokers only for charitable contributions.  Government's Exhibit 638 at 16.  Vigil further let Garcia know that it does not help Vigil if the charities to which these people donate are outside New Mexico.  Id.  The United States alleges that Vigil asks Garcia, on the recording, "who gives a shit if they donate to a charity in New York on my behalf?"  Id.   The United States alleges that Vigil went on to lament that those donations "don't help me."  Id.

The United States argues that Vigil asserted that the FBI "set him up" throughout the first trial and implied that, but for being set up, he never would have taken the bribe money that he was allegedly captured taking on camera.  The United States, in its brief on this motion, points to the cross-examination of Michael Montoya, for example, during which Vigil's defense counsel pronounced: "I'm not sure where you're coming from either, Mr. Montoya, trying to set up innocent people, lying to the jury under oath."   Transcript of Testimony of Michael Andrew Montoya at 246:10-12 (taken April 19, 2006)("Montoya Transcript").  Later, during the cross-examination of George Everage, Vigil's defense counsel asked: "So you, together with the FBI, then, started squeezing . . . to put the pressure on Robert, and it's recorded, isn't it?"  Transcript of Testimony of George Everage at 198:23-25 (taken April 20, 2006)("Everage Transcript").  Vigil's defense counsel further asked Everage: "You're instigating all of this.  You and the FBI together are pushing this

thing right now, right." Id. at 210:10-11.

The United States notes the cross-examination of Leo Sandoval:

> Q:  Seven days later [after Sandoval's arrest], you get on the phone, and you actually say, "Let's put the shit on Robert," right?
>
> A:  I don't recall exactly what I – what our conversation entailed, but I recall saying, "Put the focus on Robert for" . . .
>
> Q:  And that is so different, isn't it, from seven days before when you told the FBI you didn't think Robert had anything to do with it.  You wrote out a written statement, you never mentioned Robert Vigil's name, but seven days later now, now you decide, "Let's put the focus on Robert"?

Transcript of Testimony of Leo P. Sandoval at 134:2-13 (taken April 24, 2006)("Sandoval Transcript").  After these questions, the United States notes that Vigil played a tape recorded conversation between Sandoval and Montoya in which Sandoval, who was cooperating with the FBI, suggested to Montoya that Montoya should "put the shit on" Vigil.  The following line of questioning then ensued:

> Q:  So did you ever have any subsequent conversations with the FBI about the fact that you wanted to put the shit on him, you wanted to put the focus on Robert? . . .
>
> Q:  And after you did a tape like the one you just did, you would give it to the FBI, wouldn't you?
>
> A:  Yes, sir.
>
> Q:  So they would have what you were talking about, "put the shit on Robert," in their possession since the day of this tape.  Isn't that right?
>
> A:  I believe so.
>
> Q:  And that was back on 12/23 – December 24th of 2003.  Isn't that right?

-7-

A:      Yes, sir.

Q:      And based on what you have told them to this point, they had no other reason to believe that Robert Vigil is doing something wrong, would they, that you know of? . . .

Q:      Did the FBI ever tell you now, after you've confessed to all this stuff with Simons, Cheung, Montoya, Nelson, Angelo, why they just don't go in and arrest all of them by now?

A:      They didn't tell me.

Q:      They wanted to keep seeing if they could get Robert Vigil somehow. Isn't that right?

A:      I have no idea what they were doing.

Q:      Well, you had told them enough, don't you think, about – by this time, you had told them about all the extortion stuff that you have testified to doing yourself already, right?

A:      Yes, sir.

Q:      And they just wanted to continue taping people at this point in February of '04?

A:      Yes, sir.

Q:      And they heard the first call, you said they have heard this call now, right?

A:      Yes, sir.

Q:      Do you know subsequent to this, do you know that the FBI set up Mr. Nelson with a bunch of cash and then had him go and try and snarl Mr. Vigil in a crime?

Sandoval Transcript at 136:16-18, 137:20 - 138:8, 141:7 - 142:4.

The United States also calls the Court's attention to Vigil's cross-examination of Kent Nelson. Vigil's defense counsel stated: "Right, right. That's what I'm talking about, and that's the

-8-

time when [the FBI] are telling you what you need to do, what you need to get out of Mr. Vigil,

things you need to say, and topics you need to hit on, right?"  Transcript of Testimony of Kent

Nelson at 262:22 - 263:1 (taken April 26, 2006)("Nelson Transcript").  Vigil's defense counsel

further pursued the following line of questioning:

> Q:     It wasn't your idea to give Mr. Vigil cash, right?
>
> A:     No.
>
> Q:     He had never asked you for money, right?
>
> A:     No, he did not.
>
> Q:     This was the FBI's idea, wasn't it?
>
> A:     Yes.
>
> Q:     It was the FBI's idea to give him the $10,000 in cash?
>
> A:     Yes, it was.
>
> Q:     You would have never done that if it wasn't for the FBI's involvement, would you?
>
> A:     No, sir.  I wouldn't have.
>
> Q:     You wouldn't have flown down and set up that meeting with Mr. Vigil, would you?

