# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                  No. CR 05-2051 JB

ROBERT VIGIL,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 as the Evidence is Insufficient to Sustain a Conviction, filed October 5, 2006 (Doc. 410)("Motion to Acquit"). The Court held a hearing on this motion on December 1, 2006. The primary issue is whether the Court should set aside the jury verdict against Defendant Robert Vigil for attempted extortion under the Hobbs Act, because there is insufficient evidence that he took a substantial step toward the completion of the crime charged. Because the Court concludes that there is sufficient evidence, taken in the aggregate, that Vigil took a substantial step toward the completion of the crime of extortion, the Court will deny Vigil's motion.

## FACTUAL BACKGROUND

Much of the factual evidence pertinent to this motion is not in dispute. Vigil does not seriously dispute that the evidence presented at trial was insufficient for a reasonable jury to find that Vigil intended to extort George Everage or that he took some steps toward extorting Everage. The issue is whether the largely undisputed evidence of those steps constitutes a substantial step toward

completion of the crime of extortion.

    **1.**      **Evidence of Vigil's Motive to Commit the Crime.**

The United States contends that it presented evidence at trial of several factors that motivated Vigil, while serving as the New Mexico State Treasurer, to transfer funds to Michael Montoya, the former State Treasurer who preceded Vigil. See United States' Response to Motion to Set Aside Verdict and For Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 as the Evidence is Insufficient to Sustain a Conviction at 3, filed October 19, 2006 (Doc. 412)("United States' Response"). First, there is evidence that, in 1999, after Vigil was unsuccessful in his bid to run for Governor of New Mexico, Montoya hired Vigil as his Deputy State Treasurer. See Transcript of Trial at 158:10-15 (Montoya)(taken September 13, 2006)("Sept. 13 Transcript").[1] There is also evidence that, later, when Vigil ran for the position of Treasurer, Montoya, in combination with Angelo Garcia and Kent Nelson, provided Vigil significant monetary and other support. See id. at 242:22-243:12. There was evidence presented that Montoya and Garcia kept a record of these expenditures, that they shared this record with Vigil, and that they indicated to Vigil that they, and Nelson, had mutually contributed to cover these expenses. See id. at 258:6-14; id. at 263:2-6.

The United States further asserts that it presented evidence that Vigil failed to report these contributions on his campaign finance report forms and knew that Montoya possessed documents through which he could prove Vigil received this money. See United States' Response at 4. Montoya testified that he showed these documents to Judy Espinosa, the New Mexico State

---

[1]The Court's citations to the transcript of the trial refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Treasurer's Office's ("NMSTO") public relations officer, and Espinosa confirmed that she confronted Vigil about what she believed were contributions missing from his campaign finance reports.  See id. at 285:2-286:24 (Montoya); Transcript of Trial at 49:11-14 (Espinosa)(taken September 19, 2006)("Sept. 19 Transcript").

In addition, there was also evidence presented that Montoya placed pressure on Vigil by threatening to run against him in the next election.  See Sept. 13 Transcript at 283:10-15 (Montoya). The jury heard a recorded conversation in which Vigil said to Garcia that, if the NMSTO was going to contract with Everage for securities lending, the NMSTO needed to ensure that Samatha Sais, Montoya's wife, receive a job as part of the transaction.  See Transcript of Recorded Conversation at 7 (taken February 23, 2005)(Government's Exhibit 589-T).   Vigil's acknowledgment that "[Montoya] is all over there telling everybody he's running for Treasurer" followed that statement. Id.  Similarly, during a conversation with Nelson on May 2, 2005, Vigil indicated that he felt he could prevent Montoya from running for State Treasurer by securing Sais a job in the securities-lending project.  See Transcript of Recorded Conversation at 38-39 (taken May 2, 2005)(Government's Exhibit 592-T).

### 2.      Evidence that Vigil Previously Directed Funds to Montoya.

The United States asserts that the jury heard evidence that, during his tenure as State Treasurer, Vigil arranged for Montoya to receive illicit payments.  See United States' Response at 3.  Garcia testified that he issued a check, written out to "Cash" in the amount of $30,000.00, to Montoya in August 2003.  See Transcript of Trial at 86:18-87:4 (Garcia)(taken September 20, 2006)("Sept. 20 Transcript"); MAV Investments' Check Payable to Cash (dated August 27, 2003)(Government Exhibit 185 at Bates AG_MAV7205---264).  Garcia testified that these funds

reflected a portion of commissions that Nelson earned from a number of securities transactions Nelson executed with the NMSTO earlier in 2003.  See Sept. 20 Transcript at 85:4-9 (Garcia). Garcia testified that Vigil had informed him that the NMSTO was going to execute the transactions with Nelson earlier in August 2003, and told Garcia to "just take care of [Montoya] and get him off my back." Id. at 87:11-14.

> **3.     Securities Lending.**

Everage testified that, while employed at the NMSTO, he proposed to Vigil that the NMSTO initiate a securities-lending program to earn additional income on the office's securities inventory. See Transcript of Direct Testimony of George Everage at 23:7-19 (taken September 15, 2006)("Everage Direct Examination").  Everage indicated that Vigil was initially reluctant because of his awareness that other state agencies had enjoyed varying degrees of success implementing similar programs. See id. at 24:24-25:3.  In response to Vigil's concerns, Everage suggested that the NMSTO could use multiple securities-lending agents, and bid the project out to the various agents to create competition and to ensure the NMSTO a better yield on its lending activity.  See id. at 25:17-21.  Everage estimated that the NMSTO could earn between one and three million dollars annually through the securities-lending program. See id. at 31:19-23.  Everage understood, however, that the securities-lending program had the potential to not make money or to make less money than he estimated.  See id. at 149:10-15; Transcript of Cross-Examination and Redirect-Examination of George Everage at 13:21-14:1 (taken September 18, 2006)("Everage Cross-Redirect").

To institute the securities-lending program, Everage recommended that the NMSTO create a position -- securities-lending oversight manager ("SLOM") -- to oversee the securities-lending agents and to ensure the agents complied with the NMSTO's investment policy. See Everage Direct

Examination at 27:15-22. Everage stated that, when he proposed the securities-lending plan to Vigil, he told Vigil that a NMSTO employee could handle the SLOM position's duties "in-house," or the NMSTO could contract with a third-party to act as the SLOM. Id. at 32:4-12. Everage represented that Vigil decided to issue a contract for the SLOM position, because the NMSTO did not have the budgetary resources to have an in-house employee perform the job functions. See id. at 36:9-14. Everage also understood that the New Mexico Legislature never allocated the NMSTO funds to have the SLOM position funded in-house. See Everage Cross-Redirect at 37:12-15. Upon learning that the NMSTO would contract the SLOM position, Everage informed Vigil that, if and when the securities-lending program was implemented, Everage would like the opportunity to bid on the contract for the SLOM position. See Everage Direct Examination at 36:22-23.

Everage, in association with several other NMSTO employees -- Vigil, Assistant State Treasurer Ann Marie Gallegos, Deputy State Treasurer Elaine Olah, the NMSTO's counsel, Dave Romero, and the NMSTO's Investment Advisor, Mark Canavan -- drafted a request for proposals ("RFP") for the SLOM position. See id. at 43:6-16; Notice of Request for Proposals for Securities Lending Oversight Manager (Government's Exhibit 512)("SLOM RFP"). Among the provisions included in the SLOM RFP was a prohibition against subcontracting work the SLOM would perform on behalf of the NMSTO. See Everage Direct Examination at 46:8-14; SLOM RFP, Part II.C ¶ 4. The SLOM RFP also indicated that the State Treasurer could terminate any contract between the NMSTO and the SLOM at will. See Everage Cross-Redirect at 22:2-4; 22:11-14; SLOM RFP, Professional Service Contract ¶ 5. Finally, the RFP established that the SLOM would be paid a fee calculated as a percentage of the value of securities that the NMSTO lent. See Everage Cross-Redirect at 35:17-23; SLOM RFP, Professional Service Contract ¶ 2.

Everage testified that, when he informed Vigil that he was interested in applying for the SLOM position, Vigil indicated that he had a friend whose wife needed a job and inquired if Everage would be willing to hire her should he receive the SLOM contract. See Everage Direct Examination at 37:5-12. Everage learned that this woman was Sais. See id. at 38:3-9. Everage testified that Vigil told him that Sais "was being a pain in his ass," and that he would appreciate Everage assisting him in "get[ting] her off his ass." Id. at 41:13-15. Everage testified that, when he first inquired what he would have to pay Sais, he was told he should expect to pay her between $500.00 and $1,000.00 per month, but that Vigil continued to place pressure on him and the price eventually escalated to $16,000.00 per year. See id. at 37:17-21; 41:16-21.

### 4.      SLOM Contract.

At Vigil's request, Romero performed an evaluation and determined that the NMSTO could legally award the SLOM contract to a former state employee. See id. at 49:13-24. On April 15, 2005, Everage left his position at the NMSTO with the intention of seeking the SLOM contract. See id. at 43:17-22; 44:1-4.

Everage testified that, subsequent to his leaving the NMSTO, he received a call from Gallegos inquring whether Everage had reached an employment agreement with Sais; Everage responded that, at a minimum, he and Sais should meet face-to-face before coming to any arrangement. See id. at 51:2-14. On April 29, 2005, Everage met with Sais in Albuquerque to discuss her professional background and qualifications. See id. at 53:8-14. At the April 29, 2005 meeting, Sais informed Everage that she was expecting her compensation to be $55,000.00 per year. See id. at 55:12-14. Based on this meeting, Everage concluded that Sais did not have any knowledge regarding securities lending, and decided that he did not wish to hire her. See id. at 59:24-60:10. In addition, during their

April 29, 2006 conversation, Sais represented to Everage that Vigil owed favors to Montoya and that Montoya was contemplating running against Vigil for State Treasurer in 2006. See id. at 60:17-21. Subsequent to his meeting with Sais, Everage called Vigil to discuss the results of the meeting. See id. at 61:3-6. Everage testified that, based on this conversation with Vigil, it was his understanding that, if he did not hire Sais, he would not be considered for the SLOM position. See id. at 61:8-9. Everage indicated that this telephone call was not recorded. See id. at 63:11-13.

Everage submitted a bid for the SLOM contract on May 3, 2005; his bid did not include any role for Sais as part of his contract performance. See id. at 62:12-17. Everage acknowledged that, at the time he submitted his application for the SLOM position, he did not have a vested right in the SLOM contract, and that Vigil had the authority to cancel the NMSTO's request for proposals and/or not to proceed with the securities-lending program. See id. at 77:20-78:6.

Everage testified that, subsequent to submitting his bid, he received a call from Gallegos who told him that he needed to come to a resolution with Sais and to include her resume with his proposal. See id. at 79:9-15. Everage faxed an addendum to his bid for the SLOM contract to the NMSTO on May 12, 2005. See id. at 81:7-8. This addendum characterized Sais as a subcontractor, indicated that Sais would send her resume directly to the NMSTO, and represented that Everage would employ Sais as a subcontractor if the NMSTO specifically approved the use of a subcontractor. See id. at 81:20-24. Everage also drafted a Memorandum of Understanding documenting the terms of his agreement with Sais. See Everage Cross-Redirect at 26:14-17. The Memorandum of Understanding provided for Sais to receive the lesser amount of forty percent of Everage's net earnings from securities lending or $45,000.00 per year. See id. at 26:18-24. Everage testified that he and Sais never signed the Memorandum of Understanding and the NMSTO never sent him an amended version

of the contract authorizing the use of subcontractors.  See Everage Direct Examination 130:7-14; Everage Cross-Redirect at 28:10-12.

Everage testified that, at some point between May 12, 2005 and May 30, 2005, someone from the NMSTO called him and told him that the NMSTO would send him the responses to a request for proposals regarding securities lending that the NMSTO had distributed to securities-lending agents. See Everage Direct Examination at 85:24-86:2.  Everage also stated that he received from the NMSTO a contract for the SLOM position that had changed the conditions of the original proposal he had submitted to the office, and requested that he sign and return the contract.  See id. at 86:15-18.  Everage signed the contract and returned it to the NMSTO, along with a request that Vigil sign a copy of the contract and return it to Everage.  See id. at 88:4-9.  Everage testified that, when he signed the contract and returned it to the NMSTO, he believed that the contract had been consummated.  See id. at 91:7-14.  Everage testified that, accordingly, the NMSTO sent him the bid proposals of three securities-lending agents, and that he reviewed and evaluated these agents' applications for the securities-lending agent position and prepared a report making recommendations to the NMSTO.  See id. at 93:17-22; 94:3-5; Government's Exhibit 524.  Finally, Everage also indicated that he had been invited to attend a June 16, 2005 meeting that had been scheduled so that the NMSTO's securities-lending evaluation committee could consider the securities-lending agents' applications.  See id. at 97:17-21.

On June 10, 2005, Everage met with Sais for a second time in an attempt to negotiate a fee-sharing arrangement for fees generated through the SLOM position.  See id. at 102:7-9.  At the conclusion of this meeting, Everage made a final determination that he would not be able to employ Sais.  See id. at 105:14-18.  Following this meeting, on June 13, 2005, Everage spoke to Vigil by

telephone.  See id. at 105:19-23.  Everage indicated to Vigil that he had offered Sais forty percent

of the SLOM's net proceeds, and Vigil replied: "No, no just deal with this George, we can't, we can't

deal with net, it can't work."   Transcript of Recorded Conversation at 2 (recorded June 13,

2005)(Government's Exhibit 591-T).   Vigil expressed displeasure that Everage was offering Sais a

percentage of net, rather than gross, proceeds, and stated that "we're not gonna be able to make this

contract if you're over here . . . trying to put a crap on it."  Id. at 3.  Vigil also represented that he

personally spoke to Sais to determine what amount of compensation she would deem adequate.  See

id. at 4.  It was Everage's understanding as a result of this conversation that Vigil was unhappy that

Everage and Sais could not reach some arrangement, and Everage felt that Vigil was threatening to

cancel his contract with the NMSTO if Everage and Sais could not resolve their disagreement.  See

Everage Direct Examination at 111:11-12; 112:9-12; Everage Cross-Redirect at 80:4-7.

At Vigil's advice, Everage followed up his conversation with Vigil by calling Gallegos.  See

Everage Direct Examination at 122:8-9.   After speaking to Gallegos, Everage considered his

prospects of working as the SLOM to be extinguished.  See id. at 122:14-16.  Everage documented

his concerns regarding what he perceived as Sais' attempt to extort the NMSTO in a letter to Vigil

dated June 13, 2006.  See id. at 122:24-123:1.   In the letter to Vigil, Everage summarized his

position: "I would hope that the threat made by you and Ms. Gallegos, that is, if Ms. Sais's demands

are not met by [Everage], that the existing SLOM contract will be repudiated and a new RFP issued

and by implication that [Everage] will likely not be re-selected as SLOM for securities lending, will

not be acted upon."   Letter from George Everage to Robert Vigil at 2 (dated June 13,

2005)(Government's Exhibit 521).  See Everage Direct Examination at 126:7-13.

The NMSTO responded to Everage's June 13, 2005 letter in a letter dated June 23, 2005.

See Everage Direct Examination at 128:21-129:1; Letter from Ann Marie Gallegos to George Everage (dated June 23, 2005)(Government's Exhibit 528)("Gallegos Letter"). The NMSTO's letter asserted that, at the time of the letter's writing, there was no legal contract in effect between Everage and the NMSTO. See Everage Direct Examination at 129:15-17; Gallegos Letter at 1. The letter further indicated that prior communications were an attempt to negotiate acceptable terms, not actual or implied threats, and that Everage "must surely recognize that in responding to the RFP, and including Ms. Samantha Sais as a proposed subcontractor, that [the NMSTO's] evaluation of [Everage's] proposal would include an evaluation of the knowledge, skills and abilities you [and Sais] both offer." Gallegos Letter at 1. See Everage Direct Examination at 129:23-130:2; Everage Cross-Redirect at 66:2-5. The letter concluded:

> In any event, we must conclude negotiations or failing that, reissue the RFP and hope for more satisfactory responses. Should you **fail to respond to this request by 5:00 p.m. July 8, 2005, we will consider your offer withdrawn** and will proceed with the re-issuance of the RFP for a Securities Lending Oversight Manager.

Gallegos Letter at 2 (bold emphasis in original). See Everage Direct Examination at 131:10-16. Everage noted that Romero was among the recipients carbon-copied on the letter. See Everage Direct Examination at 131:25-132:8.

Everage responded to the NMSTO's letter in a letter dated July 7, 2005. See Everage Direct Examination at 132:19-23; Letter from George Everage to Ann Marie Gallegos (dated July 7, 2005)(Government's Exhibit 529)("Everage Response Letter"). In the letter, which Everage's wife, an attorney, assisted in drafting, Everage argued that there was a legal contract in effect between Everage and the NMSTO and that, in preparing the report evaluating the securities-lending agents that had submitted bids to the NMSTO, Everage had performed pursuant to that contract. See

Everage Response Letter at 1; Everage Direct Examination at 133:20-134:6.   Everage further maintained that his failure to employ Sais could not invalidate the contract because Sais was a subcontractor, the contract expressly prohibited subcontracting, and that the contract had never been amended or reformed to allow subcontracting.   See Everage Response Letter at 1; Everage Direct Examination at 134:13-20.   In a letter dated July 15, 2005, Romero responded to Everage's letter alleging Everage's legal analysis was flawed, and re-asserting that no contract existed between Everage and the NMSTO.   See Everage Direct Examination at 139:1-9; Letter from Dave Romero to George Everage (dated July 15, 2005)(Government's Exhibit 530).

Everage testified that he did not lose any money as a result of the NMSTO cancelling any SLOM contract he might have had.   See Everage Cross-Redirect at 16:4-6.   Everage did acknowledge, however, that he had indicated to Sais, in a tape-recorded conversation, that he lost $5,000.00 to $6,000.00 per month in projected earnings as a result of the NMSTO rescinding his contract.   See id. at 17:1-2; 17:11-16.   Everage emphasized that these were projected losses; he testified that "[t]here was no money for me to lose.  I never had it in my hand."   Id. at 20:10-11.

**5.    The Second RFP.**

On August 9, 2005, the NMSTO issued a revised RFP for the SLOM position.   See Request for Proposals for Professional Services to Provide Securities Lending Oversight Manager Services to the Office of the New Mexico State Treasurer at 5 (Government's Exhibit 532)("Second SLOM RFP").   The Second SLOM RFP contained a provision that granted the NMSTO the discretion to bifurcate the SLOM position into two components and award separate contracts to: (i) a securities-lending manager; and (ii) an information-technologies ("IT") manager.   See id., Part I.C.   In an August 24, 2005 meeting with Nelson, Vigil indicated that the NMSTO issued the Second SLOM

RFP because Everage did not want to pay Sais enough money, and that the new RFP structure gave the NMSTO more control over the amount each party to the SLOM contract would be paid. <u>See</u> Transcript of Recorded Conversation at 70 (recorded August 24, 2005)(Government's Exhibit 598-T). Vigil also told Nelson that he was unconcerned whether Everage submitted a response to the second RFP, because his primary concern "was more ah Samantha, you know, trying to give her a job." <u>Id.</u> at 71.

Andrew Perkins, a former contract employee at the NMSTO, testified that Gallegos asked him whether he would be interested in submitting a bid to the second RFP. <u>See</u> Transcript of Trial at 33:12-18 (Perkins)(taken September 18, 2006)("Sept. 18 Transcript"). When Perkins indicated that he would be interested, but that he did not have any knowledge regarding securities lending, Gallegos provided him a textbook on the subject. <u>See id.</u> at 34:7-14. Subsequent to this encounter, Perkins submitted a bid in response to the Second SLOM RFP. <u>See id.</u> at 38:13-15. Perkins' proposal indicated that he was partnered with Thomas Chepucavage, an individual with a bachelor's degree in information technology and professional experience as an information-technology consultant with Accenture Consulting. <u>See id.</u> at 40:2-10. Perkins was aware, however, that two or more contracts could be awarded. <u>See id.</u> at 60:2-6.

Several days after receiving Perkins' response to the Second SLOM RFP, Gallegos contacted Perkins and informed him that the NMSTO had awarded the IT portion of the SLOM contract to Sais. <u>See id.</u> at 45:10-12. At a subsequent meeting at the NMSTO involving Vigil, Perkins, Sais, and Gallegos, Vigil informed Perkins that thirty percent of the fees generated through securities lending would be allocated to Perkins' firm, and that Sais would receive half of that thirty percent. <u>See id.</u> at 49:4-10. Perkins testified that he would have preferred to work with Chepucavage, but did not

believe working with Sais was optional.  See id. at 50:20-51:5.

## PROCEDURAL BACKGROUND

On July 25, 2006, a grand jury returned a Fifth Superceding Indictment charging Vigil with twenty-four counts of racketeering and extortion in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), and the Hobbs Act, 18 U.S.C. §§ 1951 & 1952.  See Fifth Superceding Indictment, filed July 25, 2006 (Doc. 259).  The Court held a jury trial in this case from September 5, 2006 to September 30, 2006.  On September 28, 2006, at the close of the United States' evidence, Vigil moved, under rule 29 of the Federal Rules of Criminal Procedure, to dismiss all charges.  The Court took the motion under advisement, but indicated to the parties that it was inclined to submit all the counts to the jury.  See Transcript of Trial at 147:2-149:1 (Court)(taken September 28, 2006).  Subsequent to the Court reserving its ruling, Vigil chose not to present any evidence.  The jury returned a verdict on September 30, 2006 finding Vigil not guilty on Counts One through Twenty-Three and guilty on Count Twenty-Four of the Fifth Superceding Indictment.  See Verdict, filed September 30, 2006 (Doc. 408).

Count Twenty-Four of the Fifth Superseding Indictment charges:

Between May 2, 2005 and September 15, 2005, both dates being approximate and inclusive, in the State and District of New Mexico, the defendant Robert Vigil, did knowingly and unlawfully affect and attempt to affect interstate commerce and the movement of articles and commodities in interstate commerce by extortion, in that the defendant Robert Vigil attempted to cause George Everage to provide money and property to another person, with Everage's consent, induced by wrongful use and threat of use of economic harm and under color of official right, in connection with Everage's efforts to work as the Securities Lending Oversight Manager for the New Mexico State Treasurer's Office.

The Court instructed the jury that "to prove an attempt, the government must prove beyond a reasonable doubt that (1) Mr. Vigil intended to commit the crime; and that (2) Mr. Vigil took a

substantial step towards commission of that crime."   See Court's Final Jury Instructions with

Citations, Instruction No. 33, at 73, filed September 28, 2006 (Doc. 394)("Jury Instructions").   The

Court explained:

> A "substantial step" is something beyond mere preparation.  A substantial step is an
> act which, in the ordinary and likely course of events, would lead to the commission
> of the particular crime.  The step must be a strong indication of Mr. Vigil's criminal
> intent, and must unequivocally mark Mr. Vigil's acts as criminal.   It should
> demonstrate commitment to the crime charged.

Id.  With the exception of replacing the phrase "the defendant" with "Mr. Vigil," the Court's

instruction tracked verbatim the Tenth Circuit's Criminal Pattern Jury Instruction 1.32.  See Tenth

Circuit Criminal Pattern Jury Instruction 1.32, at 52 (2005).

On October 5, 2006, Vigil filed this motion, pursuant to rule 29 of the Federal Rules of

Criminal Procedure, arguing that the evidence presented at trial, when considered in the light most

favorable to the jury's verdict, was insufficient to sustain a conviction and requesting the Court to

enter a judgment of acquittal on Count Twenty-Four of the Fifth Superseding Indictment.  See

Motion to Acquit at 9.  Vigil filed a second motion concomitant with this one, asserting that, even

when all the evidence presented at trial is considered in the light most favorable to the jury's verdict,

the facts of this case related to the NMSTO's attempt to engage in securities lending do not constitute

a violation of the Hobbs Act.  See Motion to Set Aside Verdict and for Judgment of Acquittal on

Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 or in the Alternative for

New Trial on Count 24, filed October 5, 2006 (Doc. 411)("Impossibility Motion").  The Court issued

a Memorandum Opinion and Order denying Vigil's second motion on January 12, 2007.[2]  See

---

[2]The Court notes that Vigil includes one paragraph in his motion arguing that legal impossibility is a recognized defense to an attempt charge.  See Motion to Acquit at 5-6.  Vigil does not make any other reference to legal impossibility in this motion.  Because the Court, in its January

-14-

Memorandum Opinion and Order, filed January 12, 2007 (Doc. 436)("Impossibility Opinion").

## RULE 29

Rule 29(b) of the Federal Rules of Criminal Procedure permits a trial court to reserve decision on a defendant's motion for judgment of acquittal, made at the close of the government's evidence, and to submit the case to the jury. <u>See</u> Fed. R. Crim. P. 29(b). If the court submits the case to the jury, and the jury returns a guilty verdict, the defendant may renew his motion within seven days after a guilty verdict. <u>See</u> Fed. R. Crim. P. 29(c). The rule provides that, if the trial court decides to reserve its decision, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

## STANDARD FOR DECIDING MOTIONS FOR ACQUITTAL

The Supreme Court of the United States has long recognized the government's burden to prove every element of a criminal charge beyond a reasonable doubt as a constitutional imperative. <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 362 (1970). This requirement, applied though the rules of evidence consistent with that standard, is a "historically grounded right[] of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." <u>Id.</u> (quoting <u>Davis v. United States</u>, 160 U.S. 469, 488 (1895)).

When reviewing challenges to the sufficiency of evidence underpinning a criminal conviction, courts must evaluate the direct and circumstantial evidence, together with all reasonable inferences that might be drawn from that evidence, in the light most favorable to the government, and determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. <u>See</u> <u>United</u>

---

12, 2007 Memorandum Opinion and Order, has previously determined that the facts presented at trial, when viewed in the light most favorable to the United States, do constitute a Hobbs Act violation, the Court need not reconsider Vigil's legal impossibility argument at this time.

States v. Isaac-Sigala, 448 F.3d 1206, 1210 (10th Cir. 2006).  A court should "not overturn a jury's finding unless no reasonable juror could have reached the disputed verdict."  United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997).  The court should let stand the conviction where a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. McPhilomy, 270 F.3d 1302, 1307 (10th Cir. 2001)(quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

In evaluating a sufficiency-of-the-evidence challenge made after a defendant has presented his case-in-chief, the court is not limited to reviewing the government's case-in-chief alone, but may review the entire record, including evidence that the defendant presents.  See United States v. Delgado-Uribe, 363 F.3d 1077, 1082 (10th Cir. 2004).  The court may not, however, weigh conflicting evidence or consider the credibility of witnesses.  See United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000).  It is the jury's responsibility to appraise witness credibility, weigh testimony, draw reasonable inferences, and reach a conclusion as to a defendant's guilt.  See United States v. Cooper, 375 F.3d 1041, 1044 (10th Cir. 2004). The court's duty is to "determine whether the evidence, if believed, would establish each element of the crime."  United States v. Vallos, 238 F.3d 1242, 1247 (10th Cir. 2001)(quoting United States v. Evans, 42 F.3d 586, 589 (10th Cir. 1994)).

Although the jury's decision is afforded great deference, "the evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained."  United States v. Weidner, 437 F.3d 1023, 1032 (10th Cir. 2006)(quoting United States v. Fox, 902 F.2d 1508, 1513-14 (10th Cir. 1990)).  In reaching a conviction, juries have "wide latitude to determine factual issues

-16-

and to draw reasonable inferences from circumstantial evidence," but inferences are reasonable only when, "with experience serving as the touchstone[,] . . . there is a reasonable probability that the conclusion flows from the facts in evidence." United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005)(internal citation omitted).   Where an inference relates to an ultimate conclusion underpinning criminal liability, "a jury may draw [the] inference only where that inference can be made beyond a reasonable doubt." Id. at 1295 n.4 (quoting United States v. Rahseparian, 231 F.3d 1257, 1264 (10th Cir. 2000)).

## THE HOBBS ACT

The Hobbs Act makes conduct unlawful that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion."  18 U.S.C. § 1951(a).  The Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).

The essence of a Hobbs Act violation is the wrongful means that a defendant employs to obtain the property in question, i.e. "a lawful right to property or lawful authority to obtain property is not a defense to extortion; rather, if [a defendant] obtains property that he has lawful authority to obtain, but does so in a wrongful manner, his conduct constitutes extortion under the Hobbs Act." Robbins v. Wilkie, 433 F.3d 755, 769 (10th Cir. 2006).  When the government charges extortion under color of official right, the court focuses on the nature of the public official's claim to the property in question, because liability attaches only when a public official "obtains a 'payment to which he was not entitled, knowing the payment was made in return for official acts.'" United States v. Kelley, 461 F.3d 817, 826 (6th Cir. 2006)(quoting Evans v. United States, 504 U.S. 255, 268

(1992)).  On the other hand, government officials acting zealously within their statutory powers do not violate the Hobbs Act merely because the results of their actions are adverse to a particular entity or business activity.  See Robbins v. Wilkie, 433 F.3d at 769-70; Sinclair v. Hawke, 314 F.3d 934, 943-44 (8th Cir. 2003)(noting "regulators do not become racketeers by acting like aggressive regulators").

When the government charges extortion based on the defendant's "wrongful use of actual or threatened force, violence, or fear," the law is well settled that the Hobbs Act proscribes the use of the fear of economic loss.  See United States v. Lotspeich, 796 F.2d 1268, 1269-71 (10th Cir. 1986)(upholding an extortion conviction premised on the use of fear of economic loss); United States v. Livingston, 665 F.2d 1003, 1005 (11th Cir. 1982)("It is well established that the use of fear of economic loss is proscribed by the extortion statute."); United States v. Quinn, 514 F.2d 1250, 1267 (5th Cir. 1975)("Fear of economic loss is a type of fear proscribed by part (b)(2) of the Hobbs Act."). Despite this recognition, federal courts have also acknowledged that this fear plays a legitimate role in many economic transactions.

> [F]ear of economic loss plays a role in many business transactions that are entirely legitimate; awareness of that fear and use of it as leverage in bargaining, in which each side offers the other property, services, or rights it legitimately owns or controls, is not made unlawful by the Hobbs Act. What the Act reaches is not mere hard bargaining but the exploitation of the fear of economic loss in order to obtain property to which the exploiter is not entitled.

Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 523-24 (3d Cir. 1998)(quoting United States v. Capo, 791 F.2d 1054, 1062 (2d Cir. 1986)("Capo I"), vacated in part on other grounds, 817 F.2d 947 (2d Cir. 1987)).  Finally, "economic loss" under the Hobbs Act is not limited to the loss of tangible property or existing relationships, "but may be no more than the [victim's] right

to make his business decisions free of threats and coercion, or other intangible rights." United States v. Lewis, 797 F.2d 358, 364 (7th Cir. 1986). See United States v. Kelley, 461 F.3d at 826 ("Under the 'fear of economic harm' theory, the defendant receives payment from the victim because the victim believes that the defendant can exercise his or her power to the victim's economic detriment."); Capo I, 791 F.2d at 1062 (stating that concept of economic loss encompasses a lost opportunity to enter into a business relationship).

## EVIDENCE NECESSARY FOR AN ATTEMPT CRIME

For a defendant to be guilty of an attempt crime, the government must prove beyond a reasonable doubt that: (i) the defendant intended to commit the crime; and (ii) the defendant took a substantial step towards commission of that crime. See United States v. Cornelio-Pena, 435 F.3d 1279, 1286 (10th Cir. 2006). Consequently, neither mere preparation nor an intent to commit a crime is sufficient to sustain an attempt conviction. See Seeley v. Chase, 443 F.3d 1290, 1296 (10th Cir. 2006)(recognizing a "dividing line between preparation and attempt"); United States v. Contreras, 950 F.2d 232, 238 (5th Cir. 1991)(acknowledging "criminal intent alone is not enough to commit an attempt"). Consistent with that understanding, modern federal courts abide by the traditional common-law rule that "the mere intent to violate a federal criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct." United States v. Resendiz-Ponce, No. 05-998, 2007 U.S. LEXIS 1004, at *10 (U.S. Jan. 9, 2007).

In evaluating the significance of conduct accompanying criminal intent, the United States Court of Appeals for the Tenth Circuit has noted that "[t]he determination as to whether an action amounts to a substantial step or mere preparation is highly fact specific." United States v. Bender,

183 Fed. Appx. 763, 770 (10th Cir. 2006).[3]  See United States v. Smith, 264 F.3d 1012, 1016 (10th

Cir. 2001)("The dividing line between preparation and attempt is not clear and depends to a high

degree on the surrounding factual circumstances.")(quoting United States v. DeSantiago-Flores, 107

F.3d 1472, 1478-79 (10th Cir. 1997), overruled on other grounds by United States v. Holland, 116

F.3d 1353, 1359 (10th Cir. 1997)).

> The "substantial step" required to establish an attempt must be something beyond
> mere preparation.  It must be an act adapted to, approximating, and which in the
> ordinary and likely course of things will result in, the commission of the particular
> crime.  A substantial step is an appreciable fragment of a crime and an action of such
> substantiality that, unless frustrated, the crime would have occurred.  The step must
> be strongly corroborative of the firmness of the defendant's criminal intent and must
> unequivocally mark the defendant's acts as criminal.  It should evidence commitment
> to the criminal venture.  However, it is not necessary that the evidence exclude every
> reasonable hypothesis of innocence or be wholly inconsistent with every conclusion
> except that of guilt.

United States v. Bender, 183 Fed. Appx. at 770 (quoting United States v. Smith, 264 F.3d at 1016).

Because "not every act that may be done with intent to produce an unlawful result is unlawful or

constitutes an attempt," however, the "substantial step" analysis is "a question of proximity and

degree[] . . . [and] courts examine the overt act to determine whether it is closely connected with the

crime which is the object of the attempt."  United States v. Monholland, 607 F.2d 1311, 1318 (10th

Cir. 1979)(internal quotations omitted).  See Hyde & Schneider v. United States, 225 U.S. 347, 387-

---

[3]The Tenth Circuit Rule 36.3(B) previously stated: "Citation to an unpublished decision is
disfavored.  But an unpublished decision may be cited to if: (i) it has persuasive value with respect
to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court
in its disposition."  Effective January 1, 2007, the Tenth Circuit has deleted rule 36.3(B) to comply
with rule 32.1(a) of the Federal Rules of Appellate Procedure.  Rule 32.1(a), which the Supreme
Court made effective December 1, 2006, prohibits a court from restricting "the citation of federal
judicial opinions, orders, judgments, or other written dispositions that have been[:] (i) designated as
'unpublished,' 'not for publication,' 'non-precedential,' 'not precedent,' or the like; and (ii) issued
on or after January 1, 2007."  Fed. R. App. P. 32.1(a).

88 (1912)(Holmes, J., dissenting)(explaining that the mere pairing of criminal intent and an overt act are insufficient to sustain an attempt; the two must combine to create a "dangerous proximity to success").

At a minimum, the defendant's substantial step must be "some overt act which would normally result in the commission of the particular crime." United States v. Horn, 113 Fed. Appx. 355, 357 (10th Cir. 2004). The Court's task is to determine "whether [the defendant's] objective acts, without relying on the intent underlying those acts, strongly corroborate his intent to [commit the crime]." United States v. Prichard, 781 F.2d 179, 181 (10th Cir. 1986). Nevertheless, the defendant need not be "on the verge of committing the specific act that constitutes the crime." Id. at 182. The Tenth Circuit has explained that, "[i]f this were the rule, much of the preventative purpose of inchoate liability could be vitiated." United States v. Tucker, No. 96-2032, 1997 U.S. App. LEXIS 6495, at *5 (10th Cir. Apr. 8, 1997)(quoting United States v. Prichard, 781 F.2d at 182). Accordingly, "in order to protect the public, modern 'attempt' law allows criminal liability to attach at some point prior to the last proximate act." United States v. Prichard, 781 F.2d at 182.

## ANALYSIS

Vigil does not dispute, for the purposes of this motion, that the evidence presented at trial was sufficient for a reasonable jury to find beyond a reasonable doubt that he intended to extort Everage. Vigil's argument is limited to his contention that he did not take a substantial step or an overt act toward the commission of the crime. See Motion to Acquit at 6. Vigil asserts that "[t]he only overt act [he] could have taken that would have resulted in the commission of a Hobbs Act violation would be to sign the [SLOM] contract." Id. Vigil concludes that "[a]ny substantial step other than the foregoing would not proximately lead to the consummation of the intended crime." Id.

-21-

The United States counters that Vigil's actions constituted "far more than a substantial step." United States' Response at 10.  The United States maintains that Vigil attempted to extort Everage by conditioning the award of the SLOM contract on Everage's willingness to share a portion of his potential proceeds with Sais.  See id. The United States contends that "the only fact that makes this charge an 'attempt' rather than a completed crime is Everage's refusal to give in to [Vigil's] demands."  Id.  The United States argues that Vigil never voluntarily withdrew from his plan to use the SLOM position to provide a job for Sais, and "at every point when there was an obstacle he continued to try to find a way around that obstacle until he was able to successfully find a way to get what he wanted."  Transcript of Hearing at 56:22-25 (Yarbrough)(taken December 1, 2006)("Hearing Transcript").

The issue is whether Vigil proceeded far enough down the path toward extortion that the law can find that he committed the crime of attempted extortion.  Because the Court believes that Vigil took substantial steps toward the completion of the crime -- beyond mere preparation and planning -- and that those steps strongly corroborate his intent to commit the crime in a manner that brought his actions within a dangerous proximity of success, the Court will deny Vigil's motion.

## I.    THE UNITED STATES PRESENTED SUFFICIENT EVIDENCE THAT VIGIL TOOK A SUBSTANTIAL STEP TOWARD COMPLETION OF THE CRIME OF EXTORTION.

Vigil contends that the evidence presented at trial regarding Count Twenty-Four is insufficient to sustain an attempt conviction.  The United States disputes Vigil's contention and has enumerated ten alleged actions that it represents constitute a non-exhaustive list of substantial steps: (i) Vigil's inquiry of Everage questioning whether, if Everage were to be awarded the SLOM position, he would be willing to hire Sais; (ii) Vigil's decision to create the SLOM position and his participation in

drafting the RFP; (iii) the NMSTO's issuance of a RFP for the SLOM position; (iv) Vigil's direction to Gallegos that she should pressure Everage to hire Sais; (v) Vigil's threatening telephone conversation with Everage after Everage's April 29, 2005 meeting with Sais; (vi) Vigil's personal discussions with Sais to determine the amount of compensation she would deem adequate; (vii) Vigil's statements to Everage indicating that the amount of compensation Everage had offered Sais was unacceptable; (viii) Vigil's direction that a letter be sent to Everage indicating that he must hire Sais as a condition of receiving the SLOM position; (ix) Vigil's direction that the NMSTO's offer to Everage be rescinded; and (x) the NMSTO's award of the second SLOM contract to Perkins.  See id. at 9-10.  In addition, the United States contends that Everage suffered actual harm from Vigil's attempted extortion -- losing out on the SLOM position that he tentatively received -- and suggests that this harm is significant evidence that Vigil's conduct was criminal.  See Transcript of Hearing at 39:25-40:5 (Yarbrough).

Vigil characterizes each of the United States' enumerated "substantial steps" as "merely menaces, preparation and planning," and argues that, "[e]ven when taken in the light most favorable to the government, none of these facts, either individually or taken in the aggregate, amount to a substantial step toward the commission of the crime charged."  Reply to United States' Response to Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 as the Evidence is Insufficient to Sustain a Conviction at 7, filed November 13, 2006 (Doc. 421)("Vigil's Reply").  Consequently, Vigil's argument depends on a characterization of the facts that the jury had before it.  Vigil contends that he and Everage merely engaged in unsuccessful contract negotiations regarding Sais.  See Motion to Acquit at 6.  Vigil appears to argue that, even if he intended to extort Everage, an admission he does not concede,

directing Everage to work out an arrangement with Sais is nothing more than a preparatory act.  See id.  Vigil contends that "between preparation for the attempt and the attempt itself, there is a wide difference," and although he concedes that preparatory acts may demonstrate his intent, he asserts that "something more than mere intention is necessary to constitute the offense charged."  Vigil's Reply at 6 (quoting People v. Murray, 14 Cal. 159, 159 (1859)).

Vigil compares his case to People v. Miller, 42 P.2d 308 (Cal. 1935), a case the Tenth Circuit cited in United States v. Monholland in support of a distinction between acts of mere preparation and overt acts that, when combined with the requisite criminal intent, will sustain an attempt conviction.  See Motion to Acquit at 7.  The defendant in People v. Miller, Charles Miller, was convicted of attempted murder based on evidence that he had, while under the influence of alcohol, publically threatened to kill an African-American farmworker, Albert Jeans, because, Miller alleged, Jeans had been annoying his wife and the authorities had refused to address the matter.  See People v. Miller, 42 P.2d at 308-09.  Miller had entered a field where Jeans was at work along with the owner of the field, Ginochio, who was also the town constable.  See id. at 309.  Miller, shouting threats and epithets at Jeans, walked approximately one-hundred yards in a straight line towards Jeans -- and while he was still approximately 150 to 200 yards from Jeans -- stopped and appeared to load his rifle.  See id.  Jeans, upon observing Miller, attempted to flee.  See id.  Miller continued towards Ginochio who took the gun from Miller without resistance.  See id.  Although the evidence indicated that Miller never aimed the gun at Jeans, the gun was found to be loaded with a .22 caliber high-speed cartridge.  See id.

The Tenth Circuit in United States v. Monholland focused its analysis of People v. Miller on the distinction the Supreme Court of California recognized between preparatory acts and overt acts

-24-

that constitute the commission of an attempt crime.

> Although conceding that it was a close case, it was emphasized that there must be a specific intent to commit the crime and, secondly, a direct ineffectual act done toward its commission. Mere intention to commit a specified crime, the court said, did not amount to an attempt; preparation alone was not sufficient. Something more is required than mere menaces, preparation, or planning. The California court added that preparation involved devising or arranging the means or measures necessary for the commission of the offense. In contrast, the attempt, it was said, is the direct movement towards the commission after the preparations are made. The court further said that the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It said that some appreciable fragment of the crime must have been committed. It must have progressed to a point where it will be consummated unless interrupted. In effect, the court was saying that the act must have passed the preparation stage so that if it is not interrupted extraneously, it will result in a crime. Unless it satisfies these elements, it is not per se indictable as an attempt.

United States v. Monholland, 607 F.2d at 1318-19 (internal quotations and citations omitted).

Although the distinction between acts in preparation and overt acts in furtherance of an attempt was important to the Supreme Court of California's holding, the court in People v. Miller also acknowledged that, "whenever the design of a person to commit a crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt." 42 P.2d at 310. To reconcile this rule with the court's earlier distinction between "the point where preparation leaves off and execution has commenced," the court in People v. Miller focused on the phrase "in furtherance of the design" in the latter rule. Id. The court in People v. Miller emphasized that acts cannot be said to be an overt act constituting the commencement of the commission of a crime until they cease being equivocal. See id. at 310. Accordingly, in finding that Miller's actions could not be characterized as more than preparation, the court in People v. Miller noted that "up to the moment the gun was taken from [Miller] no one could say with certainty whether the defendant had come into the field to carry out his threat to kill Jeans or merely to demand his arrest by the constable." Id.

-25-

Although the Tenth Circuit in United States v. Monholland focused on the distinction between preparatory and overt acts, it reached a result consistent with the Supreme Court of California's result in People v. Miller.  The defendants in United States v. Monholland were charged with an attempt to receive explosives in interstate commerce, in violation of 18 U.S.C. § 844(d), with the knowledge and intent that the explosives would be used to kill an Oklahoma State Associate District Judge.  See 607 F.2d at 1316-17.  The only evidence of an act in furtherance of an attempt was limited to a conversation between the defendants and a third-person inquiring into the price of explosives.  See id. at 1317.  In holding the evidence insufficient to sustain an attempt conviction, the Tenth Circuit appeared to focus on the tenuous connection between the acts and the defendants' intent to commit the underlying crime.  The Tenth Circuit reasoned: "There is no act on the part of the defendants that can be regarded as directly aimed toward the commission of the offense and which is proximate and germane thereto."  See id. at 1320.

Vigil argues that, consistent with the Supreme Court of California's reasoning in People v. Miller, the acts the United States enumerates were merely preparation, "because they involved devising or arranging the means or measures necessary for the commission of the offense."  Motion to Acquit at 6.  Vigil argues that, after he made these preparations, he never made a direct movement towards the commission of the crime.  See id.  He contends that his acts thereafter did not reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation of the crime.  Vigil argues that no appreciable fragment of the crime was ever committed and, therefore, his actions do not satisfy the elements of attempt.

In an attempt to emphasize the preparatory nature of the acts the United States alleges as "substantial steps," Vigil juxtaposes six additional acts which he asserts would have had to occur for

the commission of the extortion to take place: (i) the execution of a valid contract between Everage and the NMSTO; (ii) Everage's submission of his recommendations regarding the securities-lending agents' applications; (iii) Vigil's approval of the securities-lending agents that Everage recommended; (iv) the execution of a valid securities-lending contract between one or more securities-lending agents and the NMSTO; (v) the execution of a trade generating commission fees for the SLOM; and (vi) distribution of some portion of the SLOM's fees to Sais pursuant to terms that Everage and Sais agreed upon. See Vigil's Reply at 7. Vigil maintains that, because no monies would be generated for the SLOM unless the NMSTO executed a securities-lending transaction, "the only substantial step Vigil could have taken would have been to enter into valid contracts with the [securities-lending agents] and direct a deal to be placed." Id. at 8.

Vigil's argument is premised on his assertion that no substantial step could occur until his actions reached a point where, unless circumstances independent of Vigil's will interrupted, a violation of the Hobbs Act was inevitable. See Vigil's Reply at 8; Transcript of Hearing at 9:20-10:1 (Bowles). Vigil cites People v. Buffum, 256 P.2d 317 (Cal. 1953), for the proposition that, to sustain an attempt conviction, the defendant's conduct "must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter." Id. at 321. He contends that, to get to this point, and establish a sufficient predicate for an attempted extortion conviction, Vigil would have had to order a securities-lending deal to go through and circumstances beyond his control would have had to frustrate that deal. See Vigil's Reply at 8. Because the Court believes that Vigil has incorrectly stated the standards that the Tenth Circuit uses to evaluate attempt crimes, and because the Court does not agree that Vigil's conduct would have to progress to the extent Vigil asserts before criminal liability for attempted extortion would attach, the Court does not

find Vigil's argument persuasive.

Although the Court recognizes that People v. Buffum is not binding precedent for courts in the Tenth Circuit, the Court also believes that it can be distinguished from Vigil's case.  The defendants in People v. Buffum were convicted of conspiracy to perform abortions in Mexico based on evidence that they made arrangements for transportation and then took women from California to Mexico for the purpose of performing abortions.  See 256 P.2d at 319.  Because the California statute prohibiting abortions made no reference to the place the abortions occurred, and because the Supreme Court of California presumed that the California Legislature did not intend to regulate extra-jurisdictional conduct, the court in People v. Buffum determined that the convictions could only stand if the acts done within California amounted to an attempt to commit illegal abortions.  See id. at 320.

The court in People v. Buffum, like the court in People v. Miller, differentiated between preparation and "a 'direct' ineffectual act done towards [a crime's] commission," and stated that, to establish the latter, "there must be some appreciable fragment of the crime committed."  Id. at 321.  The court's holding in People v. Buffum, however, did not rely on this distinction, and also like the court in People v. Miller, paid particular attention to the defendants' state-of-mind while performing the acts alleged to constitute the attempt.  The Supreme Court of California in People v. Buffum reasoned that, while coordination and transportation were acts in preparation to performing abortions in Mexico, they were not unequivocal acts done toward the commission of a crime, because California's abortion statute did not regulate conduct outside of California.  See id. at 320, 321.  In contrast, Vigil does not contend -- for the purposes of this motion -- and the Court does not believe, that the Hobbs Act fails to proscribe the objective of the criminal actions that the United States

alleges.[4]

Moreover, while language similar to that the Supreme Court of California used in People v. Buffum is not absent from Tenth Circuit jurisprudence, see United States v. Bender, 183 Fed. Appx. at 770 ("A substantial step is an appreciable fragment of a crime and an action of such substantiality that, unless frustrated, the crime would have occurred."), the Circuit's caselaw also demonstrates, that, when a defendant's actions corroborate his criminal intent, the policies underlying the prosecution of inchoate crimes dictate that his conduct need not progress to the point of being "on the verge of committing the specific act that constitutes the crime." United States v. Prichard, 781 at 181.

In United States v. Prichard, the Tenth Circuit considered a defendant's appeal for attempted bank robbery based on the defendant's arguments that his actions did not constitute anything more than preparation. See 781 F.2d at 180. The trial evidence in United States v. Prichard indicated that the defendant had reconnoitered the target bank for one to two weeks to learn the bank manager's system for opening the bank, had learned the make of the bank manager's car, and had prepared a sketch of the bank. See id. In addition, after agreeing to perform two robberies -- one of the bank and another of a bowling-alley manager -- with an accomplice (a Federal Bureau of Investigation informant), the defendant had the accomplice obtain a car, handcuffs, and gloves, and directed the

---

[4]In his Impossibility Motion, filed simultaneously with this motion, Vigil alleged, among other arguments, that even when the evidence was considered in the light most favorable to the jury's verdict, the facts presented at trial did not constitute a violation of the Hobbs Act. Vigil's impossibility argument rested primarily on his assertion that he could not have attempted to extort Everage, because Everage never acquired a property interest from which to extort. The Court has already addressed this argument and determined that the evidence presented at trial was sufficient for a reasonable jury to find beyond a reasonable doubt that Everage had a property interest and that Vigil attempted to obtain that interest with the intent of exercising the rights associated with that interest, or transferring them to Sais, for his own benefit. See Impossibility Opinion at 38-47.

accomplice to ascertain the bank manager's home address.  See id.  The defendant and the accomplice discussed a plan to execute the robberies by holding the managers' families hostage to coerce them into complying with their demands.  See id. at 181.  The defendant was eventually arrested while approaching the bank manager's house on an evening when the evidence indicated that his primary purpose there was merely to observe the house, and during which he was recorded as stating that he intended to rob the bowling-alley manager that evening.  See id.

The Tenth Circuit in United States v. Prichard commenced its analysis with the recognition that "the question of when preparation ends and attempt begins is exceedingly difficult."  Id.  To arrive at a result, the Tenth Circuit stated that it "must determine whether [the defendant's] objective acts, without relying on the intent underlying those acts, strongly corroborate his intent to rob the bank."  Id.  The Tenth Circuit was cautious to point out, however, that, "[b]ecause [the defendant] was convicted, in responding to this inquiry, we must view the evidence in the light most favorable to the government."  Id.

In finding the evidence was sufficient to sustain an attempted robbery conviction, the Tenth Circuit in United States v. Prichard acknowledged that there was ambiguity in the record about precisely which robbery the defendant intended to perform on the night of his arrest, but held that there was sufficient evidence in the record to corroborate his intent to rob the bank.  See id. at 182. The Tenth Circuit observed that the defendant's actions -- observing the bank, ascertaining information about the bank manager's car and home address, and assembling the instruments necessary to commit the crime -- were not "insufficient for conviction by virtue of being so 'commonplace that they are engaged in by persons not in violation of the law.'"  Id. (quoting United States v. Oviedo, 525 F.2d 881, 885 (5th Cir. 1976)).  The Tenth Circuit explained that to require

a crime to reach a more definite stage would thwart the policies underlying prosecution for inchoate liability:

> The police need not wait until the defendant is on the verge of committing the specific act that constitutes the crime. If this were the rule, much of the preventative purpose of inchoate liability would be vitiated. Instead, in order to protect the public, modern "attempt" law allows criminal liability at some point prior to the last proximate act.

781 F.2d at 182. See United States v. Tucker, 1997 U.S. App. LEXIS 6495, at **5-6 (quoting United States v. Prichard and affirming defendant's attempted bank robbery conviction where defendant reconnoitered the bank premises, planned his getaway, disguised himself, and walked into a bank, but was arrested before using a prepared note demanding money).

More recent Tenth Circuit cases, including those that couch their "substantial step" analysis in the language Vigil advocates, reach similar conclusions. At the hearing on this motion, Vigil's counsel cited United States v. DeSantiago-Flores, and argued that a substantial step must be "adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of a particular crime." Hearing Transcript at 4:11-17 (Bowles)(quoting United States v. DeSantiago-Flores, 107 F.3d at 1478-79). Despite this language, however, the Tenth Circuit's result in United States v. DeSantiago-Flores does not support Vigil's position.

The defendant in United States v. DeSantiago-Flores had been convicted of attempted money laundering involving an attempt to engage in an unlawful cocaine purchase. See 107 F.3d at 1475. The trial evidence presented to the jury indicated that the defendant, a Colorado resident, had been arrested while staying overnight at a hotel in Nevada while on his way to California to purchase cocaine. See id. at 1479. The hotel was the same one the defendant had repeatedly used on previous trips to California to buy drugs, and the defendant was found with over $87,000.00 in cash in his

possession.  See id.  In addition, a woman who had accompanied the defendant on the trip to California testified that the defendant explained to her that the police had detained him too soon to catch him with any drugs.  See id.  Finally, a search of the defendant's home revealed only trace amounts of cocaine, although a number of witnesses testified that they had seen larger amounts of cocaine there in the past.  See id.

The Tenth Circuit in United States v. DeSantiago-Flores aggregated these steps and stated that, when "all of the evidence is viewed together, it is sufficient to support an inference of intent and that [the] defendant's money laundering scheme had advanced beyond mere preparation."  107 F.3d at 1479.  Unlike Vigil, who argues that an attempt must have progressed to the point where an observer would conclude that the crime has been committed but for the last, ultimate step, see Hearing Transcript at 6:16-20; 9:9-11 (Bowles), the Tenth Circuit does not set the bar so high.  The Tenth Circuit in United States v. DeSantiago-Flores affirmed the defendant's conviction because "[h]is actions toward a course of conducting a prohibited financial transaction are sufficient to provide strong corroboration of his intent to consummate the financial transaction and evidence his commitment to the criminal venture."  107 F.3d at 1479.

Consistent with the result in United States v. DeSantiago-Flores, the United States compares this case to the Tenth Circuit's decision in United States v. Ramirez, 348 F.3d 1175 (10th Cir. 2003).  See United States' Response at 10-11.  The defendant in United States v. Ramirez had met with an undercover narcotics officer to discuss a possible methamphetamine sale, and had reached an agreement on the amount of drugs to be purchased and the location for the sale.  See 348 F.3d at 1178.  Subsequent to making these arrangements, the defendant called the undercover agent and changed the location from an agreed upon restaurant to a motel.  See id.  Although the agent chose

not to go to the motel because of safety concerns -- and thus the transaction never occurred -- there was evidence that the defendant did proceed to the motel.  See id. at 1180.

In sustaining the defendant's conviction for attempt to possess more than fifty grams of methamphetamine with the intent to distribute, the Tenth Circuit in United States v. Ramirez reasoned that arranging the terms and location of the sale, calling to change the location of the sale, and proceeding to the agreed upon location were "act[s] adapted, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime." Id. at 1181 (quoting United States v. Smith, 264 F.3d at 1016). The Tenth Circuit considered it a reasonable inference that, had the undercover agent proceeded to the motel, the narcotics sale likely would have taken place.  See United States v. Ramirez, 348 F.3d at 1181.  The Tenth Circuit in United States v. Ramirez concluded by noting that, given that the defendant had been convicted, it must view the evidence in the light most favorable to the government, and that the evidence was sufficient for a rational jury to find each element of an attempt crime.  See id.

Even more recently, in United States v. Bender, the Tenth Circuit affirmed the conviction of a defendant who had been convicted of possession of a firearm in furtherance of an attempt to distribute cocaine.  See 183 Fed. Appx. at 770-71.  The defendant in United States v. Bender had argued that the "substantial step" necessary to sustain the  attempt element of his offense -- that he attempted to distribute cocaine -- could not have occurred until his accomplice approached a motel on foot, walking away from the defendant's parked car, to execute a drug sale the defendant had assisted to arrange.  See id. at 770.  The Tenth Circuit, despite describing a substantial step as "an action of such substantiality that, unless frustrated, the crime would have occurred," determined that the defendant's argument took a narrow view of the substantial step requirement.  Id.

The Tenth Circuit in <u>United States v. Bender</u> held that a reasonable jury could have concluded that numerous earlier steps corroborated the defendant's intent to distribute cocaine: (i) the defendant had provided a small amount of cocaine to an associate with the intent that the associate sell the cocaine; (ii) the defendant had delivered a sample of cocaine to an individual who was described at trial as the "middleman" in the frustrated motel sale that led to the defendant's arrest;  (iii) the defendant had retrieved a hidden parcel of cocaine to sell at the motel; and (iv) the defendant had participated in telephone calls necessary to arrange the frustrated motel sale.  See <u>id.</u> at 770-71.  The Tenth Circuit again acknowledged that "the determination as to whether an action amounts to a substantial step or mere preparation is highly fact specific," but concluded "that the evidence was sufficient to allow the jury to find that these events were indicative of [the defendant's] requisite intent to distribute cocaine and also represented a substantial step toward that distribution."  <u>Id.</u>

Similar to the Tenth Circuit in <u>United States v. Prichard</u>, <u>United States v. Ramirez</u>, and <u>United States v. Bender</u>, the Court is cognizant of the fact that Vigil was convicted of attempted extortion, and therefore the Court must view the evidence in the light most favorable to the jury's verdict.  Evaluated in that light, Vigil's argument overlooks evidence of a number of steps that -- individually and cumulatively -- a reasonable jury could find corroborate his intent to extort Everage.  Moreover, because Vigil's argument concentrates on his contention that Everage had no entitlement to payment, even under a signed contract for the SLOM position, he does not address whether the steps the United States alleges might corroborate Vigil's intent to extort non-monetary property interests, including the right to compete for government contracts on a level-playing field, the right to contract with parties of Everage's choosing, the right to make business decisions free of coercion, and the right to decide with whom to work.  The Court believes that, with respect to these interests, the

evidence presented at trial was sufficient for the jury to conclude that Vigil attempted to extort Everage, and that he took substantial steps towards, if not succeeded in, that extortion.

The Court believes that, given Tenth Circuit caselaw, the jury could have found that a number of the steps the United States alleges were direct actions towards the commission of extortion and corroborative of Vigil's commitment to the criminal venture. The evidence presented at trial indicated that Vigil inquired of Everage whether, if he received the SLOM position, he would consider hiring Sais. See Everage Direct Examination at 37:5-12. Vigil authorized the creation of the SLOM position and participated in drafting the RFP for the position. See id. at 43:6-16. The NMSTO issued the RFP to the public on or about April 18, 2005. See SLOM RFP. Everage testified that, during his telephone conversation with Vigil subsequent to his April 29, 2005 meeting with Sais, Vigil conveyed to him that, if he did not hire Sais, he would not be considered for the SLOM position. See Everage Direct Examination at 61:3-6.

The United States presented evidence that Vigil personally spoke to Sais to determine what amount of compensation she would deem adequate. See Government's Exhibit 591-T at 4. Based on these conversations, and in response to Everage's and Sais' inability to reach an agreement on Sais' compensation, Vigil indicated to Everage during a June 13, 2005 telephone call that he was dissatisfied with Everage's offer to Sais and expressed to Everage that "we're not gonna be able to make this contract if you're over here . . . trying to put a crap on it." Id. at 3.

On June 23, 2005, Gallegos wrote to Everage explaining that he "must surely recognize that in responding to the RFP, and including [Sais] as a proposed subcontractor, that [the NMSTO's] evaluation of [Everage's] proposal would include an evaluation of the knowledge, skills and abilities you [and Sais] both offer." Gallegos Letter at 1. Gallegos' letter explained that, should Everage fail

to satisfactorily respond to the letter by July 8, 2005, the NMSTO would consider his bid withdrawn and reissue the RFP.  See id. at 2.  Finally, the NMSTO eventually issued a second RFP, awarded the contract to Perkins, and Vigil told Perkins that Sais would receive fifty percent of the commissions Perkins earned from securities lending.  See Sept. 18 Transcript at 49:4-10.

Vigil's argument that additional steps are necessary to constitute the substantial step necessary for an attempted extortion conviction overstates the substantial-step requirement and misunderstands the nature of the property interest the jury could have found Vigil was attempting to extort.  Each of the acts the United States alleges, taken individually, evidences Vigil's intent to obtain a property interest belonging to Everage, and either to exercise it himself or to transfer it to Sais to his profit. More important, none of the acts, considered individually, was essential for the jury to reach a guilty verdict on Count Twenty-Four; "[a]ll [these] acts were rather part of a single course of conduct culminating in the charged 'attempt.'"  United States v. Resendiz-Ponce, 2007 U.S. LEXIS 1004, at *13.  As the Supreme Court recently explained, "the unity of the plan embraces all the parts."  Id. (quoting Swift & Co. v. United States, 196 U.S. 375, 396 (1905)(Holmes, J.)).  Vigil's actions were sufficient to provide the jury "strong corroboration of his intent to consummate the financial transaction and evidence his commitment to the criminal venture."  United States v. DeSantiago-Flores, 107 F.3d at 1479.

Finally, Vigil, citing People v. Bracey, 360 N.E.2d 1094 (N.Y. 1977), contends that, even if the acts the United States alleges are acts in furtherance of his criminal aim, they do not reach the level of attempt because they do not carry the project forward to within a dangerous proximity to the criminal end.  See Vigil's Reply at 7.  Vigil's argument is not compelling for two reasons.  First, People v. Bracey was not a "substantial step" case, but a case in which the Court of Appeals of New

York evaluated whether the defendants had the requisite criminal intent to sustain an attempted robbery conviction.  See 360 N.E.2d at 1097-98 (noting that the case "poses an unusual problem . . . [because in] most attempt cases, the defendant's actual intent or purpose is not in issue and the only questions are whether he committed an overt act that went beyond the stage of mere preparation").  In outlining the legal background to the court's analysis, the court in People v. Bracey stated that a substantial step is an act that carries "the project forward within dangerous proximity to the criminal end to be attained," but the court also noted that "[t]he act need not be 'the final one towards the completion of the offense.'"  Id. at 1097.  Nevertheless, the Court of Appeals of New York decided without analysis that the acts in question -- menacing a candy store and attempting to enter the store with a pellot pistol -- if coupled with the requisite criminal intent for robbery, "clearly demonstrated that they came dangerously close to their goal."  Id..

Second, the Court believes that a reasonable jury could have concluded that Vigil came dangerously close to successfully extorting Everage.  Indeed, the Court has already found that a reasonable jury could have determined that the property interest Vigil attempted to extort was Everage's right to make business decisions free from coercion and to contract with parties of his own choosing; under these theories, a reasonable jury might have concluded that Vigil actually succeeded in extorting Everage.  In any case, the evidence of Vigil's actions was sufficient to establish that he came dangerously close to succeeding in extorting Everage.  If Everage had gone along with Vigil's wishes, there is nothing but Vigil's speculation to suggest that the extortion would have not been completed.  Based on the trial evidence, a reasonable jury could have concluded that, had Everage acted with complicity, the extortion attempt would have succeeded.

## II.    THE FACTUAL DISPUTES OR DISAGREEMENTS DO NOT PRECLUDE A FINDING OF A SUBSTANTIAL STEP.

To avoid the conclusion that he took a number of substantial steps toward completion of the crime, Vigil also contends that evidence in the record does not support a number of the ten "substantial steps" the United States alleges.  The Court has carefully reviewed the record and believes that the record supports the conclusion that Vigil took substantial steps toward completion of the crime.  In reaching its conclusion in Part I, the Court has narrowed the United States' factual allegations to the extent that the Court believes the trial record supports them.  Although the Court believes that, in bringing certain steps to the Court's attention, the United States has placed an advocate's spin on the factual record, the Court does not believe that any individual fact is wholly unsupported in the record or that the United States' suggested inference from the evidence is unreasonable.  Moreover, even if some of the ten steps are not adequately supported in the record, the remaining steps support a finding of a substantial step.

Vigil first disputes the United States' step (iii): "[Vigil] set this kickback scheme into motion by directing the NMSTO to issue a RFP for the SLOM position.  As [Vigil] knew at the time, he would force anyone who wanted this position to hire Sais."  United States' Response at 9.  See Vigil's Reply at 2.  Vigil contends that there is no evidence pertaining to his state of mind regarding whether he would force parties interested in the SLOM position to hire Sais.  See Vigil's Reply at 2.

The Court notes that, in reaching its conclusion in Part I, it limited its consideration of the United States' step three to the fact that the NMSTO issued a RFP for the SLOM position; it did not make any assumptions regarding Vigil's state of mind with respect to Sais or necessarily characterize,

based on this fact alone, the NMSTO's interest in securities lending as a "kickback scheme." The Court recognizes, however, that intent is most often proved by circumstantial rather than direct evidence. Here, there is ample evidence from which a reasonable jury could conclude that Vigil intended to force anyone who got the SLOM position to hire Sais. As an example, the jury heard a recorded conversation in which Vigil told Nelson that he was unconcerned with whether Everage submitted a response to the second SLOM RFP, because his primary concern was "trying to give [Sais] a job." Government's Exhibit 598-T at 71.

Vigil disputes the United States' step (v): "At the suggestion of [Vigil's] agent, Everage met with Sais on April 29, 2005. He did not reach an agreement with Sais as [Vigil] wanted. As a result, on May 2, 2005, [Vigil] personally threatened Everage by telling Everage that he would not get the SLOM position unless he reached an agreement with Sais." United States' Response at 9. See Vigil's Reply at 9. He contends that there is no evidence that Vigil ever personally threatened Everage. See Vigil's Reply at 2.

In reaching its conclusion the Court did not consider the United States' assertion that Everage met with Sais at the suggestion of Vigil's agent, because the record is somewhat unclear on this point. Everage testified that after he left his employment at the NMSTO, Gallegos called him inquiring whether he had reached an employment agreement with Sais. See Everage Direct Examination at 51:2-10. Everage acknowledged, however, that it was he, and not Gallegos, who insisted that, before he hire Sais, he should meet with her in person. See id. at 51:12-14.

The Court believes that a reasonable jury could have determined that, after Everage conveyed to Vigil that he did not wish to hire Sais during a May 2, 2005 telephone call, Vigil threatened him by telling him that he would not get the SLOM position unless he reached an agreement with Sais.

Although the May 2, 2005 telephone call was not recorded, see id. at 63:11-13, Everage testified that

it was his understanding, based on this conversation with Vigil, that, if he did not hire Sais, he would

not be considered for the SLOM position, see id. at 61:8-9.  As the trier of fact, the jury was entitled

to assess the evidence and find Everage's testimony credible.

Vigil also disputes the United States' interpretation of Vigil's comment to Everage during a

June 13, 2005 recorded telephone conversation, in which Vigil responded to Everage informing him

that he had offered Sais the lesser of $45,000.00 or forty-percent of the SLOM's net proceeds: "No,

no just deal with this George, we can't, we can't deal with net, it can't work."  Government's Exhibit

591-T at 2.  The United States contends that, "[b]y using the pronoun "we," [Vigil] was obviously

referring to himself and [Sais]."  United States' Response at 7.  Vigil maintains that this assertion is

speculation.  Vigil's Reply at 2.  The Court disagrees.  Given the remainder of the conversation, one

in which Vigil represents that he had personally spoken to Sais to determine what amount of

compensation she would deem adequate, see Government's Exhibit 591-T at 4,and viewing all the

evidence in the light most favorable to the United States,  a reasonable jury could reach this

conclusion.

In an attempt to buttress his assertion that he did not take any substantial steps towards the

commission of extortion, Vigil disputes the United States' presumption that a valid contract for the

SLOM position existed between Everage and the NMSTO.  See Motion to Acquit at 6; United

States' Response at 8 n.3.  Vigil represents that, pursuant to N.M. Stat. Ann. § 37-1-23, a contract

with the State of New Mexico is only enforceable if there is a "valid, written, signed contract."

Motion to Acquit at 6.  Accordingly, Vigil contends that there could not have been a valid contract

between Everage and the NMSTO until the State signed the contract.[5]  See Vigil's Reply at 2.  In

addition, Vigil argues that the United States cannot point to evidence that he personally sent the

SLOM contract to Everage or that he directed the contract to be sent.  See id.

Regardless whether a valid contract ever existed, Vigil's argument with respect to the

contract's impact on the Court's substantial step analysis is inconsistent.  In his Motion to Acquit,

Vigil first argues that "[t]he only overt act [he] could have taken that would have resulted in the

commission of a Hobbs Act violation would be to sign the contract."  Motion to Acquit at 6

(emphasis in original).  He also states, however, that "even if [he] had signed the contract, the

substantial step requirement would still not be met."  Id. at 7.  In his Reply, Vigil appears to argue

that a valid contract would not be sufficient to sustain his conviction, because additional events would

need to occur for fee-generating securities-lending transactions to occur and monies distributed to

Sais.  See Vigil's Reply at 7.  At the hearing on this motion, Vigil's counsel reaffirmed his position

that, even if a valid contract had been signed, it would not be sufficient to constitute a substantial

step.  See Hearing Transcript at 26:16-27:2 (Bowles).

The Court has already decided, however, that a contractual entitlement to definite, tangible

property was not a legal prerequisite to Everage establishing a property interest that Vigil could

_____

[5]The Court notes that N.M. Stat. Ann. § 37-1-23 does not expressly require a signature:
"Governmental entities are granted immunity from actions based on contract, except actions based
on a valid written contract."  N.M. Stat. Ann.§ 37-1-23(A).  New Mexico administrative regulations,
however, may require signatures for a contract to be valid.  See Rule 2.20.2.9(A) NMAC
(2007)("The original and at least one copy of every contract, voucher, travel voucher, purchase order
or other financial commitment required to be submitted to the department shall be signed by an
authorized officer.").  In any case, because the Court concludes that the existence of a valid,
contractual agreement is not necessary to sustain Vigil's attempted extortion conviction, it need not
decide, for the purposes of this motion, whether Vigil's imputation of an implicit signature
requirement is a proper construction of N.M. Stat. Ann. § 37-1-23.

attempt to extort.  See Impossibility Opinion at 38-47.  A reasonable jury could have concluded that Vigil attempted to extort more than the proceeds to which Everage would have been entitled under any contract.  More pertinent is the consideration that, because Vigil was not convicted of extortion, but of attempted extortion, it is irrelevant that no actual property was extorted; "the offense of attempted extortion is complete when the defendant has attempted to induce his victim to part with property."  United States v. Foster, 443 F.3d 978, 985 (8th Cir. 2006).  As Vigil points out in his Motion to Acquit, factual impossibility is not a defense to an attempt charge.  See Motion to Acquit at 5; United States v. Mitov, 460 F.3d 901, 908 (7th Cir. 2006)(holding that factual impossibility is no defense to an attempted extortion charge).  That Vigil did not take the final steps needed to create the tangible property he wished to extort would not prohibit a reasonable jury from concluding that the steps he did take were adequate to constitute attempted extortion.

The issue whether a legally enforceable contract existed is therefore irrelevant to this motion, and the Court will not focus on that issue in this opinion.  A signed contract would have been another step, most likely substantial, among a number of steps that Vigil had already taken, but it was not a necessary step to complete the crime of attempted extortion.  The Court believes that, once Vigil discussed hiring Sais with Everage, approved the creation of the SLOM position, sent out the SLOM RFP, tentatively selected Everage, and began to take steps to pressure Everage to hire Sais, he had moved beyond preparation and planning and commenced the commission of the crime.

Finally, in addition to the factual assertions that Vigil specifically disputes, Vigil disputes all factual allegations that the United States has not supported with proper references to the record.  See Vigil's Reply at 2.  As this opinion reflects, however, the Court has independently reviewed each of the United States' statements about the record and limited its consideration to statements for which

it has found support.  Accordingly, to the extent the Court has relied on the "substantial steps" the United States presents in its Response to Vigil's Motion to Acquit, the Court concludes that there is sufficient evidence in the record to justify its reliance.

### III.   THE COURT AND THE JURY CAN CONSIDER THE EVIDENCE INTRODUCED ON THE OTHER COUNTS.

In its Response to Vigil's Motion to Acquit, the United States emphasized evidence that Vigil had transferred illicit monies to Montoya and evidence that Vigil was indebted to Montoya.  <u>See</u> United States' Response at 3-5.  Vigil maintains that the Court should not consider these allegations of a "factual scheme to transfer illegal funds to [Montoya], and receive illegal monies from Montoya and [Garcia]" because Vigil was acquitted of this conduct.  Vigil's Reply at 1.   Vigil cites no authority for this sweeping proposition, and the Court is not aware of any.  To the contrary, the jury was instructed to consider all of the evidence presented at trial and was authorized to draw all reasonable inferences that the evidence supported.  <u>See</u> Jury Instructions, Instruction No. 6, at 8. Moreover, because criminal intent is an element of an attempt crime, the evidence that the United States highlights is especially relevant, and the jury was entitled to consider it.

Much of the evidence the United States presented was intended to prove Vigil's guilt of other crimes for which he was charged.  There is no assurance, however, that the United States would have presented less evidence, or that the trial would have been abbreviated, if the United States had only sought conviction on Count Twenty-Four.  A reasonable jury may have decided that the evidence the United States emphasizes in its Response was helpful to explain the nature of Vigil's relationship with Montoya, and Vigil's motive to help Montoya.  Some evidence might have gone to the pattern that had been used to pay Montoya in the past and to introduce the individuals involved in that scheme.

Vigil has not adequately explained why the jury, and now the Court, cannot consider that evidence in evaluating the sufficiency of the evidence for Count Twenty Four.  The Court believes that the evidence is relevant and that it is helpful to place the conduct for which Vigil was convicted in its appropriate context, and will consider the evidence.

Taking the evidence in the light most favorable to the United States, the evidence against Vigil with respect to Count Twenty-Four is sufficient for a reasonable jury to conclude that Vigil intended to extort Everage and that he took a substantial step that corroborated his intent.  The Court will not acquit Vigil of the charge in Count Twenty-Four of the Fifth Superseding Indictment.  There is sufficient evidence for the Court to find that Vigil's actions satisfy the elements of the inchoate crime of attempt and to sustain a conviction.

**IT IS ORDERED** that the Defendant's Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 as the Evidence is Insufficient to Sustain a Conviction is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

David C. Iglesias
    United States Attorney
Jonathan M. Gerson
Steven C. Yarbrough
    Assistant United States Attorneys
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

-44-

Jason Bowles
B.J. Crow
Bowles & Crow
Albuquerque, New Mexico

– and –

Samuel H. Bregman, II
Eric Loman
The Bregman Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant*