IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                      No. CR 05-2051 JB

ROBERT VIGIL,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Objections to Pre-Sentence Report, filed December 22, 2006 (Doc. 429)("United States' PSR Objections"); (ii) the Defendant's Objections to the Presentence Report, filed January 5, 2006 (Doc. 430)("Vigil's PSR Objections"); and (iii) the Defendant's Motion for Downward Departure, filed January 16, 2006 (Doc. 437)("Motion for Downward Departure"). The Court heard these objections at the sentencing hearing held on January 24, 2007. The primary issues are: (i) whether the conviction for attempted extortion is properly grouped under the United States Sentencing Guidelines with other uncharged conduct and the conduct for which Defendant Robert Vigil was acquitted, requiring the Court to consider that conduct under the Guidelines; (ii) whether it is constitutional for the Court to consider conduct, established by a preponderance of the evidence, for which Vigil was acquitted at trial; (iii) whether the Court should depart downward under the Guidelines because of a number of factors that Vigil advances; and (iv) whether the Court should vary from the Guidelines because the Guidelines' sentence of 235 to 240 months is not reasonable. Because the Court believes that the United States Probation Office ("USPO") has, with a few exceptions, properly applied the Guidelines in its

Presentence Investigation Report ("PSR") and its Addendum to the Presentence Report ("Addendum"), because current law within the United States Court of Appeals for the Tenth Circuit counsels that the Court calculate the guideline sentence using conduct found by a preponderance of the evidence, and because the Court believes that the guideline sentence would not be a reasonable sentence for Vigil, the Court will, for the most part, overrule the objections and vary from the guideline sentence.

## PROCEDURAL BACKGROUND

In the course of resolving the parties' pre-trial and post-trial motions, and in making evidentiary rulings throughout the course of the proceedings, the Court has already made some factual findings, by a preponderance of the evidence, that are relevant to the sentencing. The Court found by a preponderance of the evidence, for example, that Vigil was a member of a conspiracy to engage in racketeering activity -- along with Michael Montoya, Angelo Garcia, Kent Nelson, and Leo Sandoval --  for the purpose of admitting co-conspirator statements at trial as non-hearsay pursuant to rule 801(d)(2)(E) of the Federal Rules of Evidence. See Memorandum Opinion and Order, filed August 31, 2006 (Doc. 329)("Court's Co-Conspirator Opinion"). The USPO has, in turn, included all conduct for which Vigil was acquitted, but which involved his co-conspirators, in the guideline calculation. The USPO has then proposed that the Court vary from the guideline sentence. See PSR ¶ 122, at 44. Together, the United States and Vigil disagree with much of what the USPO has done or suggests.

1.     **The Fifth Superseding Indictment.**

On July 25, 2006, a grand jury returned a Fifth Superceding Indictment charging Vigil with twenty-four counts of racketeering and extortion in violation of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), and the Hobbs Act, 18 U.S.C. §§ 1951 &

1952. See Fifth Superceding Indictment, filed July 25, 2006 (Doc. 259)("Indictment"). The Court

held a jury trial in this case from September 5, 2006 to September 30, 2006. The jury returned a

verdict on September 30, 2006 finding Vigil not guilty on Counts One through Twenty-Three and

guilty on Count Twenty-Four of the Indictment. See Verdict, filed September 30, 2006 (Doc.

408)("Verdict").

> Count Twenty-Four of the Fifth Superseding Indictment charges:
>
> Between May 2, 2005 and September 15, 2005, both dates being approximate and
> inclusive, in the State and District of New Mexico, the defendant Robert Vigil, did
> knowingly and unlawfully affect and attempt to affect interstate commerce and the
> movement of articles and commodities in interstate commerce by extortion, in that the
> defendant Robert Vigil attempted to cause George Everage to provide money and
> property to another person, with Everage's consent, induced by wrongful use and
> threat of use of economic harm and under color of official right, in connection with
> Everage's efforts to work as the Securities Lending Oversight Manager for the New
> Mexico State Treasurer's Office.

Indictment at 31.

The United States' charging language in Count Twenty-Four does not precisely track the

language of the Hobbs Act. Count Twenty-Four of the United States' Indictment, unlike 18 U.S.C.

§ 1951(b)(2), is worded in the conjunctive. Paragraph two of Count Twenty-Four charges that Vigil

attempted to extort property "by wrongful use and threat of use of economic harm and under color

of official right." Indictment at 31 (emphasis added). The Hobbs Act's definition of "extortion" is

written in the disjunctive -- encompassing the taking of property "by wrongful use of actual or

threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2)

(emphasis added).

2.    **Finding of Conspiracy.**

The Court has made some relevant decisions about the existence of the conspiracy in response to the United States' motion to allow the admission of co-conspirator statements as non-hearsay pursuant to rule 801(d)(2)(E). See Government's Motion to Admit Co-Conspirator Statements as Non-Hearsay Pursuant to Fed. R. Evid. 801(d)(2)(E), filed August 4, 2007 (Doc. 267). The Court has already found, by a preponderance of the evidence, a conspiracy to engage in racketeering activities existed and that Vigil -- along with Montoya, Garcia, Nelson, and Sandoval -- was a member of the conspiracy. See Court's Co-Conspirator Opinion at 10. The pattern of activity that comprised the substantive acts in furtherance of the conspiracy's objectives constitutes much of the relevant conduct that the PSR attributes to Vigil. In its PSR, the USPO has also linked the conspiracy's conduct and Vigil's offense of conviction into a single course of conduct.

In issuing its decision on the United States' motion to admit the co-conspirator statements, the Court relied upon its earlier denial of a rule 29 motion Vigil filed after his first trial before the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico. See Memorandum Opinion and Order, filed August 7, 2006 (Doc. 268). The Court noted in its Co-Conspirator Opinion that it "ha[d] already ruled that there was sufficient evidence at the first trial for a reasonable jury to conclude that the United States proved, beyond a reasonable doubt, that Vigil took part in the racketeering conspiracy charged in the indictment." Court's Co-Conspirator Opinion at 7. The Court went on to "find[] that the same evidence establishes, by a preponderance, the existence of a conspiracy and of Vigil's membership therein." Id. at 10. The Court has, accordingly, already found -- by the same evidentiary standard to be used at sentencing -- that the conspiracy alleged in the indictment existed and that Vigil was a member thereof.

3.      **Jury Instructions and Verdict Form.**

Unlike  the language of the United States' Fifth Superceding Indictment, the Court's jury instructions related to Count Twenty-Four tracked the language of the Hobbs Act and charged the jury that they could find Vigil attempted to extort Everage "either (a) by wrongful use of actual or threatened fear, or (b) under color of official right."   Court's Final Jury Instructions with Citations, Instruction No. 31, at 68, filed September 28, 2006 (Doc. 394)("Jury Instructions").  On the other hand, the verdict form presented to the jury required that the jury find Vigil guilty or not guilty "as charged in Count Twenty-Four of the indictment."   Verdict at 5.

The Court's instructions directed the jury that "[t]o reach a verdict, whether it is guilty or not guilty, [every juror] must agree." Jury Instructions, Instruction No. 39, at 79.  The jury was told that its "verdict must be unanimous on each count of the indictment."  Id.  The verdict form did not contain, however, any special interrogatories requiring the jury to identify upon which method of extortion it based its unanimous verdict.

4.      **Rule 29 Motions.**

On September 28, 2006, at the close of the United States' evidence, Vigil moved, under rule 29 of the Federal Rules of Criminal Procedure, to dismiss all charges.  The Court took the motion under advisement, but indicated to the parties that it was inclined to submit all the counts to the jury. See Transcript of Trial at 147:2-149:1 (Court)(taken September 28, 2006).  Subsequent to the Court reserving its ruling, Vigil chose not to present any evidence.  The jury returned a verdict on September 30, 2006, finding Vigil not guilty on Counts One through Twenty-Three and guilty on Count Twenty-Four of the Fifth Superceding Indictment.  See Verdict.

On October 5, 2006, Vigil filed two motions, pursuant to rule 29, requesting that the Court

enter a judgment of acquittal on Vigil's behalf.  Vigil's first motion argued that the evidence presented at trial, when considered in the light most favorable to the jury's verdict, was insufficient to sustain a conviction for attempted extortion because the United States failed to prove that Vigil took a substantial step toward the commission of the crime.  See Defendant's Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 as the Evidence is Insufficient to Sustain a Conviction, filed October 5, 2006 (Doc. 410)("Substantial Step Motion").  Vigil's second motion primarily asserted that, even when all the evidence presented at trial is considered in the light most favorable to the jury's verdict, the facts of this case related to the attempt of the New Mexico State Treasurer's Office ("NMSTO") to engage in securities lending do not constitute a violation of the Hobbs Act.  See Motion to Set Aside Verdict and for Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 or in the Alternative for New Trial on Count 24, filed October 5, 2006 (Doc. 411)("Impossibility Motion").  Vigil's second motion argued: (i) that the jury's verdict was ambiguous regarding upon what method of extortion it premised its conviction; (ii) that Everage never acquired a property interest that Vigil could extort; (iii) that Vigil's actions did not affect interstate commerce; and (iv) that Vigil's conviction offends due process because the Hobbs Act does not provide adequate notice that the conduct the United States alleges violates the Act.  See id.

The Court issued a Memorandum Opinion and Order denying Vigil's Impossibility Motion on January 12, 2007.  See Memorandum Opinion and Order, filed January 12, 2007 (Doc. 436)("Impossibility Opinion").  The Court determined that the jury's general verdict, although ambiguous as to what theory upon which the jury premised its conviction, was not invalid and that the evidence was sufficient for a reasonable jury to find that Vigil attempted to extort Everage under

either theory submitted to the jury -- either by placing him in fear of economic harm and/or under color of official right.  See id., Part I.C, at 27-38.  The Court concluded that Everage's reasonable expectation of some profit, his right to compete fairly for government contracts, and his right to conduct his business free from coercion all established a property interest that the jury could have determined Vigil attempted to extort.  See id., Part II, at 38-47.  In addition, the Court ruled that Vigil's attempt to manipulate monies generated by securities lending -- an activity involving interstate activity -- established the requisite nexus between Vigil's conduct and interstate commerce necessary to fall within the auspices of the Hobbs Act.  See id., Part III, at 47-55.  Finally, the Court held that the Hobbs Act put Vigil on sufficient notice that his actions were illegal, and thus his conviction does not offend due process.  See id., Part IV, at 55-57.

The Court issued a Memorandum Opinion and Order denying Vigil's Substantial Step Motion on January 19, 2004.  See Memorandum Opinion and Order, filed January 19, 2004 (Doc. 440)("Substantial Step Opinion"). The Court concluded that Vigil took substantial steps toward the completion of the crime -- beyond mere preparation and planning -- and that those steps, taken individually and in the aggregate, corroborated his intent to commit the crime in a manner that brought his actions within a dangerous proximity of success.  See id. at 22.  The Court held that the evidence, viewed in the light most favorable to the jury's verdict, was sufficient for a reasonable jury to find Vigil guilty beyond a reasonable doubt of the crimes the United States charged in Count Twenty-Four.

**5.    The USPO's Guideline Calculation.**

The USPO prepared the PSR and provided it to the parties on December 8, 2006.  The PSR determined that Vigil's adjusted offense level was forty and his criminal history category was I.  See

PSR ¶¶ 73 & 76, at 32, 33. Based on those calculations, the USPO found that the guideline imprisonment range was 292 to 365 months. See id. ¶ 102, at 40. Because the statutory maximum term of imprisonment is twenty years, however, see 18 U.S.C. § 1951(a), the PSR concluded that the guideline imprisonment term is 240 months pursuant to U.S.S.G. § 5G1.1(a), see PSR ¶ 102, at 40.

### a.    Base Offense Level.

The USPO determined that the appropriate guideline for determining Vigil's base offense level is U.S.S.G. § 2C1.1. See PSR ¶ 64, at 30. U.S.S.G. § 2C1.1(a)(1), which applies to extortion committed under color of official right, provides that, when a defendant was a public official during the commission of the crime, the base offense level is fourteen.

### b.    Special Offense Characteristics.

### i.    Multiple Extortions.

The PSR includes a two-level increase in Vigil's base offense level, pursuant to U.S.S.G. § 2C1.1(b)(1), because the USPO determined that the offense involved more than one bribe or extortion. See id. ¶ 65, at 30.

### ii.    The PSR's Relevant Conduct Determination.

The USPO reached its conclusions on the basis of not only the facts of the offense of conviction, but also upon relevant conduct that the USPO concluded the United States established by a preponderance of the evidence at trial. The USPO found, pursuant to U.S.S.G. § 2C1.1(b)(2), that the Court should adjust Vigil's offense level upward by eighteen levels on the basis of "the value of anything obtained or to be obtained by a public official or others acting with a public official."[1]

---

[1]U.S.S.G. § 2C1.1(b)(2) instructs that, when the value calculated is greater than $5,000.00, the defendant's base offense level should be increased by the number of levels indicated in the table included in U.S.S.G. § 2B1.1. The table in U.S.S.G. § 2B1.1 instructs that, when the value calculated

Id. ¶ 66, at 31.  The PSR identified this total value as $3,121,175.40.  See id. ¶ 66, at 32.  The PSR

broke this sum down into the following components: (i) $42,180.00, representing the value of forty

percent of $105,450.00 -- the gross amount Everage testified he estimated he would earn in the first

year of the Securities Lending Oversight Manager ("SLOM") contract; (ii) $244,888.00, representing

the amount of payments Nelson transferred to Garcia, acting as Vigil's agent, during Vigil's term as

New Mexico State Treasurer; (iii) $11,500.00, representing cash payments Nelson gave to Vigil on

May 2, 2005; and (iv) $2,822,607.40, representing the value of all payments that members and

associates of the RICO enterprise and conspiracy received during Montoya's term in office as New

Mexico State Treasurer.  See id.

### iii.    High-Level Position Enhancement.

The PSR includes a four-level increase in Vigil's base offense level, pursuant to U.S.S.G. §

2C1.1(b)(3), because the USPO determined that Vigil held a high-level decision making or other

sensitive position.  See id. ¶ 67, at 32.  The PSR noted that, "[a]s the elected State Treasurer, [Vigil]

made several high level decisions regarding who would handle monetary investments involving the

funds of the [S]tate of New Mexico."  See id.

### c.    Aggravating Role.

The PSR includes a two-level increase in Vigil's base offense level, pursuant to U.S.S.G. §

3B1.1(c), because the USPO determined that Vigil was an organizer, leader, manager, or supervisor

in criminal activity.  See id. ¶ 69, at 32.  The PSR states that, after becoming Treasurer in 2003, Vigil

took over the kickback scheme that Montoya had originated during his term in office.  See id.  The

---

is greater than $2,500,000.00, but less than $7,000,000.00, eighteen levels should be added to the
defendant's base offense level.

PSR asserts that, during his term in office, Vigil managed and supervised Garcia and directed Nelson's activities.  See id.

### 6.    **Proposed Variance.**

The PSR concluded by opining that "a guideline imprisonment term of 240 months is greater than necessary to comply with [the goals of sentencing]" and sentencing factors that 18 U.S.C. § 3553(a) defines.  Id. ¶ 121, at 44.  The USPO recommended that "the Court vary downward from the applicable sentencing guideline range."  Id. ¶ 122, at 44.  The PSR asserts that "[a] downward variance would still reflect the seriousness of the offense, and a lower sentence would promote respect for the law, and provide just punishment for the defendant's conduct in this case."  Id. ¶ 121, at 44.  The PSR makes only the following statement in support of its proposed variance from the guideline term of imprisonment:

> In this case, when looking at the nature and circumstances of the offense and the history and characteristics of the defendant, the Court should consider several factors. Robert Vigil is currently 53 years old and this is his first contact with law enforcement or any Court.  Additionally, the defendant has no history of violence.  Mr. Vigil is a very educated person, and has maintained a stable employment history for his adult life.

Id. ¶ 120, at 44.  The PSR made no recommendation as to the extent of the proposed downward variance.  See id. ¶ 122, at 44.

### 7.    **Addendum.**

Pursuant to rule 32(f)(1) of the Federal Rules of Criminal Procedure, the United States filed objections to the PSR.  See United States' PSR Objections.  The United States objects to the USPO's conclusion that a guideline imprisonment term of 240 months is greater than necessary to comply with sentencing goals and to the recommended downward variance.  See id. at 1-2.  Vigil also objects to

the PSR that the USPO submitted, arguing that there are constitutional and non-constitutional reasons that the Court should not consider the conduct for which Vigil was acquitted. See Vigil's PSR Objections.

On January 16, 2007, the USPO disclosed the Addendum. As to the United States' objection, the USPO stated that, as detailed in the PSR, it is the USPO's assessment that a downward variance would appear to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Vigil's conduct. See Addendum at 1. Beyond one factual exception related to the location of his wedding, the USPO did not agree with any of Vigil's objections. See id. at 1-9. On the same day, Vigil filed a motion for a downward departure from the applicable guideline range. See Motion for Downward Departure.

## RELEVANT LAW REGARDING CALCULATION OF GUIDELINE SENTENCES

Real conduct is the cornerstone of the United States Sentencing Guidelines. But when the Guidelines require the sentencing court to consider conduct for which the defendant was acquitted and to enhance the defendant's sentence based on the judge's finding that the conduct occurred by a preponderance of the evidence, the court's actions can be viewed as at tension with the jury's verdict of acquittal. Nevertheless, the Tenth Circuit has made it clear that, not only can the sentencing court consider conduct for which the defendant was acquitted, the sentencing court, under the Guidelines, makes findings about that conduct by a preponderance of the evidence.

### 1.    Relevant Conduct.

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 cmt. n.1(H). In

United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States referenced the Hobbs Act as an offense for which relevant conduct must be taken into account when imposing a sentence.  See id. at 250-51.

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

Id. (quoting 18 U.S.C. § 1951(a))(emphasis in original).  The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

## 2.   Sentencing Guidelines Regarding Extortion.

Because "extortion . . . can encompass a vast range of very different kinds of underlying conduct," the Guidelines treat extortion differently depending on the method the defendant used to extort -- or, in the case of attempted extortion, attempted to extort -- his victim.  In choosing the operative guideline provision in this case, these distinctions complicate the Court's task because the jury's verdict is ambiguous as to the theory of extortion for which it chose to convict Vigil.

### a.   U.S.S.G. § 1B1.2(a).

Absent an express direction noting an exception, the Guidelines are to be applied in a specific order.  See U.S.S.G. § 1B1.1.  The first step is to "[d]etermine, pursuant to [U.S.S.G.] § 1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction."  U.S.S.G. § 1B1.1(a).  See U.S.S.G. § 1B1.2.  To determine the guideline section, U.S.S.G. § 1B1.2(a) directs the Court to "[r]efer to the Statutory Index

(Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction."  U.S.S.G. § 1B1.2(a).  For offenses involving an attempt, the court should apply U.S.S.G. § 2X1.1 in addition to the guideline referenced in the Statutory Index for the substantive offense.  Id.

> ### b.    Appendix A.

Appendix A contains the statutory index that specifies the offense guideline section or sections in Chapter Two (Offense Conduct) applicable to the defendant's statute of conviction.   For defendants convicted under 18 U.S.C. § 1951, Appendix A lists four guideline sections: 2B3.1, 2B3.2, 2B3.3, and 2C1.1.  The Introduction to Appendix A instructs that, where "more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted."   U.S. Sentencing Guidelines, Appendix A -- Statutory Index, Introduction.

> ### c.    U.S.S.G. § 1B1.2(b).

Once the Court has determined the appropriate offense guideline section pursuant to U.S.S.G. § 1B1.2(a), it must consider other relevant conduct -- in accordance with U.S.S.G. § 1B1.3 -- to calculate the defendant's base offense level and to determine the applicable guideline sentencing range.  See U.S.S.G. § 1B1.2(b).  The Application Notes to U.S.S.G. § 1B1.2 indicate that, "[w]here there is more than one base offense level within a particular guideline, the determination of the applicable base offense level is treated in the same manner as a determination of a specific offense characteristic."  U.S.S.G. § 1B1.2 cmt. n.2.  In addition, the guidelines require that "the 'relevant conduct' criteria of [U.S.S.G.] § 1B1.3 are to be used, unless conviction under a specific statute is expressly required."  Id.

### d.     U.S.S.G. § 1B1.3.

The Sentencing Guidelines define the activity that the court should consider in determining the guideline sentencing range.

(a) Chapters Two (Offense Conduct) and Three (Adjustments).  Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)     (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  In evaluating jointly undertaken criminal activity under subsection (1)(B), the Guidelines distinguish between the findings the court must make for sentencing purposes and those traditionally relevant to conspiracy law analysis.  The Guidelines recognize that, "[b]ecause a count may be worded broadly and include the conduct of many participants over a period of time,

-14-

the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy."  U.S.S.G. § 1B1.3 cmt. n.2.  Consistent with that recognition, a defendant's relevant conduct does not include conduct in which the co-conspirators engaged before the defendant joined the conspiracy, even if the defendant knew of that conduct.  See id.; United States v. Bad Wound, 203 F.3d 1072, 1077 (8th Cir. 2000)("A person cannot be held liable for the losses caused by other conspirators in the scheme prior to the time the person entered the conspiracy.").  Nevertheless, once a defendant joins the criminal activity, U.S.S.G. § 1B1.3(a)(1)(B) provides that he is accountable for the conduct of others that was both: "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3 cmt. n.2.  See United States v. Westcott, Nos. 06-5018, 06-5019, 06-5026, 2007 U.S. App. LEXIS 1870, at *13 (10th Cir. Jan. 26, 2007).  Once the court has found jointly undertaken criminal activity by a preponderance of the evidence, if the underlying offenses are of the type for which U.S.S.G. § 3D1.2(d) would require grouping of multiple counts, it must then determine whether that activity is relevant to the offense of conviction because it is either part of the same common scheme or plan or part of a continuous course of conduct.  The Application Notes to U.S.S.G. § 1B1.3 characterize "common scheme or plan" and "same course of conduct" as "two closely related concepts," provide the court guidance regarding the proper standards to apply in making these findings, and enumerate a non-exhaustive list of factors pertinent to the court's consideration of each category.  U.S.S.G. § 1B1.3 cmt. n. 9.

> (A)  Common scheme or plan.  For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.

\*          \*          \*

(B)  <u>Same course of conduct</u>.  Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.  Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.  When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

<u>Id.</u>

### e.    U.S.S.G. § 3D1.2.

When counts against a defendant involve substantially the same harm, U.S.S.G. § 3D1.2 requires the counts be grouped together into a single group for sentencing purposes.

Counts involve substantially the same harm within the meaning of this rule:

(a)  When counts involve the same victim and the same act or transaction.

(b)  When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c)  When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)  When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2(a)-(d).  In addition to these general rules, Subsection (d) of U.S.S.G. § 3D1.2, the subsection cross-referenced in U.S.S.G. § 1B1.3(a)(2), also directs the court to group offenses covered under numerous specific guidelines, including U.S.S.G. § 2C1.1, and expressly excludes from

-16-

grouping offenses that other guidelines cover, including U.S.S.G. §§ 2B3.2 & 2B3.3.

The Guidelines recognize that subsection (d) has the likelihood of being used most frequently, because "[i]t provides that most property crimes (except robbery, burglary, extortion and the like), drug offenses, firearms offenses, and other crimes where the guidelines are based primarily on quantity or contemplate continuing behavior are to be grouped together." U.S.S.G. § 3D1.2 cmt. n.6. In addition, "[c]ounts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under [the] subsection." Id. See United States v. Taylor, 97 F.3d 1360, 1364 (10th Cir. 1996).

Finally, the Guidelines do not require that a defendant be convicted on each of the counts to which U.S.S.G. § 3D1.2(d) applies before a court may consider uncharged conduct or conduct for which the defendant was acquitted as relevant conduct under U.S.S.G. § 1B1.3(a)(2). See U.S.S.G. § 1B1.3 cmt. n.3 ("Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts."). The Supreme Court has confirmed that, at least so far as is necessary to calculate the applicable guideline sentencing range, the sentencing court may consider conduct that is not formally charged or that is not an element of the offense of conviction. See United States v. Booker, 543 U.S. at 251-52 (quoting U.S.S.G. § 1B1.3 cmt. background).

   **f.**  **U.S.S.G. § 2X1.1.**

When a defendant has been convicted of an attempt, U.S.S.G. § 2X1.1(b)(1) provides that his base offense level should be decreased three levels, "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for the

apprehension or interruption by some similar event beyond the defendant's control." Id.  The Application Notes to U.S.S.G. § 2X1.1, however, indicate that certain offense guidelines, including U.S.S.G. § 2C1.1, expressly cover attempts, and therefore U.S.S.G. § 2X1.1 does not apply to guideline sentencing calculations under those guideline provisions.  See U.S.S.G. § 2X1.1 cmt. n.1.

## LAW REGARDING SIXTH AMENDMENT RIGHT TO JURY TRIAL

While the United States is often described generally and somewhat loosely as a democracy, and certainly enjoys democratic features, the focus is often on, at the federal government level, the elected branches -- the President and the Congress.  Yet, when one stares at the mosaic that makes up the United States' constitutional system, there is, in fact, nothing more truly democratic than what takes place, day after day, in federal courts across the nation, when the citizens are summoned to the courthouse to apply the law that Congress has passed and the President has signed to the specific facts of a particular case and of an individual defendant.  The citizens of this country valued this democratic mechanism well before the Constitution and the Bill of Rights were drafted, and the passage of time has only ingrained further the importance of jury trials into the fabric of the nation's view of what constitutes justice.

It now cannot be seriously disputed, as the nation enters its third century, that one of the most precious and treasured rights that United States citizens and residents have is the right to trial by jury.  This fundamental right is a cornerstone of the American criminal justice system, and the Sixth Amendment has long embodied and protected this means of resolving criminal charges that the government brings.  As Alexander Hamilton noted in Federalist Paper No. 83, "all are satisfied of the utility of the [jury trial ] institution, and of its friendly aspect to liberty."  The Federalist No. 83, at 499 (Alexander Hamilton)(Clinton Rossiter ed., 1961).

The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government."

Id.  The right to jury trial is "no mere procedural formality, but a fundamental reservation of power in our constitutional structure." Blakely v. Washington, 542 U.S. 296, 306 (2004).  In the majority opinion that Justice Scalia authored, the Supreme Court in Blakely v. Washington acknowledged that, "[j]ust as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." Id.  As Justice Scalia emphasized through a series of quotations from Thomas Jefferson and John Adams, the right of citizens to participate in the judiciary through jury trial is so fundamental that the "judge's authority to sentence derives wholly from the jury's verdict." Id.

## SENTENCING LAW AND GUIDELINES

## I.    CONSTITUTIONALITY OF CONSIDERING RELEVANT CONDUCT AND THE APPLICABLE EVIDENTIARY STANDARD.

In a sentencing proceeding, the United States need only prove the existence of a fact relevant to sentencing by a preponderance of the evidence, rather than beyond a reasonable doubt.  The recent upheaval in federal sentencing jurisprudence has not affected the applicable standard for sentencing proceedings in the Tenth Circuit.  Moreover, conduct for which the defendant was acquitted may fairly be used as relevant conduct so long as the preponderance of the evidence standard is satisfied.

The Supreme Court has expressly and repeatedly approved of sentencing courts' reliance upon, and consideration of, conduct for which the defendant was acquitted under the Guidelines' sentencing regime.  The practice is, in essence, an artifact of the lower burden of proof that has always been applicable to sentencing proceedings.  Furthermore, the use of conduct for which the

-19-

defendant was acquitted for sentencing purposes is consistent with Fifth Amendment due process and the Sixth Amendment right to jury trial.  The Supreme Court and the Tenth Circuit have already both definitively spoken on this issue.

### 1.   Supreme Court Relevant Conduct Jurisprudence.

In Witte v. United States, 515 U.S. 389 (1995), the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and a 1991 attempt to import marijuana.  See id. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See id.   At sentencing, the district court concluded that, because the 1990 attempt was part of the same continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3 and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See id. at 394.

In September 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See id.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See id. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the Double Jeopardy Clause's prohibition against multiple punishments.  See id.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of

a charged offense does not punish the offender for the relevant conduct." United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other Circuit Courts of Appeals, including the Tenth Circuit, that had previously considered this question. See id. at 255 & n. 19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See Witte v. United States, 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  Id. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being 'punished' for uncharged relevant conduct as though it were a distinct criminal 'offense.'"  Id. at 402 (quoting United States' Brief at 23).  Sentencing enhancements do not punish a defendant for uncharged offenses; rather they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  Witte v. United States, 515 U.S. at 403.

In United States v. Watts, 519 U.S. 148 (1997), the Supreme Court, in a per curiam opinion, relied upon the holding of Witte v. United States and upheld a sentencing judge's use of conduct for which the defendant had been acquitted against a double jeopardy challenge.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every

-21-

Circuit Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit --and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence. See id. at 149 (citing, among other authorities, United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).

There were two Ninth Circuit cases on appeal in United States v. Watts. See United States v. Watts, 67 F.3d 790 (9th Cir. 1995); United States v. Putra, 78 F.3d 1386 (9th Cir. 1996).  In United States v. Watts, a jury convicted Vernon Watts of possessing cocaine with intent to distribute, but acquitted him of using a firearm in relation to a drug offense.  See id. at 149-50.  Despite Watts' acquittal on the firearms count, the district court found by a preponderance of the evidence that Watts had possessed guns in connection with the drug offense, and, at sentencing, added two offense levels to his base offense level pursuant to U.S.S.G. § 2D1.1(b)(1).  See id. at 150.  The Ninth Circuit vacated the sentence, holding that "a sentencing judge may not, 'under any standard of proof,' rely on facts of which the defendant was acquitted."  Id. (quoting United States v. Watts, 67 F.3d 790, 797 (9th Cir. 1995))(emphasis in original).

The second case on appeal, United States v. Putra, involved a defendant, Cheryl Putra, whom authorities had videotaped selling cocaine to a government informant on two separate occasions.  See United States v. Watts, 519 U.S. at 150.  The jury convicted Putra of aiding and abetting possession with intent to distribute one ounce of cocaine in association with the first sale, but acquitted her of aiding and abetting possession with intent to distribute five ounces of cocaine in association with the second transaction.  At the sentencing hearing, the district court determined that the United States had proved by a preponderance of the evidence that Putra had been involved in both sales, explained

-22-

that the second sale was relevant **conduct u**nder U.S.S.G. § 1B1.3, and aggregated the amounts of both sales to calculate Putra's base offense level under the Guidelines.  See United States v. Watts, 519 U.S. at 151.  "Reasoning that the jury's verdict of acquittal manifested an 'explicit rejection' of Putra's involvement in the [second] transaction," the Ninth Circuit reversed and vacated the sentence. Id. (quoting United States v. Putra, 78 F.3d at 1389).

The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661:  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information," and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.  The Supreme Court distinguished the different limitations on the presentation of evidence at trial and at sentencing:  "Highly relevant -- if not essential -- to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."  Id. (quoting Williams v. New York, 337 U.S. 241, 247 (1949)).  The Supreme Court noted that, "under the pre-Guidelines sentencing regime, it was 'well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted.'" United States v. Watts, 519 U.S. at 152 (quoting United States v. Donelson, 695 F.2d 583, 590 (D.C. Cir. 1982)(Scalia, J.)).

The Supreme Court in United States v. Watts then turned to the Guidelines.  The Supreme

-23-

Court acknowledged that the Guidelines, like 18 U.S.C. § 3661, articulate "in sweeping language the conduct that a sentencing court may consider in determining the applicable guideline range." United States v. Watts, 519 U.S. at 152-53 (citing U.S.S.G. § 1B1.3). The Supreme Court appeared to be persuaded by the Guidelines' conclusion that, at least for offenses involving "a pattern of misconduct that cannot readily be broken down into discrete, identifiable units that are meaningful for purposes of sentencing," U.S.S.G. § 1B1.3 cmt. background, "relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses." United States v. Watts, 519 U.S. at 153 (quoting U.S.S.G. §1B1.3 comment., backg'd)(emphasis added in United States v. Watts). Considering 18 U.S.C. § 3661 and the Guidelines in totality, the Supreme Court stated that, "[i]n short, we are convinced that a sentencing court may consider conduct of which a defendant has been acquitted." United States v. Watts, 519 U.S. at 154.

Relying on its earlier decision in Witte v. United States, the Supreme Court in United States v. Watts went on to explain why its ruling did not violate the Double Jeopardy Clause. The Supreme Court in United States v. Watts reaffirmed its holding that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." 519 U.S. at 154 (citing Witte v. United States, 515 U.S. at 395).

The Supreme Court in United States v. Watts criticized the Ninth Circuit for "fail[ing] to appreciate the significance of the different standards of proof that govern at trial and sentencing," and stated that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." 519 U.S. at 155 (quoting United States

v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)).  The Supreme Court agreed with the dissenting judge in United States v. Putra, the Honorable J. Clifford Wallace, then-Chief United States Circuit Judge, and adopted the proposition that "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge."  United States v. Watts, 519 U.S. at 155.  The Supreme Court in United States v. Watts reasoned that, because "[a]n acquittal is not a finding of any fact[,] . . . [w]ithout specific jury findings, no one can logically or realistically draw any factual finding inferences."  Id. (quoting United States v. Putra, 78 F.3d at 1394 (Wallace, C.J., dissenting)).

Because the jury's verdict was only dispositive regarding whether there was a reasonable doubt as to the defendant's guilt, the Supreme Court in United States v. Watts concluded that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof."  519 U.S. at 156 (quoting Dowling v. United States, 493 U.S. 342, 349 (1990)).  The Supreme Court acknowledged, however, "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence."  United States v. Watts, 519 U.S. at 156.  In footnote two, the Supreme Court cited cases from the Supreme Court and from the First, Second, Third, Seventh, Eighth, Ninth, and the District of Columbia Circuits that suggested that clear and convincing evidence might be required for judicial findings that result in extraordinary sentence enhancements.  See id. at 156 n.2.  The Tenth Circuit, however, which has rejected a higher standard, created the split in the circuits.  See United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1990)("At least as concerns making guideline calculations the issue of a higher than a preponderance standard is foreclosed in this circuit.").  In the end, the Supreme Court in United States v. Watts reversed the Ninth Circuit and held that even "a jury's

-25-

verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  519 U.S. at 157.

In United States v. Watts, Justices Stevens and Kennedy filed separate dissenting opinions. In his dissent, Justice Stevens conceded that 18 U.S.C. § 3661 does support the per curiam opinion's "narrow holding that sentencing courts may sometimes 'consider conduct of the defendants underlying other charges of which they had been acquitted,'" but countered that the statute "sheds no light on whether the district judges' application of the Guidelines in the manner presented in these cases was authorized by Congress, or is allowed by the Constitution."  519 U.S. at 161 (Stevens, J., dissenting).  Justice Stevens noted that, "[b]y their own terms, the Guidelines incorporate the broadly inclusive language of [U.S.C.] § 3661 only into those portions of the sentencing decision in which the judge retains discretion."  Id. at 162 (Stevens, J., dissenting).  Justice Stevens concluded that, if the evidence upon which a defendant was acquitted is used to increase the defendant's base offense level, it should be proven beyond **a reasonable doubt.  Id. at 163 n.2 (Stevens, J., dissenting)**("Since Watts' base offense level was increased by this evidence, I believe it should have been proved beyond a reasonable doubt.").  Justice Stevens distinguished Watts' and Putra's cases from the Supreme Court's decision in McMillan v. Pennsylvania, 477 U.S. 79 (1986), a case in which the defendant's minimum sentence was enhanced on the basis of a fact proved by preponderance of the evidence.  In McMillan v. Pennsylvania, the Supreme Court upheld a Pennsylvania sentencing provision that established a minimum sentence of five years imprisonment if the sentencing judge found by a preponderance of the evidence that a defendant convicted of certain enumerated felonies visibly possessed a firearm during the commission of the offense.  See 477 U.S. at 80.

Justice Stevens distinguished <u>McMillan v. Pennsylvania</u> from the facts in <u>United States v.</u> <u>Watts</u>, because under the sentencing scheme in <u>McMillan v. Pennsylvania</u>, the maximum sentence was unchanged by the judge's finding.   <u>See</u> <u>United States v. Watts</u>, 519 U.S. at 166 (Stevens, J., dissenting).   Justice Stevens noted that the actual sentence imposed upon the defendant in <u>McMillan</u> <u>v. Pennsylvania</u> "was within the range that would have been available to the judge even if the enhancing factor had not been proved."   <u>United States v. Watts</u>, 519 U.S. at 166 (Stevens, J., dissenting).   Justice Stevens reasoned that "the holding [in <u>McMillan v. Pennsylvania</u>] should not be extended to allow a fact proved by only a preponderance to increase the entire range of penalties within which the sentencing judge may lawfully exercise discretion."   <u>United States v. Watts</u>, 519 U.S. at 166 (Stevens, J., dissenting).   Justice Stevens concluded his dissent:

> Whether an allegation of criminal conduct is the sole basis for punishment or merely one of several bases for punishment, we should presume that Congress intended the new sentencing Guidelines that it authorized in 1984 to adhere to longstanding procedural requirements enshrined in our constitutional jurisprudence.  The notion that a charge that cannot be sustained by proof beyond a reasonable doubt may give rise to the same punishment as if it had been so proved is repugnant to that jurisprudence.

<u>Id.</u> at 169-70.

Justice Kennedy, writing separately in dissent, echoed Justice Stevens' concerns and criticized the per curiam opinion for failing to address distinctions between uncharged conduct, like that addressed in <u>Witte v. United States</u>, and conduct related to a charge for which the defendant was acquitted.   <u>See</u> <u>United States v. Watts</u>, 519 U.S. at 170 (Kennedy, J., dissenting).   Justice Kennedy expressed concern that, at a minimum, "increas[ing] a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal."   <u>Id.</u>

2.      **Tenth Circuit Relevant Conduct Jurisprudence.**

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  In United States v. Coleman, 947 F.2d 1424 (1991), the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See id. at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See id. at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."), and United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply two-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy").

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit in United States v. Coleman ruled that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See id. at 1429.  The Tenth Circuit summarized that, in reviewing federal caselaw, it found "persuasive the decisions that have allowed a sentencing

court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." Id.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that drug quantities used as relevant conduct to establish a defendant's offense level should be proven by clear and convincing evidence rather than by a mere preponderance of the evidence. See 11 F.3d at 1512. Washington objected to his sentencing, because the drug quantity the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his guideline sentence range, from 210 to 262 months, to life. Washington argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." Id. at 1515.

Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," see id. at 1516, it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." Id. (citing McMillan v. Pennsylvania, 477 U.S. at 84). While the phrase "ordinary case" might suggest there are exceptions, the Tenth Circuit's remaining language suggested that it was shutting the door on that possibility. The Tenth Circuit concluded that, "[a]t least as concerns making guideline calculations[,] the issue of a higher than a preponderance standard is foreclosed in this circuit." United States v. Washington, 11 F.3d at 1516. Finally, more recent Tenth Circuit decisions -- issued subsequent to the Supreme Court's holdings in Witte v. United States and United States v. Watts -- have reaffirmed the Tenth Circuit's position regarding the sentencing court's consideration of relevant conduct. See United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the

defendant's argument that a dramatic increase in sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear and convincing evidence standard at sentencing and noting that this argument was "foreclosed by binding precedent" in the Tenth Circuit); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(same).

###    3.    Sixth Amendment Jurisprudence.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution limited this discretion and that the Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. In Blakely v. Washington, the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (additional emphasis removed). In United States v. Booker, the Supreme Court expanded its earlier holdings to apply to sentencing enhancements that exceeded maximum sentences under the Sentencing Guidelines. See 543 U.S. at 239 ("Regardless of whether the legal basis of the accusation is in a statute or in guidelines promulgated by an independent commission, the principles behind the jury trial right are equally applicable.").

The majority opinions in Apprendi v. New Jersey, Blakely v. Washington, and in the

constitutional majority in United States v. Booker reflect the Supreme Court's[2] concern that sentencing enhancements based on uncharged, dismissed, and acquitted crimes may undermine, if not directly contravene, many of the fundamental components of the adversary system that the Framers intended -- specifically notice, jury trial, and proof beyond a reasonable doubt. See United States v. Booker, 543 U.S. at 238 ("[T]he Framers would not have thought it too much to demand that, before depriving a man of [ten] more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to 'the unanimous suffrage of twelve of his equals and neighbors,' rather than a lone employee of the State.")(quoting Blakely v. Washington, 542 U.S. at 313). Justice Scalia noted in Blakely v. Washington that sentencing factors cannot be elevated to the "tail which wags the dog of the substantive offense." 542 U.S. at 307 (quoting McMillan v. Pennsylvania, 477 U.S. at 88). Justice Scalia explained that this threshold would be crossed when legislatures -- and presumably the federal Sentencing Commission -- enact sentencing mechanisms that exceed "the judicial estimation of the proper role of the judge." Blakely v. Washington, 542 U.S. at 307.

　　In United States v. Booker, the Supreme Court expressly rejected, however, any argument that its holding was inconsistent with its earlier holding in United States v. Watts. See United States v. Booker, 543 U.S. at 240 & 240 n.4. In his majority opinion in United States v. Booker, Justice Stevens -- joined by Justices Scalia, Souter, Thomas, and Ginsburg -- described the issue in United States v. Watts as "a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause." United States v. Booker, 543 U.S. at 240 n.4. Justice Stevens stated that the Supreme Court in United States v. Watts "held that the Double Jeopardy Clause permitted a court

---

[2]The same five justices -- Stevens, Scalia, Souter, Thomas, and Ginsburg -- joined in all three opinions.

to consider acquitted conduct in sentencing a defendant under the Guidelines,"[3] but limited the holding by pointing out that "[i]n neither Witte [v. United States] nor [United States v.] Watts was there any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment." United States v. Booker, 543 U.S. at 240. Justice Stevens concluded that the issue the Supreme Court confronted in United States v. Booker "simply was not presented" in United States v. Watts. United States v. Booker, 543 U.S. at 240.

Justice Stevens' opinion in United States v. Booker asserted that the constitutional infirmity of the Guidelines' sentencing regime was not in permitting judges to consider acquitted conduct, but that the Guidelines were binding on district judges. See id. at 233. The constitutional majority in United States v. Booker indicated that there would have been no Sixth Amendment constitutional violations in the cases before them if the Guidelines were advisory. See id.

Justice Thomas, writing separately in dissent in United States v. Booker reached a similar conclusion in finding that the Guidelines, as applied to Defendant Freddie Booker, were unconstitutional because they "required the judge to make findings that increased Booker's offense level beyond the Guidelines range authorized by the jury." Id. at 319 (Thomas, J., dissenting)(emphasis added). Justice Thomas also questioned the constitutionality of the preponderance-of-the-evidence standard as applied to fact finding underlying sentencing enhancements. In critiquing the commentary to U.S.S.G. § 6A1.3, which states that "the Commission

---

[3]Justice Breyer's majority opinion in United States v. Booker -- which Chief Justice Rehnquist, and Justices O'Connor, Kennedy, and Souter joined -- characterizes the scope of the holding in United States v. Watts in a very similar fashion. Justice Breyer states that the Supreme Court "held in United States v. Watts that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found unproved (beyond a reasonable doubt)." United States v. Booker, 543 U.S. at 251.

believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case," see U.S.S.G. § 6A1.3 cmt., Justice Thomas countered that the Supreme Court's holding in United States v. Booker "corrects this mistaken belief." 543 U.S. at 319 n.6 (Thomas, J., dissenting). Justice Thomas continued: "The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant." Id.

Consistent with this conclusion, the Supreme Court in United States v. Booker found those provisions of the Federal Sentencing Reform Act of 1984 that made the Guidelines mandatory, see 18 U.S.C. § 3553(b)(1), or which rely upon the Guidelines' mandatory nature, see 18 U.S.C. § 3742(e), incompatible with the Sixth Amendment, see United States v. Booker, 543 U.S. at 245. Accordingly, the Supreme Court in United States v. Booker severed and excised 18 U.S.C. § 3553(b)(1) -- the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guideline range -- from the remainder of the Act, thus "mak[ing] the Guidelines effectively advisory." Id. The Supreme Court's holding in United States v. Booker "requires a sentencing court to consider Guideline ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." Id. at 245-46.

The Supreme Court has recently confirmed that an advisory guidelines system comports with the Sixth Amendment. In Cunningham v. California, 127 S. Ct. 856 (2007), Justice Ginsburg, joined by the other four justices who had been part of the constitutional majority in United States v. Booker and Chief Justice Roberts, noted that, despite disagreement over the most appropriate method to

-33-

remedy the mandatory Guidelines' constitutional infirmity, all nine justices that took part in the <u>United States v. Booker</u> decision agreed that "the Federal Guidelines would not implicate the <u>Sixth Amendment</u> were they advisory." <u>See id.</u> at 866.  The only other member of the current Supreme Court that did not participate in the <u>United States v. Booker</u> decision, Justice Alito, also acknowledged in <u>Cunningham v. California</u> that the Supreme Court in <u>United States v. Booker</u> "unanimously agreed that judicial factfinding under a purely advisory guidelines system would [] comport with the <u>Sixth Amendment</u>." <u>Cunningham v. California</u>, 127 S. Ct. at 874 (Alito, J., dissenting.).

Not only did making the Guidelines advisory remedy the Supreme Court's Sixth Amendment concerns, it seems to have alleviated the constitutional concerns regarding the appropriate burden of proof that existed under the mandatory system.  A person who is found guilty of a crime beyond a reasonable doubt is exposed to the maximum punishment the statute of conviction allows, rather than the maximum allowed under the Guidelines, and it is therefore constitutional to sentence the guilty defendant any where within the range based on facts proved only by a preponderance of the evidence. <u>See</u>, <u>e.g.</u>, <u>Harris v. United States</u>, 536 U.S. 545, 558 (2002)("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.").  Nevertheless, since <u>United States v. Booker</u>, at least one United States Circuit Judge and several United States District Judges have concluded that sentencing based upon conduct for which the defendant was acquitted is unconstitutional.  <u>See United States v. Faust</u>, 456 F.3d 1342, 1352 (11th Cir. 2006)(Barkett, J., specially concurring)("When a sentencing judge finds facts that could, in themselves, constitute entirely free-standing offenses under the applicable law -- that is, when an enhancement factor could

have been named in the indictment as a complete criminal charge -- the Due Process Clause of the Fifth Amendment requires that those facts be proved beyond a reasonable doubt."); United States v. Coleman, 370 F. Supp. 2d 661, 671 (S.D. Ohio  2005)(Marbley, J.)("[T]he jury's central role in the criminal justice system is better served by respecting the jury's findings with regard to authorized and unauthorized conduct.")(emphasis in original); United States v. Pimental, 367 F.Supp.2d 143, 152 (D. Mass. 2005)(Gertner, J.)("To consider acquitted conduct trivializes 'legal guilt' or 'legal innocence' -- which is what a jury decides -- in a way that is inconsistent with the tenor of the recent case law."); Judge Nancy Gertner, Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing, 32 Suffolk U. L. Rev. 419, 436 (1999)("Actual innocence or actual guilt is less significant in a constitutional criminal justice system than legal guilt or legal innocence, adjudicated by a jury.")(hereinafter Circumventing Juries).

In United States v. Pimental, the Honorable Nancy Gertner, United States District Judge for the District of Massachusetts, discussed at length the federal sentencing scheme in the post Blakely v. Washington and United States v. Booker environment, and called for judges to apply a "beyond a reasonable doubt" standard to relevant conduct.  See United States v. Pimental, 367 F. Supp. 2d at 153.  According to Judge Gertner both the plain language and reasoning of United States v. Booker "substantially undermines the continued vitality of United States v. Watts."  United States v. Pimental, 367 F. Supp. 2d at 150.  Judge Gertner observed that "it makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, . . . and also conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing."  United States v. Pimental, 367 F. Supp. 2d at 150 (internal citation omitted).

Judge Gertner's discussion was premised on her view that "[t]he jury is intended to be the centerpiece of the criminal justice system." United States v. Pimental, 367 F. Supp. 2d at 150. Quoting from her law review article, Judge Gertner stated that, determining "more than actual truth, guilt, or innocence, its decisions represent a popular conception of a 'just verdict.'" Id. (quoting Circumventing Juries at 433). Judge Gertner argued in United States v. Pimental that, "when a jury acquit[s] a defendant based on [the beyond a reasonable doubt] standard, one would have expected no additional criminal punishment would follow." United States v. Pimental, 367 F. Supp. 2d at 150 (quoting Circumventing Juries at 433). According to Judge Gertner, this expectation is "a matter of simple justice." United States v. Pimental, 367 F. Supp. 2d at 150 (quoting Apprendi v. New Jersey, 530 U.S. at 476.).

Judge Gertner concluded that her findings were consistent with Justice Stevens' principal opinion in United States v. Booker, but found that "this position, that one can consider acquitted conduct because the Guidelines are now advisory, seems to hark back to the period pre-mandatory Guidelines." United States v. Pimental, 367 F. Supp. 2d at 151.

> What the judge did in sentencing [before the Guidelines] -- a specialized, professional function -- was totally different from what the jury did. There was no Sixth Amendment issue, or even the requirement of full evidentiary safeguards because sentencing facts did not have binding and determinate consequences. Thus, just as during the pre-Guidelines discretionary sentencing regime, when a judge could consider acquitted conduct in the mix of sentencing facts, so he or she can do so now after [United States v.] Booker.

Id. at 151-52. Judge Gertner distinguished this earlier sentencing regime from sentencing under the mandatory Guidelines, because "while pre-Guideline data may have included acquitted conduct in the mix of sentencing factors, such data did not have quantifiable consequences; in a guideline regime, each fact has a determinate impact." United States v. Pimental, 367 F. Supp. 2d at 152 n.16 (quoting

Circumventing Juries at 433).

Judge Gertner described the current status of federal sentencing law as a hybrid system embodying elements of the purely discretionary pre-Guidelines sentencing and elements of the mandatory rule-based Guidelines sentencing. See United States v. Pimental, 367 F. Supp. 2d at 152. In Judge Gertner's estimation, the nature of this system "has certain consequences in terms of the significance of acquitted conduct, and more generally, the procedural protections at sentencing." Id. These consequences derive from the fact that "when a court considers acquitted conduct it is expressly considering facts that the jury verdict not only failed to authorize; it considers facts of which the jury expressly disapproved." Id. Judge Gertner also criticized the distinction jurists have made between the jury's role of deciding guilt and the judge's task of deciding facts. Judge Gertner contended that this distinction is disingenuous "in this hybrid regime where rules still matter, and certain facts have important, if not dispositive, consequences." Id. at 153. Judge Gertner summarized: "To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense -- as a matter of law or logic." Id.

As a result of her concern for the integrity of jury verdicts, Judge Gertner reasoned, "[e]ven if [United States v.] Watts emerged unscathed from [United States v.] Booker, and a judge may consider all facts, including acquitted conduct, the standard of proof to be applied should be beyond a reasonable doubt." United States v. Pimental, 367 F. Supp. 2d at 153. Because "[c]ertain facts . . . continue to assume inordinate importance in the sentencing outcome," Judge Gertner concluded in United States v. Pimental that "they should be tested by our highest standard of proof." Id.

As a final point, Judge Gertner asserted that, "[i]ndeed, even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth

-37-

Amendment's Due Process requirement is."  Id.  Judge Gertner concluded:

> We cannot have it both ways: We cannot say that facts found by the judge are only advisory, that as a result, few procedural protections are necessary and also say that the Guidelines are critically important.  If the Guidelines continue to be important, if facts the Guidelines make significant continue to be extremely relevant, then Due Process requires procedural safeguards and a heightened standard of proof, namely, proof beyond a reasonable doubt.

Id. at 154.

In United States v. Coleman, 370 F. Supp. 2d 661 (S.D. Ohio 2005), the Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, took a position similar to Judge Gertner in United States v. Pimental.  Judge Marbley acknowledged in United States v. Coleman that, "[i]n interpreting the practical effects of the two majority opinions in [United States v.] Booker, most courts agree that judicial fact-finding may be made by a preponderance of the evidence so long as the court is operating in an advisory regime."  United States v. Coleman, 370 F. Supp. 2d at 667.  Judge Marbley disagreed with this conclusion and indicated that, in his opinion, all enhancements should be determined under the beyond a reasonable doubt standard.  See id. at 668. Nevertheless, because of  what he described as compelling dicta from the United States Court of Appeals for the Sixth Circuit, and a "multi-circuit consensus," Judge Marbley stated that he would "continue to review enhancements, with the exception of those relating to acquitted conduct, by a preponderance of the evidence."  Id.

Judge Marbley recognized conduct for which the defendant has been acquitted as exceptional circumstances and asserted that "the beyond a reasonable doubt standard reflects the seriousness of the determinations made within the criminal justice system, as opposed to the civil system."  Id. at 668 n.8 (citing United States v. Gray, 362 F. Supp. 2d 714, 720 (S.D. W. Va. 2005)).  This assertion

reflected Judge Marbley's understanding that, "[t]o the extent that an enhancement detracts from a defendant's liberty, its imposition should be considered with extreme scrutiny."  Id.

Similar to Judge Gernter in United States v. Pimental, Judge Marbley's analysis in United States v. Coleman was premised on his view that assessing conduct for which the defendant was acquitted against a standard less than beyond a reasonable doubt eviscerated a criminal defendant's Sixth Amendment right to a jury trial.  See United States v. Coleman, 370 F. Supp. 2d at 668.  Judge Marbley acknowledged that, in United States v. Watts, the Supreme Court had expressly authorized sentencing courts to consider acquitted conduct under a preponderance of the evidence standard, but agreed with Judge Gertner that "[t]he viability of [United States v.] Watts . . . was questioned by Justice Stevens' constitutional majority opinion in [United States v.] Booker."  United States v. Coleman, 370 F. Supp. 2d at 669.  In United States v. Coleman, Judge Marbley noted Justice Stevens' narrow interpretation of the Supreme Court's holding in United States v. Watts, and the Justice's observation that, because the Supreme Court "did not even have the benefit of full briefing or oral argument" in United States v. Watts, "[i]t is unsurprising that [the Supreme Court] failed to consider fully the issues presented" in United States v. Booker.  United States v. Coleman, 370 F. Supp. 2d at 669 (quoting United States v. Booker, 543 U.S. at 240 n.4).

Judge Marbley contended that United States v. Booker, read in the context of its predecessors -- Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, Ring v. Arizona, 536 U.S. 584 (2002), and Blakely v. Washington -- detracts from United States v. Watts' continued validity.  See United States v. Coleman, 370 F. Supp. 2d at 670.  Judge Marbley interpreted this line of cases to stand for the proposition that "a judge's determination at sentencing must be guided by the jury-authorized verdict."  Id.  According to Judge Marbley in United States v. Coleman, even Justice

Breyer's remedial opinion in United States v. Booker was not inconsistent with this conclusion, because it "limit[ed] sentences to the jury-authorized statutory maximum," as the United States Code defines that sentence. United States v. Coleman, 370 F. Supp. 2d at 670.

With this background, Judge Marbley found it paradoxical that Supreme Court caselaw had "elevated the role of the jury verdict by circumscribing a defendant's sentence to the relevant statutory maximum authorized by a jury; yet, the jury's verdict is not heeded when it specifically withholds authorization." Id. Judge Marbley then stated that he was unpersuaded by courts, including the Tenth Circuit, that have attempted to resolve this paradox, and thereby reconcile the holding of United States v. Watts with more recent jurisprudence, "by focusing solely on the narrow remedial holding of Justice Breyer's opinion" in United States v. Booker. United States v. Coleman, 370 F. Supp. 2d at 670-71.

In reaching this conclusion, Judge Marbley was critical of the Tenth Circuit's decision in United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), a case in which the Tenth Circuit upheld a sentence enhanced on the basis of conduct for which the defendant was acquitted despite acknowledging a perceived tension in a court's consideration of such conduct. The Tenth Circuit in United States v. Magallanez admitted:

> The defendant in this case might well be excused for thinking that there is something amiss, under this constitutional principle, with allowing the judge to determine facts on which to sentence him to an additional 43 months in prison in the face of a jury verdict finding facts under which he could be required to serve no more than 78 months.

Id. at 683. Despite this recognition, Judge Marbley, in United States v. Coleman, characterized the Tenth Circuit's holding in United States v. Magallanez as "upholding the sentence because [United States v.] Booker did not sever 18 U.S.C. § 3661" -- the provision which states that "[n]o limitation

shall be placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for the purpose

of imposing an appropriate sentence."  United States v. Coleman, 370 F. Supp. 2d at 671 (quoting

18 U.S.C. § 3661).

Judge Marbley was also critical of the Tenth Circuit's limited discussion of the perceptions

that courts' use of conduct for which a defendant was acquitted engender.

> Although the statement about the defendant's perception of his sentence is made in
> passing by the [Tenth Circuit] in [United States v.] Magallanez, this Court notes that
> consideration of acquitted conduct has a deleterious effect on the public's view of the
> criminal justice system.  A layperson would undoubtedly be revolted by the idea that,
> for example, a "person's sentence for crimes of which he has been convicted may be
> multiplied fourfold by taking into account conduct of which he has been acquitted."
> United States v. Frias, 39 F.3d 391, 393 (2d Cir. 1994)(Oakes, J., concurring).  As
> Judge Oakes opined, "this is jurisprudence reminiscent of Alice in Wonderland . . .
> As the Queen of Hearts might say, "Acquittal first, sentence afterwards."  Id.  See
> also Daniel J. Freed, Federal Sentencing in the Wake of Guidelines: Unacceptable
> Limits on the Discretion of Sentencers, 101 Yale L.J. 1681, 1714 (1992)("Most
> lawyers, as well as ordinary citizens unfamiliar with the daily procedures of criminal
> law administration, are astonished to learn that a person in this society may be
> sentenced to prison on the basis of conduct of which a jury has acquitted him, or on
> the basis of charges that did not result in conviction.").

United States v. Coleman, 370 F. Supp. 2d at 671 n.14.  Because Judge Marbley found that "the

jury's central role in the criminal justice system is better served by respecting the jury's findings with

regard to authorized and unauthorized conduct," he found the Tenth Circuit's reasoning in United

States v. Magallenez unpersuasive.

Judge Marbley also recognized collateral consequences of enhancing sentences based on

acquitted conduct.  He noted that enhancements "would not only affect Defendants' liberty by

lengthening the sentences imposed, but would also result in the 'heightened stigma associated with

an offense the legislature has selected as worthy of greater punishment.'"  United States v. Coleman,

370 F. Supp. 2d at 672 (quoting Apprendi v. New Jersey, 530 U.S. at 467).  Judge Marbley stated that, by so using enhancements, "[t]he legal innocence associated with acquittal would be summarily eviscerated."  Id.  Moreover, Judge Marbley contended that "consideration of acquitted conduct skews the criminal justice system's power differential too much in the prosecution's favor."  United States v. Coleman, 370 F. Supp. 2d at 672.  In Judge Marbley's view, consideration of acquitted conduct permitted the prosecution "a second bite at the apple," and  "allow[ed] the government to perfect its case and ready it for re-litigation at the sentencing 'mini-trial.'"  Id.

Finally, Judge Marbley acknowledged that his result was not without any potential drawbacks. Judge Marbley stated that he was "cognizant that a negative consequence of refusing to consider acquitted conduct is the possibility that 'eliminating the availability of acquitted conduct evidence at sentencing might alter prosecutorial charging decisions.'"  Id. at 673 (internal quotation omitted). This potential result is because prosecutors might decline to bring certain charges because they fear those charges may result in acquittal and, instead, wait to bring facts supporting those charges to the court's attention as relevant conduct at sentencing.  See id.  While Judge Marbley refused to minimize the import of this concern, he argued that "it simply does not justify overriding jury verdicts of acquittal."  Id.

Despite these concerns that judges around the nation have raised, the Tenth Circuit has spoken clearly that it does not agree with their position.  In United States v. Magallanez, one of the cases that Judge Marbley criticized in United States v. Coleman, the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement findings/analysis, and that United States v. Watts retained vitality.  See United States v. Magallanez, 408 F.3d at 684-85.

United States v. Magallanez involved plain error review of a drug sentence in which a jury found the defendant, Pete Magallenez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See id. at 676.  As part of its verdict, the jury, through special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See id. at 682.  The district court's findings increased the defendant's guideline sentencing range from 63 to 78 months to 121-151 months.  See id. at 682-83.

Magallanez argued that the district court's additional findings with respect to the amount of drugs attributable to him violated Blakely v. Washington.  See id. at 683.  On appeal, Magallanez argued that Blakely v. Washington and United States v. Booker required the district court to accept the jury's special finding of drug quantity for sentencing purposes.  See United States v. Magallanez, 408 F.3d at 683.

The Tenth Circuit in United States v. Magallenez admitted that, "[a]t first blush, there might seem to be force to [Magallenez'] argument," and noted that "[t]he constitutional violation identified in Blakely [v. United States] and [United States v.] Booker, after all, was the Sixth Amendment right to trial by jury."  United States v. Magallanez,  408 F.3d at 683.  The Tenth Circuit countered, however, that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  Id. at 684.  The Tenth Circuit in United States v. Magallenez cited United States v. Watts and stated that, in that case, it was

-43-

significant that the Supreme Court had held that the Ninth Circuit's decisions conflicted not only with the Sentencing Guidelines, but with the "clear implications of 18 U.S.C. § 3661." United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 149). The Tenth Circuit reasoned that, because the Supreme Court had stated in United States v. Watts that the Guidelines did not alter the unlimited nature of the information 18 U.S.C. § 3661 authorized sentencing courts to consider, "it follows that the [Supreme] Court's partial invalidation of the Guidelines in [United States v.] Booker could not have altered it, either." United States v. Magallanez, 408 F.3d at 684 (citing United States v. Watts, 519 U.S. at 152).

The Tenth Circuit supported its conclusion by arguing that the decision in United States v. Watts "was predicated on the rationale that 'different standards of proof . . . govern at trial and sentencing.'" United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 155). The Tenth Circuit continued by acknowledging the Supreme Court's recognition in United States v. Watts that "[a]n acquittal by the jury proves only that the defendant was not guilty beyond a reasonable doubt," and that "[b]oth before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence." United States v. Magallanez, 408 F.3d at 684 (citing United States v. Watts, 519 U.S. at 156). Consistent with this interpretation of United States v. Watts, the Tenth Circuit held that "[a] jury verdict of acquittal on related conduct, therefore, 'does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'" United States v. Magallanez, 408 F.3d at 684 (quoting United States v. Watts, 519 U.S. at 157).

In a footnote to its opinion in United States v. Magallenez, the Tenth Circuit acknowledged

Justice Stevens' language in United States v. Booker -- the language that Judge Marbley references in United States v. Coleman -- that calls into question the vitality of United States v. Watts after the Supreme Court's decision in United States v. Booker. See United States v. Magallenez, 408 F.3d at 684 n.1. The Tenth Circuit concluded, however, that, because Justice Stevens, in United States v. Booker, distinguished United States v. Watts, and stated that "[n]one of our prior cases is inconsistent with today's decision," United States v. Booker, 543 U.S. at 241, United States v. Watts "remains good law, and it is not the place of an inferior court to overrule it," United States v. Magallenez, 408 F.3d at 684 n.1. Consequently, the Tenth Circuit concluded "[n]othing in [United States v.] Booker changes this analysis." United States v. Magallenez, 408 F.3d at 684.

To the contrary, the Tenth Circuit noted that, "18 U.S.C. § 3661, which underlay the decision in [United States v.] Watts, remains in full force." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines "effectively advisory," the Tenth Circuit in United States v. Magallenez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." United States v. Magallanez, 408 F.3d at 685 (internal citation omitted). In the Tenth Circuit's estimation, "the only difference is that the court has latitude, subject to reasonableness review, to depart from the resulting Guideline ranges." Id.

## LAW REGARDING GUIDELINE SENTENCES

The Supreme Court's holding in United States v. Booker "requires a sentencing court to consider Guideline ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." United States v. Booker, 543 U.S. at 245-46. Under the new advisory Guidelines scheme, "district courts have a freer hand in determining sentences." United States v. Trujillo -

Terrazas, 405 F.3d 814, 819 (10th Cir. 2005).  Thus, "while the Guidelines will exert gravitational pull on all sentencing decisions . . . district courts now have more discretion to tailor sentences to the individual circumstances of a defendant."  Id.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

18 U.S.C. § 3553(a)(2)(A)-(D).  See 18 U.S.C. § 3551 ("[A] defendant who has been found guilty of an offense described in any Federal Statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.").  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines, (ii) the nature of the offense and the defendant's character; (iii) the types of available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, the Tenth Circuit has clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant because "the

-46-

Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." Id. (internal quotations omitted). See United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006)(holding that sentences within the Guidelines' recommended range will be presumed reasonable). In summation, a sentencing court must now consider all the factors enumerated in 18 U.S.C. § 3553, including the Guidelines, and resolve conflicts between them; the Guidelines remain a highly significant factor in the court's analysis and sentences that fall within the Guidelines' range are presumptively reasonable.

Moreover, in Justice Breyer's remedial opinion in United States v. Booker, the Supreme Court recognized the important role that the advisory Guidelines continue to play in facilitating Congress' goal of achieving national uniformity of sentencing. See 543 U.S. at 246. To conform with Congressional intent, sentences must be "reasonable." See id. at 260-61. Consistent with that recognition, and the presumptive reasonableness of Guidelines sentences, the Tenth Circuit has adopted a two-step approach to reviewing criminal sentences for reasonableness. See United States v. Kristl, 437 F.3d at 1055. First, the Tenth Circuit reviews the district court's consideration of the applicable guideline range; if "the district court properly considered the relevant Guidelines range and sentenced the defendant within that range, the sentence is presumptively reasonable." Id. Second, once this presumption is established, the burden shifts to the defendant to demonstrate why the sentence is unreasonable in light of the other relevant sentencing factors. See id.

On the other hand, criminal sentences that vary materially from the properly calculated guideline sentencing range are not accorded a presumption of reasonableness. See United States v. Cage, 451 F.3d at 594-95. In United States v. Cage, the Tenth Circuit reversed a district court and

remanded for new sentencing on grounds that the district court's variance from a guideline term of imprisonment was unreasonable.  The defendant in United States v. Cage, Sabrina Cage, had pled guilty to conspiracy to distribute more than 500 grams of methamphetamine and of using a telephone to facilitate a drug trafficking offense.  See id. at 587-88.  Based on Cage's mitigating role in the offense and the United States' concession that Cage had been a minor participant in the conspiracy, the Tenth Circuit determined that the district court had properly calculated her guideline imprisonment range as forty-six to fifty-seven months.  See id. at 587.  The district court originally sentenced cage to forty-six months imprisonment, but, aware that the Supreme Court's decision in United States v. Booker was pending at the time of Cage's sentencing, the district court fashioned an alternative sentence of six days to be imposed if the Supreme Court were to find the Guidelines unconstitutional.  See id. at 588.  On the day United States v. Booker was decided, Cage filed a motion to apply the alternative sentence and the district court subsequently ordered the Bureau of Prisons to release her.  See id.

The district court articulated its reasons for imposing its alternative sentence at the time it issued its order enforcing the application of that sentence.  See id. at 595.  The district court emphasized that: (i) Cage had a son with medical problems for whom no one else could care; (ii) Cage did not play a major role in the conspiracy and her background and post-conviction behavior indicated that she was unlikely to commit further crimes; (iii) Cage did not have a continuing drug problem and had no previous criminal history; and (iv) the time that Cage had spent in jail was sufficient to impress upon her the wrongfulness of her action.  See id.

In finding the district court's alternative sentence unreasonable, the Tenth Circuit observed that the factors the sentencing court cited were all properly considered under 18 U.S.C. § 3553(a),

-48-

but found that the sentencing court had placed undue weight on them.  See id.  The Tenth Circuit

explained that the determination whether a sentence was reasonable depended on the strength of the

correlation between the magnitude of the presence of the factors enumerated in 18 U.S.C. § 3553(a)

and the extent of the district court's departure from the guideline sentence:

> Because this case presents such an extreme divergence from the best estimate of
> Congress's conception of reasonableness expressed in the Guidelines, it should be
> considered reasonable only under dramatic facts.  Had the comparative difference
> been smaller but still outside the guidelines range, the district court's decision would
> not have been presumptively reasonable but an appropriate justification would suffice
> for this court to determine that it is reasonable.  However, where as here, a district
> court effectively ignores the advice of the Guidelines that the crimes of conspiracy to
> distribute methamphetamine and using a telephone to facilitate drug trafficking merit
> a substantial term in prison, we should only treat the actual sentence as being a
> reasonable application of the [18 U.S.C.] § 3553(a) factors if the facts of the case are
> dramatic enough to justify such a divergence from the politically-derived guideline
> range.

Id. at 594-95.  The Tenth Circuit found that the facts of Cage's case were not dramatic enough to

justify the material variance from the guideline sentence.  The Tenth Circuit acknowledged that the

factors the district court articulated might justify some departure from the guideline range, but

concluded that "they simply are not dramatic enough to warrant such an extreme downward

variance."  Id. at 596.

## ANALYSIS

Vigil argues that the USPO did not correctly calculate the guideline sentencing range in the

PSR, because the USPO used conduct of which Vigil was acquitted to enhance his base offense level.

Vigil contends that this use of conduct of which he was acquitted violates his Fifth and Sixth

Amendment rights and that, because the basis for his sentence enhancements were unconstitutional,

the sentence the USPO calculated is unreasonable under the Guidelines.  See Vigil's PSR Objections

at 8.  Because the Court believes that, for the most part, the USPO has accurately and constitutionally calculated Vigil's guideline sentence, the Court will overrule his objection to the PSR.

The United States does not object to the USPO's calculation of Vigil's guideline sentence. The United States does object, however, to the USPO's recommendation that the Court vary downward from the applicable guideline sentence.  See United States' PSR Objections at 1.  Because the Court does not believe the guideline sentence is a reasonable sentence -- and will therefore vary from the guideline sentence -- the Court will overrule the United States' objection.

## I.   **FACTUAL OBJECTIONS.**

Vigil makes a number of factual objections to assertions and characterizations that the USPO makes in the PSR.  See Vigil's PSR Objections at 17-19.  The United States has not made any factual objections to the PSR.

### A.   **PSR ¶ 18, at 5.**

Paragraph 18 of the PSR states, in pertinent part: "In February 2002, Michael Montoya authorized Angelo Garcia to approach Mr. Vigil to discuss using the Kent Nelson proceeds for campaign expenses.  Mr. Garcia spoke with Robert Vigil and explained that the money would come from the Kent Nelson kickbacks."  PSR ¶ 18, at 5.  Vigil objects to this assertion and states that "Garcia testified that he never told [] Vigil that the money for his in kind campaign contributions were from [k]ickbacks."  Vigil's PSR Objections at 17.

The Court notes that the testimony from several witnesses at both trials, including Montoya and Garcia, indicates that Garcia, at Montoya's request, informed Vigil that Montoya, Garcia, Sandoval, and Nelson would assist Vigil in paying for some of his campaign expenses, but there is no testimony that any of the co-conspirators ever expressly stated to Vigil that those expenses would

-50-

be paid for with kickback monies.  At the sentencing hearing, the United States' counsel agreed that this testimony was the extent of the evidence regarding the source of the monies the co-conspirators spent on behalf of Vigil's 2002 campaign.  See Transcript of Hearing at 13:2-3 (Gerson)(taken January 24, 2007)("Hearing Transcript").[4]  In addition, the Court acknowledges that Government's Exhibit 490, a ledger of campaign expenses that Montoya, Garcia, Sandoval, and Nelson allegedly incurred on Vigil's behalf, and that Garcia testified he shared with Vigil, does not indicate the source of the funds used to pay for those expenses.

Consistent with these findings, the Court will sustain Vigil's objection to paragraph 18 in part. The Court will eliminate the word "kickbacks" at the end of the second sentence of paragraph 18 and place a period after the name "Nelson."

**B.    PSR ¶ 22, at 6.**

Paragraph 22 of the PSR states that "[u]nder the New Mexico Campaign Reporting Act, Mr. Vigil was obliged to report all cash contributions, in kind contributions, and expenditures."  PSR ¶ 22, at 6.  The PSR asserts that none of Vigil's campaign reports made references to an "April 2002 payment to Digital Arts, or to the May 30, 2002 purchases of advertising."  Id.  Vigil objects to these statements, contending that a representative from the New Mexico Secretary of State's Office ("NMSOSO") testified that in-kind contributions would not require a listing of who paid for services. See Vigil's PSR Objections at 17.

At the sentencing hearing, the Court indicated that, consistent with Vigil's objection, it would add a sentence to paragraph 22 that a representative from the NMSOSO testified that in-kind

---

[4]The Court's citations to the transcript of the sentencing hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

contributions would not require a listing of who paid for services.  See Hearing Transcript at 14:2-6 (Court).  The United States' counsel indicated that he had no objection to this addition.  See id. at 13:20 (Gerson).  The Court has reviewed the transcript of the trial, however, and specifically the testimony of Lupita Blea, the SOSO's custodian of records and an employee in the SOSO's ethics department, and does not find any record of her making this statement.  Nevertheless, because the United States did not dispute this legal point at the sentencing hearing, the Court will sustain Vigil's objection in part and will make the more limited finding that in-kind contributions do not require a listing of who paid for services.

**C.   PSR ¶ 23, at 6.**

In paragraph 23, the PSR asserts, in pertinent part, that Montoya testified that he had a conversation with Vigil in which Vigil told Montoya that, when Vigil was Treasurer, "he would run all the NMSTO's investments through Mr. Montoya."  PSR ¶ 23, at 6.   Vigil objects to this statement and contends that Montoya never testified that Vigil would run all his investments through Montoya.  See Vigil's PSR Objections at 17.

At the sentencing hearing the United States referenced testimony which it asserted supported the PSR's statement.  See Hearing Transcript at 14:22-16:12 (Gerson).  The United States pointed to the following portions of Montoya's testimony:

> A:  Vigil had talked with me about maybe hooking up with one of the investment firms, and by me hooking up with one of the investment firms, he would be able to help that investment firm.  So we talked about that.
>
> Q:  And helping that investment firm out, what did you understand him to mean?
>
> A:  The same type of -- Same type of business I was doing with Kent Nelson.
>
> Q:  That he would steer business to that particular investment firm in return for cash

-52-

payments.  Is that what you understood?

A:  Yes, sir.

Transcript of Excerpts from the Testimony of Michael Montoya at 4:5-15 (taken September 13, 2006).

Q: All right.  Also in the latter part of 2002, did you reach an understanding with Mr. Vigil concerning his use of multiple investment advisors?

A:  Robert talked about that, yes sir.

Q:  And did you have an understanding as to whether you would receive cash for transactions done by investment advisors if you could line up those advisors?

A:  Yes.

Q:  What was your understanding?

A:  Just that I would -- if I could hook up with a firm or -- so that -- we'd work out something.

Q:  Any by "asking," what do you mean?

A:  Well, payments, however – However we could work it out.  We didn't discuss it or anything.  We just – He just indicated to me, Michael, hook up with an investment firm; we can work something out.

Id. at 7:16-8:6 (taken September 14, 2006).  Based on these proffers, the Court sustained Vigil's

objection at the sentencing hearing and ruled that it would eliminate the sentence to which Vigil

objected.[5]

_____

[5]In further review of the record, however, the Court has found evidence that supports the statement in the PSR.  On September 14, 2006 -- in response to a question regarding whether he had ever spoken to Vigil about whether he would continue to receive cash for NMSTO's transactions once Vigil became Treasurer -- Montoya testified: "We just talked about that one time when Robert mentioned to me, after he had won in the primary, that, 'Michael, when I get in, all of my investment activity will be run through you.'"  Id. at 7:4-6.  Nevertheless, consistent with its ruling at the sentencing hearing, the Court will eliminate the statement from the PSR.

-53-

### D.      PSR ¶ 24, at 7.

Paragraph 24 of the PSR states, in pertinent part, that "Mr. Garcia testified that he told Robert Vigil that he did not have any other broker from whom he would receive kickbacks, and he reminded Robert Vigil that Nelson had been the source of the campaign funds." PSR ¶ 24, at 7. Vigil objects to this statement, contending that Garcia never so testified. See Vigil's PSR Objections at 17.

At the hearing on this motion, the United States cited testimony which it asserted supports paragraph 24 of the PSR. See Hearing Transcript at 17:2-19:10 (Gerson). The United States pointed to the following portions of Garcia's testimony:

Q: Okay. Did you have any conversation with Mr. Vigil when he gave you this letter in June 2003?

A: In fact, I met him at the Olive Garden in Santa Fe, and we were outside in the parking lot, and I was telling him about Kent Nelson, you know, that basically I need for him to get some kind of business. He showed me this letter, and he says, "Look, he's being investigated." I says, "That's news to me." I said, "Let me have it. Let me call Kent Nelson, find out what's going on."

Q: Just to clear up who's saying which of those things, you said that you saw Mr. vigil at the Olive Garden restaurant in Santa Fe, correct?

A: Correct.

Q: And did you raise the question of when Mr. Nelson was going to get business when you saw Mr. Vigil?

A: Yes.

Q: And did Mr. Vigil reply to you?

A: Yes, he did.

Q: And is that when Mr. Vigil showed you this letter, Exhibit 469?

A: Yes.

Q:  And was it Mr. Vigil who then said to you, "Look, he's being investigated?"

A:  Correct.

Q:  When Mr. Vigil said that, did you understand him to be referring to Kent Nelson?

A:  Yes.

Q:  And is that when you said back to Mr. Vigil, "This is news to me?"

A:  Oh, I was surprised.  Basically, I didn't know about it until, basically, when he showed me the letter and I read it.  After he left, I asked him if I could keep it, which he gave me the letter, and I called Kent Nelson, and Kent Nelson wasn't aware of it, so I faxed it to him.

Q:  Okay.  Did you say anything more to Mr. Vigil about whether you needed Kent Nelson to do work for the treasurer's office?

A:  Yes.

Q:  What did you say to Mr. Vigil?

A:  I told him, you know, "He's my guy, he's the one that I got to help you with the campaign, and you need to get him some kind of flex repos with him."

Q:  Do you know what became of this investigation that was referenced in the letter, Exhibit 469?

A:  I don't have any idea.

Q:  Now, sometime later in 2003, did Mr. Nelson finally start to get business again from the treasurer's office?

A:  Yes, he did.

Transcript of Testimony of Angelo Garcia at 120:22-122:19("Garcia Testimony").  Because the Court believes that the statement that Vigil objects to in paragraph 24 is more an inference from the testimony the United States points to than a precise statement as to what Garcia testified, the Court will sustain Vigil's objection.  The Court will delete the sentence in paragraph 24 that reads "Mr.

Garcia testified that he told Robert Vigil that he did not have any other broker from whom he would

receive kickbacks, and he reminded Robert Vigil that Nelson had been the source of the campaign

funds."

### E.    PSR ¶ 26, at 7.

Paragraph 26 of the PSR references the kickback payments underlying Counts Three through

Twenty-One of the Fifth Superceding Indictment.  Paragraph 26 states in part:

> These counts were supported by testimony of Angelo Garcia, Leo Sandoval, Kent
> Nelson, bank records, and recorded conversations with Robert Vigil. . . .  Mr. Garcia
> testified at trial that he received the funds from Mr. Nelson as the agent of Robert
> Vigil.  The continued payments by Kent Nelson were a condition of his continuing to
> receive work from the NMSTO, and that, if Mr. Nelson had stopped sending the
> money, Mr. Vigil would have stopped giving Kent Nelson flex repo work.

PSR ¶ 26, at 7.  Vigil objects to this paragraph, contending that Garcia did not offer testimony

specifically stating that the continued payments by Nelson were a condition of his continuing to

receive work from the NMSTO and that, if Nelson had stopped sending the money, Vigil would have

stopped giving Nelson flex repo work.  See Vigil's PSR Objections at 17.

The Court finds that there is evidence in the record to support the USPO's statements in

paragraph 26.  During his direct examination, Garcia testified that it was his understanding that, if

Nelson stopped sending money to Garcia, "we'd get rid of Kent Nelson."  Garcia Testimony at

142:6-8.  When asked to elaborate on that answer, Garcia clarified: "Basically, I would tell Robert

that [Nelson] wasn't cooperating with me, and he wouldn't give him any more business."  Id. at

142:11-12.  Because the Court believes that the USPO has fairly stated the testimony in paragraph

26, it will overrule Vigil's objection.

**F.      PSR ¶ 28, at 8.**

Paragraph 28 of the PSR describes a June 8, 2004, conversation between Vigil and Garcia. The USPO states that, during a conversation regarding how Garcia could contribute to Vigil's campaign fund, "Mr. Garcia told Robert Vigil 'yeah, I'll give it to you in cash or whatever and whatever's gonna benefit you.'" PSR ¶ 28, at 8. The PSR then indicates that Vigil replied "yeah, I'll play that." Id. Vigil objects, contending that he did not respond "yeah, I'll play that." Vigil's PSR Objections at 17. Vigil represents that the United States agreed with him about what the tape stated and had, at one point, corrected its transcript, only to change it again to reflect the disputed phrase. See id.

At the sentencing hearing, the United States' counsel disputed that the transcripts were ever changed and indicated that the transcript that was shown to the jury contained the phrase, "yeah, I'll play that." Hearing Transcript at 22:24-23:8 (Gerson). Vigil's counsel continued to represent that Vigil did not use the disputed phrase during the recorded conversation. Based on these representations, the Court will not strike any of the USPO's statement in paragraph 28, but it will add a note indicating that Vigil maintains the tapes do not reflect that he used the phrase "yeah, I'll play that," and that the United States continues to maintain that the tapes do so reflect his use of that phrase. Vigil's objection is sustained in part.

**G.      PSR ¶ 31, at 8.**

Paragraph 31 of the PSR references the kickback payments underlying Counts Three through Twenty-One of the Fifth Superceding Indictment. Paragraph 31 of the PSR states, in pertinent part:

> The payments listed in Racketeering Acts One through Nineteen were confirmed by checking accounts and credit card records of Angelo Garcia and of Kent Nelson . . . The transactions listed in Counts Three through Twenty-One represented transfers

of funds from Mr. Nelson's commission proceeds into Mr. Garcia's bank accounts, where they became available for both Robert Vigil and Mr. Garcia to draw upon. These were fully supported by Kent Nelson's bank records and by Mr. Garcia's bank records.

PSR ¶ 31, at 8.  Vigil objects to this paragraph, contending that there was no testimony that "Vigil had  any authorized or other access to Angelo Garcia's bank accounts."  Vigil's PSR Objections at 17.  Vigil represents that, in fact, Garcia testified that he used money received from Nelson for his own use, and that there was no way for Vigil to specifically identify the source of the monies Garcia contributed to Vigil's campaign.  See id.

Because the Court has not found, and the United States has not cited, any evidence that Vigil had any authorized or other access to Garcia's accounts, the Court will strike the portion of paragraph 31 that suggests Vigil had such access.  The second-to-last sentence of paragraph 31 will be edited to state: "The transactions listed in Counts Three through Twenty-One represented transfers of funds from Mr. Nelson's commission proceeds into Mr. Garcia's bank accounts, where they became available for Mr. Garcia to draw upon."  The Court will not make any other alterations to paragraph 31.  Vigil's objection is sustained in part and overruled in part.

**H.    PSR ¶ 37, at 10.**

Paragraph 37 states in part: "On August 24, 2005, Kent Nelson flew to New Mexico and once again was met by Robert Vigil in an official NMSTO vehicle."  PSR ¶ 37, at 10.  Vigil objects to this paragraph and represents that the recording of the August 24, 2005 meeting between himself and Nelson clearly demonstrates that he was not driving a government vehicle at that time.  See Vigil's PSR Objections at 17.  At the sentencing hearing, the United States' counsel indicated that there was no support for the assertion that Vigil was driving a government vehicle at the time of his meeting

with Nelson, and agreed with Vigil's objection.  See Hearing Transcript at 27:14 (Gerson).

The Court will sustain Vigil's objection to paragraph 37.  The Court will strike the phrase "in an official NMSTO vehicle," from the first sentence of paragraph 37.  The Court will not make any other changes to the paragraph.

**I.      PSR ¶ 40, at 11-12.**

Paragraph 40 of the PSR involves the facts underlying Count Twenty-Four of the Fifth Superceding Indictment.  Paragraph 40 states, in pertinent part:

> In May 2005, George Everage submitted his response to the SLOM RFP.  Assistant Treasurer Ann Marie Gallegos contacted him to say that he needed to hire Samantha Sais-Montoya, the wife of former State Treasurer Michael Montoya, as a subcontractor in order to get the job. . . .  [Everage] contacted Robert Vigil, who told him to offer her a small sum of the contract.  When Mr. Everage next spoke with Ms. Sais-Montoya, however, she demanded $60,000 per year[.]  . . .  Mr. Everage . . . had several telephone conversations with Ann Marie Gallegos and with Robert Vigil concerning Ms. Sais-Montoya.  Ms. Gallegos told him that it would really help Robert Vigil if Mr. Everage could reach an agreement with Ms. Sais-Montoya.  Robert Vigil told George Everage that if he was unable to reach an agreement with Ms. Sais-Montoya, the State Treasurer's Office would rescind the RFP and start over.  In the meantime, Mr. Everage had already been issued a contract for the SLOM position, which he had signed and returned to the State Treasurer's Office, and George Everage was already receiving work under the contract.  Finally, when Mr. Everage was unable to reach an agreement with Ms. Sais-Montoya, he received a letter from agency counsel Dave Romero, Jr., denying that he had a contract, but asserting that, even if he did have a contract, the State Treasurer's Office was rescinding it.

PSR ¶ 40, at 11-12.  Vigil objects to this paragraph, contending that the testimony reflected that Everage was unsure whether he had a contract.  See Vigil's PSR Objections at 18.  Vigil also maintains that there was no testimony offered that Gallegos ever told Everage that, if he was unable to reach an agreement with Sais, the NMSTO would rescind the original SLOM RFP and restart the bidding process with a second RFP.  See id.  Vigil asserts that the evidence clearly demonstrated that Sais' participation in the securities-lending project was part of the NMSTO's evaluation of Everage's

-59-

response to the RFP.  See id.

Everage's testimony indicates that he believed he had a contract.  See  Transcript of Direct Testimony of George Everage at 91:7-14 (taken September 15, 2006)("Everage Direct Examination").  There was also evidence that Gallegos told Everage that the NMSTO would rescind and reissue the RFP if he did not come to an agreement with Sais, and that the NMSTO considered Sais' participation in the securities-lending project a component of Everage's response to the SLOM RFP.  On June 23, 2005, Gallegos wrote a letter to Everage asserting that, at the time of the letter's writing, there was no legal contract in effect between Everage and the NMSTO.  See id. at 128:21-129:1; Letter from Ann Marie Gallegos to George Everage (dated June 23, 2005)(Government's Exhibit 528)("Gallegos Letter").  The letter further indicated that prior communications were an attempt to negotiate acceptable terms, not actual or implied threats, and that Everage "must surely recognize that in responding to the RFP, and including Ms. Samantha Sais as a proposed subcontractor, that [the NMSTO's] evaluation of [Everage's] proposal would include an evaluation of the knowledge, skills and abilities you [and Sais] both offer."  Gallegos Letter at 1.  The letter concluded:

> In any event, we must conclude negotiations or failing that, reissue the RFP and hope for more satisfactory responses.  Should you **fail to respond to this request by 5:00 p.m. July 8, 2005, we will consider your offer withdrawn** and will proceed with the re-issuance of the RFP for a Securities Lending Oversight Manager.

Gallegos Letter at 2 (bold emphasis in original).  In light of this evidence, the Court will overrule Vigil's objection to paragraph 40.

### J.      PSR ¶ 44, at 12.

Paragraph 44 states, in pertinent part, that "Mr. Vigil told Mr. Perkins that he would have to

hire Ms. Sais-Montoya as a subcontractor, and would have to pay her from his revenues." PSR ¶ 44, at 12. Vigil objects to this paragraph, contending that Perkins never testified "that he would have to pay Sais from his revenues." Vigil's PSR Objections at 18. Vigil argues that, in fact, Perkins testified that he wanted all the contract, but got only a portion. See id. Vigil maintains that it was clear that Perkins would get paid for the work which he did and that Sais would get paid for the work which she did. See id.

Vigil's characterization of Perkins' testimony is partially inaccurate. Perkins testified that several days after receiving his response to the Second SLOM RFP, Gallegos contacted Perkins and informed him that the NMSTO had awarded the information-technologies portion of the SLOM contract to Sais. See Transcript of Trial at 45:10-12 (Perkins)(taken September 18, 2006). At a subsequent meeting at the NMSTO involving Vigil, Perkins, Sais, and Gallegos, Vigil informed Perkins that thirty percent of the fees generated through securities lending would be allocated to Perkins' firm, and that Sais would receive half of that thirty percent. See id. at 49:4-10.

To more accurately reflect the evidence presented at trial, the Court will change the sentence to which Vigil objects to read as follows: "Mr. Vigil told Mr. Perkins that Mr. Perkins would receive thirty percent of the fees generated through securities lending and that Ms. Sais-Montoya would receive one-half of that thirty percent." Vigil's objection is sustained in part and overruled in part.

## K.    PSR ¶ 45, at 13.

Paragraph 45 of the PSR concerns Vigil's motivation for committing the crime of conviction, attempted extortion. Paragraph 45 states:

> Evidence adduced at trial also established, by a preponderance, that Robert Vigil was motivated to provide income to the Sais-Montoya household in order to forestall a campaign by Michael Montoya for the State Treasurer job, as well as for the purpose

of buying Mr. Montoya's continued silence as to Robert Vigil's improper use of extortion kickbacks in his 2002 election.  Mr. Montoya met with NMSTO employee Judy Espino[s]a and showed her the records of Mr. Vigil's unreported campaign expenditures.  Ms. Espino[s]a reported back to Robert Vigil concerning these financial records.  Robert Vigil's motive in committing the attempted extortion of George Everage thus ties this offense directly into the ten year long racketeering history of the NMSTO.

PSR ¶ 45, at 13.  Vigil objects to this paragraph, contending that the United States did not offer

evidence of Vigil's motive or evidence explaining why Vigil committed the attempted extortion.  See

Vigil's PSR Objections at 18.

The Court, in ruling on Vigil's post-trial motions for acquittal filed pursuant to rule 29, has

already found evidence of Vigil's intent and motive to commit the attempted extortion for which he

was convicted.

The United States contends that it presented evidence at trial of several factors that motivated Vigil, while serving as the New Mexico State Treasurer, to transfer funds to Michael Montoya, the former State Treasurer who preceded Vigil.  See United States' Response to Motion to Set Aside Verdict and For Judgment of Acquittal on Count 24 of the Fifth Superseding Indictment Under Fed. R. Crim. P. 29 as the Evidence is Insufficient to Sustain a Conviction at 3, filed October 19, 2006 (Doc. 412)("United States' Response").  First, there is evidence that, in 1999, after Vigil was unsuccessful in his bid to run for Governor of New Mexico, Montoya hired Vigil as his Deputy State Treasurer.  See Transcript of Trial at 158:10-15 (Montoya)(taken September 13, 2006)("Sept. 13 Transcript").  There is also evidence that, later, when Vigil ran for the position of Treasurer, Montoya, in combination with Angelo Garcia and Kent Nelson, provided Vigil significant monetary and other support.  See id. at 242:22-243:12.  There was evidence presented that Montoya and Garcia kept a record of these expenditures, that they shared this record with Vigil, and that they indicated to Vigil that they, and Nelson, had mutually contributed to cover these expenses.  See id. at 258:6-14; id. at 263:2-6.

The United States further asserts that it presented evidence that Vigil failed to report these contributions on his campaign finance report forms and knew that Montoya possessed documents through which he could prove Vigil received this money.  See United States' Response at 4.  Montoya testified that he showed these documents to Judy Espinosa, the New Mexico State Treasurer's Office's ("NMSTO") public relations officer, and Espinosa confirmed that she confronted Vigil about what she

-62-

believed were contributions missing from his campaign finance reports. See id. at 285:2-286:24 (Montoya); Transcript of Trial at 49:11-14 (Espinosa) (taken September 19, 2006) ("Sept. 19 Transcript").

In addition, there was also evidence presented that Montoya placed pressure on Vigil by threatening to run against him in the next election. See Sept. 13 Transcript at 283:10-15 (Montoya). The jury heard a recorded conversation in which Vigil said to Garcia that, if the NMSTO was going to contract with Everage for securities lending, the NMSTO needed to ensure that Samantha Sais, Montoya's wife, receive a job as part of the transaction. See Transcript of Recorded Conversation at 7 (taken February 23, 2005) (Government's Exhibit 589-T). Vigil's acknowledgment that "[Montoya] is all over there telling everybody he's running for Treasurer" followed that statement. Id. Similarly, during a conversation with Nelson on May 2, 2005, Vigil indicated that he felt he could prevent Montoya from running for State Treasurer by securing Sais a job in the securities-lending project. See Transcript of Recorded Conversation at 38-39 (taken May 2, 2005) (Government's Exhibit 592-T).

Substantial Step Opinion at 2-3 (footnote omitted). In light of this evidence the Court will overrule Vigil's objection to paragraph 45.

### L.   PSR ¶ 46, at 13.

Paragraph 46 of the PSR references Vigil's participation in a racketeering conspiracy that the United States alleged in Counts One and Two of the Fifth Superceding Indictment. Paragraph 46 states, in pertinent part that, "[a]lthough the evidence adduced at trial did not show participation in the racketeering activity by Mr. Vigil before 1999, and did not show any financial benefit to Robert Vigil before he took office as State Treasurer in 2003, his relevant conduct for sentencing purposes should include all of the racketeering conduct going back to 1999." PSR ¶ 46, at 13. Vigil objects to this paragraph, stating that no financial benefit to him was ever shown. See Vigil's PSR Objections at 18.

The Court will overrule Vigil's objection to paragraph 46. The Court believes its earlier findings, as well as the findings it made in resolving Vigil's rule 29 motions, suggest that Vigil received some financial benefit from the racketeering activity. In connection with its findings of fact

at the sentencing hearing, however, the Court will adjust the PSR to reflect that Vigil began participating in the criminal enterprise on or about April 1, 2002, and received his first financial benefits from the enterprise in the spring of 2002.

**M.     PSR ¶ 48, at 13.**

Paragraph 48 of the PSR discusses the nature of Vigil's role in the racketeering conspiracy. Paragraph 48 states, in pertinent part:

> The uncontradicted testimony at trial showed that no investment decisions were made without the defendant's approval. . . . Mr. Montoya testified that the defendant could have prevented the kickback scheme from continuing once he became Deputy State Treasurer, but that the defendant never did so because he understood that he would become the beneficiary of the scheme once he became the State Treasurer." PSR ¶ 48, at 13-14.

Vigil objects to this paragraph, and maintains that the USPO's contention that the testimony demonstrated that no investment decisions were made without his approval is improper. See Vigil's PSR Objections at 18. Vigil represents that Montoya testified that he made all investment decisions during his administration and that Nelson testified that he did not even know Vigil during the Montoya Administration. See id. Vigil states that the most to which Montoya testified was that Vigil was his deputy and was in charge of the investment department. See id. Vigil also contends that Montoya never testified that Vigil could have prevented the kickback scheme from continuing once he became Deputy State Treasurer, or to any reason for why he did not do so. See id.

Because the Court believes that the evidence supports that statements the USPO makes in paragraph 48 by a preponderance of the evidence, the Court will overrule the objection.

**N.     PSR 49, at 14.**

Paragraph 49 of the PSR states, in pertinent part that, "[t]he evidence at trial established the

-64-

defendant was in charge of flexible repurchase agreements ('flex repos') during his tenure as Deputy

State Treasurer."  PSR ¶ 49, at 14.  Vigil objects to this paragraph, contending that the evidence at

trial established only that he was in charge of signing off on documents for processing transactions

that others had initiated.  See Vigil's PSR Objections at 18.

Montoya gave the following testimony regarding Vigil's responsibilities while Deputy State

Treasurer:

> Q:  Okay.  What were his [Vigil's] job duties as deputy state treasurer?
>
> A:  I had two deputies, Robert and Sam Taylor, and Robert was in charge of the investment side.  Sam was in charge of the internal side, the employees.  Robert was in charge of local government pool cash management and investments.
>
> Q:  And when you say that he was in charge of the investment side, is that to say that the New Mexico State Treasurer's Office during you second term made investments?
>
> A:  Yes, sir.
>
> Q:  What kind of investments did the New Mexico State Treasurer's Office make during your second term of office?
>
> A:  We were doing flex repos, agency paper, treasury paper, and putting money in different banks.

Transcript of Trial at 158:21-159:10 (Montoya)(taken September 13, 2006).  Given the language of

Montoya's testimony, the Court finds that the USPO's statement is adequately supported in the

record, and will overrule Vigil's objection to paragraph 49.

**O.     PSR ¶ 50, at 14.**

Paragraph 50 of the PSR discusses the appointment of Kent Nelson as investment advisor to

the NMSTO in 1999, and again after Vigil became State Treasurer in 2003.  Paragraph 50 states, in

pertinent part:

In order to appoint Mr. Nelson, Michael Montoya issued a call for applications (a "Request for Proposals" or "RFP") and established a reviewing committee, but this was a sham process because Mr. Montoya had pre-selected Kent Nelson. Mr. Montoya put Robert Vigil on the reviewing committee. Mr. Montoya testified at trial that either he or Mr. Sandoval told the defendant that Mr. Nelson was Michael Montoya's choice for the job. The defendant's scoring sheet was entered into evidence at trial, showing that the defendant scored Mr. Nelson the highest of all the applicants for the position, even though there were better qualified applicants in the running (including the incumbent, Peter Simons). One of the categories on the score sheet was for experience in performing investments with the proceeds of a new source of state funds called Tax Revenue Anticipation Notes (or "TRANS"). As of 1999, the only investment advisor who had ever invested TRANS proceeds for the NMSTO was Peter Simons. In order to make Kent Nelson's point total come out on top, the defendant actually scored Mr. Nelson higher in this category than he scored Mr. Simons. The evidence further showed that, years later, when the defendant took office as State Treasurer in 2003, NMSTO employee Mark Canavan told the defendant that Kent Nelson had never been qualified to be appointed as an investment advisor, and that even after doing the work for four years he still did not satisfy the minimal pre-requisites for the job. The defendant nonetheless reappointed Mr. Nelson

. . . .

PSR ¶ 50, at 14. Vigil objects to this paragraph, contending that the evidence showed only that Vigil completed an evaluation for financial investment advisors, and that Nelson's application had been falsified, thereby warranting a high score from any evaluator. See Vigil's PSR Objections at 18.

At the sentencing hearing, Vigil's counsel clarified that he did not have factual objections to the statements in paragraph 50, but had concerns about the inferential conclusions drawn from the statements. See Hearing Transcript at 37:10-12 (Bowles). Given Vigil's representations at the sentencing hearing, for the limited purpose of ruling on the factual objections to the PSR, the Court will overrule Vigil's objection to paragraph 50.

**P.    PSR ¶ 51, at 14-15.**

Paragraph 51 of the PSR discusses concerns individuals in state government conveyed to Vigil -- while Vigil was Deputy State Treasurer -- about the NMSTO's use of Nelson as an investment

advisor, and transactions executed through Nelson after the NMSTO purportedly fired Nelson.

Paragraph 51 states, in pertinent part:

> In November of 2000, the defendant wrote Kent Nelson a letter telling him that his contract was being terminated. The termination letter was a sham, however, as the defendant continued using Mr. Nelson as an investment advisor to obtain bids on flex repos throughout the remainder of the defendant's term as Deputy State Treasurer. . . . The defendant accordingly had actual knowledge that fees were being paid to Mr. Nelson for flex repos even after the defendant had supposedly fired him.

PSR ¶ 51, at 14-15. Vigil objects to this paragraph, contending that Nelson testified that Montoya

told him to disregard the letter of termination that Vigil signed. See Vigil's PSR Objections at 19.

Vigil contends that it was clearly Montoya's decision to continue using Nelson as a bidding agent.

See id.

At the sentencing hearing, Vigil's counsel clarified that he did not have objections regarding

the factual accuracy of the statements in paragraph 51, but had concerns about the inferential

conclusions drawn from the statements. See Hearing Transcript at 37:21-22 (Bowles). Given Vigil's

representations at the sentencing hearing, for the limited purpose of ruling on the factual objections

to the PSR, the Court will overrule Vigil's objection to paragraph 51.

### Q. PSR ¶ 52, at 15.

Paragraph 52 of the PSR discusses Vigil's knowledge of his co-conspirators involvement in

a kickback scheme. Paragraph 52 states:

> The foregoing facts establish that the defendant knew that Michael Montoya was receiving cash in return for steering investments through Kent Nelson or other associates of the racketeering enterprise. This conclusion is further supported by the trial testimony of Mr. Montoya and Mr. Garcia, in the course of which each related conversations he had with the defendant in mid to late 2002 concerning the use of investment advisors by the NMSTO. Based upon these conversations, Michael Montoya and Angelo Garcia each concluded that the defendant knew that Mr. Montoya had been receiving cash from Kent Nelson and other associates in return for

investment work.

PSR ¶ 52, at 15.  Vigil objects to this paragraph and contends that no evidence was ever presented that he had any direct knowledge that Montoya was receiving kickbacks from Nelson.  <u>See</u> Vigil's PSR Objections at 19.  Vigil contends that Montoya said he never told him he received kickbacks. <u>See</u> <u>id.</u>

At the sentencing hearing, Vigil's counsel clarified that his objection was to the conclusory nature of these statements and not necessarily to the statements' factual accuracy.  <u>See</u> Hearing Transcript at 37:21-22 (Bowles).  Given Vigil's representations at the sentencing hearing, for the limited purpose of ruling on the factual objections to the PSR, and because the Court concludes the record supports the statements made in paragraph 52, the Court will overrule Vigil's objection.

**R.     PSR ¶ 60, at 26-29.**

The USPO contacted Everage in an effort to obtain a victim impact statement.  Everage provided the written victim impact statement contained in paragraph 60 of the report.  It is the policy of the USPO in the District of New Mexico to include in their entirety written victim impact statements received from victims in a defendant's PSR.

Vigil objects to any of Everage's statements to the extent that they contradict statements in the record and were not presented at trial.  <u>See</u> Vigil's PSR Objections at 19.  Vigil represents that he has challenged those statements in briefing with the Court and will challenge any relevant statements on appeal.  <u>See</u> <u>id.</u>  Other than a reference to his briefing, however, Vigil does not specify what statements in the PSR he is challenging.  The Court will note Vigil's objection to Everage's statement to the extent that evidence does not support it or it contradicts the record, but will overrule Vigil's objection to paragraph 60.  It is proper for the Court to consider the victim's statements at

sentencing.

### S.   PSR ¶ 82, at 35.

Paragraph 82 of the PSR states that Vigil was married to his wife, Viola Vigil, on September 8, 1973 in Las Vegas, New Mexico.  See PSR ¶ 82, at 35.  Vigil objects to this paragraph and states that he and his wife were married in Villanueva, New Mexico.

The USPO made this correction in its Addendum to the PSR.  See Addendum at 9.  The Court will dismiss this objection as moot.

## II.   THE PSR -- FOR THE MOST PART -- PROPERLY APPLIES THE UNITED STATES SENTENCING GUIDELINES AND ACCURATELY CALCULATES THE GUIDELINE IMPRISONMENT TERM.

Vigil's primary objections are legal ones.  He contends, through both a constitutional analysis and through a guideline argument, that the USPO should not include any of what he calls "acquitted conduct," and enhancements based thereon, in the guideline calculation.  Hence, Vigil maintains that, as currently calculated, his sentence is not only unconstitutional, but it is incorrect under the Guidelines.  In attempt to avoid Vigil's constitutional issues, the Court will address the guideline calculation objection first.  See United States v. Visinaiz, 96 Fed. Appx. 594, 598 (10th Cir. 2004)(holding federal courts should avoid constitutional issues when a case may be decided on other grounds).

### A.   THE PSR PROPERLY CALCULATED VIGIL'S GUIDELINE TERM OF IMPRISONMENT TO INCLUDE TWENTY YEARS.

The Court believes that U.S.S.G. § 2C1.1 is the most appropriate guideline for the offense conduct charged in the count of which Vigil was convicted.  Consistent with this finding, the Court must group Vigil's count of conviction with the other counts with which he was charged pursuant

to U.S.S.G. § 3D1.2(d) and for which there is a preponderance of the evidence.  Accordingly, the Court will overrule Vigil's objection to the USPO's calculation of the guideline imprisonment range.

> **1.    U.S.S.G. § 2C1.1 is the "Guideline Most Appropriate for the Offense Conduct Charged in the Count of Which the Defendant was Convicted."**

The Court's first task is to determine the "guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted."  U.S. Sentencing Guidelines, Appendix A -- Statutory Index, Introduction.  Part C of Chapter Two is titled "Offenses Involving Public Officials and Violations of Federal Election Campaign Laws."  U.S.S.G. § 2C1.1 is titled "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions."  The base offense level under U.S.S.G. § 2C1.1 is fourteen if the defendant was a public official and twelve otherwise. See U.S.S.G. § 2C1.1(a)(1)-(2).  In addition, U.S.S.G. § 2C1.1 provides for enhancements if the offense involved more than one extortion, see id. § 2C1.1(b)(1), if the value of the extorted payment was greater than $5,000.00, see id. § 2C1.1(b)(2), and if the defendant was an elected and/or a high-level decision making public official, see id. § 2C1.1(b)(3).  Considering all these factors in totality, U.S.S.G. § 2C1.1  seems a leading candidate for most appropriate guideline.

Part B of Chapter Two is titled "Basic Economic Offenses."  Three guidelines with potential to be the "guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted" are contained in Subpart Three of Part B, which is titled "Robbery, Extortion, and Blackmail."  Of these three, U.S.S.G. § 2B3.1, titled "Robbery," seems the least appropriate potential guideline.  It starts with a base offense level of twenty and can, given the  facts

of the case, be increased dramatically.   Specifically, the base offense level under U.S.S.G. § 2B3.1

may be enhanced if the robbery involved the property of a financial institution or post office, see id.

§ 2B3.1(b)(1), if a firearm or other dangerous weapon was discharged, brandished, possessed, or

otherwise used in the commission of the robbery, see id. § 2B3.1(b)(2), and if any victim sustained

bodily injury in association with the robbery, see id. § 2B3.1(b)(3).   Interestingly, however, the Court

does not need to consider other related counts, see U.S.S.G. § 3D1.2(d); the facts of the offense are

deemed sufficient.   The Court will not consider U.S.S.G. § 2B3.1 as a candidate for most appropriate

guideline in this case.

        The second potential candidate for most appropriate guideline in Subpart Three of Part Two

is U.S.S.G. § 2B3.2, titled "Extortion by Force or Threat of Injury or Serious Damage."   Because

the Court has determined that the jury may have found extortion by fear of economic harm, this

guideline is a possible candidate.   Upon closer examination of its enhancements, however, the Court

does not believe it is the "most appropriate."   The base offense level under U.S.S.G. § 2B3.2 is

eighteen, but similar to U.S.S.G. § 2B3.1, it can be increased dramatically.   The base offense level

may be enhanced if the offense involved threat of death, bodily injury, or kidnapping, see U.S.S.G.

§ 2B3.2(b)(1), if the value of the extorted payment was greater than $10,000.00, see id. §

2B3.2(b)(2), if a firearm or other dangerous weapon was discharged, brandished, possessed, or

otherwise used in the commission of the offense, see id. § 2B3.2(b)(3), if any victim suffered bodily

injury in association with the offense,   see id. § 2B3.2(b)(4), and, if any person was abducted or

restrained to facilitate the commission of the offense or to facilitate escape, see id. § 2B3.2(b)(5).

In addition, U.S.S.G. § 2B3.2 contains two cross references to other guideline provisions when the

offense occurred under circumstances that would constitute murder or attempted murder.   See

U.S.S.G. § 2B3.2(c)(1)-(2).  As with the requirements of U.S.S.G. § 2B3.1, in applying U.S.S.G. §

2B3.2, the Court does not need to consider other related counts.  See U.S.S.G. § 3D1.2(d).

None of the sentencing enhancements applicable under U.S.S.G. § 2B3.2 -- except perhaps

subsection (b)(2)("amount demanded or the loss to the victim exceeded $10,000") -- plainly apply

to Vigil's crime of conviction.  Moreover, the application notes to U.S.S.G. § 2B3.2 emphasize

violence, physical force and personal injury over moderate economic harm.

> This guideline applies if there was any threat, express or implied, that reasonably
> could be interpreted as one to injure a person or physically damage property, or any
> comparably serious threat, such as to drive an enterprise out of business.  Even if the
> threat does not in itself imply violence, the possibility of violence or serious adverse
> consequences may be inferred from the circumstances of the threat or the reputation
> of the person making it.  An ambiguous threat, such as "pay up or else," or a threat
> to cause labor problems, ordinarily should be treated under this section.

U.S.S.G. § 2B3.2 cmt. n.2.  Of equal importance is that the application notes to U.S.S.G. § 2B3.2

distinguish crimes involving public officials, noting that the guidelines for bribery involving public

officials are found in Part C of Chapter Two, and mentioning that extortion under color of official

right is covered under U.S.S.G. § 2C1.1.  See U.S.S.G. § 2B3.2 cmt. n.3.  Finally, while it is perhaps

possible to squeeze fear of economic harm into the scope of U.S.S.G. § 2B3.2, under the

circumstances of this case, it would appear that U.S.S.G. § 2C1.1 remains more appropriate.  What

caselaw is available supports the conclusion that U.S.S.G. § 2B3.2 is not the most appropriate.

In United States v. Inigo, 925 F.2d 641 (3d Cir. 1991), the United States Court of Appeals

for the Third Circuit reviewed the sentences of three defendants  who had been convicted under the

Hobbs Act of attempting and conspiring to extort $10,000,000.00 from E.I. DuPont de Nemours and

Company ("DuPont").  See id. at 643.  The defendants in United States v. Inigo had stolen

proprietary textile technology while DuPont employees and had offered to sell the technical

information back to DuPont in exchange for not selling the data to competitors or producing textiles on their own.  See id. at 644-46.  On appeal, one of the defendants argued that the district court had erred in sentencing him under U.S.S.G. § 3B3.2 rather than U.S.S.G. § 2B3.3, the section titled "Blackmail and Similar Forms of Extortion."  United States v. Inigo, 925 F.2d at 658.

The Third Circuit in United States v. Inigo agreed with the defendant, noting that "extortion has a different meaning under the guidelines than it does under the Hobbs Act."  Id.  The Third Circuit reasoned that, whereas the elements of 18 U.S.C. § 1951 are established when an extortioner induces his victim to part with property through fear of economic harm (and affects interstate commerce), "Sentencing Guideline [U.S.S.G.] § 2B3.2, as it relates to extortion through fear of economic harm, indicates that quite serious economic harm must be threatened before the extortion guideline applies."  United States v. Inigo, 925 F.2d at 658.

In reaching its conclusion, the Third Circuit in United States v. Inigo found that the consequences of the defendant's crime, "if completed, would have been purely economic," and emphasized that "physical force was not involved."  Id. at 659.  The Third Circuit remanded the defendant's case for resentencing under U.S.S.G. § 2B3.3, because, although both U.S.S.G. § 2B3.2 and U.S.S.G. § 2B3.3 reference demands for money, "the difference between them lies in the kind of harm threatened."  United States v. Inigo, 925 F.2d at 659.  The Third Circuit, relying in part on U.S.S.G. § 2B3.2's application note's focus on violence and physical force, held that U.S.S.G. § 2B3.2 required "either a physical threat or an economic threat so severe as to threaten the existence of the victim."  United States v. Inigo, 925 F.2d at 659.  Despite the large amount of money the defendants had demanded, the Third Circuit concluded that "[n]o such threat was made in this case."  Id.

The Third Circuit in United States v. Inigo pointed to one additional factor that suggests U.S.S.G. § 2B3.3 is more interested in purely economic crimes and U.S.S.G. § 2B3.2 is more precisely aimed at those crimes that involve violence.  See United States v. Inigo, 925 F.2d at 659.  The provision of U.S.S.G. § 2B3.2 that provides for sentence enhancements based on the value of the property underlying the offense, U.S.S.G. § 2B3.2(b)(2), calculates additional offense levels based on the table in U.S.S.G. § 2B3.1(b)(7).  The table in U.S.S.G. § 2B3.1(b)(7) has eight offense levels and treats equally all losses over $5,000,000.00.  The provision of U.S.S.G. § 2B3.3 that provides for sentence enhancements based on the value of the property underlying the offense, however, U.S.S.G. § 2B3.3(b)(1), calculates additional offense levels based on the table in U.S.S.G. § 2B1.1.  The table in U.S.S.G. § 2B1.1 has sixteen offense levels and assigns various enhancements at incremental levels up to $400,000,000.00.

Considering all these factors, the Court does not believe that U.S.S.G. § 2B3.2 is the "most appropriate" guideline for the crime of which Vigil was convicted.  While Vigil's conviction could possibly be squeezed into the scope of U.S.S.G. § 2B3.2's language, the Court believes that U.S.S.G. § 2C1.1 and U.S.S.G. § 2B3.3 remain better candidates.  The Court will choose between those guidelines.

U.S.S.G. § 2B3.3 appears to cover extortion involving only a demand or receipt of money, and "where there clearly is no threat of violence to person or property."  U.S.S.G. § 2B3.3 cmt. n.1.  The base offense level under U.S.S.G. § 2B3.3 is nine, see id. § 2B3.3(a), and the offense level may be enhanced if the value of the extorted payment exceeds $2,000.00, see id. § 2B3.3(b).  Pursuant to U.S.S.G. § 3D1.2(d), the Court does not consider related counts when determining the offense level under U.S.S.G. § 2B3.3.  The guideline has two cross references, both to one of the other

guidelines the Court has considered.  The first cross reference states that, if the offense involved extortion under color of official right, apply U.S.S.G. § 2C1.1.  See U.S.S.G.§ 2B3.3(c)(1).  The second cross reference states that, if the offense involved extortion by force or threat of injury or serious damage, apply U.S.S.G. § 2B3.2.  See U.S.S.G. § 2B3.3(c)(2).

U.S.S.G. § 2B3.3 also appears to be aimed at comparatively minor crimes.  The "Background" section to U.S.S.G. § 2B3.3, for example, states that "[e]xtortionate threats to injure a reputation, or other threats that are less serious than those covered by [U.S.S.G.] § 2B3.2, may also be prosecuted under 18 U.S.C. §§ 875-877, which carry higher maximum sentences.'"[6]  U.S.S.G. § 2B3.3 cmt. background.

The Court rests its decision to apply U.S.S.G. § 2C1.1 over U.S.S.G. § 2B3.3 on three primary reasons.  First, the Court believes that the plain language of the Guidelines points the Court to U.S.S.G. § 2C1.1.  In Appendix A, the Introduction tells the Court to "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted."  Count Twenty-Four charged Vigil with violating the Hobbs Act by making a threat of economic harm and, in the conjunctive, of acting under color of official right.  See Indictment at 31.  Thus, the indictment charged Vigil with committing an extortionate act under color of official right.  The plain language of the Introduction to Appendix A would suggest U.S.S.G. § 2C1.1 is the most appropriate guideline.

Moreover, the cross reference in U.S.S.G. § 2B3.3(c)(1) also states that, "[i]f the offense involved extortion under color of official right, apply [U.S.S.G.] § 2C1.1."  The verdict form stated

---

[6]The statutes referenced in the Background, 18 U.S.C. §§ 875-877, all prohibit extortionate or threatening communications transmitted through interstate commerce or the mail service.

the jury found Vigil guilty as charged in Count Twenty-Four.  See Verdict at 5.  Assuming that the

jury did as it stated, the offense "involved extortion under color of official right."  Again, the plain

language of U.S.S.G. § 2B3.3(c)(1) would suggest U.S.S.G. § 2C1.1 is the most appropriate

guideline.

Second, the Guidelines have a philosophical preference throughout for the higher sentence.

The application notes to U.S.S.G. § 1B1.1, the guideline section that instructs sentencing courts how

to apply the Sentencing Guidelines, instruct that, "[w]here two or more guideline provisions appear

equally applicable, but the guidelines authorize the application of only one such provision, use the

provision that results in the greater offense level."  U.S.S.G. § 1B1.1 cmt. n.5.  Application Note 5

points to U.S.S.G. § 2A2.2(b)(2) as an example.  Pursuant to U.S.S.G. § 2A2.2(b)(2), if a firearm

is both discharged and brandished, the provision applicable to the discharge of the firearm -- the

provision embodying the greater enhancement -- would be used.  See U.S.S.G. § 1B1.1 cmt. n.5.

While the Court, as has been discussed above, does not believe that U.S.S.G. § 2C1.1 and U.S.S.G.

§ 2B3.3 appear equally applicable, and while Application Note 5 to U.S.S.G. § 1B1.2 does not

expressly state that the Court should always select the greater offense level, by analogy, it supports

the Court's selection of U.S.S.G. § 2C1.1 under the circumstances of this case.  In any case, the

Guidelines plainly allow the Court to go to the higher offense level and do not mandate the Court

choose the guideline with the lower offense level.  Again, by analogy, this philosophical preference

supports the Court's finding that U.S.S.G. § 2C1.1, which has a greater offense level than U.S.S.G.

§ 2B3.3, is the most appropriate guideline.

Third, when the Court looks at the sentencing enhancements and commentary discussions in

all four of the extortion guidelines, none seems more applicable than U.S.S.G. § 2C1.1.  The cross-

reference in U.S.S.G. § 2B3.3 suggests that, if the crime of conviction involves a person holding a political office, the Court should handle it under U.S.S.G. § 2C1.1, not under the other extortion guidelines.  In sum, the Guidelines point to U.S.S.G. § 2C1.1 as the most appropriate guideline for Count Twenty-Four as charged in the Fifth Superseding Indictment -- the count under which Vigil was convicted.

### 2.    The USPO Properly Applied U.S.S.G. § 3D1.2(d) to the Facts of this Case.

U.S.S.G. § 1B1.2(b) provides that, after the Court selects the appropriate guideline, it must determine the applicable guideline range in accordance with U.S.S.G. § 1B1.3 (Relevant Conduct).

### a.    U.S.S.G. § 1B1.3(a)(1).

U.S.S.G. § 1B1.3(a)(1) requires the Court to determine the offense level considering all acts and omissions "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1).  Vigil argues that none of the conduct underlying Counts One through Twenty-Three occurred during the commission of the offense in Count Twenty-Four, in preparation for that offense, or in the course of attempting to avoid detection for that offense.  See Vigil's PSR Objections at 10; Hearing Transcript at 55:17-24 (Bowles).  Vigil  maintains that, because of the absence of those elements, none of the conduct underlying Counts One through Twenty-Three constitutes "relevant conduct" as defined in U.S.S.G. § 1B1.3(a).  See Vigil's PSR Objections at 10.

The USPO states in its Addendum that its guideline calculations do not rely on the conduct underlying Counts One through Twenty-Three occurring during the commission of, in the preparation for, or in the course of attempting to avoid detection of the conduct underlying Count Twenty-Four. See Addendum at 3.  The USPO maintains that these factors are merely some of the factors that the

-77-

Court needs to examine when attempting to determine if multiple counts should be considered part of relevant conduct.  See id.  The USPO agrees that, under the circumstances of Vigil's case, the scope of U.S.S.G. § 1B1.3(a)(1) would not encompass the conduct underlying Counts One through Twenty-Three.

The Court agrees with Vigil and the USPO that U.S.S.G. § 1B1.3(a)(1) does not encompass the conduct underlying Counts One through Twenty-Three.  Subdivisions (1)(A) and (1)(B) of U.S.S.G. § 1B1.3(a)(1) remain applicable, however, because they help define the conduct that the Court must consider for Count Twenty-Four under the other subsections of U.S.S.G. § 1B1.3(a).

### b.        U.S.S.G. § 1B1.3(a)(2).

The United States grounds its argument that the conduct underlying Counts One through Twenty-Three is relevant on U.S.S.G. § 1B1.3(a)(2).  See United States' PSR Objections at 4-6. Vigil counters that subsection (a)(2) does not apply, for two reasons.  First, Vigil asserts that the Guidelines do not require grouping of Counts One through Twenty-Three with Count Twenty-Four. See Vigil's PSR Objections at 11.  Second, Vigil contends that the United States has not established that Count Twenty-Four is part of the "same course of conduct or common scheme or plan" with Counts One through Twenty-Three.  Id. (quoting U.S.S.G. § 1B1.3(a)(2)).

The Court notes at the outset that Vigil does not, either in his written objections or in his argument at the sentencing hearing, draw distinctions between any of the first twenty-three counts and concedes that all of Counts One through Twenty-Three may have been related to each other.  See Vigil's PSR Objections at 10.  Vigil merely contends that those counts were not related to the attempted extortion charge, which involved an attempt by Vigil to direct Everage to hire Sais.  See id.  Thus, for purposes of this argument, the Court will assume that, if Count Twenty-Four may be

grouped with any of Counts One through Twenty-Three, they all may be grouped.

As to Vigil's first argument, the Court believes that U.S.S.G. § 1B1.2(a)(2) requires grouping the conduct underlying Count Twenty-Four with the conduct underlying Counts One through Twenty-Three if certain conditions are met.  In determining a defendant's offense level and specific offense characteristics, U.S.S.G. § 1B1(a)(2) states that, "with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts," the court's calculations shall be based on "all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1(a)(2).  Subdivisions 1(A) and 1(B) include:

> (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . .

U.S.S.G. § 1B1.3(a)(1)(A)-(B).

Vigil suggests that, for the purposes of U.S.S.G. § 1B1.3(a)(2), subdivisions 1(A) and 1(B) are similarly limited by the trailing clause -- "that occurred during the commission of the offense" -- which modifies the application of those subdivisions for the purposes of applying U.S.S.G. § 1B1.3(a)(1).  See Hearing Transcript at 62:8-17 (Bowles).  The Court disagrees.  The paragraph structure of subsection (a)(1) -- with its indentations -- makes clear that U.S.S.G. § 1B1.3(a)(2) incorporates only subdivisions (1)(A) and (1)(B), not all of subsection (a)(1); otherwise, relevant conduct beyond the crime of conviction would fall outside the scope of U.S.S.G. § 1B1.3(a)(2) and

the entire subsection would be rendered meaningless.

At least one Circuit Court of Appeals has taken a position consistent with the Court's conclusion. In <u>United States v. Johnson</u>, 347 F.3d 635 (7th Cir. 2003), the United States Court of Appeals for the Seventh Circuit noted that, when faced with a groupable offense, reading U.S.S.G. § 1B1.3(a)(2) in the manner Vigil proposes would create unnecessary confusion. <u>See</u> 347 F.3d at 639. That is because the sentencing court could not know whether relevant conduct consisted of actions related to the commission of the crime of conviction, as described in subsection (a)(1)'s trailing clause, or whether it included all acts that were "part of the same course of conduct or common scheme or plan" as the offense of conviction, as described in subsection (a)(2). <u>Id.</u> The Seventh Circuit remedied this confusion by holding that "the reference to subsections (1)(A) and (1)(B) in U.S.S.G. § 1B1.3(a)(2) refers only to the subsections themselves and not the trailing clause." <u>Id.</u>

The Seventh Circuit in <u>United States v. Johnson</u> found additional support for this conclusion by looking at U.S.S.G. § 1B1.3 in its entirety. The Seventh Circuit noted that U.S.S.G. § 1B1.3(a)(2) makes specific reference to subdivisions (1)(A) and (1)(B), whereas a similar incorporative reference in U.S.S.G. § 1B1.3(a)(3) refers to U.S.S.G. § 1B1.3(a)(1) as a whole -- not simply subdivisions (1)(A) and (1)(B). <u>See id.</u> To give this variation in language meaning, the Seventh Circuit "assume[d] that the Sentencing Commission meant to include the trailing clause in subsection (a)(3) but not in subsection (a)(2)," and held that, "[c]onsequently, the trailing clause of [U.S.S.G. § 1B1.3](a)(1) is not applicable in the case of a groupable offense." <u>Id.</u> at 639-40. The Seventh Circuit recognized that "[s]ubsection (a)(2) allows a court to consider a broader range of conduct than does the trailing clause of [subsection] (a)(1)." <u>Id.</u> at 640.

Because the Court finds that it may incorporate the acts described in U.S.S.G. § 1B1.3(a)(1)(A) and (a)(1)(B) in its U.S.S.G. § 1B1.3(a)(2) analysis, it must now determine whether Vigil's offense of conviction is one for which U.S.S.G. § 3D1.2(d) would require grouping. The guidelines require grouping under U.S.S.G. § 3D1.2(d), "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss . . . or some other measure of aggregate harm." U.S.S.G. § 3D1.2(d). The United States asserts that Hobbs Act offenses are of a character for which U.S.S.G. § 3D1.2(d) would require grouping of multiple counts, and therefore all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction in this case should be included as relevant conduct for sentencing purposes. See United States' PSR Objections at 5.

Not all offenses that would seem to fall within the scope of U.S.S.G. § 3D1.2(d)'s language are to be grouped under the subsection. The application notes to U.S.S.G. § 3D1.2(d) indicate that, although the subsection provides that most property crimes are to be grouped together, certain crimes, including "robbery, burglary, extortion and the like," are an exception to this general rule. U.S.S.G. § 3D1.2(d) cmt. n.6. In addition, certain guidelines -- including U.S.S.G. §§ 2B3.1, 2B3.2 & 2B3.3 -- are specifically excluded from the operation of U.S.S.G. § 3D1.2(d). See U.S.S.G. § 3D1.2(d). Despite the language of the application notes and the specific exclusion of the general extortion guidelines, however, U.S.S.G. § 3D1.2(d) also enumerates a number of guidelines -- including U.S.S.G. § 2C1.1 -- which the subsection expressly states are to be grouped under the provision. See U.S.S.G. § 3D1.2(d). Again, not all extortions are the same; they are of different varieties and the Guidelines treat different extortions differently. In any case, because of the express reference to U.S.S.G. § 2C1.1 in U.S.S.G. § 3D1.2(d), the Court finds that Vigil's crime of

conviction is one for which U.S.S.G. § 3D1.2(d) would require grouping.

In light of these findings, Vigil makes three additional arguments contending that the facts of this case do not support consideration of relevant conduct under U.S.S.G. § 1B1.3(a)(2). First, Vigil asserts that he did not participate in any jointly undertaken criminal activity. Second, Vigil argues that Count Twenty-Four is not part of a common scheme or plan with the other uncharged conduct and conduct for which he was acquitted that the USPO considered in its relevant conduct analysis. Third, Vigil contends that Count Twenty-Four is not part of the same course of conduct as the other uncharged conduct and conduct for which he was acquitted that the USPO considered in its relevant conduct analysis.

### (i) Jointly Undertaken Criminal Activity.

In the case of jointly undertaken criminal activity, relevant conduct under U.S.S.G. § 1B1.3 includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). The application notes to U.S.S.G. § 1B1.3 define "jointly undertaken criminal activity" as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3 cmt. n.2. Although the Guidelines require a court to consider this conduct regardless whether Vigil has been charged with a conspiracy, the Court has previously found by a preponderance of the evidence that Vigil -- with Montoya, Garcia, Nelson, and Sandoval -- was a member of a conspiracy to receive kickbacks in exchange for NMSTO business. See Co-Conspirator Opinion (finding by a preponderance of the evidence that Vigil was a member of the conspiracy for the purpose of admitting co-conspirator statements at trial consistent with Federal Rule of Evidence 801(d)(2)(E)).

Unlike traditional conspiracy law, however, the Guidelines specify that jointly undertaken criminal activity does not include the conduct of the other members of the conspiracy before Vigil joined the conspiracy, even if Vigil had knowledge of the conspiracy. See U.S.S.G. § 1B1.3 cmt. n.2. The Court must therefore determine the point at which Vigil became a member of the conspiracy. Because mere knowledge of the conspiracy's activities is not sufficient to make a defendant culpable for jointly undertaken criminal activity, to make its determination the Court must determine at what point Vigil stopped being a passive observer of the conspiracy's activity and began to actively manipulate the criminal activity to his benefit.

The Court believes that the evidence, when viewed cumulatively, is sufficient to prove by a preponderance of the evidence that Vigil had knowledge of the kickback scheme during his time as Montoya's Deputy Treasurer.  In 1999, Vigil was on the selection committee that selected Nelson as the NMSTO's investment adviser; Montoya testified that it was conveyed to Vigil that Nelson was Montoya's pre-selected choice.  See Transcript of Trial at 193:10-12 (Montoya)(taken September 13, 2006).  More specifically, when asked at the first trial whether Vigil understood why Montoya wanted Nelson to be selected as investment advisor, Montoya responded, "Robert knew."  Testimony of Michael Montoya at 98:21-25 (taken April 19, 2006).  Consistent with Montoya's testimony that "Robert knew," Sandoval testified that Vigil complained to him about the obvious methods Montoya used to receive kickbacks from Nelson and questioned why Montoya did not use methods more similar to the "pay-for-play" methods Vigil used to award state business while State Auditor.  See Transcript of Trial at 239:6-9 (Sandoval)(taken September 14, 2006).

Vigil's role in the NMSTO as Deputy State Treasurer in charge of investments and as Chair of the State Treasurer's Investment Committee ("STIC") also counsel for a finding that he had

knowledge of the conspiracy's activities during Montoya's term as Treasurer.  As Deputy State Treasurer in charge of investments, Vigil signed the paperwork for transactions, including flexible repurchase transactions, executed through Nelson. As chair of the STIC, Vigil became aware that others in state government, and specifically individuals at the State Board of Finance, questioned the amount and source of commissions that Nelson was earning through NMSTO business.  In response to these criticisms, Vigil drafted the November 2000 letter that Montoya directed be sent "firing" Nelson, and Vigil continued to sign paperwork for trades executed through Nelson after this "firing."

The Court believes that this evidence is adequate to find by a preponderance of the evidence that Vigil had knowledge of the jointly undertaken criminal activity; the Court must also determine, however, at which point it believes Vigil began participating in the activity.  The USPO concludes that Vigil joined the conspiracy in 1999, when Montoya put Vigil on the reviewing committee that selected Nelson as the NMSTO's investment adviser.  The evidence that supports Vigil was more than merely aware of the conspiracy at that point, however, is limited.  The evidence indicates that, at that point, Montoya still directed the machinations of the conspiracy and that he, Garcia, Nelson, and Sandoval were the exclusive beneficiaries of the conspiracy's proceeds.  The Court believes that the first time Vigil's active participation in the conspiracy can be established by a preponderance of the evidence is in March 2002, when he began to accept campaign assistance from his co-conspirators knowing that the funds for this assistance was derived from kickback proceeds.

Montoya, Garcia, Nelson, and Sandoval all testified that in late 2001, or early 2002, the four met at Montoya's "treehouse" in Los Lunas and agreed to assist Vigil in his bid to become Treasurer. Garcia testified that in March 2002, at some point before the 2002 Democratic state primary, Vigil met him at a sign-production company that Garcia's son-in-law owned.  Garcia testified that the

purpose of the meeting was for Vigil to deliver a photograph to be used in campaign materials and to review signage.  Garcia indicated that Vigil questioned who would pay for the materials and that he responded that he, in conjunction with Montoya, Nelson, and Sandoval, would cover it.  Garcia also inquired of Vigil what other assistance he needed.  Because the Court believes that, by this point in time, a preponderance of evidence indicates that Vigil had knowledge of the jointly undertaken criminal activity, and agreed to become an active participant in manipulating its proceeds, the Court will attribute co-conspirators' illicit activity -- engaged in after April 1, 2002 -- to Vigil, and will consider it in the Court's relevant conduct analysis under U.S.S.G. § 1B1.3.

### (ii) Common Scheme of Plan.

For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor.  See U.S.S.G. § 1B1.3 cmt. n.9(A).  Such factors include: (i) common victims; (ii) common accomplices; (iii) common purpose; or (iv) similar modus operandi.  See id.  Because of some of the material legal and factual differences between Vigil's offense of conviction and the other conduct in which Vigil and his co-conspirators engaged, the Court does not find that these factors substantially connect the offense of conviction to other criminal or illicit activity.

The Court does not believe that the offenses committed in the course of the conspiracy to receive kickbacks and the offense of conviction have common victims for the purposes of the Court's U.S.S.G. § 1B1.3 analysis.  The application notes to U.S.S.G. § 3D1.2 indicate that the term "'victim' is not intended to include indirect or secondary victims."  U.S.S.G. § 3D1.2 cmt. n.2.  The notes indicate that, generally, one person will be most affected by the offense behavior and be identifiable as the victim.  See id.  While certainly the citizens of New Mexico may be victims of all

of Vigil's activity, and may be the primary victims of the activity charged in Counts One through Twenty-Three, the Court believes that Everage is the primary victim in Count Twenty-Four. The Court notes that Everage has submitted a victim's impact statement. Because the application note suggests that secondary, or indirect, victims are not within the scope of U.S.S.G. § 3D1.2, the Court cannot find by a preponderance of the evidence that the offenses involve common victims. Everage is the primary victim in Count Twenty-Four and therefore the Court must look at the other common plan or scheme factors.

The Court also does not find by a preponderance of the evidence that the count of conviction and the other conspiratorial offenses involved common accomplices. Whereas the other offenses charged relate to a conspiracy involving -- at various times and in varying degrees -- Montoya, Garcia, Nelson, and Sandoval, Vigil alone orchestrated, directed, and executed Count Twenty-Four.

Whereas the purpose of the kickback scheme charged in Counts One through Twenty-Three related to making money for individual conspiracy members during Montoya's term as Treasurer, or raising money for personal, political, and charitable causes during Vigil's term as Treasurer, the purpose underlying the offense of conviction appears somewhat different. The Court does not entirely disregard the presence of this common purpose factor, and it acknowledges that it may be more present than the other three factors, but it also believes that Count Twenty-Four is unique in that the facts underlying the count position the co-conspirators in an adversarial relationship. Rather than a collaborative effort to make money, the Court finds that the evidence is more accurately described as Vigil's effort to fend off Montoya. Moreover, even though this purpose is related to Vigil's earlier and common purpose of raising and protecting political capital, the Court does not believe that the nature of the offenses make that commonality so <u>substantial</u> as to create a common

plan or scheme.

Finally, Count Twenty-Four appears to involve a unique <u>modus</u> <u>operandi</u>; whereas the other related activity was based on a scheme in which an investment adviser would provide cash kickbacks in exchange for NMSTO business, Count Twenty-Four was premised on an outside contractor employing another individual in exchange for a contract to do business with the state.

The Court also notes that both Vigil and the United States, in their presentations at trial, in their pretrial motion practice, and in their evidentiary objections throughout the course of the proceedings, have tended to view Count Twenty-Four as a unique, stand-alone charge. The jury's verdict seems to likewise validate this interpretation. Although the Court recognizes that the parties' treatment of Count Twenty-Four is not legally dispositive, it believes that it affirms its conclusion that the offense of conviction is not part of the same plan or scheme as the other relevant activity that the Court must consider.

### (iii) Same Course of Conduct.

Although the Court has determined that Count Twenty-Four and the other conspiratorial offenses are not part of a common scheme or plan, it recognizes that "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. n.9(B). Factors that are relevant to the Court's analysis include: (i) the degree of similarity between the offenses; (ii) the regularity of the offenses; and (iii) the temporal proximity between the offenses. <u>See</u> <u>id.</u> In addition, when one of these factors is absent, a stronger presence of one of the other factors is required. <u>See</u> <u>id.</u>

The Court has expressed concern that there are differences, legally and factually, between the offense of conviction and Vigil's other relevant conduct; however, the Court is cognizant that they are also not entirely dissimilar. Count Twenty-Four, like much of the other conduct in which Vigil engaged, involves extortion. Like the kickback scheme charged in the earlier counts, Vigil capitalized on his position within the NMSTO to engage in the activity underlying Count Twenty-Four. There is evidence that, for Vigil, all of his actions were politically motivated.

As a second point, the Court notes that, while the modus operandi may have been different between Count Twenty-Four and the other counts with which Vigil was charged, the Court believes that the United States has shown Vigil repetitively engaged in extortion and in extortion activities. As a result, the Court believes that the United States has also shown the presence of the regularity factor.

In addition to finding the presence of the first two factors relevant to the "same course of conduct analysis," the Court also recognizes a very strong temporal proximity between the conduct underlying Count Twenty-Four and the other relevant conduct. Indeed, there is evidence that Vigil engaged in this conduct simultaneously.

The RFP for the SLOM position was issued in April 2005. Vigil, Everage, Sais, and others at the NMSTO engaged in a series of negotiations, letter exchanges, and telephone conversations that can be characterized as constituting the body of the offense for the next several months. During this period, Vigil continued to engage in discussions with Nelson regarding upcoming deals, and accepted money from Nelson on more than one occasion, as reflected in Counts Twenty-Two and Twenty-Three of the Fifth Superceding Indictment. When Nelson inquired when he could have some business, Vigil responded that "we always have business," and, over the course of the next several

months, continued to discuss possible upcoming flexible repurchase transactions.

The Court also believes it important that there is evidence that the securities-lending arrangement was not Vigil's first attempt to find a job for Sais. In a February 2, 2005 recorded conversation, Vigil indicates to Garcia that he hoped that Nelson would employ Sais as a consultant and pay her $500.00 or $1000.00 per month. See Government's Exhibit 586, Transcript of Recorded Conversation between Robert Vigil and Angelo Garcia at 10 (recorded February 2, 2005). There is evidence that, if the NMSTO was going to engage in securities lending, it was always Vigil's intention to have Everage hire Sais. In a February 23, 2005 recorded conversation, at least two months before the mechanisms for the SLOM contract were put in place, Vigil lamented to Garcia about the amount of time that it was taking Everage to establish securities lending and stated that, "if we're going to go there, we've got to get Samantha a job." Government's Exhibit 589, Transcript of Recorded Conversation between Robert Vigil and Angelo Garcia at 7 (recorded February 23, 2005).

These factors all indicate to the Court -- by a preponderance of the evidence -- that the activities underlying Count Twenty-Four reflect a continuous course of conduct between Vigil's count of conviction and the other activity relevant to his sentencing.

## B.    THE PSR'S RELEVANT CONDUCT DETERMINATIONS.

It is not enough for the Court to determine that it may consider relevant conduct in calculating Vigil's guideline sentence. The Court must still review the evidence and determine on an individual basis whether each of the uncharged acts and offenses for which Vigil has been acquitted have been proven by a preponderance of the evidence. In addition, the Court must calculate the value of each of the extorted payments to properly apply the sentencing enhancement provision of U.S.S.G. § 2C1.1(b)(2).

1.      **Uncharged Conspiratorial Offenses.**

At the sentencing hearing, although Vigil's counsel objected to the Court's finding that Vigil was a member of any conspiracy, he conceded that the United States had proved by a preponderance of the evidence that there had been a conspiracy to execute NMSTO securities transactions through investment brokers who would provide kickbacks and to execute flexible repurchase transactions through Nelson. See Hearing Transcript at 95:11-19 (Bowles). The Court agrees. Montoya, Garcia, Nelson, and Sandoval all twice testified under oath to their involvement in these illicit transactions, and all have entered into agreements with the United States Attorney acknowledging their guilt of federal crimes in association with these transactions. Because the Court finds by a preponderance of the evidence that the conspirators committed these crimes, and by a preponderance of the evidence that Vigil was a member of the conspiracy, it must consider each of the conspiratorial offenses that occurred after Vigil became a member of the conspiracy and calculate the value of each of these offenses.

The USPO has calculated the value of kickback payments that Nelson made to the other co-conspirators before Vigil became Treasurer by totaling the value of bank transfers Nelson made to Garcia from January 4, 2000 through January 14, 2003. See PSR ¶ 53, at 15-18. The USPO considered the value of all these payments -- for a total of $2,822,607.40 -- in calculating Vigil's offense level. The Court has previously ruled, however, that the evidence is not sufficient to prove by a preponderance of the evidence that Vigil was a member of the conspiracy until April 1, 2002. Consequently, the Court will only consider those payments Nelson transferred to Garcia after that date. Accounting for this adjustment, the Court finds that the value of the payments associated with the conspiratorial offenses is $1,052,725.00.

2.      **Counts Three Through Twenty-One.**

The Court's jury instructions related to Counts Three through Twenty-One tracked the language of the Hobbs Act and charged the jury that it could find Vigil attempted to extort Everage "either (a) by wrongful use of actual or threatened fear, or (b) under color of official right."  Jury Instructions, Instruction No. 31, at 68.  The Court finds by a preponderance of the evidence that Vigil committed extortion as alleged in Counts Three through Twenty-One by placing Nelson in fear of economic harm.  The Court also finds by a preponderance of the evidence that Vigil committed extortion under color of official right as alleged in Counts Three through Five.  The Court does not find by a preponderance of the evidence, however, that Vigil committed extortion under color of official right as alleged in Counts Six through Twenty-One.

a.      **The Court Finds by a Preponderance of the Evidence that Vigil Committed Extortion as Alleged in Counts Three through Twenty-One by Placing Nelson in Fear of Economic Harm.**

The Court informed the jury that "'fear of economic loss or harm' includes fear of a direct loss of money, fear of harm to future business operations, or fear of some loss of ability to compete in the marketplace in the future if the victim did not pay Mr. Vigil."  Jury Instructions, No. 31, at 68.  The Court believes there is sufficient evidence in the record for it to find by a preponderance of the evidence that Vigil induced Nelson to make payments to Garcia -- reflected in Counts Three through Twenty-One -- by placing Nelson in fear of economic harm.  The Court believes that Nelson could have reasonably concluded that, unless he continued to make kickback payments through Garcia, the NMSTO would not use his services as an investment advisor on flexible repurchase agreement transactions.

Nelson testified that he understood his making contributions to Vigil's golf tournament,

campaign, and other charitable and political solicitations was a pre-requisite to receiving business from the NMSTO.  See Testimony of Kent Nelson at 92:1-7 (taken April 25, 2006).  Nelson stated, specifically, that he would have to make a "business decision" whether the amount of business Vigil was providing was worth his contribution/donation expenses.  Id. at 98:8-16.  Similarly, in several recorded conversations, Nelson explained to Vigil that he was willing to assist Vigil and to make contributions, but that he needed business in return.  See Government's Exhibit 596, Transcript of Recorded Conversation between Robert Vigil and Kent Nelson at 4 (Recorded on August 16, 2005). Finally, the Court also notes Vigil's continued willingness to do business with Nelson despite his lack of qualifications,  Vigil's awareness that people in the NMSTO and on the Board of Finance had concerns about Nelson's fees, and Vigil's awareness that the NASD was investigating Nelson.

Garcia's testimony echoed Nelson's perception.  During his direct examination, Garcia testified that it was his understanding that, if Nelson stopped sending money to Garcia, "we'd get rid of Kent Nelson."  Garcia Testimony at 142:6-8.  When asked to elaborate on that answer, Garcia clarified: "Basically, I would tell Robert that [Nelson] wasn't cooperating with me, and he wouldn't give him any more business."  Id. at 142:11-12.  Testimony from other broker dealers who did business with the NMSTO, which suggested Vigil's charitable solicitations were more frequent than other similar clients, and the United States' charts and exhibits showing a large number of charitable and political contributions that Nelson, Garcia, and other entities made corroborate that testimony.

The Court also finds support for its conclusion in the circumstantial evidence regarding Vigil's familiarity with executing pay-for-play schemes.  Sandoval testified that Vigil -- when he was Deputy State Treasurer under Montoya -- complained to him about the obvious methods Montoya used to receive kickbacks from Nelson and questioned why Montoya did not use methods more

similar to the "pay-for-play" methods Vigil used to award state business while State Auditor. <u>See</u> Transcript of Trial at 239:6-9 (Sandoval)(taken September 14, 2006). This testimony is corroborative of the United States' allegations that Vigil engaged in pay-for-play schemes while he was State Auditor and that, because of these activities, Vigil was the subject of investigations that the New Mexico Attorney General and the Federal Bureau of Investigation performed. Recorded conversations in which Vigil expressed that he helped others who helped him, and in which he expressed disregard for brokers who would not or could not contribute to his personal and political causes also supports the Court's conclusion. <u>See</u> Government's Exhibit 586, Recorded Conversation between Robert Vigil and Angelo Garcia at 15-16 (recorded February 2, 2005).

Taken in aggregate, the Court believes that these factors are sufficient to establish by a preponderance of the evidence -- although perhaps not beyond a reasonable doubt -- that Vigil committed extortion by placing Nelson in fear of economic harm. This finding is also consistent with the Court's ruling -- in response to Vigil's rule 29 motions -- that the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Vigil was guilty of the crimes the United States charged in Count Twenty-Four of the Fifth Superceding Indictment. <u>See</u> Memorandum Opinion and Order, filed January 12, 2006 (Doc. 436). Finally, the Court finds that the value of the kickback payments associated with Counts Three through Twenty-One is $242,010.00.

> **b.  The Court Believes that the Evidence is Insufficient to find by a Preponderance of the Evidence that Vigil Committed Extortion Under Color of Official Right as Alleged in each of the Counts Three through Twenty-One.**

The Court's instructions to the jury required more definitive findings for the jury to find Vigil guilty of extortion under color of official right. To prove extortion under color of official right, the

United States must prove that Vigil obtained payments to which he was not entitled in return for promised performance or nonperformance of a specific official act.  <u>See</u> Jury Instructions, No. 31, at 70.  Although the United States need not prove the existence of an expressly articulated agreement between Vigil and Nelson, Nelson's, and by proxy, Garcia's, mere hope of favorable treatment in the future is not sufficient.

Moreover, because a candidate for state public office in New Mexico may accept a cash campaign contribution from a person seeking to do business with his office without violating the Hobbs Act, the Court must find that payments are made in return for an official's explicit promise or undertaking to perform an official act in exchange for the payment received.  Vigil and Nelson must have arrived at a meeting of minds that official action will be taken in exchange for payment.

### (i) Counts Three Through Five.

The Court believes that the United States has proved that Vigil took property corresponding to Counts Three through Five under color of official right.  The evidence suggests that, in August 2003, Vigil arranged flexible repurchase deals, using Nelson as the investment advisor, because he wanted Garcia to make payments to Montoya.

Garcia testified that, before the NMSTO entered into flexible repurchase agreement deals in August 2003, Vigil indicated to him that the deals were going to happen and directed Garcia to "just take care of Michael and get him off my [Vigil's] back."  Garcia Testimony at 131:19-22.  Garcia sent a check to Montoya, in the amount of $30,000.00, dated August 27, 2003.  <u>See</u> Government's Exhibit 185.  Montoya testified at the first trial that he received this check from Garcia and assumed it was to account for money that Montoya was still owed at the time he left office at the end of 2002.  <u>See</u> Testimony of Michael Montoya at 283:15-19; 284:1-8 (taken April 19, 2006).

Before the date of Garcia's check -- August 27, 2003 -- the NMSTO executed two flex repo transactions through Kent Nelson with settlement dates on August 5, 2003 and August 19, 2003, respectively.   Nelson made three transfers to MAC investments before August 27, 2003: (i) $17,500.00 on August 11, 2003; (ii) $10,000.00 on August 18, 2003; and (iii) $51,100.00 on August 22, 2003.  The Court believes the timing of these transactions -- the first deals done through Nelson during Vigil's term as Treasurer -- sufficiently corroborates the testimony of Garcia and Montoya to the extent that the Court finds the United States has proven by a preponderance of the evidence that Vigil took this official action in exchange for property that he could distribute to Montoya.

### (ii) Counts Six Through Twenty-One.

The United States has not presented any similar testimony that sufficiently establishes a correlation between the specific kickback payments reflected in Counts Six through Twenty-One and specific securities transactions, or other official acts, in which Vigil engaged, or declined to engage. There is no testimony that adequately connects the dots between individual kickback payments and subsequent transactions.

The Court notes that there is a great deal of evidence that Garcia received money on a regular basis from Nelson.  There is also evidence that Garcia facilitated payments to numerous personal, political, and charitable causes on behalf of Vigil or in response to Vigil's solicitations.  Garcia testified that kickback money funded all of these donations/contributions.

Nevertheless, there is not sufficient evidence that proves by a preponderance of the evidence that Vigil extorted these particular payments under color of official right.  The United States' exhibits and the witnesses' testimony do not create the link between kickbacks and specific official acts necessary to make a finding that, with respect to Counts Six through Twenty-One, Vigil extorted

Nelson under color of official right.  That businessmen who had done business with the Treasurer in the past, and who wished to continue doing business in the future, made donations or contributions to curry favor, is not, standing alone, illegal and does not constitute a violation of the Hobbs Act. Indeed, the jury was told that payments made based on "Nelson's mere hope of favorable treatment in the future is not sufficient."  Jury Instructions, Instruction No. 31, at 70.

Moreover, the testimony related to these payments does not support the alleged mechanics of the kickback scheme under Vigil.  Garcia testified that he collected kickbacks from Nelson as Vigil's agent and that it was his understanding that Vigil would receive thirty percent of Nelson's fees. See Garcia Testimony at 141:24-142:5.  The evidence does not indicate, however, that Vigil received thirty percent of those fees.  The testimony suggests by a preponderance of the evidence that Vigil was aware of the kickbacks to Garcia, that he was aware that Montoya had received thirty percent of Nelson's commissions, and that money was generally available to Vigil when he requested Garcia and Nelson to assist him in personal, political, or charitable causes, but there is insufficient evidence that there was an explicit, or even an implicit, understanding that Vigil would receive thirty percent of each transaction.

Nor do the figures presented at trial lead to this conclusion.  The United States' Exhibit 608 purports to document Investment Agent Fees for transactions the NMSTO executed between April 23, 2003 and June 8, 2005.  Government's Exhibit 608 indicates that during that time Nelson received approximately $582,331.00 in commissions, and that he made $242,010.00 in transfers to Garcia reflected in Counts Three through Twenty-One.  The United States' exhibit also indicates that, during that time, approximately $97,046.34 was transferred to various entities as payments, donations, or contributions on behalf of Robert Vigil or other New Mexico interests.  Only a portion of these

payments can be attributed to Nelson and Garcia.  Of this amount, the Court, in preparing for the sentencing hearing, has been able to link $45,192.50 to Nelson and Garcia, including the $30,000.00 payment to Montoya.  The Court does not believe that this amount, relative to the size of the commission Nelson received -- and considerably less than thirty percent of those commissions -- demonstrates, in the absence of corroborative evidence linking particular payments to particular securities transactions, more than Nelson's and Garcia's real-world business sense and desire to maintain a favorable relationship with Vigil, and concludes that these payments do not reach the level of payments made in return for the promised performance or nonperformance of specific official acts. The Court concludes that the evidence is insufficient to prove by a preponderance of the evidence that, with respect to counts Six through Twenty-One, Vigil extorted Nelson under color of official right.

### 3.        Counts Twenty-Two and Twenty-Three.

The Court's Instruction No. 31 indicated to the jury that Counts Twenty-Two and Twenty-Three of the Fifth Superceding Indictment charged Vigil with extortion solely based on his wrongful acquisition of property under color of official right, but did not allege that he obtained property through fear of economic harm.  See Jury Instructions, Instruction No. 31, at 69.  The Court's instructions distinguished Counts Three through Twenty-One and Count Twenty-Four which, the Court noted, allege that Vigil obtained property by inducing the victim through fear of economic harm and/or under color of official right.

The Court's findings with respect to Counts Twenty-Two and Twenty-Three are based on similar reasoning to its findings that the United States has not proved Vigil committed extortion under color of official right in Counts Six through Twenty-One.

Count Twenty-Two derives from a May 2, 2005 incident during which Nelson met Vigil in Albuquerque and transferred $11,500.00 to Vigil.  Nelson testified that, of that money, $1,500.00 was for a fundraiser dinner that Vigil was organizing.  See Testimony of Kent Nelson  at 131:2-9 (taken April 25, 2006)("Nelson Testimony").  A recorded conversation of the exchange indicates that Nelson did explain to Vigil that this money was for his dinner.  See Government's Exhibit 592, Recorded Conversation Between Robert Vigil and Kent Nelson at 6 (recorded May 2, 2005).  Vigil responded to Nelson that he might use some of the money for a dinner to benefit his brother, Richard Vigil, another state politician.  See id.  Nelson testified that he knew that Vigil had a brother before May 2, 2005 and that he had contributed to Richard Vigil's campaign before.  See Nelson Testimony at 132:1-10.  The recording also indicates that Nelson told Vigil the remaining $10,000.00 was money "he was out from Angelo."  Government's Exhibit 592 at 6.  Nelson testified that he understood, from a previous conversation with Vigil, that Garcia had previously committed to raising $10,000.00 for Vigil and that he had not come through on that promise.  See Nelson Testimony at 133:2-9.

Count Twenty-Three derives from an August 24, 2005 incident, during which Nelson met Vigil in Albuquerque and transferred $1,900.00 to Vigil.  A recording of the meeting between Vigil and Nelson reveals that Nelson originally attempted to give Vigil $5,000.00, but that Vigil refused.  See Government's Exhibit 598, Recorded Conversation Between Robert Vigil and Kent Nelson at 14 (recorded August 24, 2005).  In the recording, Vigil indicates that he did not want to accept such a large sum, stating that, "I don't wanna put you out or anything, cause I want you to, I wanted you to write some checks to some people for me."  Id.  Nelson testified that the money Vigil did accept was for a fundraiser scheduled for the following day.  See Nelson Testimony at 193:17-20.

The nature of the conversations between Vigil and Nelson refutes the existence of an

understanding between the men that Nelson was making these payments in return for a promise to perform specific official acts.  To the contrary, on May 2, 2005, when Nelson asks Vigil -- after handing him the money -- can I get a commitment from you that I can get more business," Vigil responds equivocally, "well, yeah, yeah, you . . . we always have business, you know, it's no problem, I mean you guys do a good job."  Government's Exhibit 592 at 7.  When pressed as to whether the NMSTO did not have more business to offer Nelson right then, Vigil responded: "Not anything . . . . we'll see, I mean, but we'll have something . . . we're gonna get the TRANS . . ., maybe we can do a little bit on that."  Id. at 8.  Vigil then goes on to discuss interest rate environments and states to Nelson that there have been good transactions in the past and that he has helped Nelson out  in the past.  See id.

The Court cannot say, without more, that these exchanges are more than Nelson making contributions to Vigil, as he had done in the past, to curry favor with the NMSTO and to continue to maintain his profitable relationship with the NMSTO.  For his part, while Vigil accepted cash from Nelson, his remarks reflect an experienced politician's acumen to inform a donor that there could be advantages for him in the future, but they do not express specific guarantees, or constitute a promise to perform a specific official act or execute a specific securities transaction.  The Court does not believe that the United States has proven by a preponderance of the evidence that Vigil committed extortion under color of official right as alleged in Counts Twenty-Two and Twenty-Three.

### 4.    Count Twenty-Four.

The jury determined that the United States proved beyond a reasonable doubt that Vigil attempted to commit extortion as alleged in Count Twenty-Four; the Court also finds Vigil guilty of the conduct charged in Count Twenty-Four by a preponderance of the evidence.  The Court must also

determine, however, the value of the offense.  See U.S.S.G. § 2C1.1(b)(2).

Everage testified that, based on his review of the securities-lending agents' proposals, he estimated that he could earn $105,450.00 per year in gross revenues.  See Transcript of Direct Testimony of George Everage at 56:9-12 (taken September 15, 2006)("Everage Direct Examination").  In his cross examination of Everage, Vigil disputed this amount, suggesting that the SLOM was expected to receive more than this amount.  See Transcript of Cross-Examination and Redirect of George Everage at 11:24-13:20 (taken September 18, 2006).  Thus, the Court concludes, by a preponderance of the evidence, that the parties expected the SLOM to receive, at minimum, $105,450.00 per year in gross revenues.  Everage testified that he expected his costs to be equivalent to approximately thirty to forty percent and that, therefore, $60,000.00 was a reasonable estimate of what his net earnings would have been under the SLOM contract.

Everage drafted a Memorandum of Understanding documenting the terms of an acceptable agreement with Sais.  See id. at 26:14-17.  The Memorandum of Understanding provided for Sais to receive the lesser amount of forty percent of Everage's net earnings from securities lending or $45,000.00 per year.  See id. at 26:18-24.  The Court recognizes that the evidence suggests that the value of the payment that Vigil and Sais demanded fluctuated, that there was no precise way to measure exactly the value of the SLOM position, and that Everage and Sais never signed the Memorandum of Understanding.  Although these factors complicate the Court's analysis, the Court believes the most reasonable approach is to use Everage's gross revenue estimates -- the minimum amount all the parties agreed the SLOM position might generate in the first year of securities lending -- and apply Everage's estimates regarding costs to find by a preponderance of the evidence that the value of the payment Vigil attempted to obtain is $24,000.00; this figure represents forty percent of

the expected net value of the SLOM contract.[7]

### 5.     U.S.S.G. § 2C1.1(b)(2).

The Court has determined that the total value of kickback payments assignable to Vigil for the uncharged conspiratorial offenses committed during Montoya's term as Treasurer is $1,052,725.00.  The Court finds that the value of the kickback payments associated with Counts Three through Twenty-One is $242,010.00.  The Court does not believe that the United States has proven by a preponderance of the evidence that Vigil committed extortion as alleged in Counts Twenty-Two or Twenty-Three, and so will not assign any value to that conduct.  The Court finds by a preponderance of the evidence that the value of the payment to be obtained in Count Twenty-Four is $24,000.00.  The total value attributable to Vigil for the offense is therefore $1,318,735.00.  Pursuant to U.S.S.G. § 2C1.1(b)(2), the Court will add sixteen levels to Vigil's base offense level.

### C.     SPECIFIC LEGAL OBJECTIONS.

### 1.     U.S.S.G. § 2C1.1(b)(1).

Pursuant to U.S.S.G. § 2C1.1(b)(1), if the offense involved more than one bribe or extortion, the Court should increase the offense level by two levels.  Vigil argues that the jury convicted him

---

[7]The Court's finding is based on its application of U.S.S.G. § 2C1.1.  The Court would reach a different finding regarding the value of Count Twenty-Four if it were applying U.S.S.G. § 2B3.3.  The Court believes that the distinction in the language of U.S.S.G. § 2C1.1(b)(2), which requires the Court to find by a preponderance of the evidence the "value of the payment," and U.S.S.G. § 2B3.3(b)(1), which requires the Court to find "the amount obtained or demanded," has significance.  The United States presented evidence that Vigil was unsatisfied with Everage's offer to pay Sais a percentage of his net proceeds, as opposed to gross proceeds, and acknowledges that Everage and Sais never signed the Memorandum of Understanding that Everage drafted.  Consequently, if the Court were applying U.S.S.G. § 2B3.3(b)(1), the Court would find by a preponderance of the evidence that Vigil demanded forty percent of Everage's gross proceeds and would find that the amount demanded was $42,180.00.  This is the amount that the USPO attributed to Count Twenty-Four in the PSR.  See PSR ¶ 55, at 18.  The United States has not objected to this valuation.

on one Count of attempting to extort Everage and that, in addition, the Court should not consider conduct for which he was acquitted.  See Vigil's PSR Objections at 16.

The Court has already determined that, for the purposes of calculating Vigil's guideline sentence under U.S.S.G. § 2C1.1, the Court must consider other uncharged  conduct and conduct for which Vigil was acquitted and has found that Vigil committed at least some of those acts by a preponderance of the evidence.  As a result, the Court concludes that the USPO properly applied U.S.S.G. § 2C1.1(b)(1) and correctly added two levels to Vigil's offense level.

## 2. U.S.S.G. § 3B1.1(c).

In calculating Vigil's guideline sentence, the USPO added two additional levels to Vigil's offense level based on its determination that he was an organizer, leader, manager, or supervisor in at least some of the conspiracy's criminal activity.  See PSR ¶ 69, at 32; U.S.S.G. § 3B1.1(c).  Vigil objects to the role adjustment and denies that he was an organizer, leader, manager, or supervisor in the criminal activity.  See Vigil's PSR Objections at 16.  Vigil argues that the entire basis for the enhancement is conduct for which he has been acquitted.  See id.  Because he maintains that the Court should not consider conduct for which he was acquitted in its sentencing factors, he reasons that the two level increase under U.S.S.G. § 3B1.1(c) does not apply.  See id.

The Court believes that the United States proved by a preponderance of the evidence that Vigil took over a kickback scheme when he became State Treasurer in January 2003.  As part of the operation of this scheme, Vigil managed and supervised Garcia and directed Nelson's activities.  Vigil had ultimate executive authority over the amount and frequency of Nelson's business with the NMSTO, and Vigil used Garcia as his middleman in distributing kickback proceeds to various personal, political, and charitable causes.  The USPO, therefore, properly applied U.S.S.G. § 3B1.1

and correctly added two levels to Vigil's offense level.

### 3.    U.S.S.G. § 2X1.1(b)(1).

Because he was convicted of an attempt crime, Vigil requests the Court grant him a three level decrease in his offense level pursuant to U.S.S.G. § 2X1.1(b)(1).  Vigil renews his argument -- raised earlier in one of his rule 29 motions -- that he did not take a substantial step toward the commission of this crime.  See Vigil's PSR Objections at 16; Substantial Step Motion.  Based on these arguments, Vigil contends that he did not and has not "completed all the acts the defendant believed necessary for successful completion of the substantive offense."  Vigil's PSR Objections at 16 (quoting U.S.S.G. § 2X1.1(b)(1)).  Vigil also maintains that "the circumstances [do not] demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control."  Vigil's PSR Objections at 16 (quoting U.S.S.G. § 2X1.1(b)(1)).

The Court has already determined that U.S.S.G. § 2C1.1 is the most appropriate guideline for the Court to use in calculating Vigil's offense level.  The application notes to U.S.S.G. § 2X1.1(b)(1) indicate that the section does not apply to U.S.S.G. § 2C1.1, because U.S.S.G. § 2C1.1 expressly covers attempt crimes.  See U.S.S.G. § 2X1.1 cmt. n.1.  Moreover, the Court has previously ruled that a reasonable jury could have found beyond a reasonable doubt that Vigil took a substantial step towards completion of the crime of extortion.  See Substantial Step Opinion.  The Court will not apply a three-level reduction under U.S.S.G. § 2X1.1(b)(1).

### D.    GUIDELINE CALCULATION.

Vigil's base offense level is thirty-eight and his criminal history category is I.  Vigil's offense level, combined with his criminal history category, results in a guideline imprisonment range of 235

to 293 months.  Because the statutory maximum imprisonment is 240 months, the guideline range is effectively 235 to 240 months.

## III.    THE COURT WILL OVERRULE VIGIL'S CONSTITUTIONAL CHALLENGES TO THE USE OF CONDUCT FOR WHICH HE WAS ACQUITTED TO DETERMINE HIS SENTENCE.

Vigil argues that the Court's use of the conduct for which he was acquitted violates his Fifth and Sixth Amendment rights.  Vigil contends that his case uniquely presents the question whether the protection of a jury trial in federal court is meaningful and reflective of the founders' intent or, instead, a meaningless speed bump to the United States obtaining the "true" sentence of the defendant no matter what the jury says.  See Vigil's PSR Objections at 6-7.  Vigil contends that "'[r]eal conduct' sentencing under the Guidelines is an 'assault' on the Sixth Amendment's 'fundamental reservation of power' in the people within 'our constitutional structure.'"  Id. at 2 (quoting Blakely v. Washington, 542 U.S. at 306, 313).  Vigil argues that, if the Sixth Amendment issues had been squarely raised and presented in Witte v. United States and United States v. Watts, the five justices in the majority in Blakely v. Washington and in the constitutional majority in United States v. Booker -- Justices Stevens, Scalia, Thomas, Souter, and Ginsburg -- would have decided those cases differently.  See Vigil's PSR Objections at 3.

Given the state of the law in the Tenth Circuit, the Court does not believe that it has to answer these questions on a blank slate. The Supreme Court and the Tenth Circuit have dealt with Vigil's argument, either in identical or in similar form.  In essence, Vigil is asserting that a jury's acquittal on a charged count is tantamount to a rejection of the facts placed before it.  This argument is incorrect, and the Court believes that the Tenth Circuit's decision in United States v. Magallanez compels, or at least strongly advises, a result different from that Vigil advocates.

Vigil attempts to distinguish United States v. Magallenez, noting that the jury in that case found the defendant guilty of the conduct to which the judge's quantity findings applied. See Vigil's PSR Objections at 7. Vigil contends that, unlike determining quantity through guideline applications, the determination of a defendant's guilt or innocence is quintessentially a jury function and goes to the heart of the Sixth Amendment. See id. Vigil argues that United States v. Magallanez did not involve a district judge applying the preponderance of the evidence standard to, or contradicting, the core jury findings, i.e., whether the defendant was criminally culpable. See Vigil's PSR Objections at 7-8.

The Tenth Circuit in United States v. Magallanez reaffirmed its earlier jurisprudence that the preponderance of the evidence standard governed the judge's findings at sentencing and noted the district judge's different determination of the drug quantity from what the jury had found was proper. See United States v. Magallanez, 408 F.3d at 685. The Tenth Circuit determined that it was plain error for the district judge to sentence the defendant in United States v. Magallanez beyond the statutory maximum that the jury's verdict authorized, but reasoned that the error did not compel reversal, because the substantial rights of the defendant were not affected and the judge had made his findings, not by a preponderance of the evidence, but "beyond any doubt." Id. at 686. It is also true that, in contrast to the defendant's circumstances in United States v. Magallenz, the jury in this case acquitted Vigil of twenty-three counts and did not make a finding of guilt in any respect on those counts. It does not follow, however, as Vigil contends, that, by definition, the jury found that he did not engage in the conduct underlying Counts One through Twenty-Three.

Vigil contends that the United States is asking the Court "to contradict the linchpin jury finding of innocence to exponentially increase Mr. Vigil's sentence." Vigil's PSR Objections at 8.

The Supreme Court has established, however, that a verdict of not guilty means no more than that the jury determined the United States failed to prove each and every aspect of a particular charge beyond a reasonable doubt.  The Supreme Court has made clear that, given the impossibility of determining why a jury did not convict on a particular count, a court charged with independently assessing a defendant's relevant conduct can draw little, if anything, from a jury's determination other than that the United States failed to prove each and every aspect of a particular count.  Contrary to Vigil's assertion, "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt."  United States v. Watts, 519 U.S. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. at 361).  Thus, that a jury may have determined that some of the technical legal elements of a particular charge were not proved beyond a reasonable doubt constitutes no reason, under current precedent, to conduct a sentencing in a vacuum, without regard to how conduct for which a defendant was acquitted might reflect on a defendant's character and history, as determined by a preponderance of the evidence.

The function of the jury in determining whether the United States proved a charge beyond a reasonable doubt is distinct from the function of the judge in determining an appropriate sentence for a particular defendant.  In sentencing a defendant, a judge must, under some of the guidelines, consider a defendant's relevant conduct.  In determining the existence of this relevant conduct, different rules and standards apply than those that apply to the jury's determination of guilt.  In arriving at a conclusion regarding the existence or non-existence of a particular fact, a judge is entitled to consider a wider range of information than a jury, and is not constrained by the rules of evidence.  Thus, a jury is tasked with performing a different function than a judge, in different circumstances.  The conclusions of a jury made during the guilt phase of a trial, then, by law, provide

little, if any, guidance to a judge tasked with making factual determinations under a different standard and circumstances than the jury.

Judges have more experience applying the Guidelines and sentencing factors than do juries. The jury gets the last word on guilt or innocence in the United States' criminal justice system, but the jury does not, except in capital cases, get any word at the sentencing. See Memorandum Opinion and Order at 14-15, filed January 9, 2007 (Doc. 433)(describing the jury's role in the criminal justice system as being important but limited). The jury has now spoken on guilt or innocence. While that body is the last word on guilt or innocence, the facts underlying the acquitted counts One through Twenty-Three, and all of Vigil's underlying conduct continues to be relevant for sentencing. The district judge's role in the system is not to contradict the jury's basic determination of guilt or innocence, but the judge must consider all information relevant to sentencing.

With advisory Guidelines, when the trial judge is not required to accept a sentence driven by enhancements or relevant conduct, "what the jury verdict authorized" means a sentence within the statutory maximum. The Court believes that it is well established in this Circuit that use for sentencing of conduct for which the defendant was acquitted, supported by a preponderance of the evidence, does not violate Vigil's Fifth or Sixth Amendment rights. The PSR's reliance upon conduct for which Vigil was acquitted, in assessing his relevant conduct, was thus proper under the Fifth and Sixth Amendments.

## IV.   THE COURT WILL NOT GRANT VIGIL'S MOTION FOR A DOWNWARD DEPARTURE.

In addition to requesting a variance, Vigil requests the Court to downward depart from the applicable Guidelines and sentence him to probation. Vigil advances a number of grounds for a

downward departure.  The Court cannot say, however, that the count of conviction in his case rests outside the heartland of extortion cases.  Vigil is not entitled to a downward departure under the facts and circumstances of this case.

### A.   THE COURT WILL CONSIDER VIGIL'S MOTION TO REQUEST BOTH A DEPARTURE AND A VARIANCE.

In United States v. Atencio, No. 05-2279, 2007 U.S. App. LEXIS 974 (10th Cir. Jan. 17, 2007), the Tenth Circuit clarified "inconsistency in our circuit's post-Booker sentencing nomenclature."  2007 U.S. App. LEXIS 974, at **5 n.1.  The Tenth Circuit stated that, "when a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines, the resulting increase or decrease is referred to as a 'departure.'"  Id.  The Tenth Circuit distinguished a "departure" from a "variance," the latter reflecting circumstances "[w]hen a court enhances or detracts from the recommended range through application of [18 U.S.C.] § 3553(a) factors."  Id.

Although Vigil styles his motion as one for downward departure, it does not limit itself to the factors applicable to departures under the United States Sentencing Guidelines.  The motion in part asks the Court to consider whether the sentencing factors enumerated in 18 U.S.C. § 3553(a) would justify imposition of a sentence below the guideline sentence.  Other portions of the motion address the "outside the heartland" standard applicable to downward departures under U.S.S.G. § 5K2.0. The motion is accordingly a hybrid request for a variance as well as for a downward departure.  While the Court will separately consider the motion's request for a variance, the motion's request for departure, and the record of this case, do not present a sufficient justification to support a downward departure.

**B.     THIS CASE DOES NOT LIE OUTSIDE THE HEARTLAND OF CASES CONTEMPLATED BY THE SENTENCING GUIDELINES.**

The determination whether a defendant's case is atypical, and thereby deserving of a departure, is a factual question involving considerations such as "the severity of the misconduct, its timing, and the disruption it causes." Koon v. United States, 518 U.S. 81, 100 (1996). Vigil argues that the severity of the misconduct for which he was convicted -- his attempt to assist Sais in obtaining employment -- is "a far distance from others that were stealing money from the public." Motion for Downward Departure at 8.

The Court acknowledges the legal and factual differences between the conduct underlying Count Twenty-Four and is sensitive to Vigil's acquittal on some charges involving more direct methods of extortion. Nevertheless, the Court must be careful not to improperly minimize the seriousness of the offense for which Vigil has been convicted. While Vigil tries to characterize his offense differently, he was not convicted of attempting to assist Sais in obtaining employment. He was convicted of attempting to obstruct commerce by extortion.

The Court is reluctant to call, as Vigil does, the counts on which he was acquitted as involving "traditional extortion cases," see id., or suggesting those are the only cases that the Sentencing Commission contemplated. Public corruption can come in a limitless number of forms. The attempted extortion of Everage was a garden variety act of public corruption -- conditioning a public contract upon the making of payments to a designee.

Vigil's crime was an ordinary kickback offense. It was within the heartland of offenses that U.S.S.G. § 2C1.1 governs, and was no less a traditional act of extortion than those charged in the acquitted counts. The USPO considered whether the offense of conviction was outside the heartland

of extortion offenses, and rejected the notion.  See PSR ¶ 116, at 42-43.  The USPO decided that Vigil "does not appear to have any circumstances that would take his case away from the heartland of cases of similarly situated defendants."  Id. at 42.  The Court agrees with the USPO and sees no reason to minimize Vigil's conduct.  The Court does not believe that Vigil's conduct falls outside the heartland of cases and will not depart downward for that reason.

The USPO also considered whether the facts of the offense of conviction justified an upward departure, because the defendant's conduct "was part of a systematic or pervasive corruption of a government function, process or office that may cause loss of public confidence in government." PSR ¶¶ 116-118, at 43 (citing U.S.S.G. § 5K2.7 ("If the defendant's conduct resulted in a significant disruption of a government function, the Court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected.")).  Although the USPO concluded that the Court would have the authority to depart upward in this case, it did not recommend that the Court consider an upward departure because the calculated guideline imprisonment term was the statutory maximum of 240 months, such that the upward departure would be moot.  See PSR ¶ 118, at 43.  The Court has calculated the guideline imprisonment range as being 235 to 240 months.  Because the calculated range and the statutory maximum are essentially equivalent, the Court agrees with the USPO that any upward departure in this case would be moot.

C.   **VIGIL'S LOW RISK OF RECIDIVISM DOES NOT JUSTIFY A DOWNWARD DEPARTURE.**

Vigil contends that he poses a low risk of recidivism because of his age, criminal history, and familial relationships, and that this low risk warrants a downward departure.  See Motion for

Downward Departure at 8. While the Court does not disagree that Vigil presents a low risk of future criminal conduct, the Court does not believe this factor warrants or justifies a downward departure. Many persons convicted of white-collar crimes present low risk of future criminal conduct. While this factor may be relevant under 18 U.S.C. § 3553(a), Vigil cites no support -- and the Court is aware of none -- for the argument that low risk of recidivism justifies a departure under Chapters 4 or 5 of the Guidelines. In any case, the Court does not believe this factor justifies a downward departure under the facts and circumstances of this case, and the Court will exercise its discretion to deny the request for a downward departure.

> ### D.   VIGIL'S EXCELLENT EMPLOYMENT HISTORY DOES NOT JUSTIFY A DOWNWARD DEPARTURE.

Vigil contends that his employment history justifies a downward departure. Vigil asserts that he has had an excellent employment history since the age of seventeen. See Motion for Downward Departure at 8. Vigil asks the Court to consider departing downward because of this employment history. Vigil states that, when considered as one of several factors, a defendant's excellent employment record constitutes an appropriate ground for a downward departure. See id. at 8-9.

Under the Guidelines, a defendant's "[e]mployment record is not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.5. Similarly, the Tenth Circuit has acknowledged that "[e]mployment history ordinarily is a discouraged basis for departure." United States v. Jones, 158 F.3d 492, 498 (10th Cir. 1998). Nevertheless, the Tenth Circuit has acknowledged that, because consideration of employment history is merely discouraged, as opposed to categorically precluded, sentencing courts may rely on such considerations in "exceptional cases." Id. at 498 n.6. The Court has already determined that Vigil's crime of conviction is an ordinary

extortion offense and therefore does not think that it would be appropriate to depart under the circumstances of this case because of his employment history.

Moreover, while the Court acknowledges Vigil's employment history and admires his work ethic, the Court does not believe that this ground warrants a downward departure or makes Vigil's case atypical. By comparison, because the Court sits in a border district, the Court sentences a large number of illegal aliens who have returned to the United States to find employment and who have been convicted of illegal reentry. If the Court departed downward in all of its illegal reentry cases because of work history and ethic, the exceptions for departure would swallow the rule. More important, Vigil's employment was the instrumentality of the offense of conviction; Vigil was able to commit the acts for which he has been convicted by abusing his high public office. It would be wrong to reward Vigil for his employment history when Vigil made criminal use of his place of employment. The Court does not believe that Vigil's work history is so out of the ordinary that it warrants a departure.

### E. THE COURT WILL NOT DEPART DOWNWARD BECAUSE OF THE COLLATERAL CONSEQUENCES VIGIL AND HIS FAMILY HAVE ALREADY SUFFERED.

The Court is cognizant that, because of the publicity surrounding this case and the expense of complicated, protracted litigation, Vigil and his family have been through a very difficult time. Vigil represents that other federal courts have previously used downward departures to compensate for the punishment suffered as a result of such collateral consequences. See Motion for Downward Departure at 5. Vigil cites two district court opinions in support of his request, each written by the same district judge. See id. (citing United States v. Samaras, 390 F. Supp. 2d 805, 809 (E.D.Wis. 2005)(Adelman, J.)(recognizing serious collateral consequences may constitute grounds for

downward departure); United States v. Redemann, 295 F. Supp. 2d 887, 894-897 (E.D. Wis. 2003)(Adelman, J.)(same)). While the Court sympathizes with Vigil and his family for the difficulties they have endured, it does not believe a departure is the appropriate remedy to compensate them for the impact of these collateral consequences. Because the Court finds that Vigil's case is within the heartland of public corruption cases, the Court does not believe that a downward departure is appropriate for these circumstances. The Court will, however, revisit these facts when it undertakes its variance analysis pursuant to United States v. Booker.

## F. THE COURT WILL NOT DEPART BECAUSE THE GUIDELINE SENTENCE WILL BE GREATER THAN NECESSARY TO COMPLY WITH THE PURPOSES SET OUT IN 18 U.S.C. § 3553(a).

Vigil argues that the guideline sentence would be "greater than necessary" to comply with the purposes set out in 18 U.S.C. § 3553(a). Motion for Downward Departure at 9. Vigil appears to argue that the lengthy guideline imprisonment range is disproportionate to the offense of conviction because his case falls outside the heartland of extortion cases. Vigil's argument conflates the "not greater than necessary" language of 18 U.S.C. § 3553(a) -- the parsimony provision -- with the "outside the heartland" concept of U.S.S.G. § 5K2.0. That is, Vigil appears to argue that the scope of 18 U.S.C. § 3553(a)'s parsimony provision is equivalent to that which U.S.S.G. § 5K2.0 possesses.

The Court's earlier finding that the offense of conviction in this case is within the heartland of extortion offenses undermines Vigil's argument that the guideline sentence would not be greater than necessary if the offense of conviction were within the heartland for extortion offenses. There is nothing particularly unusual about the offense of conviction; Vigil corruptly attempted to use his office to obtain payments to his designee in return for state work. The Court will deny Vigil's request

-113-

for a downward departure pursuant to the so-called parsimony provision.

## V.   THE COURT WILL OVERRULE THE UNITED STATES' OBJECTION TO THE USPO'S RECOMMENDATION THAT THE COURT GRANT A VARIANCE.

The PSR provides sufficient factual and legal bases to overcome the presumption of reasonableness of the guideline term of imprisonment.  Imposition of a sentencing variance would not undermine respect for the law, and would instead provide punishment that is appropriate to the seriousness of the offense.  A sentencing variance would still deter the kind of conduct in which Vigil engaged.

### A.   THE GUIDELINE SENTENCE IS PRESUMED REASONABLE.

For the most part, the PSR correctly and properly calculated the guideline term of imprisonment at twenty years.  Such a guideline sentence is a presumptively reasonable sentence.  See United States v. Kristl, 437 F.3d at 1054.  Conversely, the reasonableness of a sentence outside the Guidelines' recommended range depends on the strength of the correlation between the extent to which the factors that 18 U.S.C. § 3553(a) enumerates are present, and the extent of the district court's departure from the guideline sentence.  See United States v. Cage, 451 F.3d at 594-95.  When a sentence presents "an extreme divergence from the best estimate of Congress's conception of reasonableness expressed in the Guidelines, it should be considered reasonable only under dramatic facts."  Id. at 594.

### B.   THE FACTS AND CIRCUMSTANCES OF THIS CASE OVERCOME THE PRESUMPTION OF REASONABLENESS ATTACHED TO THE GUIDELINE SENTENCE.

The United States concedes that the imposition of the guideline term of imprisonment is harsh.  See United States' PSR Objections at 18.  Nevertheless, the United States argues that no facts

-114-

disclosed in the PSR overcome the presumption of reasonableness of the guideline term of imprisonment.  See id.; Hearing Transcript at 175:6-9 (Gerson).  The United States contends that the only facts the PSR cites as grounds for a variance are inadequate bases for a material variance from the guideline term of imprisonment.  See United States' PSR Objections at 15.  The United States also contends that the facts upon which the PSR relies are not completely accurate, although the United States does not specify the alleged inaccuracies.  See id. at 15-16.  The United States further argues that the PSR presents no compelling justification for a downward variance and that the ends of federal criminal sentencing would be undermined should a materially different sentence be imposed. See id. at 18.  In sum, the United States contends that these assertions do not overcome the presumption of reasonableness that attaches to a properly calculated guideline term of imprisonment. The United States thus objects to the recommendation for a variance from the Guidelines, because no facts or reasoning beyond the length of the guideline imprisonment term itself justify such a variance.  See id. at 19-20.

The United States compares Vigil's case to United States v. Cage and asserts that, if the facts of that case did not justify the material variance reflected in the district judge's alternative sentence, the facts of Vigil's case cannot do so either.  See United States' PSR Objections at 17.  The United States argues that, in contrast to the defendant in United States v. Cage, Vigil is not the sole source of care for a sick child, he was a major figure in the criminal activity for which he is to be sentenced, and he has not already served time for his conviction.  See United States' PSR Objections at 17.  The United States summarizes that, "[f]ar from presenting the 'dramatic' facts that [United States v.] Cage requires as justification for a substantial variance, [Vigil] presents only the most ordinary of circumstances."  Id. at 17-18.

The Court might be inclined to agree with the United States that the USPO in its PSR does not, alone, present sufficient facts and justifications to justify a material variance from the guideline sentence. Moreover, Vigil, in his Motion for Downward Departure and through his oral argument at the sentencing hearing, primarily relies upon his legal arguments concerning the impropriety of the Court considering conduct for which he was acquitted in relation to calculating the guidelines sentence, and does not add much new information about why his sentence under the Guidelines, when properly calculated, is not reasonable. Because the Court, however, has independent concerns about the reasonableness of a twenty-year guideline sentence that neither Vigil nor the USPO expressly raised or addressed,  the Court issued, pursuant to United States v. Atencio and to rule 32(h) of the Federal Rules of Criminal Procedure, a Notice listing seven additional grounds it was considering as the basis of a variance.  See Notice, filed January 18, 2006 (Doc. 439).  Those grounds, when coupled with the grounds the PSR and Vigil advance, counsel that the Court should vary from the guideline sentence.  Those grounds do not, however, counsel that the Court should give Vigil probation.  See Motion for Downward Departure at 10 (requesting the Court sentence Vigil to probation).

The United States also disputes the PSR's contention that a reduced sentence will still satisfy the goals of the criminal justice system.  The United States argues that such sentencing factors as the seriousness of the offense, the need to promote respect for the law, and affording adequate deterrence to criminal conduct, all support the imposition of the guideline term of imprisonment.  See United States' PSR Objections at 18-19.  As the Court will demonstrate, however, it believes that a variance will better satisfy the goals of the criminal justice system than will a guideline sentence.  The Court believes a sentence that varies from the guideline sentence will reflect the seriousness of Vigil's

criminal offense more accurately than the guideline sentence.  Finally, the Court believes that a variance will provide adequate deterrence to Vigil's possible future criminal conduct and to others in positions similar to his.  In sum, the Court is convinced that a variance will still protect and promote the sentencing factors the Court is compelled to consider, and will provide a sentence that is sufficient, but not greater than is necessary, to achieve the purposes of the Sentencing Reform Act.

### 1.    The Nature and Circumstances of the Offense.

In imposing a reasonable sentence on Vigil, the Court must consider the nature and circumstances of the offense of conviction.  See 18 U.S.C. § 3553(a)(1).  The United States argues that the nature and circumstances of the offense do not support a variance from the guideline sentence.  See United States' PSR Objections at 18.  The problem is what the Court considers to be Vigil's offense.

The jury found Vigil guilty of a public corruption offense.  The jury found, beyond a reasonable doubt, that Vigil, one of the highest ranking public officials in the government of the State of New Mexico, conditioned the granting of a public contract upon the payment of kickbacks to his designee.  There is nothing in the nature of the offense of conviction that the Court can identify that would justify a variance from the guideline sentence.

Nevertheless, the Court cannot lose track of the fact that the jury convicted Vigil only of Count Twenty-Four of the Fifth Superseding Indictment, involving the attempted extortion of Everage with respect to the hiring of Sais.  The Court has acknowledged the similarities between Count Twenty-Four and the other charged counts, but it has also recognized legal and factual differences that make Count Twenty-Four distinguishable, at least in some respects, from Counts One through Twenty-Three, which involve an elaborate conspiracy to receive kickbacks from investment

advisers by conducting securities transactions with state money.

It is true that the offense underlying the count of conviction is of the same character as the conduct of which he was acquitted; in each instance, Vigil abused the trust of the people of New Mexico by conditioning his official acts upon the payment of money to his associates. The Court has also determined that the count of conviction was part of a continuing course of conduct with the acquitted counts. Nevertheless, the Court believes that the count of conviction is less serious than the counts of which he was acquitted; thus, its nature and character support a variance.

Vigil does not dispute that the information contained in Counts One through Twenty-Three involve very serious offenses; he simply maintains he did not engage in the conduct those counts allege. Vigil contends, moreover, that the jury found that he was not a member of the racketeering conspiracy alleged in the earlier counts and that he did not receive any kickbacks. The Court, however, declines to draw that conclusion from the jury's verdict. As the Supreme Court emphasized in United States v. Watts, the Court cannot read the verdict as rejecting anything except legal guilt. In addition, the Court, before trial, has already found that Vigil was a member of a conspiracy to award state securities transactions in exchange for kickback payments by a preponderance of the evidence, and has reaffirmed that conclusion during the sentencing hearing for the purposes of finding that Vigil engaged in jointly undertaken criminal activity. The Court thus does not believe it can diminish the offense for which he is being sentenced or the evidence that he was part of the conspiracy that Montoya began.

The United States successfully did its job in prosecuting the crimes charged in Counts One through Twenty-Three. The United States entered into guilty pleas with individuals who admitted to defrauding the citizens of New Mexico out of millions of dollars. Judge Parker will sentence

Montoya, Garcia, and Nelson for their conduct.  There does not seem to be a sound reason to punish Vigil disproportionately for his role in the conspiracy -- conduct for which he was acquitted and for which the Court has found he joined but did not orchestrate or originate -- when others will be sentenced primarily for this conduct.

In sum, Vigil's offense of conviction is a serious offense for which Congress has provided a serious penalty, but there are also differences between Counts One through Twenty-Three and Count Twenty-Four.  The Court thus concludes that this factor supports a variance from the 235 to 240 month sentence range under the Guidelines, because it is unlikely that Montoya, Garcia, and Nelson will receive sentences near that range for their roles in more serious conduct.  Accordingly, the Court believes that its focus on a sentence appropriate for the offense of conviction, without too much reliance on conduct for which he was acquitted, is most appropriate, and suggests a variance will lead to a more reasonable sentence than the guideline sentence.  The Court will overrule the United States' objection to the PSR's recommended variance from the guideline term of imprisonment.

### 2.    Vigil's History and Characteristics.

The Court should take into account, as mitigating factors in his sentencing, Vigil's good qualities.  But the Court must also consider the manner in which Vigil ran the NMSTO and abused the public trust invested in him in conducting state business.  Taken as a whole, the Court does not believe that Vigil's personal history and characteristics support a variance.

Vigil grew up with sixteen brothers and sisters in a family of farmers, in the small town of El Pueblo, New Mexico.  See Motion for Downward Departure at 3.  Vigil represents that his family had very modest means and, from early on in his life, he worked hard to contribute to his family.  See id.  Vigil obtained a degree in business and accounting as a part-time student at New Mexico

Highlands University, where he was an excellent student.  See PSR ¶ 87, at 35.

Vigil represents that he is very close to his family.  He has been married to his wife Viola for thirty-three years.  See PSR ¶ 82, at 35.  He has two daughters and a grandson.  See id.  From all that the Court has seen, Vigil is a responsible family man who has always supported his wife and children in every way possible.

Vigil maintains that he has lived in the Las Vegas area almost his entire life and that he has very close ties to his community.  See Motion for Downward Departure at 4.  The Court has carefully read and considered the character letters that Vigil has submitted to the Court and that the Court has otherwise received, and notes that Vigil has enjoyed a good reputation in some parts of his community before his arrest and has, on some levels, lived a good life.  In addition, the Court has personally observed the significant support Vigil's family, friends, and community have bestowed upon him during the course of these proceedings.

Vigil has no prior criminal record.  Vigil is fifty-three years old, and this case is the first time that he has been charged with any criminal wrongdoing.

The statute also requires, however, that the Court consider the manner in which Vigil ran the NMSTO and his history of requiring individuals who sought state business to pay for those business opportunities as factors in arriving at a sentence.  In assessing Vigil's character, the Court can neither blind itself to what it has seen with its own eyes -- Vigil taking cash payments from Nelson in his personal vehicle while discussing what future deals the NMSTO may be able to execute through Nelson -- nor deafen itself to what it has heard with its own ears -- Vigil's numerous tape recorded statements indicating that he requires those to whom he gives business to kick something back.

The Court also believes that Vigil had fair warning that what he was doing could amount to

criminal conduct.  Vigil was the subject of investigations that the New Mexico Attorney General and the Federal Bureau of Investigation performed as long ago as the mid-1990s.  These investigations, pertaining to kickbacks and payments to associates in return for state contracts when Vigil was State Auditor, did not lead to the filing of criminal charges, but they should have put him on early notice in his political career that he needed to distinguish between smart politics and criminal conduct.  Vigil ran too close to that line and, in the end, crossed it.

In the end, when a successful politician stands before the Court on corruption charges, he or she can usually present evidence of many good qualities and can parade before the Court others who will attest to those qualities.  This ability is often the reflection of what originally brought the defendant to prominence in public life.  To place too much emphasis on those qualities would run the risk of not punishing people in public life for their crimes.  The Court must not lose sight at sentencing that Vigil's activities have undermined the public's esteem for its state officials and have caused irreparable damage to the public's confidence in New Mexico's government.

That Vigil does not have a prior criminal record is already reflected in his criminal history calculation.  His home life, while something to be very much admired and appreciated, is not out of the ordinary and does not support a variance.  Cf. United States v. Cage, 451 F.3d at 595-596 (reversing district court's downward variance for defendant who was the sole care provider for a child with major medical problems).  Moreover, the count of conviction in this case is not an isolated incident.  The proof adduced at trial, and the evidence that the Court precluded the United States from using at trial, show that the attempted extortion of Everage was part of a continuing pattern of behavior in which Vigil used government office for his own benefit or for the benefit of his associates. This pattern began as early as Vigil's term as New Mexico State Auditor.  The evidence adduced at

trial showed that this pattern continued through Vigil's time as Deputy State Treasurer and during his term as State Treasurer. The Court should not use this continuing pattern of wrongful behavior as a basis for a downward variance from the guideline sentence. The Court believes that, while Vigil has many good and admirable qualities, they do not so override the harm he and his co-conspirators have done that the Court should vary from the guideline sentence because of his history and characteristics.

        **3.**      **18 U.S.C. § 3553(a)(2)(A)-(D).**

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2). Accordingly, the Court's sentence must: (i) "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense;" (ii) "afford adequate deterrence to criminal conduct;" (iii) "protect the public from further crimes of the defendant; and" (iv) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D).

        **a.**      **To Reflect the Seriousness of the Offense.**

It is important that the Court, throughout this sentencing process, not improperly minimize the seriousness of the offense for which Vigil has been convicted. Nevertheless, the Court is not convinced that the imposition of the guideline term of imprisonment is consistent with the comparative seriousness of the offense. A guideline sentence would certainly reflect the seriousness of the offense and of the relevant conduct for which Vigil was not convicted, but a sentence of twenty-years imprisonment also runs the risk of being perceived as draconian rather than as a reasonable sentence for the conduct underlying Count Twenty-Four, and of overstating the

seriousness of the offense.  Indeed, the Court believes that the guideline sentence over-reflects the seriousness of the offense of conviction and puts too much emphasis on the relevant conduct for which he was not convicted.  Giving Vigil the guideline sentence would result in him receiving the heightened stigma associated with an offense that Congress and the Commission have selected as worthy of greater punishment than attempted extortion.  See Apprendi v. New Jersey, 530 U.S. at 467.  The Court agrees with the USPO's assessment that a downward variance would still reflect the seriousness of the offense, properly take recognition of the relevant conduct, and better reflect the seriousness of Vigil's criminal conduct.

### b.      To Promote Respect for the Law.

The count of conviction in this case is for a very serious offense, and promotion of respect for the law requires that the Court impose a suitably severe sentence that corresponds to the seriousness of the offense.

The Court agrees with the United States that Vigil's conduct and the conduct of his predecessors at the NMSTO has brought shame and disgrace upon the civil government in the State of New Mexico.  See United States' PSR Objections at 18.  The actions of Vigil and his co-conspirators have eroded the New Mexico public's respect for the law and undermined its trust in its publicly elected officials.  Accordingly, a guideline sentence would promote respect for some of the law -- that portion aimed at punishing corrupt public officials -- and undo some portion of the damage that Vigil, Montoya, and others caused.  The imposition of a sentencing variance, by contrast, runs the risk of reinforcing the cynicism of many in the public who believe that powerful public figures in New Mexico can always avoid the penalties that ordinary citizens must incur for criminal conduct.

On the other hand, there is another law that the Court must respect.  In its January 18, 2007

Notice that it was contemplating a variance, the Court raised an issue about the statutory requirement that a criminal sentence must promote respect for all of the law.  The Court expressed its concern that "18 U.S.C. § 3553(a)(2)(A), which requires the Court to consider the effectiveness of a sentence in promoting respect for law, may also embody some respect for the jury system."  Notice ¶ 3, at 2.  The Court continued that the use of acquitted conduct as relevant conduct, "while constitutional under the Fifth and Sixth Amendments, might nonetheless be seen as shifting too much discretion to the judge and disrespecting the carefully cherished right to a jury."  Id.    As the Court's ruling and opinion has made clear, the Court is fully cognizant that the Supreme Court has authorized the use of conduct for which a defendant is acquitted as long as that evidence meets the appropriate evidentiary standard.  The Court is also cognizant that Vigil's exercise of the carefully cherished right to a jury resulted in his conviction on a single count for violation of the Hobbs Act, for which he faces a possible term of imprisonment of up to twenty years.  See 18 U.S.C. § 1951(a).  In any case, there is no limit to the information the Court may consider in deciding where, within the zero to twenty-year range, the sentence should fall for it to be reasonable under 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3661.

The United States asserts that the Court will promote respect for the rule of law if it imposes a sentence in accord with the Constitution and with the laws of the United States.  See United States' Response to Defendant's Motion for Downward Departure at 5 n.2, filed January 19, 2007 (Doc. 441)("United States' Response").  The United States suggests that the Court does not promote respect for the rule of law by according Vigil sentencing benefits to which he is not entitled.  See id.  Finally, the United States questions whether a sentence variance based upon the "hypothetical risk" that a guideline sentence disregards the criminal justice system's respect for a defendant's right to a

jury trial is a reasonable and an appropriate factor in the Court's analysis pursuant to United States
v. Booker.  See United States' Response at 5-6 n.2.

      The Court is not convinced that its concern for possible damage to the right to a jury trial is
unreasonable or involves a merely hypothetical risk, but believes that it is reasonable for the Court
to consider all law, to be concerned about respect for all law, and to worry that most people might
perceive imposition of a guideline sentence as disregarding the jury's verdict under the Sixth
Amendment.  The Court believes this issue of respect for the Sixth Amendment to be a real problem
in trying to arrive at a reasonable sentence under United States v. Booker.

      The Court is concerned that the guideline sentence, even though properly and constitutionally
calculated, runs the risk of disrespecting what the public also perceives to be the law.  As Professor
Freed of Yale Law School has written: "Most lawyers, as well as ordinary citizens unfamiliar with
the daily procedures of criminal law administration, are astonished to learn that a person in this
society may be sentenced to prison on the basis of conduct of which a jury has acquitted him, or on
the basis of charges that did not result in conviction."  Daniel J. Freed, Federal Sentencing in the
Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers, 101 Yale L.J. 1681, 1714
(1992).  Indeed, Professor Freed's statement is consistent with Judge McConnell's acknowledgment
in United States v. Magallanez that the defendant "might well be excused for thinking that there is
something amiss, under this constitutional principle, with allowing the judge to determine facts on
which to sentence him to an additional [forty-three] months in prison."  408 F.3d at 684.

      Consistent with U.S.S.G. §§ 1B1.3(a)(2), 2C1.1(b)(2), & 2B1.1(b)(1), Vigil's offense level
was enhanced twelve levels above where it would have been had the Court calculated his sentence
solely on the value of his offense of conviction and disregarded relevant conduct.  Making no other

changes in the Court's findings, this would have reduced the guideline imprisonment range from 235 to 240 months down to a range of 63 to 78 months.  Thus, the facts are clear that Vigil's guideline sentence is substantially the result of conduct for which the United States chose not to charge Vigil and twenty-three counts for which Vigil was acquitted.  Under the facts of this case, the Court believes that, if it did not vary from the Guidelines, the legal innocence associated with acquittal would be eviscerated in the public's mind.  The Court fully recognizes its power to enhance Vigil's sentence for conduct of which Vigil was acquitted, but concludes that considering the conduct of which he was acquitted to the extent the Guidelines suggest would come close to disregarding the jury's primary role of determining guilt and innocence.

The Court does not believe the guideline sentence would promote respect for the law as most citizens know it, and believes a variance will promote respect for the law more than the guideline sentence will.  Because the guideline sentence is the same under these circumstances as it would have been had Vigil been convicted of all twenty-four counts charged against him, it is not reasonable. While the Court must not ignore the relevant conduct, to put too much emphasis on it -- more than on the conduct for which he was found guilty -- runs the danger of trivializing legal guilt and legal innocence  -- the province of the jury -- in a way that is inconsistent with how the public perceives the law.  While to do so would not render the jury's time and service meaningless, it does, in this case, decrease their role and increase the role of the judge disproportionately.  In a democratic society, it gives the impression that the ruling class undervalues -- probably in direct contradiction to the high esteem the citizens hold therein -- the verdict that a body of the citizens rendered.  It does some violence to the Framers' notion of peer juries as the citizenry's aegis against an over-aggressive sovereign wielding the endless resources of the federal government.  On a more practical level, it

sends a less than civic message to the jurors who took weeks out of their lives to carefully consider the case that what they did does not matter as much as most Americans assume that it does.

While the political process has created a sentencing guideline system that diminishes the role of the jury in sentencing, and the jury's views with respect to conduct for which they acquitted Vigil does not bind the Court, the jury's decision should be given some respect throughout a criminal case. While "real conduct" sentencing, even in the case of conduct for which a defendant has been acquitted, has withstood Constitutional challenge, it remains, at some levels, at tension with the role of the jury in our criminal justice system. The task of a sentencing court is to make certain that it faithfully applies the law that Congress and the Sentencing Commission provide, but at the same time, render a verdict that respects all the nation's law, including those values the public perceives as embedded in the Sixth Amendment. The People have spoken through the political branches of government, but the importance of a fair judiciary, and the jury system specifically, remain in the hearts and minds of the citizens. The Court believes that the public's perception of the allegations raised at Vigil's trial, and its perception of what it means for one to exercise his or her constitutional right to put the Government to its burden to prove guilt beyond a reasonable doubt remain important in carefully taking into account the respect-for-the-law factor.

Rather than resolve this tension with an absolute answer, what <u>Blakely v. Washington</u> and <u>United States v. Booker</u> have done is to put more discretion in the trial judge. The Court can take into account, when it deals with the respect-for-the-law factor, that most people -- lawyers and lay citizens -- would not imagine the result to which the Guidelines would lead the Court in this case, but would instead imagine a sentence more consistent with the crime for which Vigil was convicted. Hence, respect for the law would suggest a sentence closer to the base offense level absent undue

reliance on the uncharged conduct and the conduct for which Vigil was acquitted.  The Court believes the public's perception of the allegations, the trial, the verdict, the conviction, and the acquittals are important in carefully taking into account the respect-for-the-law factor.  While it may be an overstatement to say that the entire criminal justice scheme, including sentencing, has as its original roots the declaration in the Sixth Amendment that citizens enjoy a right to a jury trial, it is one of the most visible, public aspects of the United States' criminal justice system.

There is another surprise in the operation of the Guidelines in this case.  Vigil has pointed out that the Guidelines' grouping rules generally help a defendant to the extent that multiple counts upon which the defendant has been convicted can be grouped together.  See Vigil's PSR Objections at 13 n.2.  In addition, although U.S.S.G. § 3D1.2(d) is the provision most frequently used to aggregate amounts in property crimes, the plain language of the subsection and the application notes to U.S.S.G. § 3D1.2 expressly preclude the application of U.S.S.G. § 3D1.2(d)'s grouping rules to extortion not committed under color of official right.  See U.S.S.G. § 3D1.2(d) & cmt. n.6.  The Court does not believe that, to promote respect for the law, it needs to stand steadfastly by the guideline calculation when people experienced with the Guidelines would not, at first blush, expect the result the Guidelines produce in this case.  Rather than a slavish adherence to a mechanical calculation and application of the Guidelines, the Court must be mindful of its duty to produce a reasonable sentence.  In this case, the Guidelines, rather than producing a sentence that promotes respect for the law, actually produce a sentence that most people would consider far out of line given the procedural history of this case.

Additionally, the Court agrees with Judge Marbley's conclusion in United States v. Coleman that the public could perceive too much consideration or emphasis on conduct for which Vigil was

acquitted as skewing the criminal justice system's power differential too much in the prosecution's favor.  After having Vigil's first trial end in a mistrial, and then having the jury return verdicts of acquittal on twenty-three out of twenty-four charged counts in the second trial, the public could rationally perceive the United States as having largely failed to meet its burden of proof at trial. Given the number of counts charged and the number of factual determinations that the Court has been obligated to make in the course of this sentencing, the public might be forgiven for viewing the imposition of a guideline sentence as the district court permitting a second or third bite at the apple, and giving the United States a chance to make its case before the Court after having failed to do so at either of the first two trials before two juries.  The public might perceive this additional bite at the apple as allowing the United States to perfect its case and re-litigate it at the sentencing based on the lower preponderance of the evidence standard.

When the Court considers conduct for which Vigil was acquitted and overemphasizes that conduct in its sentencing decision, it considers facts that the jury, through its verdict, did not emphasize.  Quite apart from the conduct for which Vigil was acquitted, all facts are not equal, especially facts that amount to separate crimes.  Here, the facts that the United States seeks to have the Court consider are not merely facts enhancing the crime of conviction, like the presence of a gun, the quantity of a controlled substance, or the vulnerability of the victim.  Rather, they are facts comprising different crimes, which the United States itself considered unique enough to charge in a different count. The jury acquitted Vigil of those counts.  Certain facts -- like the precise time that Vigil joined the kickback conspiracy or the value of kickback payments that the co-conspirators received before Vigil became Treasurer in 2003 -- assume inordinate importance in the sentencing outcome.  While the jury decides only legal guilt, the Court should be careful not to give the facts the

jury did not emphasize important, if not dispositive, consequences.  The sentence should respect the jury as an institution.

The Court shares the USPO's assessment that a downward variance would promote respect for the law.  Indeed, the Court believes that a downward variance would do so considerably better than the guideline sentence.  In McMillan v. Pennsylvania, then-Associate Justice Rehnquist expressed concern that enhancements a judge determined at sentencing, based solely on the preponderance of the evidence, give the impression of "a tail which wags the dog of the substantive offense."  477 U.S. at 88.  In this case, given the great disparity between a sentence for the crime of conviction and a sentence for all relevant conduct, the Court shares that concern.

### c.      To Provide Just Punishment for the Offense.

Justice Stevens, in his dissent in United States v. Watts, recognized "that respected jurists all over the country have been critical of the interaction between the Sentencing Guidelines' mechanical approach and the application of a preponderance of the evidence standard to so-called relevant conduct."  519 U.S. at 164 (Stevens, J., dissenting).  These criticisms often derive from situations in which a defendant has been charged with multiple counts, is acquitted on some counts, and yet still receives a sentence similar or identical to what he would have received had he been convicted of every count.  See United States v. Frias, 983 F.2d 369, 395 (2d Cir. 1993)(Newman, J., dissenting).  In United States v. Frias, the Honorable Jon O. Newman, United States Circuit Judge, opined -- in a case involving a defendant that had been convicted of two firearms offenses, acquitted of a drug conspiracy, but whose sentence based on relevant conduct was equivalent to what it would have been had he been convicted of the conspiracy -- that "[a] just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation

of conduct resulting in an acquittal." Id. at 396 (Newman, J., dissenting).

Similarly, the Court does not believe it would be just to sentence Vigil precisely as if he had been convicted of each of the twenty-three counts on which he was acquitted. The guideline sentence in this case fails to make any distinction between allegations of conduct resulting in a conviction, and those resulting in twenty-three acquittals. While the Court believes that it must consider the conduct for which he was acquitted to determine Vigil's guideline sentence, the Court also believes that it would be unjust, under the facts and circumstances of this case, to emphasize that conduct more than the conduct for which he was convicted.

To follow the Guidelines would be to consider the conduct upon which Vigil was acquitted with too much effect. The Court can and should consider that conduct, but to give it the effect that the Guidelines give is not reasonable under the circumstances. While the data should include conduct for which Vigil was acquitted in the mix of sentencing factors, such data has an extreme quantifiable consequence in this case. The task is to give that conduct impact on the sentencing and remain reasonable.

The Court does not believe that the guideline sentence, with its extraordinary emphasis on relevant conduct for which Vigil was not convicted, would be a just sentence. Vigil cites United States v. Carvajal, No. 04 Cr. 222 (AKH), 2005 U.S. Dist. LEXIS 3076 (S.D.N.Y. Feb. 22, 2005), for the proposition that "[a] judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life." Motion for Downward Departure at 4 (quoting United States v. Carvajal, 2005 U.S. Dist. LEXIS 3076, at *16). Vigil asserts that "[a]ny prison sentence for a man in Mr. Vigil's position[,] with daughters of an impressionable age and a wife who depends upon him[,] runs the real risk of doing nothing other than destroying any hope he may have

for the future."  Motion for Downward Departure at 4. While this loss of hope is no more true of Vigil than it is for any other defendant, here, the guideline sentence is so long that it might, given Vigil's age, put him away for the greater part of his remaining years.  The Court has watched Vigil during the course of the proceedings and believes he has extraordinary fortitude to endure what he has had to undergo.  Nevertheless, the Court believes that even Vigil may have a diminished possibility of rehabilitation and of hope for the future if there is nothing in his life for which to look forward beyond imprisonment.

Furthermore, while the Court declined to grant a downward departure under the Guidelines based on collateral consequences that Vigil and his family have suffered, the Court believes that, when evaluating the justness of Vigil's punishment for the purposes of reaching a reasonable sentence under United States v. Booker, it is important to consider all other forms of punishment Vigil has already suffered.  The Court acknowledges that Vigil was forced to resign his position as State Treasurer. He has suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case and the case against his co-conspirators.  During the most recent federal Congressional election for the district in which the Court sits, Vigil was unflatteringly portrayed as the face of public corruption in heavily played campaign commercials that both major political parties produced. Vigil and his family have endured the expense and emotional cost of two very lengthy, public trials.   Vigil represents that he has incurred several hundred thousand dollars in attorney fees and costs.  See Motion for Downward Departure at 5.

While Vigil has already been punished much, and his guideline sentence might be greater than necessary because of the damage to his reputation and his high legal bills, he has not been punished sufficiently.   Vigil cites two district court cases, both from outside the Tenth Circuit and both

authored by the same district judge, that make reference to collateral consequences -- including the loss of a public service job -- as potential factors for a Court to consider under United States v. Booker.  See Motion for Downward Departure at 5 (citing United States v. Samaras, 390 F. Supp. 2d at  809; United States v. Redemann, 295 F. Supp. 2d at 894-897).  Vigil does not, however, cite a case, and the Court has not found one in its independent research, which suggests that a convicted criminal defendant should receive a reduced sentence because of his loss of high status or because of his large legal bills.  Although the Court will consider collateral consequences in fashioning a just sentence, it will decline to shorten Vigil's sentence to the extent that he requests based on these factors.

The Court shares the USPO's assessment that a downward variance would provide just punishment for Vigil's conduct.  The guideline sentence would not be, under the circumstances of this case, just or reasonable.

> **d.      To Afford Adequate Deterrence to the Criminal Conduct in Which Vigil Engaged.**

Vigil is fifty-three years old, and this criminal offense is his first.  Vigil cites two district court cases from the United States Court of Appeals for the Second Circuit, each authored by the same district judge, for the proposition that the "connection between age and the risk of recidivism has been recognized by many courts as a mitigating factor."  Motion for Downward Departure at 5 (citing United States v. Lucania, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005)(Sifton, J.)("Post-Booker courts have noted that recidivism is markedly lower for older defendants."); Simon v. United States, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005)(Sifton, J.)("Post-Booker, however, at least one Court has noted that recidivism drops substantially with age.").  In any case, while the need to afford deterrence and

to protect the public from further crimes Vigil may commit exists, the Court is less concerned about this factor than about other factors.  The Court does not have a great concern that Vigil will commit another crime.

The Court must, however, not fail to fully address the statutory factor of deterrence, and deterrence refers not only to Vigil, but to the community at large and, in particular, to the community of public officials.  The Court must be concerned about deterring other public officials from doing what Vigil did.  The Court will be cautious about varying from the Guidelines because of this factor.

The imposition of the guideline term of imprisonment would act as a deterrent to public officials' use of the machinery of government to generate illicit funds for themselves or for their designees.  The United States argues that, among the purposes of the Sentencing Commission and the Congress in fashioning the guideline applicable in this case, U.S.S.G. § 2C1.1, was to deter public corruption by providing stiff sentences in public corruption cases.  See United States' PSR Objections at 19.  The United States contends that a variance from the guideline term of imprisonment would risk telling corrupt public officials that they need not fear the severe sentences for their misconduct that Congress has approved.  See id.

The Court agrees with the United States and is concerned that, rather than satisfying this sentencing consideration by imposition of a sentence below the guideline term of imprisonment, a material variance from the guideline term could undermine the sentence's ability to deter other corrupt officials from conduct similar to that in which Vigil and his co-conspirators engaged.  On the other hand, it is somewhat speculative to think that a corrupt politician will or will not cross the line depending on whether the Court gives a guideline sentence or varies.  What the Court must do is fashion a sentence that will, as much as possible, deter corrupt public officials without disregarding

other 18 U.S.C. § 3553(a) factors.

### e.      To Protect the Public From Further Crimes by Vigil.

The Court finds that Vigil has a low risk of recidivism because of his age and because of his lack of a prior criminal history.  It is also significant that Vigil was convicted of a white-collar crime involving abuse of a public office; it is highly unlikely that Vigil will be able to attain another position that will allow him to commit a similar crime.  In addition, there is no evidence that Vigil has a history of violence or a violent demeanor.  In sum, the Court believes that there is minimal need to protect the public from further crimes that Vigil might commit.

### f.      To Provide Vigil with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

Vigil contends that this section does not apply.  See Motion for Downward Departure at 6. The Court agrees that this factor is not as prominent or important as other factors it must consider. In any case, the Court will not base its variance on this factor.

### 4.      The Kinds of Sentences Available.

Because the Court has now established the guideline range, the Court must consider the kinds of sentences available and the sentencing range established in the Guidelines.  Specifically, the Court must consider the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines.  See 18 U.S.C. § 3553(a)(4)(A).  Moreover, even after the Supreme Court's decision in United States v. Booker, the Court understands that the Guidelines are not merely one of seven equal sentencing factors enumerated in 18 U.S.C. § 3553.  As the record and this opinion both reflect, the Court has considered in exhaustive detail the guideline sentence.  While the Court has concluded that a variance produces a more reasonable sentence, it has considered the

Guidelines at every step of its analysis, including in arriving at a more reasonable sentence.

> **a.      The Court Must Not Improperly Minimize the Place of the Sentencing Guidelines Within the Statutory Sentencing Scheme Set Out in 18 U.S.C. § 3553(a).**

Even though the Court will vary from the guideline sentence, the Court must not improperly minimize the place of the Sentencing Guidelines within the statutory sentencing scheme set out in 18 U.S.C. § 3553(a).  The Sentencing Guidelines are not merely one of seven equal sentencing factors set forth in the statute.  While it is certainly true that six other factors are listed, the factors are not to be weighed equally.  See United States v. Cage, 451 F.3d at 593 (describing the Guidelines as more than "just one factor among many").  The Court must be careful not to deny the proper weight to the advisory Guidelines within the statutory sentencing scheme and thereby present a skewed picture of what would constitute a reasonable sentence in this case.

> **b.      The Court will Apply Both the Preponderance-of-the-Evidence and the Beyond-A-Reasonable-Doubt Standard to Determine the Reliability of the Guideline Sentence.**

One of the most important questions the Court faces in the new advisory regime is how much confidence to place in the advice of the Guidelines.  Justice Stevens, in his dissent to Justice Breyer's remedial opinion in United States v. Booker, raised the question directly:  "How will a judge go about determining how much deference to give to the applicable Guidelines range?"  543 U.S. at 301 (Stevens, J., dissenting in part).  The Court must be careful not to turn the presumption of reasonableness on its head and find, in effect, that the guideline imprisonment term is unreasonable because it is long.  It is therefore the Court's responsibility to develop principled methods for addressing this question and for determining how much weight to put in the advisory guideline range, especially in light of the additional factors that the Court must consider pursuant to 18 U.S.C. §

3553(a). While the Court fully recognizes and acknowledges that it must, under the Guidelines, apply the preponderance of the evidence standard in resolving factual questions, the reasonable-doubt standard, as a measurement of reliability, remains well-suited to the task of determining how much faith the Court should place in the Guidelines' advice.

Other district courts that have engaged in this analysis have found considering the same factual questions under various standards of proof helpful, because "the burden of proof represents a substantive embodiment of social values regarding the risk of error." United States v. Gray, 362 F. Supp. 2d at 722. Applying various standards of proof to the same evidence can endow the Court with confidence in its result, as "standards of proof are important for their symbolic meaning as well as for their practical effect." Addington v. Texas, 441 U.S. 418, 426 (1979). Stated another way, "[a]lthough the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." In re Winship, 397 U.S. 358, 370 (1970)(Harlan, J., concurring). In criminal trials, in particular, the use of a heightened evidentiary standard reflects our society's recognition that, "[i]n the administration of criminal justice, our society imposes almost the entire risk of error upon itself . . . by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt." Addington v. Texas, 441 U.S. at 423-24.

At sentencing, however, the administration of criminal justice continues, only with some of the risk that society assumed at trial transferred to the defendant by the lower standard of proof applicable to judicial fact finding. Thus, "[a]s a tool for reducing the risk of error, reasonable doubt retains its usefulness in the advisory regime." United States v. Gray, 362 F. Supp. 2d at 723.

Considered in this context, the Court believes there is wisdom -- at least in cases where the Guidelines ask the Court to consider conduct for which the defendant has been acquitted -- in proceeding in a manner similar to that which the Honorable Joseph R. Goodwin, United States District Judge for the Southern District of West Virginia, adopted in United States v. Gray:

> The practical effect of factfinding at sentencing, even under the advisory regime, is most often to increase a defendant's period of incarceration based on findings that I make by a preponderance of the evidence. The risk of error is not insignificant or inconsequential. Even though the defendant is already theoretically exposed to the maximum prison term allowed by statute, an erroneous factual determination regarding relevant conduct at sentencing will likely result in a longer period of incarceration then if the determination were not made. It therefore seems important to consider the risk of error when calculating the advisory range of incarceration. The reasonable-doubt standard presents a useful tool for closing the margin of error in this context.
>
> *          *          *
>
> At each sentencing, I will continue to calculate the advisory Guideline range based on a preponderance of the evidence. This initial determination is required by the remedial Booker majority opinion, which dictates that the district courts must still calculate and consider the Guideline range, but does not change the applicable burden of proof. I have examined our sentencing jurisprudence for assistance in weighing the strength of the Guideline advice, and I have found that the reasonable-doubt standard offers a principled means of evaluating the credibility of the advisory Guideline range, reducing the risk of erroneous factual determinations, and informing the exercise of my discretion under the advisory Guideline regime.

Id. Accordingly, after the Court calculates and considers the advisory guideline range for Vigil by a preponderance of the evidence, the Court will consider what the guideline range would be if based solely on conduct that the jury found beyond a reasonable doubt. While this additional consideration is not binding on the Court's determination, under the new regime, neither are the advisory Guidelines themselves. This task will, however, help the Court to weigh the reliability of the advice that the Guidelines provide, and will inform the exercise of the Court's discretion as it determines an

appropriate sentence in light of the advisory guideline range and 18 U.S.C. § 3553(a)'s factors.

In some cases, the advisory guideline sentence based only on the jury's verdict and the advisory guideline sentence based on relevant conduct will be different, but the difference will not be drastic. In other cases, however, there may be drastic differences between the two ranges. In United States v. Magallenez, for example, the Tenth Circuit concluded that the maximum sentence the defendant could have received based solely on the jury's verdict was 78 months, whereas the minimum sentence he could have received based on the judge's drug quantity finding was 121 months -- a difference of at least 43 months. See 408 F.3d at 682-83. While this disparity is not determinative of the ultimate sentence, a wider disparity indicates a larger risk of factual error underlying the advisory guideline calculations. Recognition of this disparity therefore helps the Court to determine the appropriate degree of deference it should give to the Guidelines' advice.

This approach finds some support in the principles that the Supreme Court has expressed in its sentencing jurisprudence. In McMillan v. Pennsylvania, for example, the Supreme Court determined that a sentencing judge could find by a preponderance of the evidence whether a defendant was in visible possession of a firearm during the commission of specified felonies -- a finding that elevated the statutory minimum sentence for the underlying felonies under Pennsylvania law -- but cautioned that the statute requiring the judge to make this finding "gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." 477 U.S. at 88. This tail-wagging-the-dog danger remains present under the advisory Guidelines. It is not uncommon for the Guidelines to recommend doubling, tripling, or quadrupling a sentence based solely on relevant conduct found by a preponderance of the evidence.

In this case, the preponderance-of-the-evidence standard creates a great disparity in possible sentences. The Court notes that applying U.S.S.G. § 2C1.1 solely to Count Twenty-Four reduces Vigil's offense level by two levels -- because the offense would no longer involve multiple extortions -- under U.S.S.G. § 2C1.1(b)(1), and by sixteen levels -- because the Court does not find that any value of the offense of conviction was proved beyond a reasonable doubt[8] -- pursuant to U.S.S.G. § 2C1.1(b)(1) and U.S.S.G. § 2B1.1. Subtracting these eighteen levels from Vigil's offense level of thirty-eight calculated using the relevant conduct, and maintaining his criminal history category of I, the result would be a guideline imprisonment range of thirty-three to forty-one months. This divergence from the range calculated using relevant conduct that the Court found by a preponderance of the evidence -- 235 months to the statutory maximum 240 months -- undermines the Court's confidence in the advisory Guidelines in this case. Thus, the Court finds that the advice of the Guidelines, while entitled to a high level of deference in Vigil's case, should not be followed precisely as calculated.

### c.    Probation and Fines.

The USPO informs the Court that Vigil is eligible for probation under 18 U.S.C. § 3561, because he was convicted of a Class C felony. See PSR ¶ 107, at 41. To be eligible for a guideline sentence of strictly probation, however, Vigil's guideline range would have to fall within Zone A of

---

[8]The Court has previously found by a preponderance of the evidence that, when applying U.S.S.G. § 2C1.1(b)(2), the value of Count Twenty-Four is $24,000.00. The Court acknowledges, however, that it had to study the record to reach this finding. The Court also notes that the jury was not asked to make any special finding regarding the value of the offense of conviction. Given the amount of conflicting testimony regarding the potential value of the SLOM contract, if any, and that Everage and Sais never reached any final agreement on what Sais' compensation would be or how it would be determined, the Court does not believes that the United States has established any value of Count Twenty-Four beyond a reasonable doubt.

the Sentencing Guidelines Table.  See U.S.S.G. § 5B1.1(a)(1).  Such a result would require a variance from the guideline imprisonment term of 235 to 240 months down to a guideline sentencing range of zero to 6 months.  See U.S. Sentencing Guidelines, Sentencing Table.

Vigil requests that the Court sentence him to probation.  The facts of this case, however, do not support such an extreme variance from the presumptively reasonable guideline sentence.  The Court does not believe that a term of probation would be reasonable or appropriate.  The Court believes that the interests of justice warrant a prison term for Vigil.

The Court deems other terms to be appropriate, too.  The Court believes a fine within the range the Guidelines recommend is appropriate based on the circumstance of this case, the nature of the offense, and the extent of Vigil's assets.  Vigil requests that, because of the great financial damage he has already suffered, the Court decline to impose a fine.  See Motion for Downward Departure at 7.  The Court does not believe a variance from the Guidelines is appropriate for the fine portion of Vigil's sentence.  Vigil and his wife have accumulated substantial assets and the Court believes a fine is appropriate.  The Guidelines provide a fine range of $25,000.00 to $250,000.00 based on Vigil's calculated offense level of thirty-eight.  See U.S.S.G. § 5E1.2(c)(3).  While the Court will not vary from the recommended fine range, it sees no reason in this case to sentence other than at the low end of the range.

The Court will start at a fine at the low end of the range -- $25,000.00.  The cost of incarceration for Vigil is $1,952.66 per month.  See PSR ¶ 113, at 42.  The Court will add the cost of Vigil's imprisonment to the $25,000.00 to calculate the total fine.  Based on the sentence the Court will impose, that total figure is in the lower half of the guideline range.

-141-

**5.**    **Any Pertinent Policy Statement Issued by the Sentencing Commission.**

Vigil contends that this section does not apply.  See Motion for Downward Departure at 7. The United States has not pointed to any particular policy statement that the Sentencing Commission has issued.  While the Court must and has considered in great detail the Guidelines, the Court will not use this factor to vary from the Guidelines.

**6.**    **The Need to Avoid Unwarranted Sentence Disparity.**

None of the other Defendants involved in this case have been sentenced yet, so the Court cannot fully evaluate this factor.  The Court is concerned, however, that none of the other Defendants will receive, because of the plea agreements into which they entered with the United States Attorney, sentences as great as the one Vigil would receive under the Guidelines.  The Court believes that a variance is necessary to make certain that Vigil does not receive the bulk of the punishment for the conduct underlying the conspiratorial offenses and the offenses for which Vigil was acquitted when other co-conspirators, Montoya in particular, may be more culpable.

The Court must also be mindful of its need to assure uniformity of sentences across the nation. The Court acknowledges that if this case were being conducted in a federal court outside the Tenth Circuit, it would likely have to make its relevant conduct findings by clear and convincing evidence, rather than by a preponderance of the evidence, because of the dramatic increase on Vigil's sentence when relevant conduct is considered.  See United States v. Watts, 519 U.S. at 156 n.2.  This difference counsels that the Court be cautious about relying too much on the relevant conduct in arriving at a reasonable sentence.

### 7.    __The Need to Provide Restitution to Any Victims__.

The USPO indicates that the victim in this case, Everage, has not made a restitution claim. <u>See</u> PSR ¶ 115, at 42.  Nor has the United States raised any issue about a need to provide restitution to any victim or victims.  The Court will not consider this factor in its variance determination.

### C.    **THE ADVISORY GUIDELINE IS TOO HARSH AND IS "GREATER THAN NECESSARY."**

While the Court believes that most federal judges do not mind the guidance and limitations that the Guidelines provide, it recognizes that judges have often been critical of the harshness of sentences that the Guidelines frequently produce.  In his Motion for Downward Departure, Vigil has provided citations to a number of cases in which judges have expressed concern over the length of a guideline sentence, and the Court has reviewed these cases with care.  <u>See</u> Motion for Downward Departure at 9-10 (citing <u>United States v. Antonakopoulos</u>, 399 F.3d 68, 81 (1st Cir. 2005); <u>Montanye v. United State</u>s, 77 F.3d 226, 233 (8th Cir. 1996)(Bright, J., dissenting); <u>United States v. Andruska</u>, 964 F.2d 640, 647 (7th Cir. 1992)(Will, S.J., sitting by designation, concurring); <u>United States v. Harrington</u>, 947 F.2d 956, 964 (D.C. Cir. 1991)(Edwards, J., concurring); <u>United States v. Jaber</u>, 362 F. Supp. 2d 365, 374 (D. Mass. 2005)(Gertner, J.);  <u>United States v. Ranum</u>, 353 F. Supp. 2d 984, 986 n.1 (E.D.Wis. 2005)(Adelman, J.); <u>United States v. Molina</u>, 963 F. Supp. 213, 215 (E.D.N.Y. 1997)).  The Court does not believe it to be controversial that a defendant's individual circumstances and the unique facts of a particular case can result in an especially harsh guideline sentence.  Indeed, the facts of Vigil's case bear witness to this reality.

Vigil argues that the Court should vary from the guideline sentence because it is "greater than necessary" to achieve federal sentencing goals.  Motion for Downward Departure at 10.  The United

States counters that three Circuit Courts of Appeal have construed the "not greater than necessary" language of 18 U.S.C. § 3553(a) -- the parsimony provision -- and each has found that the provision does not impose any distinct obligation upon a sentencing court. See United States' Response at 10 (citing United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006); United States v. Smith, 472 F.3d 222, 224-25 (4th Cir. 2006); United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)). In United States v. Navedo-Concepcion, for example, the Third Circuit acknowledged that the precise meaning of the parsimony provision was "hard to discern" and noted that "case law provides no indication that courts have given it any clear functional significance." 450 F.3d at 58. In addition to the cases the government cites, the Court notes that at least one other district court in the Tenth Circuit has also found that "[d]etermining what the parsimony provision means is difficult." United States v. Wilson, 350 F. Supp. 2d 910, 922 (D. Utah 2005)(Cassell, J.).

Although the Tenth Circuit has not considered the independent meaning of the parsimony clause, at least one Circuit Court of Appeals has recently taken a contrary position to the cases upon which the United States relies and found that the parsimony clause may play a role, at least when a district court has determined that two sentences would be equally sufficient in meeting sentencing goals. In United States v. Ministro-Tapia, 470 F.3d 137 (2d Cir. 2006), the Second Circuit held that, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of [18 U.S.C.] § 3553, it could not, consistent with the parsimony clause, impose the higher." Id. at 142. Because the Tenth Circuit has not provided specific instruction to the contrary, and because the Court is reluctant to find that Congressional language has no meaning and then ignore it, the Court finds the Second Circuit's holding persuasive. The Court agrees with the United States that the "not greater than necessary" language of U.S.C. § 3553(a) is perhaps not an independent basis for the

reduction of a criminal sentence as a departure or variance, but believes that it is an additional check

on the Court's sentencing analysis under United States v. Booker and 18 U.S.C. § 3553.

While the Court cannot say that this case falls outside the heartland of traditional extortion

cases, the advisory guideline sentence in Vigil's case is too harsh and is greater than necessary to

satisfy federal sentencing goals.  Because the Court believes that a sentence below the recommended

guideline range will be sufficient, the Court will vary from the guideline sentence.

### D.   IMPACT ON PROSECUTORIAL CHARGING DECISIONS.

The Court shares the concern that Judge Marbley articulated in United States v. Coleman that

a negative consequence of refusing to consider conduct for which the defendant was acquitted is its

potential to affect prosecutorial charging decisions.  See 370 F. Supp. 2d at 673.  In light of the

Court's rulings in this matter, prosecutors may be tempted to decline to bring charges that they fear

could result in acquittal and wait to bring supporting facts to the Court's attention at sentencing

subject to proof only by a preponderance of the evidence.  On the other hand, refusal to consider the

conduct of which a defendant is acquitted could actually cause the prosecutor to over charge, for fear

that, if the government did not obtain a conviction, it would not be considered at all.  While this

concern and possible impact is of significant import, a conclusive evaluation of its effect is beyond

the scope of the Court's task at this juncture.

In any case, this concern does not eliminate the Court's obligation to arrive at a reasonable

sentence for Vigil.  The jury in this case did not explicitly authorize a sentence for most of the

conduct that the United States seeks the Court to take into account.  The Court fears that, if it

overemphasizes the conduct for which Vigil was acquitted, it will marginalize the jury's finding of

acquittal and, to the public, give the appearance that the Court gave the United States another

opportunity to make a case that, in some part, failed.

In conclusion, the Court agrees with the USPO that there are sufficient reasons that justify the imposition of a sentence below the presumptively reasonable guideline sentence. The factors listed in 18 U.S.C. § 3553(a) support a variance in this case.

### E.   THE COURT CONCLUDES THAT A SENTENCE OF THIRTY-SEVEN MONTHS IS A REASONABLE SENTENCE AND THAT THE GUIDELINE SENTENCE IS NOT REASONABLE.

While the Court does not believe that the Guidelines have produced a reasonable sentence, the Court believes that it should, as much as possible, attempt to fashion a variance that corresponds to the policies that the Guidelines express and embody.

While the Court has concluded that U.S.S.G. § 2C1.1 is "the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted," the Court remains concerned about the ambiguity of the verdict. If the jury followed precisely the Court's Jury Instruction No. 31, and found Vigil extorted Everage solely by fear of economic harm, U.S.S.G. § 2B3.3 might be the more appropriate guideline. If U.S.S.G. § 2B3.3 governed, the base offense level would be nine and, under U.S.S.G. § 3D1.2(d), the Court would not consider relevant conduct except that associated with the offense of conviction. Under U.S.S.G. § 2B3.3(b) and U.S.S.G. § 2B1.1(b)(1), and based on a finding by a preponderance of the evidence that the amount demanded was greater than $30,000.00, but less than $70,000.00, the Court would add six levels. Vigil would be subject to the two-level role adjustment increase under U.S.S.G. § 3B1.1(c), but would be entitled to a three-level reduction under U.S.S.G. § 2X1.1(b)(1), because the offense of conviction is for an attempt crime. Thus, applying U.S.S.G. § 2B3.3 based on a finding that Vigil committed the conduct underlying Count Twenty-Four exclusively by placing Everage in fear of economic harm would

-146-

produce a base offense level of fourteen; combined with a criminal history category of I, Vigil's guideline sentencing range would be fifteen to twenty-one months.

The Guidelines, however, express particular concerns about a public official who commits extortion.  The cross-reference in U.S.S.G. § 2B3.3(c)(1) refers the Court to U.S.S.G. § 2C1.1 if the offense involved extortion under color of official right.  The Court does not believe that it should ignore that concern about public officials, even if it were to use U.S.S.G. § 2B3.3 as the most appropriate guideline.  In this situation, even giving Vigil the benefit of the crime of conviction being an attempt, the Court would be two levels higher if a person is a public official and six levels if the person is an elected public official.  Adding those six levels to the fourteen levels the Court calculated under U.S.S.G § 2B3.3, the Court would arrive at an offense level of twenty, and a guideline imprisonment range of thirty-three to forty-one months.  In addition, under this analysis, if the Court were to add the three levels it subtracted on the basis that the offense was an attempt, the offense level would be twenty-three, and the guideline imprisonment range would be forty-six to fifty-seven months.

A third approach would be to apply U.S.S.G. § 2C1.1 and calculate Vigil's offense level without regard to the relevant conduct for which he was uncharged or acquitted.  Beginning with an offense level of fourteen, adding four levels for the value of the payment ($24,000.00) under U.S.S.G. § 2C1.1(b)(2) and U.S.S.G. § 2B1.1(b)(2), four levels for being an elected public official under U.S.S.G. § 2C1.1(b)(3), and the two-level role adjustment increase under U.S.S.G. § 3B1.1(c), the total offense level is twenty-four and the resulting guideline imprisonment range would be fifty-one to sixty-three months.

Using these guidelines, which largely ignore relevant conduct for which Vigil was acquitted,

the low end of the guideline ranges would be fifteen and fifty-one months.  The Court does not believe the low end for U.S.S.G. § 2B3.3 is appropriate, because it does not fully reflect the Guidelines' higher sentences for publicly elected officials.  On the other hand, the fifty-one months does not take into account that this was an attempt crime and that the jury verdict was ambiguous. Something in the middle of the low-end of each range would be thirty-seven months.

If the Court uses the base offense level of fourteen arrived at under U.S.S.G. § 2B3.3 and eliminates the reduction for attempt, the resultant level would be seventeen, with a guideline range of twenty-four to thirty months.  Sentencing at the low end of the range, the Court would arrive at a sentence of twenty-four months.

If the Court were to take the U.S.S.G. § 2C1.1 range, and reduce it by the amount to which Vigil would be entitled for an attempt under U.S.S.G. § 2X1.1(b)(1), the offense level would be twenty-one, which would give a range of thirty-seven to forty-six months.

Using these different calculations, which are an attempt to check the discretion of the judge and to give effect to the factors that seem important under the Guidelines, it appears that a sentence of thirty-seven months would be reasonable.  That number, or something close to that number, comes up using a number of different calculations.  While it largely puts aside the conduct for which Vigil was acquitted, it otherwise reflects many of the policies that the Guidelines explain and reflect.  The Court will sentence Vigil to thirty-seven months.

**IT IS ORDERED** that the Defendant's Motion for Downward Departure is denied.  The United States' objections to the Presentence Report are overruled.  The Defendants' objections to the Presentence Report are sustained in part and overruled in part.  The Court will vary downward from the applicable guideline range and impose a reasonable term of imprisonment.

As to Count Twenty-Four of the Fifth Superceding Indictment, the Defendant, Robert Vigil, is committed to the custody of the Bureau of Prisons for a term of thirty-seven months. The Defendant is placed on supervised release for a term of three years. The Defendant must comply with the following standard conditions and mandatory conditions of supervised release: (i) the Defendant will submit to DNA collection in compliance with statutory requirements while incarcerated or at the direction of the USPO; and (ii) the Defendant shall not possess, have under his control, or have access to any firearm, ammunition, explosive device, or other dangerous weapons as defined by federal, state, or local law. The Defendant must comply with the following special conditions of supervised release: (i) the Defendant must provide the USPO access to any requested financial information, personal income tax returns, authorization for release of credit information, and other business financial information in which the defendant has control or interest; (ii) the Defendant shall have no contact with the co-Defendants in this case; (iii) the Defendant shall have no contact with the victim in this case; and (iv) the Defendant shall not obtain or maintain employment where he has any fiduciary responsibility without the prior approval of the USPO. The Defendant will pay a total fine of $97,248.42, to be paid in payments of not less than $2,702 per month. The Defendant will pay a special assessment of $100.00, which is due immediately.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
   United States Attorney
Jonathon M. Gerson
Steven C. Yarbrough
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Jason Bowles
B.J. Crow
Bowles and Crow
Albuquerque, New Mexico

   – and –

Sam Bregman
Eric Loman
The Bregman Law Firm
Albuquerque, New Mexico

   *Attorneys for the Defendant*