Id. at 264:6-20.  Vigil's defense counsel continued by asking, "'[a]nd they want you as part of their

goals, one of the goals of this, to get you to get Mr. Vigil to definitely commit to business to you,

correct[,]' and '[b]ecause the FBI at this time, aren't they telling you to try to link Mr. Vigil to

kickbacks?'"  Id. at 273:5-7 & 277:1-2.

   The United States, in support of its motion, also directs the Court to Vigil's questioning of

Mark Canavan: "Let's just get to the point here, sir.  On May 2nd, do you know that the FBI tried

to set up Mr. Vigil with Mr. Nelson giving him cash? Do you know that?" Transcript of Testimony of Mark Canavan at 132:16-19 (taken May 1, 2006)("Canavan Transcript"). Vigil's counsel also asked: "Well, sir, the next two deals that were done after the FBI tried to set up Mr. Vigil were both not given to Mr. Nelson, were they?" Id. at 133:6-8. On cross-examination of FBI Special Agent Margaret Russin, Vigil's counsel asked: "So the FBI set up Mr. Nelson with this money three days or two days – three days before that report was filed. Is that right." Transcript of Testimony of Margaret Russin at 83:6-8.

In the first trial, Vigil never provided notice of an entrapment defense or asked for an instruction on entrapment.

On May 2, 2006, the United States filed a notice of its intent to offer predisposition evidence to rebut Vigil's entrapment defense. See Notice of United States Intent to Offer Predisposition Evidence to Rebut Defendant's Entrapment Defense, filed May 2, 2006 (Doc. 188). Vigil has asserted that he did not receive an instruction on entrapment in the first trial and did not formally raise an entrapment defense. See Transcript of Hearing at 73:22-23 (taken August 15, 2003)(Jason Bowles).[1] The United States maintains that Vigil attempted to lay the groundwork of an entrapment defense, but, to keep the United States from offering predisposition evidence, neither acknowledged this defense nor asked for a jury instruction.

In its motion, the United States argues that, by not formally asserting an entrapment defense or requesting an instruction on entrapment, Vigil was able to put his entrapment defense before the jury and yet prevent the United States from presenting predisposition evidence in rebuttal. See

---

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Predisposition Motion at 6.  The United States requests that, should Vigil again raise a "backhanded" entrapment defense, the Court should permit the United States to introduce evidence of his predisposition.  So that Vigil will be placed on notice, the United States asks the Court to instruct Vigil accordingly.

The United States represents that evidence of Vigil's conduct while State Auditor will be relatively brief and succinct.  The United States anticipates calling a small number of witnesses who will testify as to their personal knowledge of "pay to play" activity in which Vigil engaged while State Auditor.  The United States will also introduce a small number of exhibits that corroborate the testimony of these witnesses.

## LAW REGARDING ENTRAPMENT

Central to an entrapment defense are the issues:  (i) whether government agents induced a defendant to commit an offense; and (ii) whether a defendant was predisposed to commit the offense charged, given the opportunity.  See United States v. Nguyen, 413 F.3d 1170, 1178 (10th Cir. 2005).  Once a defendant asserts an entrapment defense, the United States has the burden of proving, beyond a reasonable doubt, that a defendant was not entrapped.  See United States v. Duran, 133 F.3d 1324, 1330 (10th Cir. 1998).  Once a defendant has asserted an entrapment defense, however, the United States may prove predisposition to commit the criminal act charged through evidence of similar prior illegal acts.  See United States v. Garcia, 182 F.3d 1165, 1168 (10th Cir. 1999).

As a general proposition, "it is well settled that an accused cannot raise the defense of entrapment unless he admits to the commission of the crime charged."  United States v. Gibson, 446 F.2d 719, 722 (10th Cir. 1971).  This is because "[i]f such a procedure were sanctioned, the defendant could effectively benefit from the entrapment defense without providing the prosecution

with adequate notice for it to meet its burden of proving beyond a reasonable doubt that the defendant was not entrapped."  United States v. Levin, 606 F.2d 47, 49 (3d Cir. 1979).  In United States v. Ortiz, the United States Court of Appeals for the Tenth Circuit modified the general rule and held that a defendant "may be entitled to raise the defense [of entrapment] if the government's case-in-chief presents sufficient evidence of entrapment."  United States v. Ortiz, 804 F.2d 1161, 1164 (10th Cir. 1986).  Nevertheless, "[w]hen a defendant testifies, he must substantially admit that he committed the necessary elements of the crime."  Id. at 1164 n.3.  The benefit of this modification is that "[b]y taking this approach, a defendant may be entitled to present the entrapment defense to the jury and also require the government to prove beyond a reasonable doubt his commission of the crime."  Id. at 1164.  Consequently, when defense statements or questioning raises matters thought to be suggestive of entrapment, the United States must object, and the Court should sustain the objection and instruct the defense to plead entrapment or abandon the line of questioning.  See United States v. Levin, 606 F.2d 47, 49 (3d Cir. 1979)(quoting United States v. Neuman, 436 F.2d 285, 286-87 (D.C. Cir. 1970).

## ANALYSIS

The United States desires to present predisposition evidence that, while State Auditor, Vigil: (i) used his public office to pressure independent auditors who sought state contracts to contribute to his campaign in return for work;  and (ii) gave preferential treatment to accountants that attended training seminars organized by the State Auditor's Office and intended to benefit Vigil, Vigil's immediate family, and charities of Vigil's choosing.

The United States maintains the record demonstrates that, through his opening statement, cross-examinations, and closing argument, Vigil did, in fact, present an entrapment defense to the

jury.  The United States argues that if Vigil intends to assert an entrapment defense in the retrial of this case, the United States is entitled to notice of that defense so that it may prepare to meet its burden to prove that Vigil was not entrapped beyond a reasonable doubt.

The United States' arguments ask the Court to characterize what Vigil did in the prior trial. The United States argues the main points that Vigil attempted to establish during the cross-examination of Leo Sandoval were: (i) before Sandoval's arrest, the FBI had no indication that Vigil was involved in illegal activity; and (ii) upon Sandoval's arrest the FBI began to use Sandoval in an attempt to ensnare Vigil into criminal activity that Vigil was not predisposed to commit.  The United States argues that Vigil's line of questioning was designed to convey that, before Sandoval's arrest, the FBI had no interest in Vigil and then, after Sandoval's arrest, Sandoval and the FBI conspired to "put the shit on" Vigil.  The United States contends that, through this line of questioning, Vigil was attempting to establish that, before Sandoval's arrest, the FBI had no reason to believe Vigil might be predisposed to misuse his public office.  The United States argues that Vigil then attempted to establish that the FBI was using Sandoval in an attempt to entrap Vigil.

The Court is not convinced that Vigil's line of questioning Sandoval clearly demonstrates that Vigil attempted to use his cross-examination of Sandoval to convey to the jury that, before Sandoval's arrest, the FBI had no reason to suspect Vigil of any wrongdoing and, subsequent to Sandoval's arrest, the FBI attempted to use Sandoval to entrap Vigil.  On the other hand, the Court need not definitely decide this issue.

If Vigil pursues an entrapment defense on retrial, however, the Court will permit the United States to introduce predisposition evidence.  Also, to provide Vigil ample notice, the Court will warn Vigil before trial that if he chooses to assert or elicit testimony in his case in chief that the FBI set

-13-

him up, that may be enough, depending on the circumstances, to trigger the Court's need to permit the United States to introduce evidence of Vigil's predisposition. In other words, if Vigil chooses to assert and elicit testimony in his case in chief that he was set-up in a context that credibly appears to the Court to be an entrapment defense, then the Court will allow introduction of predisposition evidence. The United States is free to complain as Vigil's case in chief proceeds so that both parties know when and if the line into an entrapment defense has been passed.

The United States asks the Court to require Vigil to make his decision immediately. The Court does not believe the caselaw supports such a requirement. Indeed, the Tenth Circuit's opinion in United States v. Ortiz suggests that a defendant can wait and listen to the United States evidence in its case in chief, and must make its decision at least by the time, if and when, the defendant testifies. Accordingly, the Court will not require Vigil to elect the defense immediately.

The United States also suggests that, if Vigil asks certain questions in its case in chief, that will trigger the entrapment defense and its ability to offer predisposition evidence. The Court disagrees. The Court believes the more proper procedure to be that, if Vigil is unfairly raising the entrapment defense in the United States' case in chief without a clear election, the United States should object, and the Court will sustain the objection to the question as beyond the scope of direct examination. Vigil is, of course, free to recall these witnesses in its case if it wants to delay its election or, at any time, make the election to raise the entrapment defense.

The United States moves in limine for the Court to hold that Vigil pursued an entrapment defense in the first trial and to declare certain questions and comments objectionable. The United States specifically argues that Vigil is pursuing an entrapment defense if he pursues a defense that he was "set up." The Court does not believe it is necessary to make these determinations about the

first trial.  The entrapment defense, and objectionable conduct, require the Court to listen to the language, context, and circumstances of Vigil's defense at trial.  Language in a retrial is rarely identical to the words in the first trial.

For example, Vigil's contentions that the FBI decided to test its theory that Vigil was "dirty" by getting Nelson to do something he had never done before, and that the FBI created and scripted the most recent incidents with Nelson, are probably not enough, alone, to raise the entrapment defense and draw a successful objection.  But if Vigil adds that the FBI's and Nelson's actions induced him to take bribe money offered him on May 2, 2005, that may be a step toward the entrapment defense, and the Court may sustain an objection if the question is asked during the United States' case in chief.  On the other hand, the additional fact might go to mistake, not entrapment.  While a mistake defense may also allow the United States to introduce similar rebuttal evidence, that would trigger a rule 404(b) analysis and not mandate that the Court allow all predisposition evidence.

Without deciding whether Vigil's defense in the first trial was a backhanded entrapment defense, it is sufficient to state that Vigil's language in the first trial will focus the Court's attention on Vigil's language in the second trial and alert the Court to possible objections.  As guidance, the Court notes that the words "set up" in certain circumstances may be equivalent to "entrap"; the Court could envision situations, however, where such words might not trigger the defense.  For example, Vigil's arguments that the FBI "set up" Nelson with cash probably would not trigger the entrapment defense.  It is likely, however, that, if Vigil asserts and elicits testimony that he was "set up," the Court will see that language as suggesting an entrapment defense and sustain an objection. Similarly, if Vigil argues that the FBI agents are "trying to set up innocent people," that assertion will

-15-

probably suggest the entrapment defense and trigger a successful objection.[2]  Words accusing the FBI of "instigating all this" may also suggest the entrapment defense and trigger objections.  Vigil needs to be careful to avoid questions that suggest the FBI had no indication, before Sandoval's arrest, that he was involved in illegal activity or wrongdoing, or that Vigil was not predisposed to commit criminal activity.

If Vigil has any concern about the use of some of the language or words he used in the first trial, or new language he wishes to use in the second trial, he is free to approach the bench for guidance so that the Court can make an informed ruling in the context of the case.

In addition, the United States asks the Court to rule before trial what evidence will come in if Vigil pursues an entrapment defense.  Specifically, the United States requests the Court admit evidence related to the period when Vigil was State Auditor.  The United States contends this evidence overlaps the evidence independently admissible under rule 404(b) of the Federal Rules of Evidence.  See United States v. Garcia, 182 F.3d 1165, 1174 (10th Cir. 1999)("Entrapment is indeed 'intertwined' with the issue of intent.").  The Court has ruled separately on the United States' request to admit rule 404(b) evidence.  See Memorandum Opinion and Order, filed September 1, 2006 (Doc. 330).  Irrespective of that ruling, the Court need not decide on this motion whether certain predisposition evidence may be admissible.  See United States v. Fadel, 844 F.2d 1425, 1430 (10th Cir. 1988)("The vast majority of courts which have considered the issue have not favored the pretrial resolution of entrapment defense motions.").

If Vigil intends to assert an entrapment defense on re-trial, the United States is entitled to

---

[2]Counsel should not ask witnesses if others are lying or, during the evidence phase of the case, accuse people of lying.  Issues of credibility are for the jury.  Counsel may, of course, in their closing arguments, characterize the testimony.

notice of such defense so that it may prepare its rebuttal case.  When a defendant invokes an entrapment defense, the strategy adds another element to the crime which the United States must prove beyond a reasonable doubt– that the defendant was not entrapped.  The United States is entitled to notice that it will have to prove this element to properly prepare its case for trial.  Vigil needs to be careful not to attempt to raise the defense so late that the Court, in fairness to the United States, precludes him from raising it at all.

**IT IS ORDERED** that the United States' Motion in Limine Regarding Admissibility of Predisposition Evidence is granted in part and denied in part.  Defendant Robert Vigil will provide the United States notice if he intends to assert an entrapment defense.  Vigil is also warned that he will open the door to the introduction of predisposition evidence if he pursues a defense that he was entrapped.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
   United States Attorney
Jonathon Gerson
Steven C. Yarbrough
   Assistant United States Attorneys
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

-17-

Jason Bowles
B.J. Crow
Bowles and Crow
Albuquerque, New Mexico

– and –

Sam Bregman
Eric Loman
Bregman Law Firm, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendant*